IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

RICHARD MEYER,　　　　　　　　§
　　　　　　Plaintiff　　　　　　§
　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　§　　　Case No. 1:18-cv-00800-LY
　　　　　　　　　　　　　　　　§
MARK WAID,　　　　　　　　　　§
　　　　　　Defendant　　　　　　§

## DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendant Mark Waid ("Mr. Waid" or "Defendant") files this Motion to Dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(2), because this Court lacks personal jurisdiction over Mr. Waid. This lawsuit filed by Richard Meyer ("Mr. Meyer" or "Plaintiff") respectfully should be dismissed.

## INTRODUCTION

Plaintiff brought this suit against Mr. Waid, a California citizen with no contacts with Texas, in an illegitimate effort to intimidate and silence Mr. Waid's free speech. Mr. Waid is a well-known comic book author who has written stories featuring many of the world's iconic superheroes, such as Superman, Captain America, Wonder Woman, and Daredeveil, to name a few. Plaintiff created a YouTube channel to promote his views that comics had become too diverse in gender, race, and sexuality in terms of characters and creators—views that are regularly expressed with patently offensive and hateful language, targeting not just the work itself but the creative people behind it. Plaintiff also sought to create his own comic book entitled JAWBREAKERS—LOST SOULS. When a publisher decided not to publish his book after learning about Plaintiff's ongoing negative campaign against diversity, Plaintiff baselessly blamed Mr. Waid, who is an outspoken proponent of diversity and defender of women and others

historically under-represented in the comics industry, rather than putting the blame where it belongs: Plaintiff's own unfavorable reputation he created through his personal words and conduct. Plaintiff's refusal to accept responsibility (and appetite for attention) culminated in this baseless lawsuit.

Plaintiff asserts claims against Mr. Waid for tortious interference with contract and defamation. These claims are completely meritless. But the problem at the outset, and which is proper to address, is that this Court lacks personal jurisdiction over Mr. Waid. Plaintiff's Complaint fails to identify any allegations or facts establishing any connection between Mr. Waid and Texas. Instead, Plaintiff merely alleges a single phone call between Mr. Waid, who was in California at the time, and a San Antonio publishing company. That is far short of the necessary substantial connection with Texas to justify personal jurisdiction. Mr. Waid did not even know that Plaintiff apparently lives in Texas (particularly in light of Plaintiff's effort to create the public impression he is in New York City, as discussed below). Therefore, Mr. Waid plainly could not have purposefully directed any conduct towards Texas.

But even if Mr. Waid knew Plaintiff was in Texas, personal jurisdiction would still not exist as a matter of law. Any connection between Plaintiff's allegations and Texas is merely collateral. For example, the book Plaintiff seeks to publish is not about Texas and would be marketed to the world. Mr. Waid's alleged statements did not reference Texas, were not made from Texas, and stemmed from Plaintiff's anti-diversity and harassment campaign which was aimed at the comic-book industry generally (rather than specifically Texas). Plaintiff fails to establish even a *prima facie* case of personal jurisdiction over Mr. Waid, thus requiring dismissal of this lawsuit.

## FACTUAL BACKGROUND

**A.  Mark Waid has no connection to Texas.**

Mr. Waid is a citizen of California and lives in Santa Monica.  Declaration of Mark Waid ("Waid Decl."), attached as Exhibit A, ¶ 3.  He works from California as a freelance author of comic books.  *Id.*   Mr. Waid does not maintain any agents for service of process in the State of Texas.  *Id.*  He was served with the summons and Complaint at his home in California.  *Id.*

Mr. Waid has no interest in, use of, or possession of real property within Texas.  *Id.* ¶ 4. He does not own or lease any personal property in Texas.  *Id.*  He does not have any bank accounts in Texas.  *Id.*  He does not maintain any assets in Texas.  *Id.*  He is not required to pay any income, business, or property taxes to Texas.  *Id.*  He has not used the Texas court system as a litigant other than as a Defendant in this matter.  *Id.*   He does not regularly do or solicit business in Texas, nor does he have any ongoing business relationships in Texas.  *Id.*  He does not have a mailing address or telephone number in Texas.  *Id.* ¶ 5.  He lived in Texas in the early 1980s when he was young (he was born in 1962), but he has not lived in Texas since then.  *Id.*  None of Mr. Waid's infrequent visits to Texas had anything to do with the allegations or people or entities identified in Plaintiff's lawsuit.  *Id.*

Mr. Waid has worked in the comic-book industry for more than 35 years.  *Id.* ¶ 2.  He has never had office space in Texas, and he does not recall any colleagues with whom he would work regularly living in Texas.  *Id.* ¶ 6.   Therefore, at the time of the alleged events in this case, including in 2017 and 2018, Mr. Waid had no connection to Texas.  *Id.*

**B.  The alleged contacts concerning Mr. Waid's connection to Texas are at most random, fortuitous, and attenuated.**

Plaintiff operates a YouTube channel called "Diversity & Comics" ("D&C"). Compl. ¶¶ 9-10.  Plaintiff broadcasts the channel across YouTube—it is not aimed at Texas.  He claims over

88,000 "followers" of his channel and 28 million "views" of his videos, *id.* ¶ 10.  As part of his marketing of the D&C channel, Plaintiff is an active user of Twitter, currently with about 20,000 "followers."  *See* Ex. A ¶¶ 7-8 & Ex. 1.  Plaintiff's D&C's Twitter page did identify, at times relevant to this lawsuit, and currently identifies, "New York, NY" as his location. Ex. 1; Ex. 7.[1]

Plaintiff alleges Mr. Waid "interfered" with the publication of Plaintiff's book JAWBREAKERS—LOST SOULS.  According to Plaintiff's allegations, JAWBREAKERS— LOST SOULS would be "a story about five ex-superheroes that come out of retirement to protect a giant, mutant ape from being exploited by a warlord"; it is clearly not a book involving any story about Texas or one aimed only at Texas audiences—but rather would allegedly be a generally marketed book.  *See, e.g.*, Compl. ¶ 15.  Plaintiff alleges he had "teamed up with top tier artists to illustrate and color the book."  *Id.*  According to press reports, those artists would be Jon Malin, Ethan Van Sciver, and Brett Smith.  *See, e.g.*, Ex. 2, *No Enemy But Peace—Richard Meyer, Antarctic Press, and Jawbreakers*, <u>Bleeding Cool</u>.  Mr. Malin's Twitter profile page indicates he is in Michigan; Mr. Van Sciver's Twitter profile page indicates he is in New Jersey; and Mr. Smith's Twitter profile page indicates he is in Arizona.  *See* Ex. A ¶ 11 & Ex. 3.

Mr. Waid made two or three social media posts (on Facebook and Twitter) regarding Plaintiff; these posts were not directed to Texas but rather were posts accessible and viewable by all of his more than 5,000 Facebook "friends" and nearly 100,000 Twitter "followers," regardless of where they were located.  Ex. A ¶ 10.  Plaintiff alleges Mr. Waid sent a tweet stating that he (Mr. Waid) had "a call in to Antarctic Press," which, Plaintiff alleges, *"[o]n information and belief*…triggered an onslaught by Waid's followers against Antarctic Press, with calls and threats to Antarctic Press…."  Compl. ¶ 18 (emphasis added).  Mr. Waid did not instruct or tell any of his

---

[1] Numbered exhibit citations refer to the exhibits to Mr. Waid's declaration.

"followers" or "friends" to call Antarctic Press—and he certainly did not instruct or tell them to make any threats to Antarctic Press.  Ex. A ¶ 18.

Plaintiff alleges Mr. Waid had one phone call with an owner of Antarctic Press. Compl. ¶ 19.  Mr. Waid did, in fact, have a single fifteen-minute phone call that he had with someone who identified himself as associated with or an owner of Antarctic Press.  Mr. Waid had left a message at Antarctic Press and asked that someone return his call.  Ex. A ¶ 14. Someone reportedly associated with Antarctic Press called Mr. Waid back, and they discussed Plaintiff.  *Id*.  Mr. Waid did not know where the person was located during this phone conversation—whether in Texas or somewhere else.  *Id*. Mr. Waid had no knowledge that Antarctic Press had any operations in or connection to Texas; Mr. Waid did not know where Antarctic Press was located (having retrieved only a phone number from industry contacts), and Mr. Waid did not and does not know where the person with whom he spoke lived, whether in Texas or elsewhere.  *Id*.

Mr. Waid also did not know where Plaintiff lived or was located.  Mr. Waid did not know that Plaintiff resided in Texas or had any connection at all to Texas.  *Id.* ¶¶ 9, 14. As noted, Plaintiff's Twitter account indicates he is based in New York.  *Id.*, Exs. 1 & 7.

### C. Plaintiff's own words and conduct directed towards the world (not just Texas) have created substantial reason why people may not do business with him.

During the one telephone call between Mr. Waid and Antarctic Press, as confirmed by Antarctic Press itself, Mr. Waid did not force or threaten Antarctic Press regarding whether to enter into business with Plaintiff.  In fact, by the time Mr. Waid had spoken to Antarctic Press, the publisher indicated it had already decided to sever ties with Plaintiff, because it had learned more about his conduct and unfavorable reputation.  *See* Ex. A, ¶¶ 16-17.  The representative told Mr. Waid that, *after learning more about Plaintiff*, Antarctic Press found Plaintiff's conduct

"indefensible." *Id.*   Mr. Waid did not tell or even ask Antarctic Press to not publish

JAWBREAKERS. *Id.* ¶¶ 16-18.  In public tweets, Antarctic Press stated:

> FACTS: Mark Waid put a call in to our office.  Staff took a message and told Mr.
> Waid our publisher would be informed.  *Nobody at AP … felt threatened in any*
> *way by Mr. Waid's call*.  We have not been bullied into a decision by any comics
> pro.
>
> ….*Mark Waid did not bully anyone at our company*.  Though he did call and
> express concern….Mark shed more light on the situation, and other factors came
> into play that do not involve any staff or freelancers at any other company, that led
> us to our decision….

Ex. 5 (emphasis added).  In other public tweets (*see* Ex. 6), Antarctic Press stated:

> Ultimately, some of our staff and freelancers were uncomfortable sharing a platform with
> anyone who makes disparaging remarks about anyone in this community.  We had to cut
> ties.  We wish Richard all the best.
>
> . . . . Some of our staff was uncomfortable once more light was shed on the creator. We
> had to make a choice we could live with. We have other creators who are right and left
> who have not made personal attacks. They are the creators we decide to work with.

As indicated by Antarctic Press's tweets, Plaintiff had carved out a negative reputation

among many in the industry and in the general public as someone intolerant of minorities and

women well before any of the events alleged in this lawsuit involving Mr. Waid (which allegedly

occurred in May 2018, *see* Compl. ¶¶ 16-19).  Plaintiff derisively calls people who support roles

for minorities, women, and the LGBT community "SJWs," or "social justice warriors."   For

example, as one article from April 2018 reports—with quotes from Plaintiff himself—Plaintiff has

engaged in what the article's author titles a "harassment campaign":

> Meyer jumped into the fray with his YouTube channel.  His videos—rambling,
> unscripted, often 20 to 30 minutes long—are a hodgepodge of comics reviews,
> analysis, and gossip regarding endless online battles. He hammered his theme home
> in every entry: that the failures of the comics industry were the direct result of hiring
> diverse talent, and that they needed to be driven out….
>
> "One of the things about SJWs is that they get a job because of surface qualities,
> being a woman, being black, being gay, being trans…."

> Both Meyer's YouTube and Twitter accounts rapidly became a repository for a constant stream of personal attacks and dog-whistles for his followers…He fixates on the physical appearance of female creators he dislikes and retweeted memes mocking certain creators as 'autistic retards' along with images of himself slapping them.
>
> ….
>
> Meyer's main achievement seems to be making life miserable for the trans creators and other marginalized figures who bear the brunt of the harassment….

Ex. 8, *#Comicsgate: How an Anti-Diversity Harassment Campaign in Comics Got Ugly—and Profitable,* <u>The Daily Beast</u>, April 2, 2018; *see also* Ex. 2, <u>Bleeding Cool</u>, May 13, 2018 (noting Plaintiff's YouTube channel, Diversity & Comics, is famed for "throwing constant and repeated gratuitously offensive insults at anyone involved with ['progressive storylines']"); Ex.9, *"The Comicsgate Movement Isn't Defending Free Speech. It's Suppressing It,"* <u>Washington Post</u> (op-ed), Sept. 13, 2018 ("Richard C. Meyer, who uses the ironic twitter and YouTube handle Diversity & Comics….became a ringleader of Comicsgate, which rallied around the argument that female, POC, and LGBT characters and creators were ruining comic books….Their goal has been to make comics less welcoming to people who aren't white and male…."). Exemplifying his uncompromising views against women, he became angry over a group of women in the comics industry who posted themselves on social media celebrating a female colleague over milkshakes: "The milkshake crew particularly raised his ire: 'They obviously seemed to not be qualified. They can't spot basic typos, they can't notice major plot holes, they antagonize the fans…'" Ex. 8.

Plaintiff's attacks on those in the comics industry are astonishing. For example, he published a YouTube program in November 2017, in which he baselessly suggested, through graphically disgusting language, that the accomplishments of various specific women were simply because of sex, and he defamed Mr. Waid and others in the industry as either "pedophiles" or as having psychological problems. *See* Ex. 8 ("Meyer called one Marvel editor a 'c\*\*-dumpster,'

accused various female writers of 'sucking their way into the industry,' and mused which famous creators were pedophiles or had psychological problems"); Ex. 2 (detailing Plaintiff's offensive name-calling over YouTube).  Plaintiff does not limit the broadcasting of his divisive views over YouTube; he also broadcasts them to the world through Twitter.[2]  He has used Twitter to broadcast generally to the world such horrific musings as:

- "Can anyone name me a female comic book writer in American comics who is:  --actually a woman; --not SJW; --doesn't insult or attack customers; *--at least moderate in talent*."  Ex. 4 (emphasis added).

- Calling someone a "Retard" who had expressed the view that there are "different kinds of artists to do … different kinds of art."  *Id.*

- "The DC Writers Workshop had only 8 people in it.  And 1 was trans.  And another was 'non-binary.'  This isn't business…which hires on merit. *This is a modern day carnival. See the Bearded Lady. See the Dog boy.*"  *Id.* (emphasis added).

- "This is literally a picture of the end of Marvel….*A woman with no comic book experience hired for her plumbing. A minstrel show diva….*"  *Id.* (emphasis added).

- "[A woman] was hired for an editor position even though she has the resume of a summer intern because BEWBS."  *Id.*

- He referred to well-known author Ta-Nahesi Coates as a "race hustler." *Id.*

---

[2] Those involved in "Comicsgate" (and generally the "alt-right" political movement) have aggressively used Twitter and YouTube to spread their messages and go after those viewed as opponents.  *See, e.g.*, *The New Troll: How Bots and Puppets Make Internet Outrage Seem Louder Than It Is*, Vox, Oct. 24, 2018, available at:
 *https://www.vox.com/culture/2018/10/24/17995502/twitter-trolls-bots-chuck-wendig-bethany-lacina* (last visited Oct. 29, 2018).

As Plaintiff's own allegations admit, "[b]y late 2017, media reports began to emerge characterizing Mr. Meyer as a bigot, racist, and part of a group that promotes white supremacy." Compl. ¶ 13.

Given his persistent attacks on others, many in the comic-book world have elected not to associate with Plaintiff. When (prior to Mr. Waid's call with Antarctic Press) one journalist told an owner of Antarctic Press about some of Plaintiff's comments, for example, that owner "seemed shocked," and said he "was going to have a serious think about the issue." Ex. 2. Representatives of comic-book stores from all over the world had unilaterally, without any input or influence from Mr. Waid, decided not to carry Plaintiff's book. *See* Ex. 2 ("A number of comic book retailers took it upon themselves to state that they wouldn't be carrying [Plaintiff's] book. There was much concern regarding some of Meyer's statements and the actions of his followers."). Plaintiff somehow obtained screenshots of a private Facebook chat among those storeowners, and he publicly disclosed the names of those who elected not to carry his book. *Id.* In publicly divulging a screenshot showing the identities of people associated with these stores, Plaintiff declared:

> OK, get ready…here come screenshots of the retailers colluding to prevent customers from buying JAWBREAKERS—LOST SOULS in comic book shops…It's from a private Facebook group for retailers titled FINAL ORDER CUTOFF

*See* Ex. 7. So, rather than identifying the stores that had decided to carry Plaintiff's book, Plaintiff identified those that decided not to carry the book—in an apparent invitation to his followers to swarm after those stores in unrelenting and unprovoked attacks. Indeed, after Plaintiff's tweet, "[s]tores suddenly experienced offensive social media messages, had personal social media accounts targeted, and saw a flood of one-star reviews." Ex. 2; *see also* Ex. 10, *Comicsgate Leader Is Suing a Marvel/DC Writer for Defamation*, The Daily Dot, Oct. 1, 2018 ("[JAWBREAKERS] was initially meant to be published by Antarctic Press (a small indie publisher), but they dropped it following backlash from the comics community. Several retailers promised to boycott the comic

if it came out…."); Ex. 11, *Antarctic Press Cancels Jawbreakers in Wake of Controversy, Retailer Boycott*, <u>CBR</u>, May 13, 2018 ("[S]everal retailers said they found themselves the victims of harassment, prompting Antarctic to [decide to] not publish *Jawbreakers*.").

It is this reputation—as someone against non-white, non-straight, and female members of the comic-book world—that caused Mr. Waid to have legitimate concerns about Plaintiff—not anything involving Texas. Ex. A ¶ 13. Plaintiff's campaign against diversity is not aimed at Texas; rather, his target is the comic-book industry as a whole—he appears to equally abhor the role of a woman or a minority whether in Texas, California, or somewhere else.[3]

## <u>ARGUMENT AND AUTHORITIES</u>

### I.   THE COURT LACKS PERSONAL JURISDICTION OVER MR. WAID.

Plaintiff asserts a claim for tortious interference with contract. Compl. ¶ 23. Plaintiff also asserts a claim for defamation, premised on alleged statements by Mr. Waid made "[t]hrough his various social media accounts." Compl. ¶ 24. Dismissal of Plaintiff's lawsuit with prejudice is inevitable—as this suit is but an effort to stifle Mr. Waid's free speech; Plaintiff's claims are so meritless Mr. Waid is confident he will recover his attorneys' fees and other costs from him. At the outset, however, this Court respectfully does not have personal jurisdiction over Mr. Waid.

#### A.  Legal Standard

A court must dismiss an action when it lacks personal jurisdiction over the defendant. FED. R. CIV. P. 12(b)(2). The plaintiff has the burden of proof in establishing personal jurisdiction and carries the initial burden of showing a *prima facie* case supporting jurisdiction. *See Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010). While uncontroverted allegations in the complaint

---

[3] Plaintiff has publicly claimed he has raised substantial amounts of money to publish JAWBREAKERS since Antarctic Press chose not to publish the book. *See* Ex. 12. That Plaintiff has apparently suffered no damages highlights the fact that this meritless lawsuit appears to be a frivolous publicity stunt.

must be taken as true, the court is not required "to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).  In deciding a Rule 12(b)(2) motion, the court may consider evidence.  *See Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir. 2002).

A district court may exercise personal jurisdiction over a non-resident defendant only if (1) the forum state's long-arm statute creates personal jurisdiction, and (2) the exercise of jurisdiction is consistent with due process.  "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  Due process is satisfied when (1) the non-resident defendant purposely availed himself of the benefits and protections of Texas by establishing minimum contacts with the State of Texas; and (2) the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.  *Id.*; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985).  A defendant is not subject to jurisdiction based on "random," "fortuitous," or "attenuated" contacts. *Burger King*, 471 U.S. at 476.

*General* personal jurisdiction is unrelated to plaintiff's cause of action and requires that the defendant have "continuous and systematic" contacts with the forum state.  *See Helicopteros Nacionales*, 466 U.S. 408, 415-16 (1984); *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002). *Specific* jurisdiction requires, among other things, that the defendant's contacts with the forum state arise from, or directly relate to, the cause of action.  *See Helicopteros Nacionales*, 466 U.S. at 414-15 & n.8; *Revell*, 317 F.3d at 470.  Neither exists in this case.

### B.  Plaintiff cannot establish general jurisdiction over Mr. Waid.

Plaintiff cannot establish general jurisdiction.  Mr. Waid is a California citizen who lives in Santa Monica, California.  Compl. ¶ 2; Ex. A ¶ 3.  Mr. Waid has no presence or even property in Texas.  *Id.* ¶¶ 3-6.  Mr. Waid was served with process in California.  *Id.* ¶ 3.

For a federal court to exercise general jurisdiction over a non-resident, the defendant's affiliations with the state must be so "continuous and systematic as to render [defendant] essentially *at home* in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (citation omitted). The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Johnston*, 523 F.3d at 609 (citation omitted).

Mr. Waid cannot be said to be "at home" in the State of Texas. He simply has no contacts with the State of Texas, much less any supporting the exercise of general personal jurisdiction. *Daimler AG*, 571 U.S. at 139; *see* Ex. A ¶¶ 3-6 (making clear Mr. Waid has no Texas contacts).

### C.  Plaintiff likewise cannot establish specific jurisdiction over Mr. Waid.

Specific jurisdiction is a claim-specific inquiry. *See, e.g.*, *Clemons v. WPRJ, LLC*, 928 F. Supp. 2d 885, 894 (S.D. Tex. 2013). Accordingly, "[a] plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *Id.* (citations and quotations omitted). The Fifth Circuit has applied a three-step analysis: (1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether he purposely directed his activities toward the forum state or purposely availed himself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable. *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 433 (5th Cir. 2014).

As the Supreme Court recently clarified, the circumstances allowing the exercise of specific jurisdiction are narrow in scope. *Walden v. Fiore*, 571 U.S. 277, 284-286 (2014). The jurisdictional inquiry must focus on the relationship among the defendant, the forum, and the litigation. *Id.* at 284. The defendant's relationship with the state "must arise out of the contacts that the defendant *himself* creates with the forum State." *Id.* (internal quotations omitted) (emphasis in original). "Due process requires that a defendant be haled into court in a forum State

based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 286. The necessary minimum contacts are not satisfied "by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* at 284. "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a *substantial connection* with the forum State." *Id.* at 284 (emphasis added). "These same principles apply when intentional torts are involved." *Id.* at 287.

1. Because the interference claim rests on merely one alleged fleeting and unintended contact between Mr. Waid and Texas, personal jurisdiction does not exist for this claim.

Even contracting with or being employed by a Texas company, without significantly more, is insufficient to establish the requisite minimum contacts for jurisdictional purposes. *See, e.g.*, *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) ("[M]erely contracting with a resident of [Texas] is insufficient to subject the nonresident to the forum's jurisdiction."). Here, Plaintiff does not allege *any* relationship between Mr. Waid and Plaintiff, business or otherwise.

Plaintiff conclusorily alleges only *one* insignificant jurisdictional assertion, that of a phone call between one of the owners of Antarctic Press and Mr. Waid. Plaintiff does not state how long the phone call might have been. Nor does he identify where either of the parties to the call were even located at the time. *See* Compl. ¶ 19. Plaintiff's allegations—even taken at face value— come nowhere close to establishing personal jurisdiction as a matter of law. Conclusory allegations—those lacking in "location, date, or other detail"—are insufficient to demonstrate that specific jurisdiction exists. *Lonestar Livestock Equip. Co. v. Southern Livestock Systems, LLC*, No. 15-447, 2015 WL 3756501, at *4 (S.D. Tex. Jun. 16, 2015). Especially in this age of mobile phones, an allegation of a phone call, even assuming tortious conduct allegedly occurred during the call, does not support personal jurisdiction:

> [C]hanges in technology have made reliance on phone calls obsolete as proof of purposeful availment.  While the ubiquity of "caller ID" may allow nonresidents to know a caller's telephone number, that number no longer necessarily indicates anything about the caller's location.  If jurisdiction can be based on phone conversations "directed at" a forum, how does a defendant avail itself of any jurisdiction when it can never know where the other party has forwarded calls or traveled with a mobile phone?

*Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005); *Lonestar Livestock*, 2015 WL 3756501, at **3-4 ("Communications with the plaintiff in the forum state are insufficient….The fact that the parties exchanged hundreds of phone calls, texts, and emails are also insufficient contacts.").  Specific jurisdiction is not established merely by "allegations or evidence that a nonresident committed a tort in a telephone call from a Texas number," even if the defendant knew the plaintiff had significant connection with Texas.  *Michiana*, 168 S.W.3d at 787 & 791-792 (noting defendant "*knew* [plaintiff] would take his RV [bought from defendant] to Texas," but finding no jurisdiction over defendant who allegedly committed fraud during call with Texas resident (emphasis in original)). Plaintiff's vague allegation Mr. Waid had a phone call with Antarctic Press does not create the type of *substantial connection* to Texas, or *purposeful* availment, that is necessary to support jurisdiction.

But the lack of jurisdiction in this case is even clearer.  Mr. Waid did not even know Plaintiff was in Texas (nor would anyone else know that from looking at Plaintiff's public profile, including his Twitter page which identifies New York as his location).  *See* Ex. A ¶ 9 & Ex. 1.[4] Mr. Waid's lack of knowledge of where Plaintiff was located makes this case especially easy.  In order to establish personal jurisdiction over a defendant who allegedly committed an intentional tort in the forum state, the plaintiff must show—as one of the necessary prerequisites—that "'the defendant *knew* that the plaintiff would suffer the brunt of the harm caused by the tortious conduct

---

[4] Mr. Waid also did not know that Antarctic Press had operations in Texas. *See* Ex. A ¶ 14.

*in the forum*, and point to specific activity indicating that the defendant expressly aimed [his] tortious conduct *at the forum*.'"   *Revell*, 317 F.3d at 475-476 & n.63 (quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 266 (3d Cir. 1998)) (emphasis in original).   Mr. Waid's lack of knowledge of where Plaintiff was located by itself defeats jurisdiction.

However, even if Mr. Waid knew Plaintiff was in Texas—which he did not—that still would not support personal jurisdiction in this case.   "[The] minimum contacts analysis looks at the defendant's contacts with the forum State itself, *not the defendant's contacts with persons who reside there.*"  *Walden*, 571 U.S. at 285 (emphasis added).   The larger context of the dispute must also be considered, even if the defendant knew the plaintiff resided in the forum state.   *See also Herman v. Cataphora, Inc.*, 730 F.3d 460, 462, 465-466 (5th Cir. 2013) (finding no jurisdiction over tortious-interference and defamation claims because the "focal point" of the dispute was not the forum, Louisiana, even though defendant, a trial consultant, made statements to a legal-affairs website to the effect plaintiffs, lawyers who worked in Louisiana, had acted improperly in relation to multi-district litigation in Louisiana, because statements at issue did not mention Louisiana and focused on parties' larger contractual relationship).

 Plaintiff's allegations only further underline the lack of any substantial connection to Texas.   For example, the case concerns a comic series to be created by a team spread across multiple states, whose subject matter would not be Texas (but rather a giant mutant ape), and that would be aimed at the world-wide comic-book market generally (not specifically Texas).   *See* Compl. ¶¶15-17; Ex. A¶ 11 & Exs. 2-3.   And Mr. Waid's comments concerning Plaintiff stems from Plaintiff's anti-diversity campaign that targets the comic-book market generally—not

anything unique or connected to Texas.  *See* Ex. A ¶ 13; Ex. 4.[5]   Because there is no relevant connection between the operative allegations of the tortious-interference-with-contract claim and Texas, let alone a substantial connection, there can be no finding of specific jurisdiction over the claim.

> 2.  <u>Plaintiff likewise cannot establish constitutionally sufficient contacts for specific jurisdiction over his defamation claim.</u>

Like his tortious-inference claim, Plaintiff's defamation claim is entirely meritless; but regardless, Plaintiff comes nowhere close to establishing he may pursue that claim in Texas.  The Court lacks jurisdiction over Mr. Waid as to the defamation claim for the same reasons it lacks jurisdiction as to the tortious-interference claim.  In fact, on the defamation claim, Plaintiff cites no allegation whatsoever in support of his defamation claim that even *potentially* shows any relevant connection to Texas. Plaintiff's defamation claim is based on alleged defamatory statements made "[t]hrough [Mr. Waid's] various social media accounts."  Compl. ¶¶ 24.

That Plaintiff—the subject of the allegedly defamatory statements—lives in Texas does not establish personal jurisdiction.  As with the tortious-interference claim, the case for jurisdiction regarding defamation fails at the outset based on Mr. Waid's lack of knowledge that Plaintiff lived in Texas.  *See* Ex. A ¶ 9.  Among other things, a plaintiff seeking to show specific jurisdiction as to defamation allegedly committed by a nonresident must first establish that the nonresident actually knew the plaintiff would "bear the brunt of the harm" in the forum state.  *Revell*, 317 F.3d

---

[5] Plaintiff alleges "[o]n information and belief" that Mr. Waid's social-medial followers called or threatened Antarctic Press. Compl. ¶ 18.  This allegation in no way supports jurisdiction.  Initially, it is facially conclusory, such that it cannot be considered.  *See, e.g.*, *Panda Brandywine*, 253 F.3d at 869 (finding allegation made "on information and belief" "merely conclusory").  More importantly, the actions of third parties do not legally create jurisdiction over Mr. Waid.  *See, e.g.*, *Walden*, 571 U.S. at 284, 291 ("[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State….Respondents' Nevada attorney contacted petitioner in Georgia, but that is precisely the sort of unilateral activity of a third party that cannot satisfy the requirement of contact with the forum State." (emphasis in original) (citations omitted)).

at 475-476.  "The defendant must be chargeable with knowledge of the forum at which his conduct is directed in order to reasonably anticipate being haled into court in that forum."  *Id.* (finding no personal jurisdiction where defendant's affidavit showed "he did not even know that [plaintiff] was a resident of Texas when he posted his [allegedly defamatory] article"); *see also Calder v. Jones*, 465 U.S. 783, 789-790 (1984) (finding jurisdiction where, among other things, the defendants "expressly aimed" widely circulated defamatory article in California because they knew plaintiff lived in California and "knew that the brunt of th[e] injury [from alleged defamation] would be felt" there).   Mr. Waid did not know Plaintiff was in Texas; therefore, he necessarily did not expressly aim any statements at Texas knowing any effects would be felt there.

But even if Mr. Waid knew Plaintiff was in Texas (which he did not), the case for jurisdiction would fall way short.  For example, Mr. Waid's alleged statements (even assuming they were actually made) do not mention Texas; they were accessible by and aimed at audiences anywhere (not specifically in Texas); they stem from Plaintiff's attacks on diversity aimed at the comic-book world generally (rather than uniquely Texas); and they allegedly harmed efforts to publish a book aimed generally at the comic-book market (rather than uniquely Texas).  The circumstances of this case make it clear Texas is not even close to the focal point of Plaintiff's claims, as would be required for the Court to exercise jurisdiction.  *See, e.g.*, *Clemens v. McNamee*, 615 F.3d 374, 377-381 (5th Cir. 2010) (finding no personal jurisdiction over defamatory statements that were published in "every major newspaper in Texas" because statements were not "made in Texas or directed to Texas residents any more than residents of any state," though defendant knew plaintiff lived in Texas and had a long commercial relationship with plaintiff, including traveling to Texas thirty-five times to work with plaintiff); *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 425-428 (5th Cir. 2005) (finding no personal jurisdiction over

defamatory statements discussing Texas residents, even though article was based in part on sources in Texas and expressly discussed Texas, because involvement of Texas was "merely collateral to the focus of the articles"); *Revell*, 317 F.3d at 473-475 (finding no personal jurisdiction over defamatory statements concerning Texas resident posted on internet where article did not mention Texas and "was not directed at Texas readers as distinguished from readers in other states").

That the alleged defamatory statements were made over "social media," such as Twitter and Facebook, highlights the absence of jurisdiction. Websites like Twitter and Facebook are "not social media pages specifically targeted to Texas residents," but rather are aimed at the world at large. *Xenex Disinfection Servs., LLC v. Deal*, No. 16-232, 2016 WL 3033779, at *3 (W.D. Tex. May 25, 2016) (dismissing case for lack of personal jurisdiction where alleged defamation occurred over social media including Twitter, which did not "specifically target" Texas).[6] Such communications that are accessible to anyone anywhere with a computer or a mobile device simply cannot be said to "'manifest an intent to *target* and *focus* on [Texas] readers.'" *Revell*, 317 F.3d at 475 (emphasis in original) (quoting *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002)); *see also Johnson v. Arden*, 614 F.3d 785, 795-797 (8th Cir. 2010) (finding no jurisdiction where defamatory statements made over website allowing people to post complaints about

---

[6] *See also Higgins v. Save Our Heroes*, No. 18-42, 2018 WL 2208319, at **3-5 (D. Minn. May 14, 2018) (dismissing for lack of jurisdiction where defamatory statements were made over internet, including Facebook and Twitter, because that was not evidence the statements were "particularly connected to Minnesota," though plaintiff lived there; "if the use of a Facebook page or Twitter handle was sufficient to confer personal jurisdiction, a defendant could be haled into court in any state"); *Professional's Choice Sports Medicine v. Hegeman*, No. 15-2505, 2016 WL 1450704, at **4-6 (S.D. Calif. April 12, 2016) (dismissing for lack of jurisdiction where defamatory statements were made over Facebook because that did not "demonstrate that the defendant *expressly aimed* its tortious conduct at the forum" (emphasis in original)); *BroadVoice, Inc. v. TP Innovations LLC*, 733 F. Supp. 2d 219, 226 (D. Mass. 2010) (dismissing for lack of jurisdiction even though defamatory statements were made on website specifically created to allow complaints against plaintiff, because the "defamatory website was aimed at Massachusetts only in the sense that it could be accessed by Massachusetts residents (along with the rest of the world)").

businesses, even though statements mentioned plaintiffs' location in forum state and the parties had a prior business relationship, because there was no evidence the website "specifically targets Missouri" and statements' mention of Missouri still did not "create the type of substantial connection between [defendant] and Missouri necessary to confer specific personal jurisdiction"). Such social-media communications also stand in sharp contrast to a situation in which a publisher physically directs many books into a forum state to commercially benefit from the state.  *See Fielding*, 415 F.3d at 425 & 427 (noting situation where defendant circulated over 10,000 copies of magazine to forum per month, showing tortfeasor had "control over the jurisdiction of his alleged tort … through his intentional availment of the economic benefits of the forum").

In sum, Mr. Waid's alleged statements do not come close to showing the necessary intention to target or focus on Texas.  Any involvement of Texas to this dispute is at most "merely collateral," *see Fielding*, 415 F.3d at 427, and Texas certainly is not "the focal point" of Plaintiff's allegations, *see Revell*, 317 F.3d at 473.  Because there is no connection between the operative facts of the defamation claim and Texas, let alone a substantial connection, there can be no finding of specific jurisdiction over the claim.

## D. Exercising personal jurisdiction over Mr. Waid would violate traditional notions of fair play and substantial justice.

Plaintiff does not establish that the exercise of jurisdiction over Mr. Waid in this case would comport with due process.  Alternatively, even if Plaintiff could allege facts sufficient to otherwise establish jurisdiction, personal jurisdiction nonetheless would be improper because it would "offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).  The Fifth Circuit considers five factors in evaluating whether the exercise of jurisdiction is unreasonable:  (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial

system's interest in the efficient administration of justice; and (5) the shared interests of the several states in furthering fundamental social policies. *See Evergreen Media Holdings, LLC v. Safran Co.*, 68 F. Supp. 3d 664, 676 (S.D. Tex. 2014). Application of these factors confirms that exercising jurisdiction here would offend traditional notions of fair play and substantial justice.

First, it would burden Mr. Waid to litigate this matter in Texas. He lives and works in California. Ex. A ¶¶ 3-6. Second, Texas has little to no interest in this litigation. The only basis for having this lawsuit in Texas appears to be that Plaintiff is located here. That is not by itself sufficient to implicate Texas' interests—especially since the subject matter of the dispute does not involve Texas but rather a proposed book aimed generally at the comic-book market and a general debate over the role of diversity in that market (not anything unique to Texas). Third, it is not necessary for suit to be maintained in Texas for Plaintiff to pursue his (meritless) claims. Fourth, Texas is not the most efficient forum given that a significant portion of any evidence, including witnesses, will be located outside of Texas. Fifth, while this lawsuit implicates issues concerning lawful speech, it presents standard tort claims and concerns an industry—comic books—that in no way is centered in Texas. *Id.* ¶ 6. Even if jurisdiction were otherwise permissible, exercising jurisdiction over Mr. Waid would offend traditional notions of fair play and substantial justice.

## CONCLUSION AND PRAYER

Defendant Mark Waid prays that this Court dismiss Plaintiff's claims and therefore this lawsuit, pursuant to Fed. R. Civ. P 12(b)(2). Mr. Waid further prays for such other and further relief to which he may be justly entitled, at law or in equity.

Respectfully submitted,

REEVES & BRIGHTWELL LLP


*/s/ Ryan Pierce*
Beverly Reeves, Esq.
State Bar No. 16716500
breeves@reevesbrightwell.com
Ryan Pierce, Esq.
State Bar No. 24035413
rpierce@reevesbrightwell.com
221 W. 6th Street, Suite 1000
Austin, TX  78701
(512) 334-4500
(512) 334-4492 (facsimile)

Mark S. Zaid, Esq.
D.C. Bar #440532 (admitted *Pro Hac Vice*)
Mark@MarkZaid.com
Mark S. Zaid, P.C.
1250 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax

**ATTORNEYS FOR DEFENDANT**


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 2nd day of November 2018 the above and foregoing document was served using the Court's ECF system on the following counsel of record:

Daniel H. Byrne
Dale L. Roberts
Fritz, Byrne, Head & Gilstrap, PLLC
221 W. 6th St., Suite 960
Austin, TX 78701
dbyrne@fbhg.law
droberts@fbhg.law


*/s/ Ryan Pierce*
Ryan Pierce

-21-