IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RICHARD MEYER, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO.:  1:18-CV-00800 |
| | § | |
| MARK WAID, | § | (Jury Demanded) |
| Defendant. | § | |

## RESPONSE TO MOTION TO DISMISS FOR LACK OF JURISDICTION

Plaintiff Richard Meyer files this Response to the Motion to Dismiss for lack of Personal Jurisdiction [Dkt. 10] (the "Motion to Dismiss").

## I.     INTRODUCTION

1.     At its base, this is a tortious interference case in which Waid intentionally interfered with a contract between two persons in Texas and that was performable in Texas.  Waid did so by initiating a phone call to San Antonio to one of the parties to the contract, soliciting a return phone call, and then encouraging that party to breach the contract.  Two weeks later, Waid traveled to Texas and publicly defamed Meyer (a Texas resident) at a Houston comic book convention.  This case belongs in Texas.  Waid's actions within this state, coupled with his actions directed toward Texas through his tortious interference with Meyer's contract with a Texas publisher, establish that Waid should have every expectation to be haled into a Texas court to answer for his actions.

## II.   SUPPORTING EVIDENCE

2.      In addition to Plaintiff's Original Complaint and the other pleadings on file, Meyer

relies on the following evidence attached to this Response to Motion to Dismiss:

**Exhibit A**:      Deposition of Joeming Dunn, with the following attached exhibits:

    <u>Exhibit 8</u>:      Antarctic Press Twitter Announcement regarding JAWBREAKERS

    <u>Exhibit 11</u>:      March 12, 2018 Email Correspondence regarding Antarctic Press Interest in Publishing JAWBREAKERS

    <u>Exhibit 15</u>:      May 9, 2018 Email Correspondence between Brian Denham and Richard Meyer regarding Potential Boycott of Book

    <u>Exhibit 18</u>:      Email Correspondence between Antarctic Press Personnel regarding Response to JAWBREAKERS inquiries

    <u>Exhibit 19</u>:      May 11, 2019 Email Correspondence Between Joeming Dunn and Antarctic Press Contributor

**Exhibit B**:      Deposition of Mark Waid, with the following attached exhibits:

    <u>Exhibit 2</u>:      Transcript of Mark Waid May 26, 2019 Panel Discussion regarding JAWBREAKERS

    <u>Exhibit 6</u>:      May 11, 2018 Facebook Post by Mark Waid regarding Call to Antarctic Press

    <u>Exhibit 7</u>:      Text Messages between Mark Waid and Joeming Dunn

**Exhibit C**:      Deposition of Benn Dunn, with the following attached exhibit:

    <u>Exhibit 10</u>:      Excerpt from "No Enemy but Peace – Richard Meyer, Antarctic Press, and Jawbreakers," article by Rich Johnston, dated May 13, 2018

**Exhibit D**:      Mark Waid Response to Interrogatory no. 1

### III.     JURISDICTIONAL FACTUAL SUMMARY[1]

**A.     Waid intentionally interfered with a contract between Texans to be performed in Texas**

3.     As described in Plaintiff's Original Complaint [Dkt. 1] (the "Complaint"), Meyer is a lifelong fan of comic books and particularly superhero comic books. Complaint ¶ 5. After creating his successful YouTube channel reviewing comic books authored by Waid and others, Meyer faced criticism that he had never written or drawn a comic book of his own. *Id.* ¶¶ 9-10, 14. In April, 2018, Meyer publicly announced that he was publishing his own comic book, JAWBREAKERS—Lost Souls, a story about five ex-superheroes that come out of retirement to protect a giant, mutant ape from being exploited by a warlord. *Id.* ¶ 15.

4.     By that time, Meyer had already begun discussions with Antarctic Press ("AP"), an independent comic book publisher located in San Antonio, Texas. *See* Exh. A, Deposition of Joeming Dunn ("J. Dunn Depo."), at pp. 18:24-19:20, 21:18-22:16.[2] By April 29, 2019, AP had agreed to publish JAWBREAKERS. *Id.*, at p. 25:13-19; Complaint, ¶¶ 16-17. And on May 9, 2018, Antarctic Press publicly announced it was publishing JAWBREAKERS via Twitter saying, "It's official!  We're publishing JAWBREAKERS in September!"  Complaint, ¶ 17; Exh. A, J. Dunn Depo., at pp.  26:13-27:10.

5.     Even before making that announcement, AP was aware of negative reaction within portions of the comic book world to Meyer's book, and that some stores even discussed plans to boycott the book.  Exh. A, J. Dunn Depo, Ex. 15.  Criticism of AP's decision continued on social

---

[1] In his Motion to Dismiss and his Declaration, Waid recounts at length statements allegedly made by Meyer in 2017 that have no bearing on whether Waid is subject to this Court's jurisdiction.  There will be an appropriate time to respond to those allegations, but that time has not yet come and Meyer will not burden the Court with a tit-for-tat response to Waid's invective.  Rather, this response will focus on the facts showing that Waid's contacts with Texas are more than sufficient for this Court to exercise jurisdiction over Waid.

[2] Antarctic Press has been a comic book publisher since 1984 and has always been located in San Antonio, Texas. *Id.*, pp. 8:3-25, 18:13-15.

media throughout May 10, 2018 and into May 11, 2018.  *Id.*, at pp. 27:19-29:21; *see also id.*, at Exh. 18 (email dated May 10, 2018 at 9:48 p.m. instructing AP personnel to observe "radio silence" regarding the JAWBREAKERS controversy and deflect any criticism to its creator, Richard Meyer).

      6.     Mark Waid acknowledged the negative reaction by some in the comic book industry to AP's announcement in a Facebook post on May 11, 2019:

> I have a call in to Antarctic Press.  Until I hear back, I'm (hesitantly) willing to give them the benefit of the doubt that they don't really understand who or what they're getting into business with, which – though it would seem a stretch – is a possibility. If I do hear back, I'll report in.  Curious as to how they feel about publishing creators whose marketing strategy is to allegedly (*koff*) *encourage their fans to threaten employees of stores*, and/or harass and one-star-review-bomb stores, that don't order their product.

Exh. B, Deposition of Mark Waid ("Waid Depo."), at p. 72:18-22 & Exh. 6 (emphasis added). Waid posted that message after calling AP's landline telephone number in San Antonio, Texas and informed an AP employee (as Waid describes it) that "[he wished] to speak to the owner," so that Waid could make sure the owner "understood why the backlash [was] happening."  *Id.*, pp. 38:4-6, 40:18-41:9; *see also* Exh. A, J. Dunn Depo., at pp.  35:5-36:6 (testifying about Waid's call to AP's landline office telephone).

      7.     AP's office manager conveyed Waid's message to Joeming Dunn ("Dunn"), AP's owner, at 12:25 p.m. stating that Waid was "looking to warn us of how badly our association with Rich Meyer might be for us," and had "mentioned death threats, among other things."  Exh. A, J. Dunn Depo. at pp. 37:10-18 & Exh. 18.  At that time,  Dunn understood that AP had contractually committed to publishing JAWBREAKERS. *Id.*, p. 41:15-19.  Frustrated with being caught in the middle between Waid's followers and Meyer's supporters, Dunn sent a lengthy screed at 4:38 p.m. to one of AP's contributors complaining that AP was being bullied into not publishing

Meyer's comic book because of past statements and political viewpoints of an author that were unrelated to the book being published.  *Id.* at 42:21-43:4 & Exh. 19.  In that missive, Dunn makes clear that AP had not decided to repudiate its contractual commitment and cancel Meyer's book at that time.[3]  *Id.* 44:13-49:17 & Exh. 19.

8.      A mere ten minutes after sending that email,  Dunn returned Waid's telephone call. *Id.*, at 51:2-51:24.  The call was not brief, but lasted twenty-seven minutes.  *Id.*  Immediately after the call, Ben Dunn[4] ("Ben"), who was with  his brother (Dunn) at the time, described him as "visibly upset" and that Ben could tell that "whatever transpired was not something positive." Exh. C, Deposition of Ben Dunn ("B. Dunn Depo.") at pp. 19:11-22:1.  Before that call, Ben understood that AP remained committed to publishing Meyer's book.  *Id.* at 20:24-21:6.  Thirty-six minutes after the call between Dunn and Waid ended, Dunn sent a text message to Waid's phone stating, "I have decided to drop the project," and that a statement on Facebook would be forthcoming.  Exh. B, Waid Depo., at p. 73:2-7 & Exh. 7.  Later that same evening, Dunn instructed AP personnel to announce on Facebook that AP would not be publishing JAWBREAKERS.  Exh. A,  Dunn Depo, at 61:6-62:4.

9.      Waid was ebullient when he responded to Dunn's text concerning AP's cancellation of its agreement with Meyer to publish JAWBREAKERS, saying, "You are a VERY good man.  Text or DM me when the statement goes up and I will recirculate it if you'd like." Exh. B, Waid Depo., Exh. 7 (emphasis original).  After Dunn confirmed that the cancellation was

---

[3] Among other comments,  Dunn remarked in the first paragraph about AP's options: "We could not release this book *even though we are contractually obligated to do so* and succumb to social media pressure (which feels a bit like we are being bullied to not release the book) or we could publish the book and continue to get the wrath we have undergone these past days from a multitude of sources."  *Id.* Exh. 19 (emphasis added).

[4] Ben Dunn is the former owner of Antarctic Press.

public, Waid again praised Dunn and thanked Dunn for doing so: "Good man.  Thank you and stay in touch."  *Id.*

10.     Just two days later, Waid was quoted at length in an article where he described his phone call with Dunn.  Exh. C, B Dunn Depo Exh. 10, at pp. 13-15.[5]  There, Waid professed to have met AP's owner and stated that the owner "seemed like a good guy" and later described AP's owner as someone Waid "knew to be a good guy."  *Id.*, at p. 13, 14.  Waid also recounted that part of the impetus for his call was as follows:

> I was surprised that [the publisher would] want to get in bed with someone whose idea of marketing was to ask his fans to put together a list of stores that chose not to carry his book and to then circulate that list along with the full names, first and last, of the stores' employees and their phone numbers for ease of targeting and harassment.

*Id.*, at 13.

11.     Over the next few days, Waid and Dunn continued to communicate via text message.  On May 15, 2018, Waid asked, "Holding up?  Why in the world is Meyer claiming that you called him in tears?" Exh. B, Waid Depo., Exh. 7. When Dunn declined to discuss the matter, Waid responded, "I don't blame you.  *You haven't turned on me, I hope?*"  *Id.* (emphasis added). Again,  Dunn declined to discuss the matter with Waid.

---

[5]Due to the length of the article, only an excerpt of the exhibit is attached.  The full article may be found here: https://www.bleedingcool.com/2018/05/13/no-enemy-but-peace-richard-meyer/

12.     In response, Waid pleaded with Dunn to confirm that Waid had not bullied Dunn into withdrawing support for JAWBREAKERS:



*Id.* When Dunn refused to provide that validation, Waid begged for it:

*Id.* Dunn refused. Exh. B, Waid Depo., at p. 49:8-17.

**B.**     **Waid Defames Meyer in Houston, Texas**

13.     Less than two weeks later, Waid traveled to Houston, Texas to attend a book-signing event at a comic book store and a comic book convention between May 22-27, 2018. *See* Exh. D., Waid Response to Interrogatory 1, at p. 4. On May 26, Waid participated in a question and answer session with a panel of comic book creators. *Id.* During that session, Waid was asked about Meyer and AP. Exh. B, Waid Depo, at pp. 49:19-50:5. Waid spoke for approximately five minutes recounting his version of the events leading to AP's decision to drop JAWBREAKERS. *Id.* at pp. 52:17-65:5.[6] After confirming that he was talking about Meyer and his artist collaborator, Waid made the following public statements <u>while in Houston</u>:

- "Uh these guys created the, you know, they did their comic, great, awesome. . . . there was, there was a bunch of stores that decided they weren't going to carry the comic, so these guys made a list of those stores . . . and their phone numbers and the names, first and last of all their employees." *Id.* 58:18-59:1.

- "And with the idea that, 'oh no, don't call them and harass them, we're not telling you to do that at all!' But here's their phone numbers and their first and last names of all their employees. Well, c'mon." *Id.*, at p. 59:12-22.[7]

- "So, *there was a publisher <u>**here in Texas**</u>*, who was going to publish their comic, for, after it had been kickstarted they were gonna, like publish it for comic stores." *Id.*, at p. 60:9-12 & Exh. 2, at p. 2 (emphasis added).

- "These guys are, these are indefensible human beings.. . . they harass women, they harass minorities, they harass LGBTQ people, um, they're full of hate. What are you doing?" *Id.*, at pp. 60:16-20.

- "But *I knew the publisher*, and I don't think he was aware of why all of a sudden it was this gigantic groundswell of hate towards him. So I said before I burn this place to the ground . . . Let me just call him and find out what's going on . . . *I know the guy* and want to make sure he knows why the Hordes of Hell are descending on him right now. *Id.*, at pp: 61:17-62:24 (emphasis added).

---

[6] A transcript of the recording was also attached as Exhibit 2 to Waid's deposition. Waid confirmed that the transcript was accurate. *Id.*, Waid Depo., Exh. 2.

[7] When asked if Waid intended that comment to suggest that Meyer was directing his followers to harass the stores and their employees, Waid responded, "Absolutely." *Id.*, at pp. 59:25-60:4.

Thus, Waid (who professed to have previously known Dunn) not only travelled to Texas where he applauded his recent interference with the Meyer/AP contract, admitting in the process that AP was Texas-based, at the same time re-publishing defamatory statements about Meyer.  *See* Complaint [Dkt. 1], at ¶ 24.

## IV.   ARGUMENT AND AUTHORITIES

### A.   Legal Standard—Purposeful Actions Directed at Forum

14.   **Prima Facie Only; Conflicts Resolved in Plaintiff's Favor**.  While it is true that "[t]he plaintiff bears the burden of establishing jurisdiction," the plaintiff "need only present *prima facie* evidence" of jurisdiction to meet its burden.  *WithdrawalEase.com v. Withdrawalaid.com*, Cause No. 1:14-CV-878-LY, 2014 WL 1247940, at *2 (W.D. Tex. Dec. 18, 2014) (quoting *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002)(emphasis original).  When evaluating such evidence, the court must accept the plaintiff's uncontroverted allegations as true and resolve any conflicts between evidence submitted by the parties in favor of the plaintiff.  *See id.*  To establish specific personal jurisdiction, the plaintiff must show that the defendant purposely directed activity at a resident of the forum and the defendant's contact with Texas "arise from, or are directly related to, the cause of action."  *Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 489 (5th Cir. 2018) (internal quotations omitted).

15.   **Single Phone Call Will Suffice**.  The Fifth Circuit has long held that minimum contact with the forum state can be established through a single phone call.  *See Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332- 34 (5th Cir. 1982) (holding defamatory statements made during single telephone call was sufficient to support personal jurisdiction).[8]  In fact, the Fifth Circuit

---

[8] The Fifth Circuit repeatedly cites *Brown v. Flowers Industries* for this proposition.  *See Trois*, 882 F.3d at 491 (citing *Brown* and upholding jurisdiction where misrepresentations were made during a single phone call); *Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001) (citing *Brown* and stating that a "single act by

recently upheld jurisdiction based on single phone call that included Texas citizens even though the call was not even initiated by the defendant.  *See Trois*, 882 F.3d at 490-91.  There, the defendant participated in a conference call initiated by a third party during which, the plaintiff asserted, one of the defendants made fraudulent statements concerning his auction company.  *Id.* In rejecting the defendants' claim that a single phone call was insufficient to confer jurisdiction, the court stated:

> Although Schnaidt [the defendant] did not initiate the conference call to Trois in Texas, Schnaidt was not a passive participant on the call.  Instead, he was the key negotiating party who made representations regarding his business in a call to Texas.  It is that intentional conduct on the part of Schnaidt that led to this litigation. . . . The defendants should have reasonably anticipated being haled into Texas court as a result of reaching out to Texas via phone in order to garner business and make specific representations.

*Id.* at 491.  Thus, the touchstone for personal jurisdiction is whether the cause of action arises from the defendant's contact with the forum state.

## B.     Waid's intentional actions directed toward Texas gave rise to Meyer's tortious interference with contract claim.

16.     Waid intentionally directed his actions towards Texas to interfere with a contract that was between Texas citizens and performable in Texas.  This Court has personal jurisdiction over Waid as a result.

17.     AP and Meyer, both citizens of Texas, entered a contract to publish JAWBREAKERS that was performable in Texas.  It is undisputed that Waid intentionally reached

---

a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted."); *SGS-Thompson Micro-Electronics, Inc. v. Ferris*, No. 93-9115, 1995 WL 313932 (5th Cir. May 1, 1995) ("In Brown, the panel reversed a district court decision that one phone call by a non-resident into the forum was insufficient "minimum contact" to support jurisdiction over the non-resident in the forum."); *D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545 (5th Cir. 1985) ("One of the defendants had initiated a single telephone call into the forum state, during which he allegedly committed the intentional tort of defamation. The claim of jurisdiction was predicated on this single telephone call.").

out to AP by calling AP's landline, business phone to discourage AP from publishing JAWBREAKERS.  And Waid bragged on social media that he had done so.  Despite Waid's initial denial under oath to this Court that he did not know where AP was located until this suit was filed,[9] faced with his recorded comments in Houston days after the call he now admits (as he must) that he knew that AP was Texas-based at least by then.  His claim that he only learned of AP's location after the call is completely implausible.  He is unable to explain how he became aware of that fact.  *See* Exh. B, Waid Depo., at pp. 44:24-46:10, 60:9-12 & Exh. 2, at p. 2.  Waid also professed on at least two occasions within that same two week period that he had previously met and knew AP's owner (Dunn) and knew that he was a "good guy."  *See* Exh. C, B Dunn Depo Exh. 10, at pp. 13-15; Exh. B, Waid Depo. pp: 61:17-62:24.  He denies using the internet to identify the 210 area code number he dialed for AP's landline, probably because AP's San Antonio address is  prominently displayed on its website; he claims instead to have procured the number from some unidentified industry source.  *Id.*, at p. 38:7-39:1.  Waid's assertion that he did not know where he was calling when he reached out to AP is simply not credible.

18.     Waid's actions during that call were intentional and deliberate – he wanted AP to drop JAWBREAKERS, and Waid succeeded.  This case falls directly in line with *Trois*, discussed above.  Like the defendant in that case, Waid intentionally reached out to a Texas citizen to interfere with its contract to publish JAWBREAKERS.  When Dunn spoke to Waid, Waid was an active participant advocating against publication of Meyer's book just as the defendant in *Trois* was an active participant making misrepresentations.  *Trois*, 882 F.3d at 489.  Here, Waid was a party in two telephone calls with Texas participants, one with AP's office manager and later with AP's owner, with the intention of convincing AP to breach its contract with Meyer.  Waid's

---

[9] *See* November 1, 2018 Declaration of Mark Waid [Dkt. 10-1].

Case 1:18-cv-00800-LY   Document 23   Filed 04/12/19   Page 12 of 16


actions during those calls alone are sufficient contacts with Texas for this Court to assert personal jurisdiction over Waid.

19.     Waid's reliance on *Michiana Easy Livin' Country, Inc. v. Holten* is misplaced. Aside from not being the law of the Fifth Circuit,[10] the only connection to Texas was a single, unsolicited phone call initiated by the Texas plaintiff to the defendant in Indiana.  *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 781 (Tex. 2005).  Again, the Fifth Circuit has repeatedly stated that intentional, tortious actions during a single telephone conversation are sufficient for the defendant to be haled into court in the forum state.  *See* footnote 8, *supra*. Moreover, in this case it was Waid who initiated contact by calling AP to threaten repercussions if it published Meyer's book.  During his half hour call with Dunn, Waid bullied him into cancelling the book.  These are intentional actions taken by Waid during those phone calls.

20.     Even if Waid were being truthful about his alleged ignorance of AP's Texas citizenship despite the evidence to the contrary, that is not enough to defeat jurisdiction.  It is undisputed that Waid called AP's business telephone with a San Antonio area code.  Federal courts are critical of arguments that willful ignorance of the state to which the defendant direct a communication defeats jurisdiction.  *See Strange v. Carnival Corp.*, No. 18-0295, 2019 WL 1281251, at *9 (W.D. La. March 20, 2019) (citing cases and approving of courts' rejections of the argument that a defendant's ignorance of the location of the phone the defendant had called defeated jurisdiction); *Luna v. Shac*, LLC, No. 14-607, 2014 WL 3421514, at *3 (N.D. Cal. July 14, 2014) (holding that sending unsolicited text messages to forum state subjected the defendant to personal jurisdiction in that state regardless of the defendant's knowledge of the recipient

---

[10] Because jurisdiction is determined by the reach of Due Process Clause under the Texas long-arm statute, this Court must follow Fifth Circuit precedent.  *See Tyson v. Austin Eating Disorders Partners LLC*, No. A-13-CA-180-SS, 2013 WL 3197641, at *4 (W.D. Tex. June 21, 2013) (rejecting defendant's reliance on *Holten* due to the Fifth Circuit's broader interpretation of the reach of the Due Process Clause).

**RESPONSE TO MOTION TO DISMISS FOR LACK OF JURISDICTION**                                                    **Page 12**

phone's location); *See also, Schneider v. Hardesty,* 669 F.3d 693, 700–01 (6th Cir.2012) ("[T]he only possible explanation [for defendant's ignorance of the plaintiff's geographic location] is that [he] intentionally buried his head in the sand, and that cannot save [him] from being subject to jurisdiction.").  In this case, Waid intentionally reached out to a San Antonio business with a San Antonio area code for the purpose of interfering with that business' contract, solicited a call back from the company's owner, and executed on his intention to interfere with AP's contract.

21.     Finally, there is also no question that Waid's bullying influenced AP's owner to cancel publication of JAWBREAKERS.  As described above, Dunn lamented to his colleague just before his call with Waid that AP was caught in the middle and was being bullied into not publishing Meyer's book, but that he was still proceeding with publication.  When Dunn called Waid, they spoke, at length, immediately after which AP announced its decision to drop the project.  Obviously concerned about legal exposure, Waid sought to insulate himself from the consequences of his actions by repeatedly soliciting assurance from Dunn that Waid had not bullied him (which Dunn refused to provide). Exh. B, Waid Depo., Exh. 7.  That is not how innocent people act.  It is clear that the telephone conversation between Waid and Dunn was the tipping point for AP, and Waid knows it.

**C.     Waid defamed Meyer in Texas while speaking to Texans.**

22.     Personal jurisdiction as to the defamation claim is not a close call.  Waid travelled to Houston, Texas and publicly repeated the statements on which Meyer's defamation claims are based.  These included the false allegation that Meyer distributed a list of the first and last names of the employees who worked at book stores who were not planning to order Meyer's book and encouraged his followers to harass the employees.  *See* Exh. A, Waid Depo. at pp. 52:17-65:5.

---

23.     The cases relied upon by Waid are irrelevant as a result.  At best, Waid's authority stands for the proposition that personal jurisdiction cannot be based solely on statements being accessible on social media or the internet in the forum state.  *See, e.g., Higgins v. Save Our Heroes*, No. 18-42, 2018 WL 2208319, at *3-5 (D. Minn. May 14, 2018) (dismissing for lack of jurisdiction where defamatory statements were made solely on the internet, including Facebook and Twitter).  In this case, Waid repeated the defamatory statement to a Texas audience in Houston.  Waid should have every expectation of being haled into a Texas court as a result.

**D.     Exercising jurisdiction over Waid will not violate traditional notions of fair play and substantial justice.**

24.     Waid's conclusory complaints about fair play and substantial justice fall flat.  Waid has no trouble travelling to Texas on multiple occasions over the years for comic book conventions and book-signings.  Waid's inconvenience is slight, at best, as a result.  There is no question that Texas clearly has a substantial interest in preventing interference with contracts between Texans that are performable in Texas.  For the same reason, the relevant witnesses for Meyer's tortious interference and defamation claims, except for Waid, are all in Texas.  Likewise, the state of Texas clearly has a substantial interest in defamation cases where the statements were made in Texas, about a Texas citizen, and to Texas residents.  Traditional notions of fair play and substantial justice are not offended by this Court's exercise of jurisdiction over Waid.

**V.     CONCLUSION AND PRAYER**

25.     Waid's intentional actions directed towards Antarctic Press and Richard Meyer give rise to Meyer's tortious interference and defamation claims.  Waid should not be allowed to tortiously interfere with Texas contracts and defame Texas citizens while in Texas and then claim that the victims must travel to California to obtain redress.  This Court clearly has jurisdiction. Waid's Motion to Dismiss must be denied.

---

WHEREFORE, Plaintiff Richard Meyer respectfully requests that Defendant's Motion to Dismiss for Lack of Jurisdiction be denied, and that Plaintiff be granted all other relief to which he is justly entitled.

Respectfully submitted,

FRITZ, BYRNE, HEAD & GILSTRAP, PLLC
221 West Sixth Street, Suite 960
Austin, Texas 78701
Telephone: (512) 476-2020
Telecopy:   (512) 477-5267

BY:     /s/ Daniel H. Byrne
          Daniel H. Byrne
          State Bar No. 03565600
          Email: dbyrne@fbhg.law
          Dale L. Roberts
          State Bar No. 24001123
          Email: droberts@fbhg.law

ATTORNEYS FOR PLAINTIFF RICHARD MEYER

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document was served on the counsel of record listed below using the Court's ECF system on April 12, 2019:

Beverly Reeves
breeves@reevesbrightwell.com
Ryan Pierce
rpierce@reevesbrightwell.com
Reeves & Brightwell, LLP
221 West Sixth Street, Suite 1000
Austin, Texas

Mark S. Zaid
mark@markzaid.com
Mark S. Zaid, P.C.
1250 Connecticut Avenue, Northwest, Suite 700
Washington, D.C. 20036

/s/ Daniel H. Byrne
Daniel H. Byrne