## Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE WESTERN DISTRICT OF TEXAS
     AUSTIN DIVISION
3   RICHARD MEYER,              *
         Plaintiff,             *
4
     VS.              * CIVIL ACTION NO.
5                        1:18-CV-00800-LY
     MARK WAID,         *
6        Defendant.       * (Jury Demanded)
7
8
9        VIDEOTAPED ORAL DEPOSITION
10                 OF
11        JOEMING W. DUNN, M.D.
12          MARCH 6, 2019
13
14
15        VIDEOTAPED ORAL DEPOSITION of JOEMING W.
16   DUNN, M.D., produced as a witness on behalf of
17   Plaintiff and duly sworn, was taken in the above-styled
18   and numbered cause on March 6, 2019, between the hours
19   of 12:20 p.m. and 4:08 p.m. before Shan Morris
20   Blanchard, Certified Shorthand Reporter in and for the
21   State of Texas, reported by computerized stenotype
22   machine at the offices of Langley & Banack, Inc., 745
23   E. Mulberry, Suite 700, San Antonio, Texas 78212
24   pursuant to Federal Rules and the provisions stated on
25   the record or attached hereto.

## Page 2

1            A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4     Mr. Daniel H. Byrne
       Fritz, Byrne, Head & Gilstrap, PLLC
5       221 W. 6th Street, Suite 960
        Austin, Texas 78701
6       Telephone: 512-476-2020
        Fax: 512-477-5267
7       Email: dbyrne@fbhg.law
8   FOR THE DEFENDANT:
9     Mr. Ryan Pierce
       Reeves & Brightwell, LLP
10      221 West Sixth Street, Suite 1000
        Austin, Texas 78701
11      Telephone: 512-334-4500
        Fax: 512-334-4492
12      Email: rpierce@reevesbrightwell.com
13  FOR THE WITNESS:
14    Mr. Otto S. Good
       Langley & Banack, Inc.
15      745 E. Mulberry, Suite 900
        San Antonio, Texas 78212
16      Telephone: 210-736-6600
        Fax: 210-735-6889
17      Email: ogood@langleybanack.com
18  WITNESS:
19    Joeming W. Dunn, M.D.
20  CERTIFIED SHORTHAND REPORTER:
21    Shan Morris Blanchard
22  VIDEOGRAPHER:
23    Lawrence Delgado
24
25

## Page 3

1   APPEARANCES CONTINUED:
2   ALSO PRESENT:
3     Richard Meyer
4     Mark Waid (via telephone)
      Mark Zaid (via telephone)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1                INDEX
                           PAGE
2   Stipulations                      1
3   Appearances                       2
4   JOEMING W. DUNN, M.D.
5   EXAMINATION BY:
6     MR. BYRNE                       7
      MR. PIERCE                     68
7     MR. BYRNE                     116
8   Reporter's Certificate          119
9
10
11            EXHIBITS
12  NO.     DESCRIPTION              PAGE
13  Ex. 11  Email string from Timothy Lim to   21
14          Diversity & Comics, et al, dated
            March 12, 2018
15  Ex. 12  Email string from Timothy Lim to   22
16          Diversity & Comics, et al, dated
            April 1, 2018
17  Ex. 13  Email string from Diversity & Comics  25
18          to Brian Denham, et al., dated
            April 28, 2018
19  Ex. 14  Email string from Drake Harris to   25
20          Diversity & Comics, et al., dated
            May 2, 2018
21  Ex. 15  Email string from Brian Denham to   28
22          Diversity & Comics, dated May 9, 2018
23  Ex. 16  Email string from Diversity & Comics  29
            to Brian Denham dated May 9, 2018
24  Ex. 17  Printout from Antarctic Press website  33
25

## Page 5

1  EXHIBITS CONTINUED:

2  Ex. 18  Email string from Doug Dlin to Joe          37
   Dunn, et al., dated May 11, 2018
3
4  Ex. 19  Email string from Joe Dunn to Joey          41
   Weltjens dated May 11, 2018
5
6  Ex. 21  Media statement on Twitter                  61
7  Ex. 22  Email from Joe Dunn to Brian Denham,        61
   et al., dated May 11, 2018
8
9  Ex. 23  Screen shots of text message between        64
   Joe Dunn and Richard Meyer
10 Ex. 24  Email string from Brian Denman to Joe       74
   Dunn, et al., dated May 9, 2018
11
12 Ex. 25  Email string from Brian Denham to Joe       76
   Dunn, et al., dated May 9, 2018
13 Ex. 26  Screen shot of Twitter posts by             78
   Diversity & Comics, dated May 9, 2018
14
15 Ex. 27  Screen shot of Twitter post by              80
   Diversity & Comics dated May 10, 2018
16
17
18 Ex. 29  Screen shot of Twitter post by              82
   Diversity & Comics dated May 11, 2018
19
20 Ex. 30  Email string from Brian Denham to Joe       83
   Dunn, et al., dated May 10, 2018
21 Ex. 31  Email string from Doug Dlin to Brian        85
   Dehnam, et al., dated May 10, 2018
22
23 Ex. 32  Email string from Doug Dlin to Joe          86
   Dunn, et al., dated May 10, 2018
24 Ex. 33  Email string from Joe Dunn to Jochen        94
   Weltjens dated May 11, 2018
25

## Page 6

1  EXHIBITS CONTINUED:

2  Ex. 34  Email string from Joe Dunn to Jochen        96
   Weltjens dated May 11, 2018
3
4  Ex. 35  Email string from Doug Dlin to Joe          101
   Dunn, et al., dated May 11, 2018
5  Ex. 36  Screen shot of Twitter post dated           103
   May 12, 2018
6
7  Ex. 37  Screen shot of Twitter post by              107
   Antarctic Press
8  Ex. 38  Screen shot of Twitter post by              108
   Antarctic Press
9
10 Ex. 39  Screen shot of social media posts           109
   dated May 12, 2018
11 Ex. 40  Response to Subpoena to Produce             114

12

13

14       TIME USED BY ATTORNEYS

15  ATTORNEY              TIME USED

16 Mr. Daniel H. Byrne         2 hours 0 minutes
17 Mr. Ryan Pierce             1 hour 13 minutes
   Mr. Otto S. Good            0 hours 0 minutes

18

19

20

21

22

23

24

25

## Page 7

1        (The reading of introductions into the

2   record according to Rule 30(b)(5)(A) was waived by all

3   parties present.)

4        THE VIDEOGRAPHER:  We're on the record on

5   March the 6th, 2019, at 12:20 p.m.

6        JOEMING W. DUNN, M.D., the witness, being

7   duly cautioned and sworn to tell the truth, the whole

8   truth and nothing but the truth, testified as follows:

9        (Time: 12:20 p.m.)

10            EXAMINATION

11  BY MR. BYRNE:

12  Q.  Would you state your name for the record,

13  please, sir?

14  A.  My full name is Joeming Wolf Dunn, D-u-n-n.

15  Q.  And do you go by Joe Dunn?

16  A.  I go by Joe or Joeming depending on who my

17  friend are, I guess.

18  Q.  Okay.  Mr. Dunn, my name is Dan Byrne, and I'm

19  representing Richard Myer in a lawsuit that I think

20  you're aware of that's been brought against Mark Waid,

21  and I'm sitting here with Mr. Meyer to my right and

22  Mr. Waid's counsel, Ryan Pierce, is sitting across the

23  table.  All right?

24  A.  Yes, sir.

25  Q.  And you -- you and I haven't met or talked

## Page 8

1   before today; correct?

2   A.  No, sir.

3   Q.  Okay.  We learned a little bit about your

4   business, Antarctic Press, this morning in the

5   deposition of your -- your brother, Ben, but I'm going

6   to go over that a little bit just to -- to make sure

7   that you and he are -- are in agreement?

8        MR. PIERCE:  And, Dan -- sorry -- same

9   agreements on objections?

10       MR. BYRNE:  Yes.

11       MR. PIERCE:  Sorry.  Go ahead.

12  Q.  (BY MR. BYRNE)  How long have you been

13  affiliated with Antarctic Press?

14  A.  Since 1989, around in that time.

15  Q.  Is that when you bought it from your brother?

16  A.  No, sir.

17  Q.  Okay.  Tell me what happened in 1989.

18  A.  My brother had a partner named Mark Ripley, and

19  they started Antarctic Press in '85, end of '84, and

20  Mark was supposed to be the financial partner and what

21  happened was Mark kind of stopped doing work for the

22  company and so my brother needed somebody to help with

23  the finance -- finances and, you know, paying the bills

24  and I was apt to do that, and so I helped him at that

25  point in time.

Page 17

1   A.   She's a freelance creator.

2   Q.   And what -- what does Joe White do?

3   A.   He also is a freelance creator.

4   Q.   And what does Austin Rogers do?

5   A.   Austin is a -- he used to -- or still does --

6   I -- runs a publishing company called Guardian Knights

7   and -- they're also here based in San Antonio and

8   they're -- recently their editor-in-chief left and he

9   took over and we were trying to do some collaborations

10  together and so his company kind of attached to our

11  company.

12  Q.   So at the time that you were deciding to

13  publish Jawbreakers, you were exploring collaboration

14  opportunities with Guardian Knights.

15  A.   Correct.

16  Q.   Who was the editor-in-chief for Antarctic Press

17  back in the spring of 2018?

18  A.   Jochen Weltjens.

19  Q.   And does he have a nickname that he goes by?

20  A.   He goes by Joey sometimes.

21  Q.   Okay.  I've seen references to Joey and --

22  A.   Yes.

23  Q.   -- and I'm wondering --

24  A.   His full name is Jochen Weltjens, but we call

25  him "Joey" and "Joe."  We have a lot of Joes at

Page 18

1   Antarctic Press.

2   Q.   Well, at least you can distinguish between Joe

3   and Joey when you're using nicknames; right?

4   A.   That's correct.

5   Q.   And do you recall about when you made the

6   decision to publish Mr. Meyer's book Jawbreakers?

7   A.   Oh, I -- I -- I can't recall --

8   Q.   Okay.

9   A.   -- exact date, no.

10  Q.   We'll get to some exhibits in a minute that

11  might help you pin that down.

12  A.   Right.

13  Q.   Has Antarctic Press always been based in San

14  Antonio, Texas?

15  A.   Yes, sir.

16  Q.   And have you lived in San Antonio throughout

17  the -- the period when you graduated from medical

18  school and today?

19  A.   No, I did my residency in Dallas for three

20  years.

21  Q.   Okay.  And so when did you move back to San

22  Antonio?

23  A.   '95, 1995.

24  Q.   So you've been in San Antonio continuously

25  since 1995; correct?

Page 19

1   A.   Yes, sir.

2   Q.   And does Antarctic Press have an office

3   presence here, a physical office?

4   A.   Yes.

5   Q.   And where is that located?

6   A.   Currently, it's in -- the address is 4700 Timco

7   West, Suite Number 100, San Antonio, Texas 78238.

8   Q.   And is -- has that been its place of business

9   throughout 2018 and 2019?

10  A.   Yes.

11  Q.   Do you maintain an internet website for

12  Antarctic Press?

13  A.   Yes.

14  Q.   And does that website show the physical

15  location of Antarctic Press as best you know?

16  A.   I -- I think so, yes.

17  Q.   You mentioned that you are -- you're not much

18  of a person for being on the internet or using social

19  media.  Did I hear that correctly?

20  A.   Correct.

21  Q.   Do you recall having any email exchanges with

22  either Richard Meyer or Mark Waid prior to the phone

23  conversation you recall having with Mr. Waid in May of

24  2018?

25  A.   No.

Page 20

1   Q.   How about any communications via Twitter or

2   Facebook or other social media?

3   A.   Not me personally.

4   Q.   Okay.  Were you aware of any Twitter or

5   Facebook communications concerning Mr. Meyer or

6   Mr. Waid prior to your conversation with Mr. Waid?

7   A.   I am aware of Brian communicating with

8   Mr. Meyer via Twitter sometimes, but me directly, no.

9   Q.   And is that something you know secondhand

10  because you were told about it by Brian?

11  A.   Correct.

12  Q.   Back to the meeting where the decision was made

13  to publish Jawbreakers.  Was there any discussion about

14  whether Jawbreakers would be a particularly good seller

15  for Antarctic Press?

16       MR. PIERCE:  Object to form.

17  A.   At the time when we discussed Jawbreakers,

18  Brian had mentioned that Mr. Meyer had a large number

19  of followers on YouTube, and I was thinking

20  that because he had a large number of followers, it was

21  possible that he could translate that to some sales.

22  Q.   (BY MR. BYRE)  Was -- was the -- was the group

23  that was discussing the decision to publish excited

24  about the prospects for successful sales from this

25  decision?

Page 21

1    MR. PIERCE:  Object to form.

2    A.  I believe it was a -- I didn't think it was any

3    more unusual than any other submission.

4    Q.  (BY MR. BYRNE)  Okay.  Does Antarctic Press

5    have a sort of philosophy about a willingness to

6    publish potentially controversial work?

7    MR. PIERCE:  Object to form.

8    A.  Our philosophy is to support creators, and so

9    we -- if we like it we, you know, publish it.

10   Q.  (BY MR. BYRNE)  Okay.  Do you have a policy or

11   philosophy about distinguishing between creators and

12   the creator's work?

13   MR. PIERCE:  Object, form.

14   A.  No.

15   MR. BYRNE:  Okay.  I think we're going to

16   need some more.

17   (Deposition Exhibit 11 marked.)

18   Q.  (BY MR. BYRNE)  Let me hand you what's been

19   marked as exhibit -- Deposition Exhibit Number 11.

20   This is a -- an email string that looks like it is all

21   dated March 12th, 2018.  Do you -- is this -- the Brian

22   Denham in this string the Brian Denham that you

23   testified is an independent contractor associated with

24   Antarctic Press?

25   A.  Correct.

Page 22

1    Q.  Okay.  Does this refresh your recollection

2    about the timing of Antarctic's decision to publish

3    Mr. Meyer's Jawbreaker comic?

4    A.  It says, "March 12th, 2018," and that sounds

5    about right.

6    Q.  Okay.  Now, at this point, had the decision

7    been made to go ahead and publish or did that actual

8    decision get made at a later date?  Do you know?

9    A.  When -- whenever a -- Brian or one of my

10   editors makes a suggestion for a book and they think

11   that it's viable, then I usually do not put it -- much

12   barriers to -- for publication.

13   Q.  Okay.  So -- so as best you can recall, the

14   decision to proceed with publishing was a go as of

15   March 12th of 2018; is that fair?

16   MR. PIERCE:  Object, form.

17   A.  Correct, yes.

18   (Deposition Exhibit 12 marked.)

19   Q.  (BY MR. BYRNE)  Mr. Dunn, I'm handing you

20   what's been marked as exhibit -- Deposition Exhibit 12.

21   Is this another email exchange in April of 2018

22   involving Brian Denham concerning the Jawbreaker

23   publication by Antarctic Press?

24   A.  Okay.

25   Q.  Is that what it is?

Page 23

1    A.  This is an email between Brian and Timothy Lim

2    in regards to suggestions for Mr. Meyer's Kickstarter.

3    Q.  And what is your understanding of Kickstarter

4    and how it works in the comics business, just

5    generally?

6    A.  Well, Kickstarter, in my opinion, it was a

7    platform to help kick start projects, just like the

8    namesake, and it is used to generate funds to help

9    whatever project a person has.  In the comic book

10   industry, it has become a way to finance a lot of

11   projects that people want to publish.  So I don't know.

12   It's -- has changed a little bit in that regard, but in

13   my opinion Kickstarter is -- meant what it was supposed

14   to be, a kick start.

15   Q.  Is there a -- isn't there another platform

16   that's also used for raising money for comic book

17   projects?

18   A.  Yes, the other main one is a platform called

19   Indiegogo, I think.

20   Q.  Okay.  Do you know whether Mr. Meyer's book,

21   Jawbreaker, was being launched through either of those

22   platforms?

23   A.  I -- I recall that -- I think it was launched

24   through Indiegogo.

25   Q.  Okay.  Did the -- do the -- do the two -- two

Page 24

1    platforms work in similar ways?

2    A.  I think there is some differences in how they

3    receive the money, but I think, in essence, yes.

4    Q.  Okay.  And is the -- is it typical, ordinary

5    course of business for Antarctic's editors, like

6    Mr. Denham, to offer tips about how to -- how to manage

7    projects as set forth in this email?

8    A.  We have had experience with Kickstarter and --

9    and so we have some suggestions always for creators

10   that may want to launch some projects through

11   Kickstarter, and so these look like some of the

12   suggestions that we make to creators.

13   Q.  So this is a -- this is a normal type of

14   communication --

15   A.  Yes.

16   Q.  -- that -- that you offer your -- your

17   contributors?

18   A.  Yes.

19   Q.  And I gather this is the kind of communication

20   that you would normally expect to see a few weeks after

21   a decision is made to -- to go ahead -- go ahead with

22   publishing or is that not case?

23   MR. PIERCE:  Object -- object to form.

24   A.  Can you restate that question again, please?

25   Q.  (BY MR. BYRNE)  Is the normal sequence once a

Page 25

1 decision is made to within a few weeks offer tips like
2 those set forth in Deposition Exhibit 12 to your
3 contributors?
4      MR. PIERCE:  Object, form.
5 **A.   If a creator asks us for Kickstarter or**
6 **Indiegogo tips, we do offer it to them.**
7      (Deposition Exhibit 13 marked.)
8 Q.   (BY MR. BYRNE)  Let me hand you what's been
9 marked as Deposition Exhibit 13, which is another email
10 exchange involving Brian Denham concerning the
11 Jawbreakers publication.  Have you seen this before?
12 **A.   I have not seen this email exchange.**
13 Q.   Okay.  So when Mr. Denham says on Sunday,
14 April 29th, 2018, in this email that, "It is a firm yes
15 that we'll publish Jawbreakers," is that an accurate
16 statement of Antarctic Press's position as of that
17 date?
18      MR. PIERCE:  Object, form.
19 **A.   Yes.**
20      (Deposition Exhibit 14 marked.)
21 Q.   (BY MR. BYRNE)  I've handed you what's been
22 marked as Deposition Exhibit 14, which is another
23 series of emails involving Mr. Denham dated May 2nd,
24 2018.  Do you recall seeing this back prior to today?
25 **A.   No.**

Page 26

1 Q.   Okay.  Does the -- do the exchanges here
2 between Mr. Denham, Mr. Meyer at Diversity & Comics,
3 and Mr. Harris, are they typical, ordinary course of
4 business types of exchanges that you see in your
5 business when moving toward publication of a comic
6 book?
7      MR. PIERCE:  Object to form.
8 **A.   Yes.**
9 Q.   (BY MR. BYRNE)  So as of May 2nd, 2018, was --
10 was it still the position of Antarctic Press that it
11 would proceed with publishing the Jawbreakers comic?
12 **A.   Correct.**
13 Q.   I hand you what was previously marked as
14 Deposition Exhibit Number 8.  Is that a posting that
15 was authorized by you to formally announce the decision
16 to publish Mr. Meyer's comic, Jawbreakers?
17 **A.   Brian is in charge of our Twitter account and I**
18 **don't -- he doesn't clear things with me before he**
19 **posts on Twitter, but, yeah, I mean, I typically trust**
20 **him on posting what we talk about in the meetings.**
21 Q.   Okay.  Do you sometimes give specific
22 instructions about what will and what will not been
23 said on behalf of Antarctic Press?
24 **A.   Typically, no.  However, in some circumstances**
25 **when the need arises, we discuss what needs to be**

Page 27

1 **posted.**
2 Q.   And -- and you -- you ultimately control what
3 gets said when you choose to exercise that control; is
4 that fair?
5      MR. PIERCE:  Object to form.
6 **A.   Correct -- oh -- correct.**
7 Q.   (BY MR. BYRNE)  Did you have any problem with
8 this announcement decision made by Brian as reflected
9 in Exh bit 8?
10 **A.   No.**
11 Q.   Okay.  Prior to -- and I believe that's
12 May 8th?
13 **A.   May 9th.**
14 Q.   May 9th.  So prior to May 9th of 2018, had you
15 become aware of any negativity or controversy
16 surrounding either Mr. Meyer or the decision by
17 Antarctic Press to publish his comic book?
18 **A.   No.**
19 Q.   And when did you first become aware of any such
20 negativity, if you can recall?
21 **A.   The first time I remember -- I don't remember**
22 **the exact date, but after the -- shortly after the**
23 **announcement, there was something that came up with a**
24 **Facebook group which were made by a bunch of comic book**
25 **retailers.**

Page 28

1 Q.   And was this a group of retailers that was
2 organizing a boycott of sorts?
3 **A.   My understanding was it was a group of**
4 **retail -- comic book retailers that were going boycott**
5 **Antarctic Press.**
6 Q.   Okay.  When you heard about that, did you
7 decide immediately to reverse your decision to publ --
8 publish Jawbreakers?
9      MR. PIERCE:  Object to form.
10 **A.   No.**
11      (Deposition Exhibit 15 marked.)
12 Q.   (BY MR. BYRNE)  I hand you what's been marked
13 as Deposition Exhibit 15.  Have you seen this email
14 string before today?
15 **A.   No.**
16 Q.   Did you have internal discussions with your
17 team, your staff, about the boycott threat?
18 **A.   Yes.**
19 Q.   And why did that boycott threat not prompt you
20 to immediately reverse your decision?
21 **A.   As in most things that I do in making**
22 **decisions, I like to get all the information possible.**
23 Q.   Okay.  In Exhibit 15, there's a line there from
24 Mr. Denham dated May 9th where he says, "That just
25 shows me we're doing the right thing standing with

Page 29

1  you." Do you see that, the very top paragraph?
2  A.  Okay.
3  Q.  Did -- did you at that time share -- share that
4  sentiment expressed by Mr. Denham?
5      MR. PIERCE:  Object, form.
6  A.  I can't -- I mean, I can't speak for what Brian
7  was thinking at the time when he spoke about that.
8  Q.  (BY MR. BYRE)  I was asking whether you also
9  thought that you were doing -- your company was doing
10  the right thing by standing with Mr. Meyer --
11  A.  I think --
12      MR. PIERCE:  Object, form.
13  Q.  (BY MR. BYRNE) -- at the time?
14  A.  I think at the time I believe that -- that we
15  believed that publishing was the right thing to do.
16  Q.  So was your company at that time pressing on
17  with the -- the process of preparing the comic for
18  eventual publication?
19  A.  I think at the time when we -- I first heard of
20  the Facebook group, that I wanted to gather everybody
21  and get information about this project.
22      (Deposition Exhibit 16 marked.)
23  Q.  (BY MR. BYRNE)  I hand you what's been marked
24  Exhibit 16 to your deposition.  It looks like an
25  exchange between Mr. Meyer and Mr. Denham later in the

Page 30

1  morning of May 9th which suggests that the -- the
2  process of preparing the book for publication
3  continued.  Is that a far interpretation of this
4  exchange?
5  A.  Yes.
6      MR. PIERCE:  Hey, Dan, when you get to a
7  good place, can we take a bathroom break?  No -- no
8  rush.  Just --
9      MR. BYRNE:  I guess this is as good a
10  time as any.  Let's go off the record.
11      MR. PIERCE:  Thank you.
12      THE VIDEOGRAPHER:  Going off the record
13  at 1:05 p.m.
14      (Recess taken 1:05 p.m. to 1:11 p.m.)
15      THE VIDEOGRAPHER:  Back on the record at
16  1:12 p.m.
17  BY MR. BYRNE:
18  Q.  Mr. Dunn earlier I think you testified that you
19  attended various comic-related conventions over the
20  years?
21  A.  Yes.
22  Q.  How many on average per year do you -- have you
23  typically attended, say, over the last five or ten
24  years?
25  A.  Over the last five or ten years as a -- me

Page 31

1  personally attended, probably around three a year.
2  Q.  Okay.  Are they typically located in Texas or
3  at various locations around the country?
4  A.  The ones I've attended are in Texas.
5  Q.  And had you ever seen Mr. Waid -- Mark Waid
6  present at any of those conventions?
7  A.  No.
8  Q.  Where -- did you ever attend any conventions
9  where he was in attendance, to your knowledge?
10  A.  I'm sure I've attended some conventions that he
11  was in attendance.
12  Q.  Okay.  Does Antarctic Press do something to
13  create a presence at -- at these conventions?  Does it
14  have a booth or do any advertising?
15  A.  Yes.
16  Q.  What -- what is the normal activity that
17  Antarctic Press takes -- takes at -- at the comic
18  conventions you're familiar with?
19  A.  We usually set up as a booth.
20  Q.  Okay.  And how would attendees at conventions
21  come to know -- what -- what would they learn about
22  Antarctic Press in the course of seeing a booth for
23  you?
24      MR. PIERCE:  Object to form.
25  A.  Typically, at a booth that we attend --

Page 32

1  Q.  (BY MR. BYRE)  Let -- let me -- let me rephrase
2  that question.  What -- what is it that you attempt to
3  convey about your company by setting up a booth to the
4  people attending these conventions?
5  A.  Typically, when we set up at conventions, we
6  try to reach the audience that attends the conventions
7  that may be comic book fans in hopes to obtaining new
8  fans.
9  Q.  New customers?
10  A.  New customers, yes.
11  Q.  And what is it that you convey about yourself
12  in order to attempt to create new customers?
13  A.  We typically sell the books that we published
14  during that period of time, and if possible, to have
15  creators attend our booth to meet with the fans and
16  potential customers.
17  Q.  Do you convey that you're a -- a -- a
18  Texas-based publisher in the course of these
19  promotions?
20      MR. PIERCE:  Object to form.
21  A.  Typically not.
22  Q.  (BY MR. BYRE)  Okay.  Do you -- do you have a
23  sign up that identifies you as based in San Antonio?
24  A.  No.
25  Q.  Do you believe that folks know where you're --

Page 37

1 proceed with publication of Jawbreakers?
2       MR. PIERCE: Object to form.
3   **A. I believe -- my recollection of the time right**
4 **before I talked to Mr. Waid, I was being inundated with**
5 **information and I was, you know, trying to organize all**
6 **my thoughts in my head. And so I don't think a final**
7 **decision had been made, but there was quite a few**
8 **things in my head at that point in time.**
9       (Deposition Exhibit 18 marked.)
10  Q. (BY MR. BYRNE) Let me hand you what I've
11 marked as Exhibit 18 to your deposition. And I think,
12 Mr. Dunn, it kind of starts chronologically on the --
13 at the end and works its way up.
14  **A. Uh-huh. Okay.**
15  Q. Is this a series of internal email exchanges
16 between you and other members of the Antarctic Press
17 team occurring between May 9th and May 11th of 2018?
18  **A. Correct.**
19  Q. And is Doug Dlin's -- it's D-l-i-n; right?
20  **A. Correct.**
21  Q. Is -- is Doug Dlin's email address the one that
22 apcog1?
23  **A. That's correct.**
24  Q. Okay. And just to identify the participants in
25 these exchanges, "mzajza" refers to who?

Page 38

1   **A. Joey Weltjens, Jochen Weltjens.**
2   Q. Okay. And is Brian Denham cleverly named
3 briandenham@gmail?
4   **A. Correct.**
5   Q. And who is twilightTXmail?
6   **A. That is Joe White.**
7   Q. And David Hutchison uses his real name at
8 Yahoo; correct?
9   **A. Correct.**
10  Q. All right. Starting on -- on May 9th at the
11 very end of this string, who raises the question about
12 thoughts on a response? Who is "apcog" again?
13  **A. I think at the time --**
14  Q. That was Doug; right?
15  **A. Correct.**
16  Q. And then on the -- third page in you have
17 Brian Denham responding to Doug's inquiry about
18 ignoring the response. Do you see that?
19  **A. Correct. I see that on May 9th.**
20  Q. Okay. And was Brian at the time telling you
21 that you had generated a lot of fans on Twitter by your
22 announcement?
23  **A. I believe --**
24  Q. It's toward the bottom of the third page.
25  **A. I believe at the time when -- after the**

Page 39

1  **announcement, there was the -- we started getting the**
2  **response to the announcement and the response to the**
3  **announcement was -- came very fast and a lot of things**
4  **came in at the same time, and -- and then I think -- I**
5  **believe Doug received, you know, a multitude of calls**
6  **and -- at the office in regards to it, and so I think**
7  **he was curious to know how to respond and -- and that's**
8  **when I started getting more involved I guess on that**
9  **aspect of it.**
10  Q. And did you agree initially with Brian's advice
11 that the inquiries should be ignored?
12       MR. PIERCE: Object to form.
13  **A. I believe that that was discussed with -- with**
14 **Brian and I think that I agreed with that, not to**
15 **respond.**
16  Q. (BY MR. BYRNE) Did you learn that there was
17 both negative and positive social media activity
18 concerning your decision?
19  **A. Yes.**
20  Q. Okay. Were you trying to evaluate whether
21 the -- the negative outweighed the positive?
22       MR. PIERCE: Object to form.
23  **A. I think I was -- at the time, I was thinking**
24 **what exactly -- what transpired to create such a**
25 **passionate response on both sides of the equation and I**

Page 40

1  **wanted to get information about all that.**
2  Q. (BY MR. BYRNE) Okay. On the very first page
3 of Exhibit 18, there's an entry there coming from
4 jdunn@antarcticpress. That's you; correct?
5  **A. Correct.**
6  Q. And so on Thursday evening at 9:48 p.m. you
7 told your team what about responding to inquiries and
8 emails?
9  **A. I think at that point in time I was surprised**
10 **about the response on both sides of the equation and --**
11 **and to keep -- I -- I -- I believe that I decided to**
12 **say not to respond to anything, and the reasoning**
13 **behind that was to not fuel any fires. And I believe**
14 **that if we had said -- you know, anything that could be**
15 **said could be misconstrued, so I decided let's not say**
16 **anything so that there's no -- there's no**
17 **miscommunication because of the fact that -- how things**
18 **sometimes at the internet -- you know, we -- you know,**
19 **so that's -- I think that's the reasoning behind it.**
20  Q. Did -- did you use the term "radio silence"?
21  **A. Correct.**
22  Q. Okay. So you told your team to be radio silent
23 in either direction on this?
24  **A. Correct.**
25       MR. PIERCE: Object to form.

Page 41

1  Q.  (BY MR. BYRNE)  So during the following day,
2  Friday the 11th, did you continue to gather information
3  or did you tune out?
4  **A.  Among the people that -- you know, that were**
5  **closest to me in the -- and I think at the time my**
6  **brother came to visit -- I had -- was still gathering**
7  **information and I had gotten some information that, you**
8  **know, I wanted clarified and I wanted to -- and from**
9  **that perspective, I think that I -- you know, I removed**
10 **myself from any social media or internet because I knew**
11 **how things were -- people were responding according to**
12 **other people, and so then at that point in time, I**
13 **just -- still gathering my thoughts about this whole**
14 **situation.**
15 Q.  Okay.  At that time, did you understand that
16 you had made a commitment to Mr. Meyer to publish his
17 comic?
18       MR. PIERCE:  Object to form.
19 **A.  Yes.**
20       (Deposition Exhibit 19 marked.)
21 Q.  (BY MR. BYRNE)  I hand you what's been marked a
22 Exhibit 19 to your deposition.  This is an email string
23 that starts with something to you from Joey at about
24 3:00 o'clock in the afternoon on Friday, May 11th, to
25 which you respond at 4:38 p.m. on Friday, May 11th.

Page 42

1  **A.  Correct.**
2  Q.  Do you see that?
3  **A.  Yes, sir.**
4  Q.  And this is just you responding directly to
5  Joey; correct?
6  **A.  Correct.**
7  Q.  There's some -- some aspects of your lengthy
8  email here that seem to be infused with some emotion.
9  **A.  Correct.**
10 Q.  Were you feeling that emotion toward Joey or
11 toward the situation or both?
12 **A.  I think my emotion was mostly to the situation.**
13 Q.  And -- and it's fair to say that Joey was
14 expressing discomfort with continuing with your
15 decision to proceed with Jawbreakers publication?
16 **A.  I think that at the time, yes, because of the**
17 **information we had gathered.**
18 Q.  And you start out by making reference to the
19 Kobayashi Maru of comic books, no-win situation.  What
20 is that a reference to?
21 **A.  There's a movie, Star Trek II, the Wrath of**
22 **Khan, and in that movie the Kobayashi Maru is an**
23 **introduction -- it was introduced at that time and**
24 **basically it was a test for -- if you're familiar with**
25 **the Star Trek it is a test for Star fleet cadets that**

Page 43

1  **they put -- they were put into a no-win situation, but**
2  **one student that was able to beat the Kobayashi Maru,**
3  **which was Captain Kirk, and so I felt like this was a**
4  **no-win situation for our -- our company.**
5  Q.  Did you -- did you have the Captain Kirk
6  solution fashioned yet?
7        MR. PIERCE:  Object to form.
8  **A.  No.**
9  Q.  (BY MR. BYRNE)  You make reference to social
10 media pressure.  Was that social media pressure coming
11 in both direction?
12       MR. PIERCE:  Object to form.
13 **A.  Yes.**
14 Q.  (BY MR. BYRNE)  Now, in the -- in the second
15 paragraph you make a reference to, "I'm going to rant
16 not to each of you personally, but to everyone who has
17 put us in this situation."  Was this -- was this being
18 circulated beyond just Joey?
19 **A.  No, it was just between me and Joey.**
20 Q.  Obviously, you use a -- a lot of powerful
21 language here, Mr. Dunn, and I don't need to go through
22 it with you line by line.  By the end of this email,
23 are you still, at least at this point, standing by your
24 decision to proceed with the publication?
25       MR. PIERCE:  Object to form.

Page 44

1  **A.  I -- I think at -- by the end of this rant that**
2  **I did in this email, I had felt that my emotional**
3  **status had been drained and I felt like I didn't want**
4  **to continue down that pathway.**
5        MR. WAID:  Yes.
6        MR. BYRNE:  Let's go off the record.
7        THE VIDEOGRAPHER:  Off the record at
8  1:42 p.m.
9        (Recess taken 1:42 p.m. to 1:52 p.m.)
10       THE VIDEOGRAPHER:  Back on the record at
11 1:52 p.m.
12 BY MR. BYRNE:
13 Q.  Mr. Dunn, before we went on the break we were
14 talking about Exhibit 19, which is the email you sent
15 at 4:38 p.m. on Friday, May 11th, last year.  To put
16 this email in context, was this email written after you
17 had received the message that Mr. Waid wanted you to
18 call him back?
19 **A.  I think so.**
20 Q.  But was it written before you actually spoke to
21 Mr. Waid?
22 **A.  I think so.**
23 Q.  And what was the reaction around your office
24 when Mr. Waid left his message, that you recall?
25 **A.  At the time, Mr. Waid called the office, the --**

Page 45

1  most of the people that work or do work for me do not
2  work at the office, and so I think that at the time
3  Doug was the only one at the office and he just relayed
4  the message to -- I think to all of us at that time.
5      Q.  Because Mr. Waid is kind of a big deal in the
6  comics industry, isn't he?
7          MR. PIERCE:  Object, form.
8      A.  I believe so.
9      Q.  (BY MR. BYRNE)  You recognized his name when
10 the message was left; right?
11     A.  Yes.
12     Q.  And reading this -- this email you -- you make
13 some comments in what you call your rant about
14 distinguish between the art and the artist?
15     A.  Correct.
16     Q.  Is that something that Antarctic Press tried to
17 do in making its publication decisions?
18     A.  Correct.
19     Q.  There is a reference in here to the credo of
20 the company being somehow related to creator of rights.
21     A.  Correct.
22     Q.  Is that --
23     A.  We believe in -- the original creation of
24 Antarctic Press was for creator rights to have
25 opportunity for creators to publish their books,

Page 46

1  maintain their rights to their book with no strings
2  attached.
3      Q.  Was that a factor that weighed in favor of your
4  decision to publish Jawbreakers --
5          MR. PIERCE:  Object to form.
6      Q.  (BY MR. BYRNE) -- initially?
7      A.  I believe that the reason for Jawbreakers, at
8  least in my mind, was that he had a following.
9      Q.  And that was because his following translated
10 into potential financial -- positive financial outcome
11 for Antarctic Press; correct?
12     A.  Correct.
13     Q.  Was -- was also was -- another factor in the
14 decision the company's history of supporting creator
15 rights?
16         MR. PIERCE:  Object, form.
17     A.  Correct.
18     Q.  (BY MR. BYRNE)  You knew that when you returned
19 Mr. Waid's call he was going to be on the side of -- of
20 trying to dissuade you from publishing Jawbreakers;
21 correct?
22         MR. PIERCE:  Object to form.
23     A.  Yes.
24     Q.  (BY MR. BYRNE)  Did you know before you
25 returned Mr. Waid's call that he -- he would be opposed

Page 47

1  to Antarctic Press proceeding with the publication?
2          MR. PIERCE:  Object to form.
3      A.  I was aware that he was opposed to Jawbreakers.
4      Q.  (BY MR. BYRNE)  And even before you talked to
5  Mr. Waid you'd be -- you'd be getting -- you -- you
6  were aware of pressure from some segments of the
7  industry to try to persuade you on behalf of arctic --
8  Antarctic Press to change your publication decision;
9  correct?
10         MR. PIERCE:  Object to form.
11     A.  Correct.
12     Q.  (BY MR. BYRNE)  In the last paragraph of your
13 email, you -- you say a couple of times, "Even if we
14 decide to publish the book," and then a few lines later
15 you say, "If we publish the book."  Would -- would it
16 be fair to say that you -- you were still considering
17 possibly proceeding with publication at the time you
18 wrote those words?
19         MR. PIERCE:  Object to form.
20     A.  I believe that I was thinking was --
21     Q.  (BY MR. BYRE)  Let -- let me come at it -- let
22 me ask you a different question.  Did the information
23 you gathered and the pressure you were getting from
24 certain segments of the industry via social media
25 prompt you to consider reversing your decision to

Page 48

1  publish as of the time you wrote this email?
2      A.  I believe I was extremely upset with the
3  situation that we were in and the time and effort and
4  the -- that was going into it, and I believe that --
5  that in conjunction with many factors was going through
6  my mind.  I mean, I -- I'll embellish and say that I
7  don't like being pushed around, but I also understand
8  the reality of the world.
9      Q.  Did you have a sense at the time you wrote this
10 email at 4:38 on the afternoon of May 11th that you
11 were being bullied?
12         MR. PIERCE:  Object to form.
13     A.  I believe that I was unduly influenced by a lot
14 of factors.
15     Q.  (BY MR. BYRNE)  In all caps in the very last
16 paragraph you -- you capitalize the phrase "more
17 bullying."  Was that referring to bullying that you
18 felt was being directed toward you or your company?
19     A.  Yes.
20     Q.  And was that bullying that originated from
21 those in the industry who were disappointed to hear of
22 your decision to publish Jawbreakers?
23         MR. PIERCE:  Object to form.
24     A.  I believe that -- I mean, it's hard for me to
25 know exactly -- you know, I mean, we had been inundated

Page 49

1  with a lot of messages, and so -- but I suspect it was
2  for people that were in the industry or familiar with
3  the industry.
4     Q.  And from people who you understood to be
5  opposed to your decision to publish?
6           MR. PIERCE:  Object to form.
7     A.  Correct.
8     Q.  (BY MR. BYRNE)  At the very end -- well, let me
9  ask -- go back to the other question I have.  Do you
10 acknowledge that your words here suggest that you had
11 not yet finalized a decision not to proceed with
12 publication because of the various references to the
13 possibility of doing so, but with your names
14 disassociated?
15          MR. PIERCE:  Object to form.
16    A.  I don't think I had made a final decision at
17 this point in time.
18    Q.  (BY MR. BYRE)  Okay.  And at the very end you
19 say -- you make reference to losing a friend close to
20 family that -- that pissed you off.  Who is that
21 person?
22    A.  I think it was Joey.
23    Q.  It was Joey?
24    A.  Yes.
25    Q.  Okay.  Because you -- you felt that your

Page 50

1  relationship with Joey at this time was such that he
2  was close to your family?
3     A.  Correct.
4     Q.  And you were worried that if you stuck with
5  your decision to publish that that might alienate Joey?
6     A.  Among other things, yes.
7     Q.  Turn to Exhibit 7 in this deposition binder, if
8  you can.  First of all, just let me ask you to
9  generally confirm that this is a series of text
10 messages between your cellphone and that of Mr. Mark
11 Waid that took place between -- well in May of 2018.
12    A.  Okay.  I do remember this actually.
13    Q.  So is that, in fact, a series of text messages
14 between you and Mr. Waid from May of '18?
15    A.  Yes, but I am going to -- I'm going to make a
16 clarification.  I was texting and responding to a lot
17 of people and I actually am not -- I thought this was
18 somebody else when I was texting some of these
19 messages, I think.  And so I can't remember who I was
20 talking to at the time, but there was a whole bunch of
21 texts that I was responding to -- to a variety of
22 people and I don't think I was aware that this was Mark
23 Waid until later on, and -- and then on -- on these
24 series of texts when I realized it was Mark, I said
25 that I'm not commenting anymore.

Page 51

1           (Deposition Exhibit 20 marked.)
2     Q.  (BY MR. BYRNE)  Okay.  Let me hand you what
3  I've marked as Exhibit 20 to your deposition.
4     A.  Okay.
5     Q.  And just -- there's one entry highlighted that
6  I think came to us highlighted.
7     A.  Uh-huh.
8     Q.  Is that highlighted phone record from your
9  cellphone?
10    A.  Yes.
11    Q.  And is that the call to Mr. Mark Waid on
12 May 11th, 2018, that's highlighted?
13    A.  Correct.
14    Q.  And when did it say it start, 4:48 p.m.?
15    A.  4:48, correct.
16    Q.  And it ended 27 minutes later?
17    A.  Correct.
18    Q.  Okay.  So going back to Exhibit 19, you called
19 Mr. Waid back 10 minutes after sending this email to
20 Joey; correct?
21    A.  Yes, I guess so.
22    Q.  And 27 minutes after 4:48 p.m. would have been
23 what time, 5:35?
24    A.  Approximately.
25    Q.  And the very first text message you have here

Page 52

1  on Exhibit 7 is 16 minutes later; --
2     A.  Correct.
3     Q.  -- correct?  So are you telling -- are you
4  thanking Mr. Waid for talking to you that afternoon in
5  this text?
6     A.  Like I said, I don't think so actually.  I
7  think I was talking to somebody else.
8     Q.  Who -- who else did you talk to that afternoon
9  about the --
10    A.  I talked to a multitude of people -- or texted
11 a lot of people, and I think -- like one of the people
12 was Timothy Lim, who was at the time friends with or --
13 I'm guessing still with -- friends with Mr. Meyer, and
14 my brother.
15    Q.  Your -- your brother --
16    A.  Well, my brother was there so I -- I guess I
17 was talking to him at my -- at my house, but I remember
18 talking to a whole bunch of different people, texting a
19 whole bunch of people, and I may have been confused
20 about who I was texting at the time.
21    Q.  Okay.  You were at your house that afternoon?
22    A.  Correct.
23    Q.  Do you have a landline?
24    A.  I do.
25    Q.  Do you have phone records for your landline?

 **Antarctic Press | Comics And Chill**
@AntarcticPress



It's official! We're publishing JAWBREAKERS in September! It will be different than the graphic novel offered on Indiegogo. We'll have a different cover.

8:14 PM - 9 May 2018

**331** Retweets **1,096** Likes   

 163     ⟲ 331     ♡ 1.1K     ✉


EXHIBIT
8
B. Dunn
PENGAD 800-631-6989

 **Gmail**

**Diversity & Comics <diversityandcomics@gmail.com>**

## Fwd: JAWBREAKERS 2
1 message

**Timothy Lim** <ninjaink@gmail.com>            Mon, Mar 12, 2018 at 11:40 PM
To: Diversity & Comics <diversityandcomics@gmail.com>

---------- Forwarded message ----------
From: **Brian Denham** <briandenham@gmail.com>
Date: Mon, Mar 12, 2018 at 11:04 PM
Subject: Re: JAWBREAKERS 2
To: Timothy Lim <ninjaink@gmail.com>

He can email me. He said not to follow him on Twitter so I'm not sure he can send direct messages there.

Jon Malin is a good get. It should be a fun project.

On Mon, Mar 12, 2018 at 10:54 PM, Timothy Lim <ninjaink@gmail.com> wrote:
> Awesome! I'm sure he'll love hearing that. If he has any questions, can he PM you on Twitter or e-mail you?
>
> The fact that he's getting Jon Malin on it will be the big selling point. Both of them combined have a substantial
> following, plus their YouTube presence reaches at least 50,000 people.
>
> On Mon, Mar 12, 2018 at 10:22 PM, Brian Denham <briandenham@gmail.com> wrote:
>> Hi Tim,
>>
>> Great news! Antarctic is interested in publishing the Jawbreaker comic.
>>
>> Antarctic is there as a publisher to Richard in any capacity he needs us. We don't force an agenda and we are
>> welcome to all creators.
>>
>> KICKSTARTER-
>> There is concern that money would be raised for the Kickstarter project before the art is finished.
>>
>> If the art can be completed before raising money for the printing/publishing that would be preferable.
>>
>> It was suggested that the Kickstarter would probably do better in Richards hands working as an individual than from
>> us as a company, but it's something that can be discussed. We've run over 20 successful Kickstarter projects and we
>> have a small staff that can handle shipping and storage of books.
>>
>> If the money is raised first through Kickstarter we can still offer it through Diamond and generate extra sales that way.
>>
>>
>> Let me know if you guys have any more thoughts or concerns.
>>
>> Brian Denham



Virus-free. www.avast.com

On Mon, Mar 12, 2018 at 4:38 PM, Timothy Lim <ninjaink@gmail.com> wrote:
> Sounds good, thanks! I'm super stoked. Richard has his fingers crossed

On Mon, Mar 12, 2018 at 4:17 PM Brian Denham <briandenham@gmail.com> wrote:
Hi Tim. I am headed to our weekly meeting now. I will bring up the Jawbreakers Kickstarter.

I have time this week to get started on the pages I need to draw.

I'll write you after the meeting.

On Mon, Mar 12, 2018 at 10:48 AM, Timothy Lim <ninjaink@gmail.com> wrote:
Hi Brian,

Richard (D&C) and I were talking and he wanted me to prod y'all to see if you'd be interested in publishing / Kickstarting the JAWBREAKERS one-shot. Don't tell anyone but the artist that he is negotiating with is Jon Malin. They're expecting a substantial turnout for funding but wanted to approach y'all first, and he knows that I'm working with you guys.

I looked at the Black Hops pages last night and realized that you have 3, not 5, pages to do. Hope that helps take the edge off! 😁

--
Timothy Lim
Professional Illustrator
NINJAINK, LLC: Portfolio
WELOVEFINE: Licensed Work

--
Timothy Lim
Professional Illustrator
NINJAINK, LLC: Portfolio
WELOVEFINE: Licensed Work

--
Timothy Lim
Professional Illustrator
NINJAINK, LLC: Portfolio
WELOVEFINE: Licensed Work

--
Timothy Lim
Professional Illustrator
NINJAINK, LLC: Portfolio
WELOVEFINE: Licensed Work

 **Gmail**

**Diversity & Comics <diversityandcomics@gmail.com>**

## Jawbrake-ers
4 messages

---

**Brian Denham** <briandenham@gmail.com>           Wed, May 9, 2018 at 9:52 AM
To: Diversity & Comics <diversityandcomics@gmail.com>

Richard,

I just heard Comics Pro retailers were going to boycott your book, and Antarctic Press if they find out we're going to publish your book. That just shows me we're doing the right thing standing with you.

Let me know if you need anything from me today.

---

**Diversity & Comics** <diversityandcomics@gmail.com>          Wed, May 9, 2018 at 9:53 AM
To: Brian Denham <briandenham@gmail.com>

Who'd you hear that from? I just saw some furry tweeting it and it only have like 6 likes.
[Quoted text hidden]

---

**Brian Denham** <briandenham@gmail.com>           Wed, May 9, 2018 at 10:09 AM
To: Diversity & Comics <diversityandcomics@gmail.com>

I heard it from a retailer who heard it from his boss. It might have gotten blown out of proportion.
[Quoted text hidden]

---

**Diversity & Comics** <diversityandcomics@gmail.com>         Wed, May 9, 2018 at 10:36 AM
To: Brian Denham <briandenham@gmail.com>

The only evidence I see is of this

 **Ryan Higgins** @RyanHigginsRyan · 24h      ∨
I have never refused to order a comic, or stock a publisher's work.

I might tomorrow.

💬 24    ⟲ 4    ♡ 48    ✉

I wrote to the guy and asked him if he wanted to talk about it.

Richard
[Quoted text hidden]



EXHIBIT

15

J. Dunn

| Subject: | Re: Jawbreakers |
|---|---|
| From: | Antarctic Press (apcog1@gmail.com) |
| To: | jdunn@antarctic-press.com; |
| Cc: | briandenham@gmail.com; alcperez@live.com; twilightxmail@yahoo.com; davidjhutchison@yahoo.com; |
| Date: | Friday, May 11, 2018 12:25 PM |

Just got a call from Mark Waid, of all people, looking to warn us of just how badly our association with Rich Meyer might be for us. He stressed he wasn't trying to dictate what we can or can't publish, but he felt we might be entering into this agreement without full awareness of what Rich is like. He mentioned targeted death threats, among other things. I claimed ignorance and said I'd pass along his message and his phone number to Joe Dunn, and thanked him for his concern.

Doug

On Thu, May 10, 2018 at 10:02 PM, Antarctic Press <apcog1@gmail.com> wrote:
I still plan to ignore the two initial complaints I've received. I'll give them that response if they write me again. (The second one seemed to come from Richard himself, though.)

Doug

On Thu, May 10, 2018 at 9:48 PM, Joeming Dunn <jdunn@antarctic-press.com> wrote:
I have decided on radio silence on Jawbreakers...essentially ignore any inquiry or email or discussion with any one...if you get a question, tweet, facebook post or call about it just say...we publish lots of books and I don't have any info on the book at this time if you have any questions about the book the creator told us you can contact him and he will answer your questions...do not engage any interview or request for questions or any inquiry...if they are not satisfied with that answer be apologetic and tell them any questions will be happily answered by the creator of the book since we cannot talk in his place. We cannot divulge his info but he can found on facebook, twitter etc...

Brian if you tweet anything...just be tweet about other books, no mention of Jawbreakers....check out these books coming out in "whenever"...you have been doing a good job on humor and deflection on twitter so keep that up...deflect any response...and be self effacing....if someone ask about Jawbreakers...give the aww shucks sorry I do not know the answer to that question...hey...you should ask the creator.

If someone emails you Doug....you can respond...thanks we appreciate your email...we are aware of your concerns about "whatever"...it may be best to contact the creator about those "statements" so that he can clarify or explain that statement to you since we cannot talk for him. You can reach him via twitter or facebook since we cannot divulge his personal information.

EXHIBIT
18
J. Dunn

**From:** Brian Denham <briandenham@gmail.com>
**To:** Joey <Mzajza@aol.com>
**Cc:** Antarctic Press <apcog1@gmail.com>; Joeming Dunn <jdunn@antarctic-press.com>
**Sent:** Thursday, May 10, 2018 9:19 PM
**Subject:** Re: Jawbreakers

I didn't know about that stuff. I looked it up online.

He did call Heather a cum dumpster in a private video for certain elite tier fans of his channel. One of them released the private video to the public. He later publicly apologized.

Richard has called people "pedophiles", or "they look like pedophiles" before. He has said those things about Mark Waid and Dan Slott.

I can't find that line about Mags- the "DC Transgendered writer" being a fucking crazy person... etc.", but it might be in one of his videos.

Him and Mags have apologized to each other, and then they started up again when a comic writer called out Richard for having a dishonorable discharge and Mags supported that creator.


On Thu, May 10, 2018 at 7:49 PM, Joey <Mzajza@aol.com> wrote:
  Brian, are any of the statements attributed to Richard below true?


  On May 10, 2018, at 2:23 PM, Antarctic Press <apcog1@gmail.com> wrote:

    Okay, but none of that tells explains what these retailers have against Jawbreaker. However, this email I just received might:

    On Thu, May 10, 2018 at 1:19 AM, Meyers Richard <cmxanddiversity@gmail.com> wrote:
      Just saw the news that you're publishing Richard C. Meyer's JAWBREAKERS.

      Your newest writer has publicly refereed to a female Marvel editor as a "cum dumpster," who sucked her way to the top, called an online reporter a "fucking fag," and suggested writers Brian Bendis, Dan Slott and Mark Waid were pedophiles.

      He also referred to a trangendered DC writer as, "...a fucking crazy person, a criminal, who is definitely, definitely going to kill himself and it's just where when and how."

      Good to know where your standards lie, guys, and that you don't mind being associated with such a class act, because you're now tied together at the hip.

      Hope it's worth it.


    Certainly none of that appears flattering, but neither does it prove how much of that it is true or explain why any of it might have happened.

    Also, I'm not sure if the fact that it came from a Richard Meyers and is about a Richard Meyers is due to odd coincidence or a name spoof or what.

    Doug

    On Wed, May 9, 2018 at 9:47 PM, Brian Denham <briandenham@gmail.com> wrote:

The retailers have a group on Facebook.

Some of the retailers have heard Jawbreaker would be not only a fundraised Indiegogo, but it would be offered in stores.

So this happened...
<image.png>

Another retailer posted on Twitter yesterday that if he finds out the publisher of Jawbreakers he will have to consider a boycott.

Richard reached out to one of the retailers to inform him of what's going on. He promised to not rat them out. So that retailer informed Richard. Richard posted on Youtube that retailers are colluding with each other to boycott the unannounced publisher. So the retailers have been trying to figure out it's us.

It's all happening earlier today and some of it is going on right now.

On Wed, May 9, 2018 at 9:42 PM, Antarctic Press <apcog1@gmail.com> wrote:
Well, I guess that's good to know.  How did these complaints that led to a boycott even get started?  Was it anything of substance, or something blown out of proportion, or nothing at all?

Doug

On Wed, May 9, 2018 at 9:38 PM, Brian Denham <briandenham@gmail.com> wrote:
There will be a lot more. Ignore them.

A few of retailers got together in a secret Facebook group to boycott whatever publisher picked up Jawbreakers.

Richard (Diversity and comics) will announce tonight on Youtube who the publisher will be. Some have speculated it's us. That's why you may have gotten this letter early.

There will be a lot more this week, but they probably don't order form us anyway.

There are a lot more fans supporting us. Don't worry about these retailers. The customers will order form retailers who support them.

These boycott retailers are saying they won't support any of our books if we carry Jawbreakers.

But the fans are hearing this and they will boycott the stores and order it directly from us, or from other retailers who support their choices.

We've already one up by a lot of fans on Twitter. Fans are going to start buying stuff off the site so you may see a small uptick in online sales.

On Wed, May 9, 2018 at 8:18 PM, Antarctic Press <apcog1@gmail.com>
wrote:
Well, this is interesting.  Any thoughts on a response?

Doug

---------- Forwarded message ----------
From: **Megan Kilar** <megankilar@gmail.com>
Date: Wed, May 9, 2018 at 8:05 PM
Subject: Jawbreakers
To: apcog1@gmail.com


Based on the harassment online by Diversity and Comics, I have decided to
boycott your company if you choose to publish Jawbreakers.

I am responsible for the Diamond order ar my retail location and we will no
lonfer be ordering from a company that supports online harassment and
threats.

Regards,

Megan M Kilar

| | |
|---|---|
| **Subject:** | Re: It Appear AP is moving |
| **From:** | Joeming Dunn (jdunn@antarctic-press.com) |
| **To:** | Mzajza@aol.com; |
| **Date:** | Friday, May 11, 2018 4:38 PM |



As you are all well aware we are in the Kobayashi Maru of comic books, a no win situation.  As you are all aware we have agreed to publish Jawbreakers which is authored by a very controversial figure. This has created a passionate response on both sides of this unfortunate equation in the comic book community. This essentially put us in a **"NO WIN" situation**. We could not release this book even though we are contractually obligated to do so and succumb to social media pressure (which feels a bit like we are being bullied to not release the book) or we could publish the book and continue to get the wrath we have undergone these past days from a multitude of sources. So we are stuck in between a rock and a hard place.

As you all know we have taken a "silence" line in regards to this situation. There are two reasons for my decision to do this. One is that as with any viral controversies on the internet, they tend to be put to the side after a couple of days, especially over the weekend.  Second that gives us time to meet on Monday to make a decision on this situation. My most important concern is to protect everyone at Antarctic Press and I hope to make a decision about our direction on Monday.  But in the meantime I am going to rant…not at each of you personally but to everyone who has put us in this situation. On Monday we are going to vote on this situation and in lieu of that impending vote I want everyone to be aware of the rant I will most likely give. No matter the decision I will take the heat for the decision so there will be nobody getting thrown under a bus and nobody will point fingers. I can take the heat and I will take the brunt of the criticism.

Now originally I was going to list the pros and cons of our decision but I realized that this is not just a pros and cons thing.  This has become a personal issue in many regards with no black and white answers.  But we can go over the basic facts. In its purest form this is a decision on whether we as a company can separate the "ART" from the "ARTIST."  Do we hold accountable the fact that this person has said many mean spirited and controversial statements which goes beyond then normal "opinions". It is where we are going to draw the line. Do we draw the line at Rod saying many insulting condescending thing about conservatives and their policies? Or is it Ben saying some things about liberals? Are those "tolerable" lines and opinions we can accept since we know them both. We have never "vette" a creator but we all know bias goes with any decision we make. If we meet a creator we don't like I am sure in the back of your mind you would say that I would never give that creator a chance to publish their work even though we are supposed to be unbiased. If anyone had a personal grudge with someone, I would certainly take that into account if especially if we decided to consider their work. That is vastly unfair but I know that life is unfair.  Are we drawing a line at this creator for his severely offensive rhetoric? He did not commit a crime but he expressed an offensive opinion. I will accept any line that you all vote for but my rant to everyone else in the industry…WHERE DO YOU DRAW THAT FUCKING LINE? And where is the line drawn on these type of issues...if a creator has 10 offensive tweets 5 years ago does that preclude them from being published now...or is the line 15 tweets...or 20...or is just 2...or even 1 tweet from last year....where is the proverbial line for any creator?  What if we want to publish someone who is Islamic or an anti-abortionist or a socialist or have a certain sexual orientation? Are we precluded from publishing them since they may have a statement or opinion that you do not agree with? Are we now restricted from publishing someone who may be an ultra douche bag? We are an ALL-INCLUSIVE publisher for the very we believe in ALL INCLUSIVITY. Have we gotten to the point where when someone from the certain religion does something bad we blame the whole religion,. When a cop does something bad, we accuse all the cops of being bad. When one person of color commits a crime, we condemn the entire race. When one politician or media member lies we think all the politicians and media members lie. So now that we publish a book that people do not agree with because of the creator of the book (for whatever reason) people are making judgments on our entire publication line? FUCK THEM.

I will admit that to a certain aspect this was a financial decision for me…I knew that he was a popular online figure I just did not realize he was that polarizing. As everyone knows we are running on fumes. Over the past two years I have had to put close to $70,000 of my own money to keep Antarctic Press afloat. To make sure bills are paid on time, to keep the lights and phone on…to keep the printers going. I know currently this is not just a financial decision and prior to this shit storm I looked at it as a purely financial decision and I thought we could handle it (using My Hero as a measure). I was extremely happy that My Hero saved our ass these past weeks… his online sales for has been remarkable and a godsend despite the flack we received (which is tame compared to what we have been getting with Richard). What Jawbreaker did on Indigogo did put some dollar signs in my eyes. Could I finally get some sustainability for Antarctic Press without me having to contribute constantly? Could he bring the fans to us as My Hero did? Now again my rant again not to you but to everyone else….I know this is not going to be a purely financial decision but I know that he could help us financially as I know his fans are passionate and supporting. But it bothers the fuck out of me that we are getting these industry professionals and pundits telling us how we should run our business even as an ALL-INCLUSIVE supporter of creator's rights. I will stand by our record of inclusion for any sex, race, religion, social standing and sexual orientation and any other fucking thing you can think of…but in this case that is completely irrelevant now. But how many of these people really support Antarctic Press? Does Rich Johnston only write about Antarctic Press when there is some sort of controversy? Would any of these "industry" supporters really support us if we called for help? If I asked Lea Hernandez to do some art for us or Mark Waid to write us a story to help us out do you think she or he would do it for free? How many of these people on the internet telling us what to do actually bought and Antarctic Press book both fans and retailers…How many copies of the 300 sales on Rochelle or the 600 sales on Adventure Finders did they buy or even worse the 1400 copies of Gold Digger? While Richard may be the most offensive fuck in the whole world he came to us with fans and financial support where no other professional did so. Even though I do not agree with Tim's political opinions when I talked to him all he wanted to do is make sure Antarctic Press was viable and financially supported and he followed up with his fans coming to us and buying his book. And for all the posers who are telling our ALL INCLUSIVE Company what to do and how to do it and never buy an Antarctic Press book…FUCK YOU!

All you do work for AP way beyond the call of duty and I will have your back. Even if we decide to publish his book I will most likely remove any of our names from anywhere in the book. Antarctic Press will still be the publisher and we will not hide that fact but IF we publish the book we can remove our personal association with it…which gets me to not to the credo of the company (Creator rights) or the financial aspect but the moral aspect. Not the moral aspect of agreeing or disagreeing with Richard but now another fucking rant…I do not give a flying fuck if you agree or disagree with Richard. But we now have to make a decision on a book based on GUILT BY ASSOCIATION. It does not matter that we are ALL INCLUSIVE CREATOR'S RIGHTS Company….but now I have to deal with the repercussions of this guilt. Richard made some very offensive inflammatory comments about many people in the industry and now because of that could that come back to harm some of you individually. You would hope any personal attack on someone by Richard would not translate into because we published him we must be like him…but I fucking know life is fucking unfair…GUILT BY ASSOCIATION. People are now taking us to task on Jawbreakers now they may take it out on the innocent people (us) just because of fucking GUILT BY ASSOCIATION. AND THOSE FUCKING PEOPLE DO NOT SEES THE FUCKING DOUBLE STANDARD IRONY of those types of actions. Richard's actions are bullying but the reaction to this is MORE BULLYING by people who are against Richard…fucking double standard irony. If I don't like a person or a product I DON'T FUCKING buy it. If I don't like a politician…I DON'T VOTE FOR THEM. But to give us threats of boycotts etc…just because of our ASSOCIATION with Richard… Christ that is so fucking unfair (and I know life is unfair) but that makes them as bad as Richard's actions and what makes it worse is THEY DON'T SEE IT. It is justified in their minds to "make a point." This does not absolve Richard…I think he is an ass online and I think he knows he is an ass online and I would tell him that and he would agree with me. It's because of that I may lose a friend (close to family) to his fucking action and that ROYALLY PISSES ME OFF.

From: Joey <Mzajza@aol.com>
To: Joeming Dunn <jdunn@antarctic-press.com>

**Sent:** Friday, May 11, 2018 2:57 PM
**Subject:** Re: It Appear AP is moving

I'm honestly not sure you understand what you're getting into, I was at the comicbook store and even Bob said so and he said,"if Joe thinks this is gonna blow over, it isn't." I thought about it long and hard, I haven't been able to sleep or work and that's because it boils down to this: I'm not comfortable being associated with this guy, it's not his work, and it's not his beliefs, it's his conduct. And, if it were any of the other guys at AP that conducted themselves similarly I would divest AP of them as well. There are standards of civil and professional conduct I believe in. This guy obviously has issues. I've told Doug to take my name of the books immediately and I'm also worried about how this may affect other AP creators and San Diego and the booth. Please be careful.