## Page 1

```
IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF TEXAS
              AUSTIN DIVISION

RICHARD MEYER,         *
     Plaintiff,        *
                       *
VS.                    *  CIVIL ACTION NO.
                       *  1:18-CV-00800-LY
MARK WAID,             *
     Defendant.        *  (Jury Demanded)



           VIDEOTAPED ORAL DEPOSITION

                       OF

                    BEN DUNN

                 MARCH 6, 2019



     VIDEOTAPED ORAL DEPOSITION of BEN DUNN,
produced as a witness on behalf of Plaintiff and duly
sworn, was taken in the above-styled and numbered cause
on March 6, 2019, between the hours of 9:58 a.m. and
11:02 a.m. before Shan Morris Blanchard, Certified
Shorthand Reporter in and for the State of Texas,
reported by computerized stenotype machine at the
offices of Langley & Banack, Inc., 745 E. Mulberry,
Suite 700, San Antonio, Texas 78212 pursuant to Federal
Rules and the provisions stated on the record or
attached hereto.
```

## Page 2

```
            A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Daniel H. Byrne
    Fritz, Byrne, Head & Gilstrap, PLLC
    221 W. 6th Street, Suite 960
    Austin, Texas 78701
    Telephone: 512-476-2020
    Fax: 512-477-5264
    Email: dbyrne@fbhg.law

FOR THE DEFENDANT:
    Mr. Ryan Pierce
    Reeves & Brightwell, LLP
    221 West Sixth Street, Suite 1000
    Austin, Texas 78701
    Telephone: 512-334-4500
    Fax: 512-334-4492
    Email: rpierce@reevesbrightwell.com

FOR THE WITNESS:
    Mr. Otto S. Good
    Langley & Banack, Inc.
    745 E. Mulberry, Suite 900
    San Antonio, Texas 78212
    Telephone: 210-736-6600
    Fax: 210-735-6889
    Email: ogood@langleybanack.com

WITNESS:
    Ben Dunn

CERTIFIED SHORTHAND REPORTER:
    Shan Morris Blanchard

VIDEOGRAPHER:
    Lawrence Delgado
```

## Page 3

```
APPEARANCES CONTINUED:
ALSO PRESENT:
    Richard Meyer
    Mark Waid (via telephone)
    Mark Zaid (via telephone)
```

## Page 4

```
                    INDEX
                                        PAGE
Stipulations                              1
Appearances                               2
BEN DUNN
EXAMINATION BY:
    MR. BYRNE                             5
    MR. PIERCE                           32

Reporter's Certificate                   43


                  EXHIBITS
NO.    DESCRIPTION                      PAGE

Ex. 8   Screen shot of Twitter announcement      15
Ex. 9   Text message string between Ben Dun      25
        and UmbrellaGuy dated June 8 through
        June 12
Ex.     Article entitled, "No Enemy But Peace    34
10      - Richard Meyer, Antarctic Press, and
        Jawbreakers"


            TIME USED BY ATTORNEYS
ATTORNEY                    TIME USED
Mr. Daniel H. Byrne       0 hours 43 minutes
Mr. Ryan Pierce           0 hours 16 minutes
Mr. Otto S. Good          0 hours  0 minutes
```

Page 5

1    (The reading of introductions into the
2 record according to Rule 30(b)(5)(A) was waived by all
3 parties present.)
4         THE VIDEOGRAPHER: And we're on the
5 record on March the 6th, 2019, at 9:58 a.m.
6         BEN DUNN, the witness, being duly cautioned
7 and sworn to tell the truth, the whole truth and
8 nothing but the truth, testified as follows:
9         (Time: 9:58 a.m.)
10                EXAMINATION
11 BY MR. BYRNE:
12   Q.  Would you state your name for the record,
13 please?
14   A.  Ben Dunn.
15         MR. PIERCE: Dan, do you want to cover
16 the preliminary things we talked about?
17         MR. BYRNE: Sure. Go ahead.
18         MR. PIERCE: Plaintiff's counsel and
19 defendant's counsel have agreed that objection to form
20 will be sufficient to preserve objections relating to
21 form-related objections and that the parties will --
22 will have any -- will have a running objection to
23 questions that go beyond the Court's order regarding
24 jurisdictional discovery.
25         MR. BYRNE: And scope just generally,

Page 6

1 yes. Okay. Those are agreed.
12   A.  Yes, sir.
13   Q.  How long have you lived there?
14   A.  I've lived there since February of the year
15 before, 2017.
16   Q.  Okay. What is your connection to Antarctic
17 Press?
18   A.  I was the founder of the company. I currently
19 freelance with the company and I'm the brother of the
20 owner.
21   Q.  Okay. What -- tell me about the founding of
22 Antarctic Press. When -- when was it founded?
23   A.  It was founded in 1985 sometime. I think it
24 was in the fall. I'm not quite sure, and we started
25 our -- we started sunsetting our first book in that

Page 7

1 year which was Mangazine Number 1, M-a-n-g-a-z-i-n-e.
2   Q.  Mangazine Number 1 --
3   A.  Yes, sir.
4   Q.  -- was your first book?
5   A.  Yep.
6   Q.  Okay. Have you ever been deposed before?
7   A.  What does that mean exactly?
8   Q.  Have you ever been in a situation like this
9 where you have a lawyer answer -- asking you questions
10 under oath?
11   A.  Yes.
12   Q.  How many times?
13   A.  Once.
14   Q.  Okay. Well, you understand this -- that you're
15 obligated to tell the truth the same as you would as if
16 you're live in court in front of a judge?
17   A.  Yes, sir.
18   Q.  And the only trick, I guess, I'd say is I have
19 a tendency to slow down toward the end of my questions
20 before I finish them so --
21   A.  Sure.
22   Q.  -- try not the jump in and the court reporter
23 will have an easier job.
24   A.  Yes, sir.
25   Q.  So you've been in the comics industry for --

Page 8

1 I'm going to do the math here -- 35 years or so?
2   A.  Yes, sir.
3   Q.  And where -- when you founded Antarctic Press
4 was your brother all -- always involved?
5   A.  No.
6   Q.  When did -- when did your -- and what's your
7 brother's name?
8   A.  Joeming Dunn.
9   Q.  Okay. Does he go by "Joe" sometimes?
10   A.  Yes, that's his shortened name.
11   Q.  His nickname?
12   A.  Uh-huh, yes, sir.
13   Q.  And when did -- when did Joe become involved
14 with Antarctic Press?
15   A.  Oh, he became involved in 1989.
16   Q.  And prior to that, did you own the company?
17   A.  Yes.
18   Q.  And did you sell it to your brother in 1989?
19   A.  No, he was my financial advisor. He helped run
20 the company by doing various things and just generally
21 mostly moral support and advisor.
22   Q.  Okay. How long did you maintain ownership in
23 the company?
24   A.  Until about 2001.
25   Q.  Were you the sole owner until 2001?

Page 17

1  A. -- yes. It was a coincidence.
2  Q. Were you privy to any communications once this
3  announcement was made that were angry or threatening
4  toward Antarctic Press?
5  A. No, I was not --
6      MR. PIERCE: Objection, form.
7      THE WITNESS: Oh, I'm sorry.
8      MR. PIERCE: It's okay. No, you can
9  answer.
10  A. No, I was not privy to any communications. My
11  brother would not show me anything.
12  Q. (BY MR. BYRNE) Okay. Prior to the phone call
13  in question, which we'll get to in a minute, what
14  kind -- what -- what you do remember about
15  conversations you had with your brother or with other
16  people at Antarctic Press about the decision to
17  publish Jawbreakers?
18  A. All right. Well, prior to the phone call,
19  we -- he started getting emails and posts when -- once
20  the announcement was made that seemed very hostile
21  toward the announcement. And someone had either
22  forwarded to him or told him that there was a -- either
23  a Facebook post of a bunch of retailers who were
24  deciding they weren't going to carry the book because
25  of their animosity toward the creator of -- of

Page 18

1  Jawbreakers. So at first, we did not take this
2  seriously because it didn't occur to us that this was
3  something would -- needed to be taken, you know,
4  seriously, and because we -- in the 30 years we've been
5  in business, we've never encountered anything of this
6  magnitude before.
7  Q. Was the -- was there any discussion that you
8  had with your brother or the other Antarctic Press
9  folks about whether this would be a good thing for the
10  company?
11  A. Well --
12      MR. PIERCE: Object, form.
13  Q. (BY MR. BYRNE) Let me -- let me rephrase.
14  A. Okay.
15  Q. Is -- was there any discussion that you had
16  your brother or others at Antarctic Press about whether
17  the publication of Jawbreakers would be a good thing
18  for the company?
19      MR. PIERCE: Object, form.
20  A. I was aware of the Kickstarter -- I mean, not
21  the Kickstarter -- I -- Indiegogo campaign, and I was
22  following it so I knew it was doing quite well. So I,
23  in my mind, translated that it would do very well for
24  AP as well. You know, and Joe, you know, thought the
25  same thing. But once he started getting hostile

Page 19

1  retaliation, you know, since the announcement, he began
2  to tell me that he had never experienced such vitriol
3  before, you know, on any book that -- I mean, we've
4  done controversial books in the past and we've had our
5  share of detractors, but this was nothing we'd ever --
6  or at least I've never experienced before. So I can
7  only say what my brother must have experienced since he
8  didn't want to show me the things he's been -- was
9  getting, but he told me he was not -- was -- it was
10  not what you -- nice. It was not very nice.
11  Q. (BY MR. BYRNE) All right. And on -- on May
12  11th of 2018 there was -- were you -- which is the day
13  of the phone call.
14  A. Yes.
15  Q. Were you in the Antarctic Press offices?
16  A. No, we were at my brother's residence.
17  Q. Okay. And were you there with your brother?
18  A. I was there with my brother but not in the same
19  room as the phone call.
20  Q. Okay.
21  A. I was in the next room.
22  Q. Okay. Were you there when the phone call came
23  in?
24  A. I was there when the phone call came in.
25  Q. And was the phone call -- well, let me ask you

Page 20

1  this. Was -- was the phone call -- do you remember the
2  sequence of events -- let me withdraw that question.
3  Do you remember the sequence of events leading up to
4  the phone call? For example, do you remember whether
5  there was a call made to the Antarctic Press offices or
6  whether -- who -- who initiated this communication is
7  what I'm trying to find out.
8  A. I'm not aware of any prior communication. I do
9  know that I was in the -- my brother's residence in the
10  main living room when he got a phone call on his -- I
11  believe it was his cellphone, and he said he had to
12  take it because it was from Mark Waid and --
13  Q. Do you know whether he dialed out to return a
14  message from Mr. Waid or whether the -- the -- the call
15  was incoming?
16  A. I -- I don't know. I -- I believe he got it
17  and he said he had to take it, so he went to another
18  room and he closed the door, and either he continued
19  the phone call on his cellphone or he transferred to
20  a -- a -- I'm not sure.
21  Q. Prior -- prior to that phone call, whether it
22  was initiated -- whoever it was initiated by?
23  A. Uh-huh.
24  Q. Was the -- was it -- what was your
25  understanding as to whether Antarctic Press was still

Page 21

1 planning to publish Jawbreakers at that time?
2          MR. PIERCE:  Form.
3     A.  Yeah, as far as I knew it was -- I'm sorry --
4 as far as I knew, nothing had changed, even up to that
5 phone call.  There was no reason for me to believe
6 otherwise.
7     Q.  (BY MR. BYRNE)  Okay.  So you -- you were not
8 privy to either side of the conversation that took
9 place between your brother and Mr. Waid; correct?
10    A.  No, but had I known, I probably would have
11 ingratiated myself, but I thought it was just another
12 business call.
13    Q.  Okay.  Did you hear any muffled sounds or any
14 tone of the conversation that was taking place in the
15 other room?
16    A.  No, I didn't hear anything.
17    Q.  Okay.  And what -- what happened next after the
18 call was --
19    A.  After the call was over, I could tell my
20 brother was not -- was not -- was visibly upset.  I
21 wouldn't say he was shaking or anything, but I could
22 tell that whatever transpired was not something
23 positive because otherwise he would have told me
24 immediately what the phone call was about and what it
25 pertained to, but he didn't say anything about the

Page 22

1 phone call to me at all.
2     Q.  So that -- that evening he didn't share
3 anything about the phone call?
4     A.  Well, later on -- no, he didn't share anything
5 about the phone call immediately afterwards.  Okay.
6 And then later, maybe an hour or two, he said he may --
7 he had to re -- maybe had to reconsider publishing the
8 book and -- Jawbreakers.  And I asked him, "Well, why?
9 You know, why would you want to do that?"  He says,
10 "Well, I" -- I believe he told me that he could not
11 bear the -- the overwhelming negative responses he was
12 getting at that time, and I -- I -- I basically just
13 told him, you know, "You -- you're the -- you're the
14 boss of the company.  You have to make that decision.
15 You know, I -- I'm against it, but you have to make
16 that final choice because it's your company."
17    Q.  Okay.  And did you have any more conversations
18 that day about his decision?
19    A.  No, he refused to talk about it, so I didn't
20 bring it up.
21    Q.  Okay.  And do you recall when the decision was
22 announced about not following through on publication?
23    A.  Um, he -- I had learned of the -- of the
24 announcement the same as everybody else on the day that
25 AP made the official announcement that they had to

Page 23

1 cancel the -- cancel the book.
2     Q.  And do you know whether it was that same day or
3 another day?
4     A.  I believe it was the next.  It was either later
5 that day or the next day.  I -- I can't recollect
6 exactly the time.
7     Q.  Okay.  I'm just going to ask you to glance
8 quickly through Exhibit 7 to the depositions in this
9 case?
10         MR. PIERCE:  Do you have an extra copy?
11         MR. BYRNE:  Yeah, I do.
12         MR. PIERCE:  My apologies.
13    Q.  (BY MR. BYRNE)  And -- and I'll just give you
14 this -- I -- I might -- I -- I really want you to
15 confirm that even though that has "Ben" at the top,
16 that -- that this is not -- whether this is a
17 conversation with you or with your brother, a text
18 conversation.
19    A.  Uh-huh.
20         MR. PIERCE:  Dan, I think I have a copy.
21    A.  I -- I don't remember this, but I -- it's
22 possible I did this.
23         MR. BYRNE:  Here it is.
24         MR. PIERCE:  Thank you very much.
25    A.  Okay.  What did -- what did you need to know

Page 24

1 about that one?
2     Q.  (BY MR. BYRNE)  Well, I'll -- I'll just say
3 this.  Does this look familiar to you?
4     A.  It does somewhat, yes.
5     Q.  Does your wife's family have a family reunion
6 in Temple on Memorial Day in 2018?
7     A.  Yes.
8     Q.  That's your wife?
9     A.  Not my wife.  My brother's wife.
10    Q.  Okay.  And you didn't have any conversations
11 with Mark Waid on May 11th?
12    A.  No, did not have any conversation with him.
13    Q.  After the decision was announced by Antarctic
14 Press to discontinue the publication of Jawbreakers,
15 what's the next substantive interaction you recall
16 having with your brother or anybody else at Atlantic
17 Press concerning Jawbreakers or the Jawbreakers
18 decision?
19    A.  Not much really.  We -- I -- I told him I would
20 support whatever decision he would make, of course, you
21 know, he's my brother.  So I wanted to make sure that
22 he -- I had his back, you know, as far as whatever
23 decision he made.  I -- you know, I -- I didn't want
24 him to think that his decision was an error in any way,
25 because, you know, he knew the consequences of it, and

 

 HOME   COMICS   FILM   TV   GAMES  COLLECTIBLES

POP CULTURE

☰ MENU

    

Search …

Home » BC Network » Recent Updates » No Enemy But Peace – Richard Meyer, Antarctic Press, and Jawbreakers

# No Enemy But Peace – Richard Meyer, Antarctic Press, and Jawbreakers

Posted by Rich Johnston May 13, 2018 1710 Comments

 

758                    26

We first covered one of **Richard Meyer's** Kickstarter projects back in 2012 on Bleeding Cool when he was a writer and artist struggling to work professionally in the comics industry. The project, called *No Enemy But Peace* seemed to go well enough, raising almost $4000 from over a hundred people.

==Meyer's latest crowdfunded comic project was on IndieGoGo. *Jawbreakers*, is a military superhero comic to be drawn by well-known comic book artist **Jon Malin,** with covers==





FACTS: Mark Waid put a call in to our office. Staff took a message and told Mr. Waid our publisher would be informed. Nobody at AP contacted @CBCebulski or @Marvel nor felt threatened in any way by Mr. Waid's call. We have not been bullied into a decision by any comics pro.

10:58 PM - 12 May 2018

107 Retweets  275 Likes

301   107   275

As for the allegations of intimidation, threats, and coercion, I asked Waid what happened. He told me:

*When I heard that fans and creators were coming down on the AP publisher for doing business with Meyer, I gave him a call. I'd met him before. He seemed like a good guy, and something didn't jibe; I was surprised that he'd want to get in bed with someone whose idea of marketing was to ask his fans to put together a list of stores that chose not to carry his book and to then circulate that list along with the full names, first and last, of the stores' employees and their phone numbers for ease of targeting and harassment. (No store "owes" it to customers to carry every comic. No store carries every comic. Stores pick and choose what they wish to sell based on what they think their customers will support and, to some degree, on their own personal feelings about the subject matter, the publisher's track record, and other factors—including, sometimes, whether or not they want to put money into the pocket of a*

*creator or creators who publicly refer to women in comics as "cumbuckets" or transgender creators as "men in wigs.") Don't be fooled, by the way–making that list wasn't about selling comics or helping or healing the industry–for that, like Mark Millar does, you'd be supportive and circulate a list of stores that DO carry your books. This was flat-out about punishing and harassing and intimidating the stores who didn't carry his book. "Nice store y'got here. Be a shame if there was allasudden a buncha one-star reviews on Yelp and Google…" C'mon. Why else would you make sure a list existed and was circulated that carried the personal information of not the owners but their employees? Would it be cool with you if, because I didn't like the way your boss does business, I phoned you directly to complain rather than him? Of course not.*

*So. I called the publisher, who I knew to be a good guy, because I suspected there was more to this than "Yes, sign us up to make money for the transphobe," and there was. He's a busy man who has a full-time day job as well as a publishing house, and he's not much for social media, so it never occurred to him to vet the creators. Why would it? That's an honest mistake to make–as a publisher myself, if I see work I like and want to publish, it doesn't automatically occur to me to just, by the way, make sure the creator is a decent human being (but apparently it ought to–lesson learned).  I phoned him out of legitimate concern to warn him that there seemed to be a lot of anger directed at him by fans unhappy that he'd so openly embrace someone whose entire reputation was based on harassment and preaching intolerance and bigotry. Not "warn" him like "Hey, if you know what's good for you, I'm just sayin'…" — warn him, as someone who has respect for him, that he may not realize who he'd gotten in bed with.*

*As it turns out, he was way ahead of me on this. It's not my place to speak for him, but he was appalled that stores–the stores he makes his living selling to–were getting harassed. He'd learned an awful lot about his new*

> partner in the previous 24 hours. He and I had a good, productive conversation, listening to one another, disagreeing on some philosophical points but agreeing on others. Again, by his request, I'm not really at liberty to go into detail about the conversation other than to make clear that (a) he'd pretty much come to his conclusions about what to do long before he and I talked, and (b) he'll back me up when I report that at no time did I ask him not to publish the book or ask him not to affiliate with its creators. (I don't have any more right to bully someone into not publishing a comic than they have the right to bully my publishers.) My purpose in calling was to discuss, as we did, the potential fallout and how to navigate it. I offered to, once the dust settles, conduct an interview with him for publication where we can talk about the choices he's made here and the thinking behind them–they're pretty interesting, particularly when it comes to the difficulty in separating the artist from the art, and I think it'd be terrifically informative.
>
> From my point of view, I think the publisher clearly had no idea what kind of a man he was helping to enrich, and I'm genuinely impressed that, now knowing what he knows, he's taken a stand even though he's in a no-win situation where he can piss off either his longtime customers and creators or a small but loud lynch mob that embraces doxxing and harassment as a marketing strategy

In the light of the cancellation, Richard posted:



**Diversity & Comics**
@DiversityAndCmx

Follow

Please don't send any negative messages or energy toward @AntarcticPress

They did what they had to do after enduring a vicious wave of bullying from SJW Comic Book Pros that was led by Mark Waid.



JAWBREAKERS- LOST SOULS graphic novel
A team of ex-superheroes attempt to save a monster from a vicious warlord who wants to exploit it!
indiegogo.com

6:08 AM - 12 May 2018

116 Retweets 468 Likes 

But it didn't seem to work. As to the targeted stores, I asked **John Hendrick** of Big Bang Comics in Dublin, whose store first tweeted out that they wouldn't be carrying the comic, while letting any customers discover other stores that might.



**Big Bang Comics**
@TheBigBang_

We are choosing not to stock the upcoming @AntarcticPress comic JAWBREAKERS

Please check comicshoplocator.com/Home/1/1/57/575 for an alternate local retailer.

2:45 PM - May 10, 2018

There's A Lot to See and Do at Your Local Comi...
comicshoplocator.com