IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RICHARD MEYER, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No. 1:18-cv-00800-LY |
| | § | |
| MARK WAID, | § | |
| Defendant | § | |

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO DISMISS FOR LACK OF JURISDICTION

Defendant Mark Waid ("Waid") files this Reply to Plaintiff's Response to the Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. #23) (the "Response").  Jurisdictional discovery has only confirmed the Court lacks personal jurisdiction over Waid.  Among other things, Plaintiff, who publicly advertised he was in New York, neither shows nor even pleads Waid knew that Plaintiff resided in Texas, thus conclusively defeating jurisdiction as to both claims.  Additionally, even this limited discovery revealed the substantive emptiness of Plaintiff's accusations.

## I. The Court Lacks Personal Jurisdiction Over Waid.

If Plaintiff persists in pursuing this meritless lawsuit, it cannot be in Texas.  Plaintiff told the Court "jurisdictional discovery is necessary to defend against the Motion to Dismiss for Lack of Personal Jurisdiction."  Dkt. #16.  That discovery only further showed the absence of jurisdiction as to each of Plaintiff's claims.  *See Trois v. Apple Tree Auction Ctr*, 882 F.3d 485, 489 (5th Cir. 2018) ("specific personal jurisdiction is a claim-specific inquiry" (citation omitted)).

### A. Plaintiff failed to establish personal jurisdiction as to the tortious-interference claim.

Plaintiff does not dispute that Waid had no knowledge that Plaintiff lived in Texas.  *See* Dkt. #10-1, Waid Decl. ¶ 9.  In fact, Plaintiff does not dispute that Plaintiff himself publicly identified his location as New York.  *Id.* ¶ 8.  Tellingly, Plaintiff does not even discuss this issue.

As the Fifth Circuit has held, "[k]nowledge of the particular forum in which a potential plaintiff will bear the brunt of the harm forms an essential part of the *Calder* [specific-jurisdiction] test." *Revell v. Lidov*, 317 F.3d 467, 475 (5th Cir. 2002); *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 427 (5th Cir. 2005); *see also Revell*, 317 F.3d at 475 & n.63 ("'[T]he plaintiff must show that the defendant *knew* that the plaintiff would suffer the brunt of the harm caused by the tortious conduct *in the forum*….'" (quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 266 (3d Cir. 1999) (emphasis in original)); *id.* (observing plaintiff must show "'the defendant is alleged to

have engaged in wrongful conduct targeted at a plaintiff whom the defendant *knows to be a resident of the forum state*'" (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (emphasis in original)).  This requirement is necessitated by the basic requirement that a defendant "*purposefully* avail[ed]" himself of the benefits and protections of the forum.  *Revell*, 317 F.3d at 475 (emphasis added).  Waid's ignorance that Plaintiff was in Texas (a fact Plaintiff himself hid as indicated by his Twitter profile) defeats any finding of jurisdiction as a matter of law.  *See, e.g.*, *Fielding*, 415 F.3d at 427 ("Knowledge that sufficient harm would be suffered in Texas is conspicuously lacking."); *Revell*, 317 F.3d at 475-76 (dismissing for lack of jurisdiction where defendant's "affidavit, uncontroverted by the record, states that he did not even know that [plaintiff] was a resident of Texas"); *Festor v. Wolf*,  No. 09-0054, 2009 WL 10669519, at **4-5 (W.D. Tex. Aug. 24, 2009) (finding no personal jurisdiction over fraud claims, even though defendant allegedly made fraudulent statements to Texas residents, where defendant did not know, at the time of the alleged fraud, that plaintiff lived in Texas).

Plaintiff's case law is easily distinguished.  That case law involves defendants who knew the plaintiffs resided in the forum state—and most of that case law also involved allegedly tortious communications with the plaintiffs themselves.  In *Trois v. Apple Tree*, 882 F.3d at 488, the primary case on which Plaintiff relies, the plaintiff expressly claimed the defendant "knew [the plaintiff] lived in Texas" during allegedly tortious phone calls with the plaintiff.[1]  When, as here,

---

[1] *See also Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001) (involving defendant who addressed fraudulent documents to plaintiff in Texas); *SGS-Thomson Micro-Elecs. v. Ferris*, 55 F.3d 632 n.3 (5th Cir. 1995) (*unpublished*) (involving defendant who sent letter to plaintiff in Texas and citing case law where defendant "direct[ed] actions toward the forum state with knowledge that brunt of injury would occur to Plaintiff in forum"); *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent*, 754 F.2d 542, 544-47 (5th Cir. 1985) (involving defendant who knew plaintiff was in Texas and even had visited in person with plaintiff in Texas prior to phone calls); *Tyson v. Austin Eating Disorders Partners*, No. 13-180, 2013 WL 3197641, at **2-4 (W.D. Tex. June 21, 2013) (involving defendant who knew plaintiff was in Texas because plaintiff was officer in Texas company in

the defendant undisputedly lacked knowledge that the plaintiff was in Texas, jurisdiction does not exist, and Plaintiff's case law is inapposite. *See, e.g.*, *Festor*, 2009 WL 10669519, at *5 (distinguishing Fifth Circuit case law involving allegedly tortious phone calls in which "there was no dispute regarding whether the defendants knew that the plaintiffs were in Texas," and finding no jurisdiction where, in contrast, "Plaintiffs fail[ed] to establish a prima facie case that [defendant] knew that Plaintiffs resided in Texas" at the time of the alleged tortious conduct). In fact, Plaintiff's claims do not arise out of any communications at all between Waid and Plaintiff himself.

Plaintiff's other points only further show the absence of jurisdiction. Plaintiff relies entirely on the phone communications between Waid and Antarctic Press ("AP") to suggest that Waid knew AP was in Texas at that time. But AP's location is immaterial given Waid's lack of knowledge regarding *Plaintiff's* location. Even putting that aside, there is no evidence Waid knew AP was in Texas at the time of the phone calls. The only discovery on this point undercuts Plaintiff's assertions. Plaintiff relies on Waid's recollection he met Ben or Joe Dunn previously; but there is no evidence any such meeting revealed AP to reside in Texas, and neither recalls meeting Waid—showing, as Waid indicated, any interactions were at industry functions and "limited." (Dkt. #10-1, ¶ 15). *See* Ex. 1 at 12:12-17; Ex. 10, Ben Dunn Depo. at 12:8-12.[2] Joe Dunn also testified that AP is not known as a Texas publisher in the industry:

> Q:  Do you convey that you're … a Texas-based publisher in the course of [AP's] promotions?
> A:  Typically not.

---

which defendant was also an officer). *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 330-31 (5th Cir. 1982), may not have involved communications directly with the plaintiff, but the case involved an intentional phone call to the U.S. Attorney for Mississippi (the forum) that prevented Mississippi plaintiffs from obtaining a loan—making clear the defendant knew the plaintiffs resided there.

[2] The Court's Order allowing jurisdictional discovery expressly allows Waid to submit evidence obtained from the discovery as part of his reply. Dkt. #17, ¶ 3. The exhibits are attached to Exhibit A, the Declaration of Ryan Pierce.

> Q: . . . Do you—do you have a sign up [at conventions] that identifies you as based in San Antonio?
> A: No.
> Q: Do you believe that folks know where you're – where you're based . . . based on what—what you see happen at these conventions and what you know about your reputation?
> . . . .
> A: I believe no.

Ex. 1 at 32:17-33:7.[3] Left with no evidence, Plaintiff resorts to conclusory assertions. Response at 11 (asserting Waid is "simply not credible"). Plaintiff's bald invective, however, is not evidence.

In sum, Plaintiff's inability to show Waid knew Plaintiff resided in Texas by itself requires dismissal of his tortious-interference claim, whether or not Waid knew about AP's location. Beyond that, however, Plaintiff has no evidence Waid knew AP's location at the time of the calls. Furthermore, even if Waid knew either Plaintiff or AP were in Texas at the time of the calls (which he did not), the larger context—the publication of a book that has nothing to do with Texas and a larger political debate about diversity in comics, which has no specific aim at Texas—still shows jurisdiction is not proper. *See* Dkt. #10 at 15-16.

---

[3] Plaintiff also emphasizes AP's "210" area code (Response at 11); but there is no evidence this area code is so well known outside of Texas that it would typically be recognized as associated with Texas—much less that Waid himself so identified it. Furthermore, while the Texas Supreme Court's decision in *Michiana Easy Livin'* may not be binding, the Court's reasoning is directly relevant here in emphasizing that a call to or from any particular area code is no reliable indicator of any purposeful availment, even if the defendant knew the area code was associated with a particular state, in light of "changes in technology," such as mobile phones. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005). *Michiana* should be held to be more persuasive than the out-of-state decisions that Plaintiff cites.

Plaintiff also falsely claims Waid stated he "did not know where AP was located until this suit was filed"; Waid only explained he did not know AP's location at the time of the calls with AP. Dkt. #10-1, ¶ 14. That remains true and unrebutted. Waid learned AP was in Texas after the brouhaha that erupted after AP's independent decision not to publish JAWBREAKERS (Resp. Ex. B, p44), but that is immaterial to Waid's knowledge at the time of the calls. *See, e.g.*, *Festor*, 2009 WL 10669519, at *5 (finding no jurisdiction, though defendant later learned plaintiff was in Texas, because there was no evidence plaintiff knew that at the time of the alleged fraud).

**B. Plaintiff cannot establish personal jurisdiction as to his defamation claim.**

Plaintiff entirely hangs his case for jurisdiction over the defamation claim on Waid's statements at a convention in Houston occurring after AP's decision to not publish JAWBREAKERS. *See* Response at 13-14. But Plaintiff's own Complaint pleads that his defamation claim stems from statements allegedly made "[t]hrough [Waid's] various social media accounts." Compl. ¶ 24. It makes sense Plaintiff would not base any defamation claim on Waid's statements in Houston, because those statements occurred *after* AP's decision to not publish JAWBREAKERS. As Plaintiff's Response states, "[a]t its base, this is a tortious interference case in which Waid [allegedly] interfered with a contract between [Meyer and AP]." Response at 1.[4]

A plaintiff must "*plead* a prima facie case for personal jurisdiction." *Fielding*, 415 F.3d at 424 (emphasis added). In ascertaining whether specific jurisdiction exists, the court therefore "look[s] only to the contact out of which the cause of action arises." *Revell*, 317 F.3d at 472; *see, e.g.*, *Festor*, 2009 WL 10669519, at *7 ("Though Defendant may have purposefully directed the subsequent acts at Texas, Plaintiffs have failed to show that any of these contacts give rise to their claims."). As Plaintiff's own pleading shows, Waid's statements in Houston are not the basis of Plaintiff's defamation claim—thus leaving only the alleged "social media" statements.

Furthermore, even if Waid's statements in Houston were relevant (which they are not), it remains the case Waid did not know Plaintiff was located in Texas until this lawsuit was filed (*see* Dkt. #10-1, ¶ 9; Ex. 11, Waid Depo. 77:13-16), which would still defeat jurisdiction. *See Revell*, 317 F.3d at 475.[5]

---

[4] Notably, discovery confirmed Plaintiff never signed any contract and AP had the unfettered discretion to decide against publishing JAWBREAKERS. Ex. 1, 71:4-8; 72:10-73:5.

[5] On substantive grounds as well, Plaintiff's defamation claim is entirely meritless. Plaintiff's own pleading admits that, by "late 2017, media reports began to emerge characterizing Meyer as a bigot, a racist, and part of a group that promotes white supremacy." Compl. ¶ 13. Therefore, any

-5-

Even if the Court were to consider Waid's Houston statements and find them sufficient for jurisdiction over the defamation claim, the Court should alternatively transfer that claim to the Central District of California, where Waid lives, which is where the tortious-interference claim would need to be litigated if at all. District courts have the discretion—even *sua sponte*—to transfer actions to other districts. *See, e.g.*, *Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 761 (5th Cir. 1989) ("Such transfers [under 28 U.S.C. § 1404(a)] may be made *sua sponte*."). This lawsuit is really about his (baseless) tortious-interference claim. Keeping Plaintiff's defamation claim here would result in unjustified judicial inefficiency.

## II. Discovery Also Established That Plaintiff's Lawsuit Is Completely Meritless.

Plaintiff spends much of his Response mischaracterizing the facts in his attempt to pursue this lawsuit in Texas. Because Plaintiff's jurisdictional arguments are intertwined with his various assertions about the merits, Waid feels compelled to correct the misleading picture Plaintiff tries to paint. For example, Plaintiff's Response asserts that, "[a]t its base, this is a tortious interference case," and then repeatedly suggests—tellingly without evidentiary support—that Waid caused AP to not publish Plaintiff's book. Response at 1, 12-13. Discovery not only highlighted the lack of jurisdiction, it further revealed this lawsuit to be a baseless publicity stunt.[6]

Plaintiff cherry-picks from AP owner and decision-maker Joeming ("Joe") Dunn's testimony to support his arguments and then astonishingly ignores explicit testimony AP decided against publishing Plaintiff's book because of Plaintiff's own conduct—not anything to do with Waid. Mr. Dunn testified he decided not to publish Plaintiff's book because his own staff and

---

insinuation repeating that premise could not be legally defamatory. Plaintiff's hate-filled targeting of other creators renders his defamation claim absurd. *E.g.*, Dkt. #10-1, Exs. 2, 4.

[6] This lawsuit also violates Anti-SLAPP provisions allowing recovery of attorneys' fees and costs.

close friends were disgusted by Plaintiff's conduct and voiced objections, to such an extent that some would sever ties with AP (*e.g*., Ex. 1 at 96:24-99:24; 108:20-109:6; Exs. 6-7), and not because of anything Waid did or said:

> Q: *And so, again, there were factors that led to Antarctic Press's decision that had no relationship to Mark Waid; correct?*
> A: *Yes.*
> Q: And those factors were concern that your staff and freelancers had expressed; correct?
> A: Correct.
> Q: And including Mr. Meyer's own conduct; correct?
> A: Correct.
> Q: *And those factors that led to AP's decision are factors unrelated to Mark Waid; correct?*
> A: *Correct.*
> . . . .
> Q: Did – you made the decision for Antarctic Press; correct?
> A: Correct.
> Q: And that was your decision; correct?
> A: 100 percent.
> Q: And you made that decision voluntarily?
> A: Correct.
> Q: *And Mark Waid, did he do anything to prevent AP from publishing Mr. Meyer's book*?
> A: *No.*

Ex.1, Dunn Depo. at 107:20-108:19; 111:7-111:16 (emphasis added).

After AP announced it would publish JAWBREAKERS, AP learned Plaintiff had revealed the identities of stores that had decided against carrying the book because of Plaintiff's well-earned reputation for harassment and hateful rhetoric. *Id.* at 74:17-76:19 & Ex. 2, Depo. Ex. 25 (redacted for privacy). AP's social-media director reported to AP staff that Plaintiff had promised not to "rat out" these retailers, and Mr. Dunn expressed the hope Plaintiff would "respond in the proper way." Ex. 1 at 77:3-78:10; 83:16-85:10. But Plaintiff did not respond in any way that could be called "proper." Instead, he publicly "ratted out" the stores by tweeting a private Facebook chat, and even openly encouraged his Twitter followers to research and reveal the identities of store

employees:



Mr. Dunn ultimately became aware of this spiteful effort. Ex. 1 at 80:12-25 & Ex. 3, Depo. Ex. 27.  As Plaintiff had requested, one of his followers publicly listed the names of store employees and related phone numbers.  *See* Ex. 4, Depo. Ex. 28 (redacted for privacy); Ex. 1, 81:5-20.  Not content with this, on the morning of May 11, 2018, Plaintiff also re-tweeted an apparent threat of violence against those stores and praised his "Incel army."[7]



*See* Ex. 1 at 82:5-23 & Ex. 5, Depo. Ex. 29.   All this occurred before Dunn ever spoke to Waid.

After announcing its decision to publish JAWBREAKERS, AP also came to learn about some of the shocking comments Plaintiff had made about other creators.  Among other things, AP's "editor in chief" (or "EIC") reported to Mr. Dunn that he had learned that Plaintiff had called his "Star Wars editor" a "c*m dumpster."  Ex. 1 at 94:11-95:21; Ex. 8, Depo. Ex. 32. This was in

---

[7] "Incels" are known for promoting hate speech against women.  *See, e.g.*, https://www.nytimes.com/2018/04/24/world/canada/incel-reddit-meaning-rebellion.html

-8-

addition to other horrific statements Plaintiff made in a YouTube video, including defaming Waid and others as "pedophiles." *Id*. at 86:22-88:23. Plaintiff never revealed this YouTube video to AP, but AP learned of all this before Dunn spoke with Waid. *Id.* at 73:18-74:1; 88:11-23.

AP's EIC found Plaintiff's conduct so egregious he sent the following email to Mr. Dunn (before Dunn ever spoke with Waid), to make clear that he did not want AP associated in any way with Plaintiff:

> I'm honestly not sure you understand what you're getting into. I was at the comicbook store and even Bob [a store owner] said so and he said, "if Joe thinks this is gonna blow over, it isn't." I thought about it long and hard, ***I haven't been able to sleep or work and that's because it boils down to this: I'm not comfortable being associated with this guy, it's not his work, and it's not his beliefs, it's his conduct. And, if it were any of the other guys at AP that conducted themselves similarly I would divest AP of them as well***. There are standards of civil and professional conduct I believe in. This guy obviously has issues. I've told [another AP employee] to take my name of [sic] the books immediately and I'm also worried about how this may affect other AP creators and San Diego and the booth. Please be careful.

Ex. 6, Depo. Ex. 34 (emphasis added); Ex. 1 at 96:24-99:24; 101:16-23. Mr. Dunn found this message to be a "big deal" because his EIC is also a "good friend, almost family." Ex.1 at 98:2-24. His EIC wanted AP to remove his name from *all books published by AP if it were to publish Plaintiff's book*. *Id.* at 99:8-16.

AP's EIC was not the only one associated with AP who strongly objected to doing business with Plaintiff. Mr. Dunn testified that "everybody" at AP had concerns about publishing Plaintiff's book after his conduct had come to light, with one creator even pulling his project from AP. *Id.* at 92:6-15; 93:13-25. Mr. Dunn confirmed the accuracy of the following May 2018 statement by AP regarding its decision to not publish Plaintiff's book:

> Ultimately, some of our staff and freelancers were uncomfortable sharing a platform with anyone who makes disparaging remarks about anyone in this community. We had to cut ties. We wish Richard all the best.

Ex. 7, Depo. Ex. 38; Ex. 1 at 108:20-109:6; *see also id.* 109:24-110:11 & Ex. 9, Depo. Ex. 39

(confirming "some AP staff were not comfortable with the thought of standing with Mr. Meyer at a [comic] convention"). AP was justifiably concerned that publishing JAWBREAKERS would associate AP and its people with Plaintiff's hateful rhetoric. *Id*. at 96:1-6; 99:8-24.

In light of all this, Mr. Meyer's own conduct led to AP's decision, not anything Waid did or said. *See, e.g.*, *id.* at 43:14-44:4 (confirming that before he spoke with Waid, Mr. Dunn "felt like [he] didn't want to continue down that pathway [of publishing Plaintiff's book]"); 108:17-19 (confirming "factors that led to AP's decision are factors unrelated to Mark Waid"); 111:14-16 (testifying Waid did not "do anything to prevent AP from publishing Mr. Meyer's book").[8]

Not only is it clear Waid did not tortiously interfere or otherwise cause Plaintiff harm, Plaintiff's lawsuit is baseless for other reasons. As noted above, Plaintiff never signed the proposed contract, and even if there were a contract, AP had the discretion to decide against publishing JAWBREAKERS—thus defeating any necessary breach. *Id*. at 71:4-8; 72:10-73:5. Mr. Dunn also testified Plaintiff's possible damages from AP's not publishing JAWBREAKERS would be between ***$1,500 and $10,000, at best.*** *Id.* at 112:2-113:16. This suit is a publicity stunt, which, if pursued at all, cannot be pursued in a court in Texas.

## CONCLUSION AND PRAYER

Defendant Waid prays that the Court dismiss Plaintiff's lawsuit pursuant to Rule 12(b)(2). Defendant further prays for such other and further relief to which he may be justly entitled, at law or in equity.

---

[8] Plaintiff puts weight on the fact that Mr. Dunn texted Waid soon after AP made the decision to not publish the book. But Mr. Dunn even poured cold water on Plaintiff's suggestions around this; Mr. Dunn explained he did not realize he was even texting with Waid but was confused and thought he was texting with someone else because he had been communicating with many people in this timeframe. Ex. 1, 50:13-25; 52:3-20; 55:17-57:4. Plaintiff also relies on testimony from Ben Dunn, but Ben testified his brother Joe never shared with him information about the call with Waid and, therefore, his observations related to the call are merely "speculation." Ex. 10, 33:13-34:7.

        Respectfully submitted,

        REEVES & BRIGHTWELL LLP

        */s/ Ryan Pierce*
        Beverly Reeves, Esq.
        State Bar No. 16716500
        breeves@reevesbrightwell.com
        Ryan Pierce, Esq.
        State Bar No. 24035413
        rpierce@reevesbrightwell.com
        221 W. 6th Street, Suite 1000
        Austin, TX  78701
        (512) 334-4500
        (512) 334-4492 (facsimile)

        Mark S. Zaid, Esq.
        D.C. Bar #440532 (admitted *Pro Hac Vice*)
        Mark@MarkZaid.com
        Mark S. Zaid, P.C.
        1250 Connecticut Ave., N.W., Suite 700
        Washington, D.C. 20036
        (202) 454-2809
        (202) 330-5610 fax

        **ATTORNEYS FOR DEFENDANT**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of April 2019, the above and foregoing document was served using the Court's ECF system on the following counsel of record:

>Daniel H. Byrne
>Dale L. Roberts
>Fritz, Byrne, Head & Gilstrap, PLLC
>221 W. 6th St., Suite 960
>Austin, TX 78701
>dbyrne@fbhg.law
>droberts@fbhg.law

>>>>*/s/ Ryan Pierce*
>>>>Ryan Pierce