EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2               AUSTIN DIVISION

3    RICHARD MEYER,          *
       Plaintiff,       *
4
    VS.                *   CIVIL ACTION NO.
5                      1:18-CV-00800-LY
    MARK WAID,          *
6       Defendant.      *  (Jury Demanded)

7

8

9              VIDEOTAPED ORAL DEPOSITION

10                    OF

11            JOEMING W. DUNN, M.D.

12              MARCH 6, 2019

13

14

15         VIDEOTAPED ORAL DEPOSITION of JOEMING W.

16   DUNN, M.D., produced as a witness on behalf of

17   Plaintiff and duly sworn, was taken in the above-styled

18   and numbered cause on March 6, 2019, between the hours

19   of 12:20 p.m. and 4:08 p.m. before Shan Morris

20   Blanchard, Certified Shorthand Reporter in and for the

21   State of Texas, reported by computerized stenotype

22   machine at the offices of Langley & Banack, Inc., 745

23   E. Mulberry, Suite 700, San Antonio, Texas 78212

24   pursuant to Federal Rules and the provisions stated on

25   the record or attached hereto.

```
 1                   A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFF:

 4          Mr. Daniel H. Byrne
            Fritz, Byrne, Head & Gilstrap, PLLC
 5          221 W. 6th Street, Suite 960
            Austin, Texas 78701
 6          Telephone: 512-476-2020
            Fax: 512-477-5264
 7          Email: dbyrne@fbhg.law

 8     FOR THE DEFENDANT:

 9          Mr. Ryan Pierce
            Reeves & Brightwell, LLP
10          221 West Sixth Street, Suite 1000
            Austin, Texas 78701
11          Telephone: 512-334-4500
            Fax: 512-334-4492
12          Email: rpierce@reevesbrightwell.com

13     FOR THE WITNESS:

14          Mr. Otto S. Good
            Langley & Banack, Inc.
15          745 E. Mulberry, Suite 900
            San Antonio, Texas  78212
16          Telephone: 210-736-6600
            Fax: 210-735-6889
17          Email: ogood@langleybanack.com

18     WITNESS:

19          Joeming W. Dunn, M.D.

20     CERTIFIED SHORTHAND REPORTER:

21          Shan Morris Blanchard

22     VIDEOGRAPHER:

23          Lawrence Delgado

24

25
```

```
 1              (The reading of introductions into the
 2    record according to Rule 30(b)(5)(A) was waived by all
 3    parties present.)
 4              THE VIDEOGRAPHER:  We're on the record on
 5    March the 6th, 2019, at 12:20 p.m.
 6              JOEMING W. DUNN, M.D., the witness, being
 7    duly cautioned and sworn to tell the truth, the whole
 8    truth and nothing but the truth, testified as follows:
 9              (Time: 12:20 p.m.)
10                        EXAMINATION
11    BY MR. BYRNE:
12        Q.    Would you state your name for the record,
13    please, sir?
14        A.    My full name is Joeming Wolf Dunn, D-u-n-n.
15        Q.    And do you go by Joe Dunn?
16        A.    I go by Joe or Joeming depending on who my
17    friend are, I guess.
18        Q.    Okay.  Mr. Dunn, my name is Dan Byrne, and I'm
19    representing Richard Myer in a lawsuit that I think
20    you're aware of that's been brought against Mark Waid,
21    and I'm sitting here with Mr. Meyer to my right and
22    Mr. Waid's counsel, Ryan Pierce, is sitting across the
23    table.  All right?
24        A.    Yes, sir.
25        Q.    And you -- you and I haven't met or talked
```

1    there was a decision that needed to be made, I would

2    make it, but beyond that, that was my role.

3        Q.    So these -- these -- these -- these folks,

4    whether they're true employees or independent

5    contractors, were given a fair amount of latitude on

6    keeping things going on a day-to-day basis?

7        A.    Yes, sir.

8        Q.    Okay.  Have you ever met Richard Meyer before

9    you got into -- in -- in person before you got into

10   today's deposition?

11       A.    No, sir.

12       Q.    Okay.  Have you ever met Mark Waid in person?

13       A.    I -- I attended a lot of conventions over the

14   years and it's possible I met him.  I don't remember,

15   but it's possible, you know, we shook hands one time or

16   talked briefly, you know, when I was in San Diego

17   Comic-Con.

18       Q.    Is it -- would it be true that you don't have

19   any independent recollection of that, you're just a

20   acknowledging the possibility?

21       A.    Yes.

22       Q.    And you knew who -- who Mark Waid was --

23       A.    Yes.

24       Q.    -- before the phone call we'll get to that

25   occurred in May of 2018; is that correct?

1    Mark Waid on the telephone?

2        A.    One time.

3        Q.    And after you made the decision not to publish

4    Jawbreakers, how many telephone conversations did you

5    have with Mr. Meyer?

6        A.    I think that it was just the one time after I

7    decided not to publish Jawbreakers.

8        Q.    Okay.  Were you the final decisionmaker on the

9    decision to publish Jawbreakers in the first place?

10       A.    Yes.

11       Q.    And what do you recall about the -- the

12   evolution of the circumstances that led to that

13   decision?  When did you first hear about Jawbreakers

14   and from what source and -- and what -- what process

15   did you go through?

16       A.    My recollection was during a normal weekly

17   meeting that we have, Brian Denham mentioned to me

18   there was a book, Jawbreakers, that he thought was a

19   good project to publish and he told me that Mr. Meyer

20   had a great deal of followers on YouTube and I -- I

21   think that's the point when I -- when that was first

22   brought up.

23       Q.    Okay.  Were you aware of any controversy

24   associated with Mr. Meyer's YouTube channel at that

25   time?

1    personally attended, probably around three a year.

2        Q.   Okay.  Are they typically located in Texas or

3    at various locations around the country?

4        A.   The ones I've attended are in Texas.

5        Q.   And had you ever seen Mr. Waid -- Mark Waid

6    present at any of those conventions?

7        A.   No.

8        Q.   Where -- did you ever attend any conventions

9    where he was in attendance, to your knowledge?

10       A.   I'm sure I've attended some conventions that he

11   was in attendance.

12       Q.   Okay.  Does Antarctic Press do something to

13   create a presence at -- at these conventions?  Does it

14   have a booth or do any advertising?

15       A.   Yes.

16       Q.   What -- what is the normal activity that

17   Antarctic Press takes -- takes at -- at the comic

18   conventions you're familiar with?

19       A.   We usually set up as a booth.

20       Q.   Okay.  And how would attendees at conventions

21   come to know -- what -- what would they learn about

22   Antarctic Press in the course of seeing a booth for

23   you?

24            MR. PIERCE:  Object to form.

25       A.   Typically, at a booth that we attend --

Joeming W. Dunn, M.D.                                              32

1    Q.    (BY MR. BYRE)   Let -- let me -- let me rephrase

2    that question.   What -- what is it that you attempt to

3    convey about your company by setting up a booth to the

4    people attending these conventions?

5    A.    Typically, when we set up at conventions, we

6    try to reach the audience that attends the conventions

7    that may be comic book fans in hopes to obtaining new

8    fans.

9    Q.    New customers?

10   A.    New customers, yes.

11   Q.    And what is it that you convey about yourself

12   in order to attempt to create new customers?

13   A.    We typically sell the books that we published

14   during that period of time, and if possible, to have

15   creators attend our booth to meet with the fans and

16   potential customers.

17   Q.    Do you convey that you're a -- a -- a

18   Texas-based publisher in the course of these

19   promotions?

20        MR. PIERCE:   Object to form.

21   A.    Typically not.

22   Q.    (BY MR. BYRE)   Okay.  Do you -- do you have a

23   sign up that identifies you as based in San Antonio?

24   A.    No.

25   Q.    Do you believe that folks know where you're --

1   where you're based --

2              MR. PIERCE:  Object to form.

3      Q.   (BY MR. BYRNE)  -- based on what -- what you

4   see happen at these conventions and what you know about

5   your reputation?

6              MR. PIERCE:  Object to form.

7      A.   I believe no.

8      Q.   (BY MR. BYRNE)  Let me hand you what's been

9   previously marked as Deposition Exhibit 5.  Is that an

10  accurate reflection of your website displays as of May

11  of 2019 on -- on the Antarctic Press web page?

12     A.   Well, I -- I have not been on the web page

13  recently but it -- it looks like it -- it is.

14     Q.   You've looked at it occasionally over the

15  years, have you not?

16     A.   Yes, sir.

17     Q.   Any reason to dispute that this accurately

18  reflects your web page as of May of 2018?

19     A.   Looks like it accurately does reflect.

20              (Deposition Exhibit 17 marked.)

21     Q.   (BY MR. BYRNE)  I hand you what's been marked

22  as Exhibit 17 to your deposition.  As distinguished in

23  the Exhibit 5, this is a printout that -- well, let me

24  ask.  Can you identify this as the "About" page for

25  Antarctic Press's website as of May of 2018?

Joeming W. Dunn, M.D.                                    36

1    Q.   -- is -- is that the only office number that
2    Antarctic Press had at the time?
3    A.   Correct.
4    Q.   And that's a landline?
5    A.   Correct.
6    Q.   And who do you recall getting the message
7    relayed to you about Mr. Waid's inquiry?
8    A.   Typically, Doug answers all the phone calls,
9    and so my suspicion is that Doug answered the call.
10   Q.   Okay.  At the time that that message was
11   received, do you have any recollection of where things
12   stood in terms of the buzz or controversy concerning
13   the social media activity since the announced decision
14   to publish Jawbreakers?
15               MR. PIERCE:  Object to form.
16   A.   I recall at that period of time that there was
17   quite a bit of information coming to me from a variety
18   of different sources, but I was gathering information
19   mostly from the people that I trusted the most, which
20   was Brian and Joey at the time, and as information was
21   being gathered, that's when Mark -- Mark's phone call
22   came in and when I -- and I responded to his phone
23   call.
24   Q.   Okay.  At the time you responded to Mr. Waid's
25   phone call, had you decided to reverse your decision to

Joeming W. Dunn, M.D.                                          43

1    they put -- they were put into a no-win situation, but
2    one student that was able to beat the Kobayashi Maru,
3    which was Captain Kirk, and so I felt like this was a
4    no-win situation for our -- our company.
5        Q.   Did you -- did you have the Captain Kirk
6    solution fashioned yet?
7                MR. PIERCE:  Object to form.
8        A.   No.
9        Q.   (BY MR. BYRNE)  You make reference to social
10   media pressure.  Was that social media pressure coming
11   in both direction?
12               MR. PIERCE:  Object to form.
13       A.   Yes.
14       Q.   (BY MR. BYRNE)  Now, in the -- in the second
15   paragraph you make a reference to, "I'm going to rant
16   not to each of you personally, but to everyone who has
17   put us in this situation."  Was this -- was this being
18   circulated beyond just Joey?
19       A.   No, it was just between me and Joey.
20       Q.   Obviously, you use a -- a lot of powerful
21   language here, Mr. Dunn, and I don't need to go through
22   it with you line by line.  By the end of this email,
23   are you still, at least at this point, standing by your
24   decision to proceed with the publication?
25               MR. PIERCE:  Object to form.

```
 1        A.    I -- I think at -- by the end of this rant that
 2    I did in this email, I had felt that my emotional
 3    status had been drained and I felt like I didn't want
 4    to continue down that pathway.
 5                    MR. WAID:   Yes.
 6                    MR. BYRNE:   Let's go off the record.
 7                    THE VIDEOGRAPHER:   Off the record at
 8    1:42 p.m.
 9                    (Recess taken 1:42 p.m. to 1:52 p.m.)
10                    THE VIDEOGRAPHER:   Back on the record at
11    1:52 p.m.
12    BY MR. BYRNE:
13        Q.    Mr. Dunn, before we went on the break we were
14    talking about Exhibit 19, which is the email you sent
15    at 4:38 p.m. on Friday, May 11th, last year.   To put
16    this email in context, was this email written after you
17    had received the message that Mr. Waid wanted you to
18    call him back?
19        A.    I think so.
20        Q.    But was it written before you actually spoke to
21    Mr. Waid?
22        A.    I think so.
23        Q.    And what was the reaction around your office
24    when Mr. Waid left his message, that you recall?
25        A.    At the time, Mr. Waid called the office, the --
```

Joeming W. Dunn, M.D.                                          50

1    relationship with Joey at this time was such that he

2    was close to your family?

3        A.    Correct.

4        Q.    And you were worried that if you stuck with

5    your decision to publish that that might alienate Joey?

6        A.    Among other things, yes.

7        Q.    Turn to Exhibit 7 in this deposition binder, if

8    you can.  First of all, just let me ask you to

9    generally confirm that this is a series of text

10   messages between your cellphone and that of Mr. Mark

11   Waid that took place between -- well in May of 2018.

12       A.    Okay.  I do remember this actually.

13       Q.    So is that, in fact, a series of text messages

14   between you and Mr. Waid from May of '18?

15       A.    Yes, but I am going to -- I'm going to make a

16   clarification.  I was texting and responding to a lot

17   of people and I actually am not -- I thought this was

18   somebody else when I was texting some of these

19   messages, I think.  And so I can't remember who I was

20   talking to at the time, but there was a whole bunch of

21   texts that I was responding to -- to a variety of

22   people and I don't think I was aware that this was Mark

23   Waid until later on, and -- and then on -- on these

24   series of texts when I realized it was Mark, I said

25   that I'm not commenting anymore.

1    on Exhibit 7 is 16 minutes later; --

2        A.    Correct.

3        Q.    -- correct?  So are you telling -- are you

4    thanking Mr. Waid for talking to you that afternoon in

5    this text?

6        A.    Like I said, I don't think so actually.  I

7    think I was talking to somebody else.

8        Q.    Who -- who else did you talk to that afternoon

9    about the --

10       A.    I talked to a multitude of people -- or texted

11   a lot of people, and I think -- like one of the people

12   was Timothy Lim, who was at the time friends with or --

13   I'm guessing still with -- friends with Mr. Meyer, and

14   my brother.

15       Q.    Your -- your brother --

16       A.    Well, my brother was there so I -- I guess I

17   was talking to him at my -- at my house, but I remember

18   talking to a whole bunch of different people, texting a

19   whole bunch of people, and I may have been confused

20   about who I was texting at the time.

21       Q.    Okay.  You were at your house that afternoon?

22       A.    Correct.

23       Q.    Do you have a landline?

24       A.    I do.

25       Q.    Do you have phone records for your landline?

Joeming W. Dunn, M.D.                                    55

1   calls from a variety of different places and when I

2   finally realized that that was -- when I realized that

3   was Mark Waid I said, "Oh, you know," -- I said "I

4   don't want to talk to him anymore," and so -- so

5   then -- when I realized that, I had marked it "Mark

6   Waid" at the time.  That's why I think I remember that.

7       Q.    Your -- your cellphone, when you dial in, a

8   text message does pop up the name of who you're

9   communicating with; correct?

10              MR. PIERCE:   Object to form.

11      A.    Yes.

12      Q.    (BY MR. BYRNE)  Do you have an iPhone?

13      A.    Yes.

14      Q.    Okay.

15      A.    But at the time I was getting calls and texts

16  from a multitude of people.

17      Q.    Right, but Mr. Waid has validated Exhibit 7 as

18  an exchange of emails between his phone and your phone?

19              MR. PIERCE:   Object to form.

20      A.    I --

21      Q.    (BY MR. BYRNE)  You don't disagree with that,

22  do you?

23      A.    I don't disagree with that because -- but I

24  think that some of my texts to -- it was not -- it was

25  not of a -- intended for him, I don't think, and then

1   when I realized that, that's when I said to him at some

2   point during the message that I don't want to -- I

3   realized I was texting the wrong person, then I said,

4   "Oh, I don't want to talk to you anymore."

5       Q.   Mr. Dunn, when -- what is it about this

6   exchange here that is inconsistent with you having

7   conversations -- text conversations with Mr. Waid in

8   May of 2018?

9               MR. PIERCE:   Object.   It's argumentative.

10      A.   I had come to the realization that I didn't

11  want to deal with the situation any further and I was

12  letting some people know that that's what my -- my

13  decision was.

14      Q.   (BY MR. BYRE)   Who would -- who else would you

15  be texting with about being prepared for a lashing from

16  the other direction besides Mr. Waid?

17      A.   At the time, I was talking to Timothy Lim quite

18  a bit.

19      Q.   Is Timothy Lim in your contacts?

20      A.   Yes.

21      Q.   Now, there's a change in the tone of your texts

22  in this exhibit starting on Tuesday, May 15th.   Do you

23  see that?

24      A.   Correct.

25      Q.   "I'm not commenting anymore"?

Joeming W. Dunn, M.D.                          57

1      A.    Right.   That's when I think I real -- that's

2   why I think I realized I was texting the wrong person

3   and responding to the wrong person at the time.   I

4   didn't realize that was Mr. Waid at the time.

5      Q.    Why didn't you say, "I didn't realize who I was

6   talking to" in your texts?

7                  MR. PIERCE:   Object form.

8      A.    At the time, I didn't want to deal with anybody

9   associated with this situation, and so I decided I

10  wouldn't respond to anybody.   I wasn't going to respond

11  to anybody.   I wasn't going to talk to anybody, and --

12  and I -- since that period of time, I have been

13  consistent in that.   I have not talked or -- to mention

14  to this anybody.

15     Q.    (BY MR. BYRNE)   Tell me about the conversation

16  you had with Mr. Meyer after your decision to terminate

17  the publication.

18     A.    After -- after the decision -- after, you know,

19  getting all the information that I had gathered in

20  regards to the situation, I knew that I was the

21  buck-stopped-here type of person about making a

22  decision.   I also realize the passionate nature of some

23  of Mr. Meyer's followers, but I --

24     Q.    I was just asking about what you -- what you

25  talked about.   You said you had a phone call.

1    discussions.

2                        MR. BYRNE:  Let's take a break.

3                        THE VIDEOGRAPHER:  Off the record at

4    2:34 p.m.

5                    (Recess taken 2:34 p.m. to 2:45 p.m.)

6                        THE VIDEOGRAPHER:  We're back on the

7    record at 2:45 p.m.

8                        MR. BYRE:  We'll pass the witness.

9                    (Time: 2:45 p.m.)

10                            EXAMINATION

11   BY MR. PIERCE:

12       Q.   Mr. Dunn, we met earlier today.  I'm Ryan

13   Pierce and I represent Mr. Waid.  Thank you for your

14   patience today.  You talked about Brian quite a bit.

15   What -- what's his last name?

16       A.   Denham.

17       Q.   And how long has he worked with Antarctic

18   Press?

19       A.   Oh, gosh.  He worked for us like two -- for a

20   couple of years like in the early 2000s and then he

21   left for a while and then he came back, I would say,

22   about four years ago.

23       Q.   So a total of how many years?

24       A.   Probably seven or eight years.

25       Q.   And do you trust him?

1    up.   Who held that position in May of 2018?

2        A.    Joe Weltjens.

3        Q.    And we've referred to him today some as Joey?

4        A.    Yeah, Joey or Jochen.

5        Q.    What does the EI -- what are the

6    responsibilities of the EIC?

7        A.    Well, in our company, it's to oversee the

8    release and production of our books.

9        Q.    And how long has Joey been associated with

10   Antarctic Press?

11       A.    20 years.

12       Q.    And do you trust Joey?

13       A.    Yes.

14       Q.    And does his opinion at Antarctic Press carry a

15   lot of weight?

16       A.    Yes.

17       Q.    And when it comes to publishing books, would

18   you override Joey's opinion if he had a strong opinion

19   on whether to publish a book?

20               MR. BYRNE:   Objection, form.

21       A.    I very rarely override anybody.

22       Q.    (BY MR. PIERCE)   And that include Joey?

23       A.    Correct.

24       Q.    Was -- was there an actual written contract

25   between Antarctic Press and Mr. Meyer?

1     A.    My recollection was I sent a copy of a contract

2  to Brian to send to Mr. Meyer, but I never got a

3  written signed contract returned.

4     Q.    Was it Antarctic Press's contemplation that

5  there would be a signed, written contract in place?

6     A.    Yes.

7     Q.    And you never received that contract?

8     A.    Correct.

9     Q.    And given that there was no contract in place,

10  did Antarctic Press have discretion in deciding whether

11  or not to publish Jawbreakers at -- around the time of

12  May of 2018?

13     A.    My guess was that there was the -- the shaking

14  of the hands and it was good enough for us to proceed.

15     Q.    And what were the terms of the shaking of the

16  hands?

17     A.    Well, my -- my guess would be that I sent the

18  contract to Brian to send to Mr. Meyer and -- and he

19  looked it over and I thought -- my guess would be it

20  was acceptable at the time.

21     Q.    So your understanding is the written contract

22  that would have been sent to Mr. Meyer would be the

23  terms that would apply?

24     A.    Correct.

25     Q.    And I take it you have a copy of that contract

1    or somebody at Antarctic Press has a copy of that

2    contract?

3         A.    Correct.

4         Q.    And did you understand that Mr. Meyer

5    understood that those would be the terms of the

6    contract as reflected in that written document?

7                    MR. PIERCE:   Objection, form.

8         A.    I -- I never discussed it with Mr. Meyer

9    directly, but that's my understanding.

10        Q.    (BY MR. PIERCE)   And under those written terms,

11   did Antarctic Press have discretion in deciding whether

12   or not to publish a book?

13        A.    Yes.

14                   MR. BYRNE:   Objection, form.

15        Q.    (BY MR. PIERCE)   And that decision whether to

16   publish the book under those terms would be up to

17   Antarctic Press?

18                   MR. BYRNE:   Objection, form.

19        A.    Yes.

20        Q.    (BY MR. PIERCE)   So as of May of 2018,

21   Antarctic Press had the right under those terms to not

22   publish Jawbreakers; correct?

23                   MR. BYRNE:   Objection, form.   Objection,

24   leading.

25        A.    Yes.

1    Q.   (BY MR. PIERCE)  Did Antarctic Press as of May

2    of 2018 have the right to decide not the publish

3    Jawbreakers?

4                 MR. BYRNE:  Objection, form.

5    A.   Yes.

6    Q.   (BY MR. PIERCE)  I think you indicated that you

7    were not aware of Mr. Meyer's association with

8    Diversity & Comics; is that right?

9    A.   That's correct.

10   Q.   And did Mr. Meyer ever tell Antarctic Press

11   about his involvement in Diversity & Comics before you

12   guys discussed Jawbreakers?

13   A.   I can't speak for other people, but I'm pretty

14   sure Brian knew Mr. Meyer.

15   Q.   Were you aware of his activity on Diversity &

16   Comics?

17   A.   No, not at all.

18   Q.   Did Mr. Meyer, as far as you know, ever share

19   with Antarctic Press a YouTube video that has been

20   referred to as The Dark Roast?

21   A.   Not that I'm aware of.

22   Q.   So when Antarctic Press was entering into

23   discussions with Mr. Meyer about whether to public

24   Jawbreakers, Antarctic Press, as far as you know, was

25   not aware of The Dark Roast?

Joeming W. Dunn, M.D.                                        74

```
1        A.    I was not aware of The Dark Roast.

2        Q.    Are -- in some of the emails there was

3    reference to a Kickstarter campaign.  Do you recall

4    that?

5        A.    In regards to?

6        Q.    Mr. Byrne showed you a couple emails that

7    referenced some information about a Kickstarter

8    campaign.  Do you recall that?

9        A.    Yes.

10       Q.    Were you aware that Kickstarter had rejected

11   Mr. Meyer's project?

12       A.    No.

13       Q.    Did Mr. Meyer make you aware of that?

14       A.    I -- first time I talked to Mr. Meyer was the

15   time I talked to him after, so not him directly, but,

16   no, I was not aware.

17       Q.    I'm going to -- this is going to be Exhibit 24.

18             MR. PIERCE:  I'm sorry.  If you want me

19   to mark them -- you don't mind?  Thank you.

20             (Deposition Exhibit 24 marked.)

21       Q.    (BY MR. PIERCE)  Mr. Dunn, I -- I believe we've

22   looked at at least some of these emails.  Does -- does

23   Exhibit 24 -- and it is 24; correct?  Sorry.  Does

24   Exhibit 24 appear to be a couple of emails dated May

25   9th, 2018?
```

1    A.    Correct.

2    Q.    And do you see the email from Megan Kilar with

3    the subject "Jawbreakers" at the bottom?

4    A.    Correct.

5    Q.    Do you know who Megan Kilar is?

6    A.    No.

7    Q.    Do you see where she says, "Based on the

8    harassment online by Diversity & Comics, I have decided

9    to boycott your company if you choose to publish

10   Jawbreakers."  Do you see that?

11   A.    Correct.

12   Q.    And was this the -- the -- had you been aware

13   of any potential harassment online by Diversity &

14   Comics before you received this email?

15   A.    Me, no.

16   Q.    And do you see Brian Denham replies?

17   A.    Yes.

18   Q.    And he copies mcazja@  REDACTED  Is that Joey?

19   A.    That's correct.

20   Q.    Brian says, "There will be a lot more."  How

21   did you interpret that -- the reference to, "There will

22   be a lot more"?

23   A.    At the time, I thought -- I actually didn't

24   know what to think about that.

25   Q.    And do you see he goes on to say, "A few of the

1   retailers got together in a secret Facebook group to

2   boycott whatever publisher picked up Jawbreakers." Do

3   you see that?

4       A.   Correct, yes.

5       Q.   And is it your understanding that when the word

6   "boycott" is used in this context, what that means is

7   the retailers have decided to not carry the book?

8               MR. BYRNE:  Objection, form.  Objection,

9   leading.

10      A.   Correct.

11      Q.   (BY MR. PIERCE)  Well, what's your

12  understanding of the use of the term "boycott" in this

13  context?

14      A.   My understanding of boycott is that they would

15  not purchase a book that was released by Antarctic

16  Press.

17      Q.   And that's a decision they would have a right

18  to make; correct?

19      A.   Yes.

20              MR. PIERCE:  This will be Exhibit 25.

21              (Deposition Exhibit 25 marked.)

22      Q.   (BY MR. PIERCE)  And by the way, if I give you

23  an exhibit, you take as much time as you need, but I'll

24  try to direct you to -- to where I'm going to ask

25  questions, but you should always tell me, "Stop.  I

1    need more time."

2        A.    Okay.

3        Q.    Does -- does Exhibit 25, the -- the last couple

4    of pages, appear to be the same emails that we just

5    reviewed?

6        A.    Yes.

7        Q.    And do you see Mr. Denham's email of May 9th at

8    9:48 p.m. and he appears to be attaching a social media

9    screen shot?  Do you see that?

10       A.    Yes.

11       Q.    And it says -- and it -- and it has some

12   comments from some individuals that appear to -- to be

13   protesting the publication of the Diversity & Comics

14   book; correct?

15       A.    Yes.

16       Q.    And can you turn the -- the page -- oh, I'm

17   sorry.  Turn back to the first page.  Do you see at the

18   bottom of the email it says, "Richard reach out to one

19   of the retailers to inform him what's going on.  He

20   promised to not rat them out.  So that retailer

21   informed Richard.  Richard posted on YouTube that

22   retealer -- retailers are colluding with each other to

23   boycott."  Do you see that?

24       A.    Yes, I do.

25       Q.    And this email is from May 9th; correct?

1     A.    Correct.

2     Q.    And that's before you ever spoke with Mark

3  Waid; right?

4     A.    Correct.

5     Q.    And Brian, in that email -- or in the sentence

6  I just read, indicates that Mr. Meyer had promised not

7  to rat out the retailers.  What's your understanding of

8  what that means to not rat them out?

9     A.    I'm guessing that -- not to expose the

10  retailers that are in this group.

11              MR. PIERCE:   This is -- will be

12  Exhibit 26.

13              (Deposition Exhibit 26 marked.)

14     Q.    (BY MR. PIERCE)   Mr. Dunn, does this appear to

15  be a screen shot of a tweet from Diversity & Comics?

16     A.    It appears so.

17     Q.    And do you see it's dated May 9th at the

18  bottom?

19     A.    On the bottom?

20     Q.    Yeah, there -- there's a date at the bottom.

21     A.    Oh, yes, I see that now.

22     Q.    And in -- in this tweet, it's stated, "It's

23  from a private Facebook group for retailers titled,

24  Final Order Cutoff."  Do you see that?

25     A.    Yes.

Joeming W. Dunn, M.D.                                    79

1     Q.    Do you know what Final Order Cutoff is?

2     A.    Yes.

3     Q.    What is that?

4     A.    In a retail -- comic book retail environment

5   when they're buying comics through Diamond

6   Distribution, there is a date -- what they call final

7   order cutoff -- before the publisher goes to

8   publication that allows retailers to either up their

9   orders or to downgrade their orders before they

10  actually go to press, so that way the publisher has a

11  more accurate representation of what numbers to

12  publish.

13    Q.    And were you aware that there could be private

14  Facebook groups for this?

15    A.    I'm aware there are private Facebook groups.

16    Q.    And did you come to know that Mr. Meyer was

17  sending on his -- sending out on his Twitter account

18  screen shots from a private Facebook group?

19    A.    I was not aware of it until later on.

20    Q.    What do you mean -- when -- later on -- at what

21  point?

22    A.    Well, after the announcement was made, then I

23  started gathering information and that's when I got

24  some of this information.

25    Q.    And that was before you spoke with Mr. Waid?

Joeming W. Dunn, M.D.                                    80

1     A.    Correct.

2             MR. PIERCE:   This is going to be

3     Exhibit 27.

4             (Deposition Exhibit 27 marked.)

5     Q.    (BY MR. PIERCE)   Mr. Dunn, does Exhibit 27

6     appear to be a tweet from the Diversity & Comics

7     account?

8     A.    It appears that way.

9     Q.    And this is dated May 10th at -- May 10th at

10    7:04 a.m.; correct?

11    A.    Correct.

12    Q.    And in tweet Mr. Meyer says, "I did the

13    research on about four or five of the stores, but if

14    someone could go through those screen shots from the

15    retailer Facebook group and make a list of the people,

16    the stores they work at, and the cities, that would be

17    great."  Do you see that?

18    A.    Correct.

19    Q.    And I take it that you had become aware that

20    Mr. Meyer was asking for his followers to make a list

21    of people working in stores that had decided not to

22    carry his book?

23            MR. BYRNE:   Objection, form.   Objection,

24    leading.

25    A.    Yes.

```
1     Q.   (BY MR. PIERCE)   And that was before you spoke
2  with Mr. Waid; correct?
3     A.   Yes.
4              (Deposition Exhibit 28 marked.)
5              MR. PIERCE:   This is Exhibit 28.   And
6  this, I would note, is going to be confidential under
7  the protective order because it reveals phone numbers
8  and names.
9              THE REPORTER:   Wait just a minute.
10              MR. PIERCE:   Sorry.
11     Q.   (BY MR. PIERCE)   Mr. Dunn, does this appear to
12  be a screen shot from Twitter?
13     A.   Yes.
14     Q.   And do you see at the top of the document it
15  says, "Here are the shops from the collusion screen
16  shots."   Do you see that?
17     A.   Yes.
18     Q.   And do you see that there are names of
19  employees and phone numbers listed?
20     A.   Yes.
21     Q.   Were -- were you aware that the names of
22  individuals and their phone numbers were being revealed
23  publicly in response to a request from Mr. Meyer?
24     A.   I did not see these, but I was made aware that
25  there was some mention of stores.
```

Joeming W. Dunn, M.D.                                                     82

```
 1      Q.    And that was before you spoke with Mr. Waid?

 2      A.    Yes.

 3                  MR. PIERCE:   This will be Exhibit 29.

 4                  (Deposition Exhibit 29 marked.)

 5      Q.    (BY MR. PIERCE)   Mr. Dunn, does this appear to

 6   be a screen shot from Twitter associated with Diversity

 7   & Comics?

 8      A.    Yes.

 9      Q.    And do you see that it's dated May 11th, 2018,

10   and the time is 6:41 a.m.?

11      A.    Yes.

12      Q.    And do you see that Mr. Meyer re-tweets or

13   quotes a tweet from the Twitter handle, Million Dollar

14   Prons, P-r-o-n-s?  Do you see that?

15      A.    Yes.

16      Q.    And that quote states, "Don't carry

17   Jawbreakers.  Say hi to leg breakers."  Do you see

18   that?

19      A.    Yes.

20      Q.    And the Diversity & Comics Twitter account

21   re-tweets and says, "To me, my Incel Army."  Do you see

22   that?

23      A.    Yes.

24      Q.    Do you know what "Incel" is?

25      A.    I think it means incelibate or something.  I'm
```

Joeming W. Dunn, M.D.                                83

```
 1    not sure about that.
 2         Q.   Are you aware that it's been designated as a
 3    hate group by certain organizations?
 4                   MR. BYRNE:  Objection, form.
 5         A.   I did not know that.
 6         Q.   (BY MR. PIERCE)  And -- and have you ever seen
 7    this tweet before as far as you can recall?
 8         A.   No.
 9         Q.   Would -- would it concern Antarctic Press if
10    one of its creators had hinted at violence if stores
11    weren't carrying his book?
12         A.   Yes.
13         Q.   And you would appreciate knowing that if that
14    were occurring; correct?
15         A.   Yes.
16                   MR. PIERCE:  This will be Exhibit 30.
17                   (Deposition Exhibit 30 marked.)
18         Q.   (BY MR. PIERCE)  And does Exhibit 30 appear to
19    be an email chain from May 10th of 2018?
20         A.   Correct.
21         Q.   And can you go to the third page and do you see
22    at 8:08 a.m. you send an email and you say, "I do not
23    want to get into a let's boycott the stores."  Do you
24    see that?
25         A.   Correct.
```

1      Q.    What did you mean by that?

2      A.    When I first got information about the stores

3    that were listing up to boycott Antarctic Press, I was

4    surprised and -- because I didn't know the whole

5    situation at that time and -- and I wanted to get more

6    infer -- more information basically.

7      Q.    And -- and you -- do you see where you say, "I

8    hope he can respond in the proper way."  Do you see

9    that?

10     A.    Yes.

11     Q.    And who were you referring to with "he"?

12     A.    I'm guessing Mr. Meyer.

13     Q.    And to your mind, would the proper way of

14   responding include asking that the detail of stores,

15   including their employees, be publicly revealed?  Would

16   that be a proper way of treating this situation in your

17   opinion?

18          MR. BYRNE:  Objection, form.  Objection,

19   leading.

20     A.    You know, I really don't like to speak for

21   other people.

22     Q.    (BY MR. PIERCE)  Well, in -- in -- in your

23   view, when you say, "I hope he can respond in the

24   proper way," did you have in mind that -- that he would

25   invite detail about the stores not carrying the book to

1    be publicly revealed?

2        A.    My hope is always to have a peaceful resolution

3    to everything.

4        Q.    And would you agree that revealing detail on

5    stores not carrying the book may not advance a peaceful

6    resolution?

7                MR. BYRNE:   Objection, form.   Objection,

8    leading.

9        A.    I believe that if -- if I was put in the

10   situation, I don't think I would approach it that way.

11               MR. PIERCE:   This will be Exhibit 31.

12   Sorry, guys.

13               (Deposition Exhibit 31 marked.)

14       Q.    (BY MR. PIERCE)  And, Mr. Dunn, does this

15   appear to be an email chain dated May 10th, 2018, and

16   the top email is from, I believe, apcog1 to Brian

17   Denham?

18       A.    Correct.

19       Q.    And apcog is Doug?

20       A.    Correct.

21       Q.    Do you see where the email says, "Poor David

22   got an earful while I was out of the office.   Some

23   local person called just to rant about what a bad

24   person Richard is."  Do you see that?

25       A.    Correct.

Joeming W. Dunn, M.D.                                    86

```
1      Q.    And what did you mean -- or I'm sorry -- what

2   did your interpret Brian to me -- mean by referring to

3   a local person?

4                MR. BYRNE:  Objection, form.

5      A.    This was from Doug to Brian.

6      Q.    (BY MR. PIERCE)  I'm sorry.  From Doug.

7                MR. BYRNE:  Same objection.

8      Q.    (BY MR. PIERCE)  What -- what's with your

9   interpretation, if any, about what is meant by local

10  person?

11               MR. BYRNE:  Same -- objection, form.

12     A.    My guess would be somebody in San Antonio that

13  called to express their displeasure with our choice.

14     Q.    (BY MR. PIERCE)  And you're copied on this

15  email; correct?

16     A.    Correct.

17     Q.    Did -- did you ever get any further detail

18  about what this person who called said?

19     A.    No.

20     Q.    And this is May 10th; correct?

21     A.    Correct.

22               MR. PIERCE:  This will be Exhibit 32.

23               (Deposition Exhibit 32 marked.)

24               THE WITNESS:  Thank you.

25     Q.    (BY MR. PIERCE)  And does this appear to be an
```

1    email chain dated May 10th, 2018?

2        A.    Correct.

3        Q.    And -- and I believe it may be a continuation

4    of some of the emails we've already looked at.  Does

5    that appear right to you?

6        A.    Yes.

7        Q.    Can you turn to the second page?  Do you -- do

8    you see where apcog, who is Doug, replies at 2:23 p.m.

9    on May 10th?  Do you see that?

10       A.    Yes.

11       Q.    And Doug refers to an email that he had just

12   received; correct?

13       A.    Correct.

14       Q.    And the referenced email refers to Mr. Meyer's

15   Jawbreakers; correct?

16       A.    Correct.

17       Q.    And according to Doug's email, that email he

18   received said, "Meyer had said some pretty awful

19   things"; correct?

20       A.    He --

21               MR. BYRNE:   Objection, form.

22       A.    He informed me of what -- I guess informed what

23   email he got and referred -- in reference to what

24   Richard said.

25       Q.    (BY MR. PIERCE)   And among what Richard had

1    said, according to this email, is that Mr. Waid and two

2    other gentlemen were pedophiles.  Do you see that?

3       A.   Yes.

4       Q.   And that Mr. Meyer had accused a Marvel editor

5    of rising through the ranks because of sex; correct?

6       A.   Correct.

7       Q.   And Mr. Meyer also used a derogatory term

8    relating to another creator's sexuality.  Do you see

9    that?

10       A.   Yes.

11       Q.   And then Mr. Meyer according to this email

12    referred to a transgender creator as, "A crazy person

13    who is definitely going to kill himself."  Do you see

14    that?

15       A.   Yes.

16       Q.   And these are Mr. Meyer's words as reported in

17    this email by Doug; correct?

18            MR. BYRNE:  Objection, form.

19       A.   Correct.

20       Q.   (BY MR. PIERCE)  And this is May 10th; correct?

21       A.   Correct.

22       Q.   Before you ever spoke with Mr. Waid?

23       A.   Yes, correct.

24       Q.   Are -- are these the type of statements about

25    creators that Antarctic Press would want to be

1    associated with?

2              MR. BYRNE:  Objection, form.

3      A.   I think -- I think at the time I wanted to make

4    sure that they were true.

5      Q.   (BY MR. PIERCE)  But if they were true, would

6    Antarctic Press want to be associated with these

7    statements?

8              MR. BYRNE:  Objection, form.

9      A.   No.

10     Q.   (BY MR. PIERCE)  And Joey asks, "Brian, are any

11   of the statements attributed to Richard below true."

12   Do you see that?

13     A.   Yes.

14     Q.   Is it fair to say that Joey is concerned about

15   this?

16     A.   Yes.

17     Q.   And were you concerned?

18     A.   Yes.

19     Q.   Can you turn to the first page?  And Brian

20   responds, do you see, on May 10th at 9:19 p.m., "I

21   didn't know about that stuff.  I looked it up online."

22   Do you see that?

23     A.   Yes.

24     Q.   And according to his email, he found proof that

25   Mr. Meyer had made at least most of these statements;

1    correct?

2        A.    Correct.

3        Q.    And this email from Brian is May 10th, which is

4    after the March and April emails that we reviewed with

5    Mr. Byrne; correct?

6        A.    Correct.

7        Q.    And Brian is saying he didn't know about this

8    stuff; correct?

9        A.    Correct.

10       Q.    Do you recall discussing these statements

11   attributed to Mr. Meyer with anyone at Antarctic Press?

12       A.    Yes.

13       Q.    What do you recall?

14       A.    That after the accusation was made about these

15   statements that I wanted to make sure that they were

16   true and that we -- you know, we -- we came and met and

17   we talked about they were true or not.

18       Q.    And when they were confirmed to have been made

19   by Mr. Meyer, did that have an impact on your view of

20   the Jawbreakers project?

21       A.    Yes.

22       Q.    A negative view, I -- I assume?

23       A.    Yes.

24              MR. BYRNE:  Objection, form.  Objection,

25   leading.

Joeming W. Dunn, M.D.                                    92

1      Q.    (BY MR. PIERCE)   All right.   You know, as

2   indicated by this last set of emails, is it fair to say

3   that AP staff had concerns about its possibly

4   publishing Jawbreakers at this point in time?

5      A.    Yes.

6      Q.    Who among AP staff expressed concerns about AP

7   publishing Jawbreakers, that you can recall?

8      A.    I believe everybody had concerns, but as in

9   most staff environments, some people expressed more

10  concerns than others.

11     Q.    Who are expressed more concerns than others?

12     A.    I would say that I think Joey, Brian, and

13  Austin were the ones that spoke out the most.

14     Q.    And Joey was the editor-in-chief; correct?

15     A.    Correct.

16     Q.    And what was Austin Rogers?

17     A.    He was another pub -- he was -- we were trying

18  to do a collaboration with another publisher and he was

19  the head of Guardian Knights comics.

20     Q.    And are -- are these people whose opinions you

21  trust?

22     A.    Yes.

23     Q.    What about any AP freelancers?   Did they

24  express any concerns that you recall about publishing

25  Richard Myer's book?

Joeming W. Dunn, M.D.                                    93

```
 1      A.    Yes.

 2      Q.    Who do you recall?

 3      A.    Joe White.  I received a lot of calls and texts

 4  and I can't remember everybody that did one way or the

 5  other.

 6      Q.    Lee Duhig is somebody you mentioned?

 7      A.    Yeah, Lee I don't think had an opinion.

 8      Q.    That you can recall?

 9      A.    That I can recall, yeah.

10      Q.    But there were freelancers that -- that

11  expressed concerns about publishing Jawbreakers?

12      A.    Yes.

13      Q.    Did any staff or freelancers inform you that

14  they did not want their name on any book from Meyer

15  that was going to be published by AP?

16      A.    I recall one freelancer, and I can't remember

17  his name, that pulled his project because of the

18  situation with Jawbreakers.

19      Q.    Do you remember what the project was?

20      A.    It was a short story in an anthology we did

21  called Mangazine and he was scheduled to be in one of

22  the issues and I think he pulled his story because of

23  it.

24      Q.    Because of Jawbreakers?

25      A.    Yes, sir.
```

Joeming W. Dunn, M.D.                                      94

1    Q.   And these concerns that -- that staff and

2    freelancers expressed to you about Jawbreakers, that --

3    those concerns were raised before you spoke with

4    Mr. Waid; correct?

5    A.   Correct.

6    Q.   And did these concerns that you received have

7    an impact on AP's decision making in terms of whether

8    to publish Jawbreakers?

9    A.   At the time I was gathering information to make

10   the decision, so yes.

11                 MR. PIERCE:  This will be Exhibit 33.

12                 (Deposition Exhibit 33 marked.)

13                 MR. GOOD:  We have a 40-exhibit limit.

14                 MR. BYRNE:  Local rule.

15                 MR. PIERCE:  I'm trying to go through

16   them quickly.

17                 MR. BYRNE:  33?

18                 THE WITNESS:  Yes.

19   Q.   (BY MR. PIERCE)  And does this appear to be an

20   email chain from May 11, 2018, between you and Joey?

21   A.   Correct.

22   Q.   And this is at May 11, 2018, at 10:23 a.m.;

23   correct?

24   A.   Correct.

25   Q.   And in Joey's email he says, "Brian confirmed

1   that Richard said the things that retailer note --

2   notified us about.  He did, indeed -- indeed, call my

3   Star Wars editor a cum dumpster."  Do you see that?

4       A.   Yes.

5       Q.   And what is -- what's the reference to his "my

6   Star Wars editor"?  What does that mean?

7       A.   Joey belongs to a group called Guru-eFX and

8   they do coloring for Marvel Comics.

9       Q.   And was it your understanding that the woman

10  whom Mr. Meyer called a cum dumpster was somebody that

11  Joey worked with?

12            MR. BYRNE:  Objection, form.

13      A.   Correct.

14      Q.   (BY MR. PIERCE)  Did Joey work with the person

15  that's the subject of the statement about being a cum

16  dumpster?

17      A.   Correct.

18      Q.   And it -- it seems that Joey thought this was a

19  big deal; is that fair?

20            MR. BYRNE:  Objection, form.

21      A.   Yes.

22      Q.   (BY MR. PIERCE)  And you respond by saying you

23  would remove him from any decision-making issues.  Do

24  you see that?

25      A.   Correct.

Joeming W. Dunn, M.D.                                    96

```
1       Q.    And were you concerned that publishing

2    Jawbreakers would inevitably associate AP folks with

3    this type of rhetoric from Mr. Meyer?

4                   MR. BYRNE:  Objection, form.  Objection,

5    leading.

6       A.    Yes.

7                   MR. PIERCE:  Exhibit 34.

8                   (Deposition Exhibit 34 marked.)

9                   MR. PIERCE:  And I apologize.  We've

10   marked this.  This is a duplicate, but I didn't want to

11   dig through my stack and try to find it.

12      Q.    (BY MR. PIERCE)  Does this appear to be an

13   email between you and Joey from May 11th, 2018, at 4:38

14   p.m.?

15      A.    Correct.

16      Q.    And you're sending this to Joey, correct, --

17      A.    Correct.

18      Q.    -- the top one?  Can you go to page 2, the

19   second page?  And do you see at the very bottom there's

20   an email from Joey to you and then the date and time

21   folds over to the next page, May 11th, 2018, at 2:57

22   p.m.  Do you see that?

23      A.    Yes.

24      Q.    And Joey says in his email, "I'm honestly not

25   sure you understand what you're getting into.  I was at
```

1    the comic book store and even Bob said so."  Do you

2    know who Bob is?

3       A.   Bob is Bob     REDACTED      He's manager of a comic

4    book store          REDACTED

5          REDACTED

6       Q.   And what -- what was your interpretation of

7    what Joey was telling you here in relation to Bob?

8       A.   He was saying that, you know, since Bob was a

9    manager at a store that he didn't believe that this

10   would blow over as -- you know -- I mean, he thought

11   this was going to go longer than what we had -- what we

12   would anticipate.

13      Q.   And what you mean by "this blowing over"?  You

14   mean the -- the concern or the outcry about publishing

15   Jawbreakers?

16            MR. BYRNE:  Objection, form.  Objection,

17   leading.

18      A.   Yes.

19      Q.   (BY MR. PIERCE)  And then Joey says, "I haven't

20   been able to sleep or work and that's because it boils

21   down to this.  I'm not comfortable being associated

22   with this guy."  Do you see that?

23      A.   Yes.

24      Q.   What did you interpret "this guy"?  To whom did

25   that reference?

1     A.    Mr. Meyer.

2     Q.    Did you feel that your editor-in-chief's

3  inability to sleep or work was a big deal to be taken

4  seriously?

5     A.    Yes.

6     Q.    Why is that?

7     A.    Because he is a friend and good -- good friend,

8  almost family.

9     Q.    And then Joey says it's his conduct that he's

10 concerned about.  Do you see that?

11    A.    Yes.

12    Q.    What -- what is meant by "his conduct" in your

13 interpretation?

14              MR. BYRNE:  Objection, form.

15    A.    When we found out some of the facts behind the

16 quotes that were sent to us that we were unaware of

17 that were true, I think that that is what conduct he

18 means.

19    Q.    (BY MR. PIERCE)  The statements by Mr. Meyer?

20    A.    Yes.

21    Q.    And he's referring to Mr. Meyer's own conduct.

22 Not that of -- not that of somebody else, Mr. Waid, or

23 anyone else; correct?

24    A.    Correct.

25    Q.    And then Joey says, "If it were any of the

1   other guys at AP that conducted themselves similarly, I

2   would divest AP of them as well."  Do you see that?

3       A.   Yes.

4       Q.   What was your understanding of what he was

5   saying there?

6       A.   That he believed that the -- that that conduct

7   was not that acceptable.

8       Q.   And then Joey says, "I've told Doug to take my

9   name off the books immediately."  Do you see that?

10      A.   Yes.

11      Q.   What -- what does that mean for his name to be

12  taken off the books?

13      A.   That means he would have no more association

14  with the books that we publish.

15      Q.   The -- Richard Meyer's books?

16      A.   All of the books.

17      Q.   And what was the reason he felt that way from

18  your perspective?

19              MR. BYRNE:  Objection, form.

20      A.   I think he was worried about guilt by

21  association.

22      Q.   (BY MR. PIERCE)   Association with Richard

23  Meyer?

24      A.   Correct.

25      Q.   And then Joey expresses worry about how this

1    may affect other AP creators in San Diego and the

2    booth.  Do you see that?

3        A.    Yes.

4        Q.    What -- what does -- what does that mean, if

5    you know, the reference to other AP creator in San

6    Diego and the booth?

7                    MR. BYRNE:  Objection, form.

8        A.    You know, we have been publishing for many

9    years and we deal with many freelancers creators and we

10   have a fairly decent presence in San Diego and he was

11   worried about the possibility of that impacting us.

12       Q.    (BY MR. PIERCE)  Okay.  Can you go to the

13   second page of the email.  Do you see in the second

14   full paragraph it starts, "All you do work for AP way

15   beyond the call of duty and I will have your back."  Do

16   you see that?

17       A.    Excuse me.  I'm sorry.  Where is that?

18       Q.    I'm sorry.  It's the second full paragraph?

19       A.    Second page.  Oh, okay.  Sorry.

20       Q.    Do you see where it says, "All you do for

21   work" -- I'm sorry -- "All you do work for AP way

22   beyond the call of duty and I will have your back."  Do

23   you see that?

24       A.    Yeah.

25       Q.    What did you mean by having your back?

1       A.    I will support them for whatever decision they

2  make.

3       Q.    So if Joey doesn't want to be -- or doesn't

4  want Antarctic Press to -- to be associated with

5  Jawbreakers you'll have his back?

6       A.    I think the context was whatever decision a

7  person makes, I will have -- support them.

8       Q.    And --

9       A.    Either one way or the other.

10      Q.    And Joey had made clear that he did not want

11 Antarctic Press to be associated with Jawbreakers;

12 correct?

13            MR. BYRNE:  Objection, form.  Objection,

14 leading.

15      A.    Correct.

16      Q.    (BY MR. PIERCE)  And did Joey's concerns and

17 the concerns of other AP staff and freelancers weigh

18 heavily on you as you were trying to make a decision

19 about what to do?

20      A.    Yes.

21      Q.    And this email from Joey that we reviewed was

22 before you ever spoke to Mr. Waid; correct?

23      A.    Yes.

24            MR. PIERCE:  This will be Exhibit 35.

25            (Deposition Exhibit 35 marked.)

1    Q.   (BY MR. PIERCE)  And this is another exhibit --
2    I apologize -- I think we've covered already.  This --
3              MR. BYRNE:  Mine just aren't good enough
4    for you, are they?
5              MR. PIERCE:  No, if I try to find them in
6    my stack, it -- we'll be here for hours.
7    Q.   (BY MR. PIERCE)  Is Exhibit 35 an email dated
8    May 11, 2018, at 12:25 p.m.?
9    A.   Yes.
10   Q.   And it -- it's from Doug; correct?
11   A.   Correct.
12   Q.   And Doug says, "I just got a call from Mark
13   Waid"; right?
14   A.   Correct.
15   Q.   And Doug reports that Mr. Waid had stressed he
16   wasn't trying to dictate what AP can or can't publish;
17   correct?
18   A.   Correct.
19   Q.   Do you have any reason to doubt that Mr. Waid
20   had stressed that he wasn't trying to dictate what AP
21   can or can't publish?
22   A.   I didn't take the call so I can't speak, but
23   Doug is -- you know, Doug is Doug.  He will say what he
24   heard.
25   Q.   Was that consistent with what Mr. Waid said to

1    you, that he wasn't trying to dictate what AP could

2    publish?

3        A.    Yes.

4        Q.    Earlier when you were talking about the

5    conversation with Mr. Waid and -- and Mr. Byrne asked

6    you questions about misogynist and racist and that kind

7    of thing -- do you recall that?

8        A.    The conversation with Mr. Waid?

9        Q.    I'm sorry.  I'm referencing Mr. Byrne's

10   questions to you.  Do you know if what Mr. Waid was

11   saying was based on statements that he had seen or read

12   from Mr. Meyer?

13       A.    I think, yes.

14       Q.    During the May 2018 timeframe, Brian Denham

15   managed the social media accounts; correct?

16       A.    Correct.

17               MR. PIERCE:  This will be Exhibit 36.

18               (Deposition Exhibit 36 marked.)

19       Q.    (BY MR. PIERCE)  And do you see -- does -- does

20   this appear to be a tweet from the Antarctic Press

21   account dated May 12th, 2018?

22       A.    Yes.

23       Q.    And it starts with, "FACTS:  Mark Waid put a

24   call into our office.  Staff took a message and told

25   Mr. Waid our publisher would be informed.  Nobody at AP

1    threat, but, you know, like I said, at the time, I was

2    under a lot of pressure at that time and I felt like a

3    lot of this pressure was uncalled for.

4       Q.   Do you -- do you recall making the statement to

5    Mr. Waid that you felt that the comments or conduct of

6    Mr. Meyer was indefensible?

7       A.   I would have a hard time for me to defend those

8    comments.

9                  (Deposition Exhibit 37 marked.)

10                 MR. PIERCE:  This will be Exhibit 37.

11      Q.   (BY MR. PIERCE)  This -- does this appear to be

12   a tweet associated with the Antarctic Press account?

13      A.   It appears to, yes.

14      Q.   And this tweet also says, "Mark Waid did not

15   bully anyone at our company."  Do you see that?

16      A.   Correct.

17      Q.   And that was sent out by Antarctic Press in --

18   as part of its social media account; correct?

19      A.   Correct.

20      Q.   And you say, "Though he did call and express

21   concern, Mark shed more light on the situation and

22   other factors came into play that do not involve any

23   staff or freelancers at any other company that led us

24   to our decision."  Do you see that?

25      A.   Yes, I do.

Joeming W. Dunn, M.D.                                    108

1      Q.    And was it true that, "Other factors came into

2   play that do not involve any staff or freelancers at

3   any other company that led us to our decision"?

4      A.    I don't know if I would agree with that.   I

5   mean, because there are -- we have a lot of staff --

6   well, freelancers that work at other companies that --

7   you know, that -- I mean, a multitude of them.

8      Q.    And so, again, there were factors that led to

9   Antarctic Press's decision that had no relationship to

10  Mark Waid; correct?

11     A.    Yes.

12     Q.    And those factors were concern that your staff

13  and freelancers had expressed; correct?

14     A.    Correct.

15     Q.    And including Mr. Meyer's own conduct; correct?

16     A.    Correct.

17     Q.    And those factors that led to AP's decision are

18  factors unrelated to Mark Waid; correct?

19     A.    Correct.

20            MR. PIERCE:   This will be Exhibit 38.

21            (Deposition Exhibit 38 marked.)

22     Q.    (BY MR. PIERCE)   And is this another -- does

23  this appear to be another social media post associated

24  with Antarctic Press?

25     A.    Correct.

1    Q.   And this one says, "Ultimately, some of our

2    staff and freelancers were uncomfortable sharing a

3    platform with anyone who makes disparaging remarks

4    about anyone in this community.  We had to cut ties.

5    We wish Richard all the best."  Was this post accurate?

6    A.   Yes.

7                MR. PIERCE:  Exhibit 39.

8                (Deposition Exhibit 39 marked.)

9    Q.   (BY MR. PIERCE)  And do these appear to be

10   additional social media posts associated with the

11   Antarctic Press account?

12   A.   It appears so, but I don't actually remember

13   reading these posts.

14   Q.   Did you remember reading the previous posts

15   that we -- that we just reviewed?

16   A.   No.

17   Q.   Were you aware that those posts had been made,

18   the -- the ones that we looked at previously?

19   A.   I was I think made aware of some of those

20   posts, but I never -- I never read any of these

21   posts --

22   Q.   Okay.

23   A.   -- prior -- when they first came out.

24   Q.   And do you see the third message down, it says,

25   "It came down to letting them know the extent of

Joeming W. Dunn, M.D.                                          110

1    Richard's online presence and some of the staff were

2    not even comfortable with the thought of standing with

3    him at a con."  Do you see that?

4        A.   Yes.

5        Q.   What is a con?

6        A.   It's a convention, comic book convention I'm

7    sure they're referring to.

8        Q.   Do you -- do you recall that some AP staff were

9    not comfortable with the thought of standing with

10   Mr. Meyer at a convention?

11       A.   Yes.

12       Q.   Who -- who expressed that concern?

13       A.   I think Joey.

14       Q.   Do you recall that we reviewed some text

15   messages between you and Richard Meyer?

16       A.   Yes.

17       Q.   Did you ever become aware that Mr. Meyer had

18   publicly tweeted out your texts with him?

19       A.   I was not --

20            MR. BYRNE:  Objection, form.

21       A.   I was not aware of that.

22       Q.   (BY MR. PIERCE)  When you were texting with

23   him.  Would you have expected that he would publicly

24   tweet out the text messages between you and him?

25       A.   I believe I have no expectation of privacy.

1      Q.    Well, did you have an expectation that he would

2    publicly tweet them out?

3      A.    I -- I didn't think he would, but -- yeah.

4      Q.    Was Antarctic Press's decision not to publish

5    Mr. Meyer's book made of its own volition?

6      A.    I'm not sure if I understand that question.

7      Q.    Did -- you made the decision for Antarctic

8    Press; correct?

9      A.    Correct.

10     Q.    And that was your decision; correct?

11     A.    100 percent.

12     Q.    And you made that decision voluntarily?

13     A.    Correct.

14     Q.    And Mark Waid, did he do anything to prevent AP

15   from publishing Mr. Meyer's book?

16     A.    No.

17     Q.    Rather it was entirely up to Antarctic Press

18   whether to publish Mr. Meyer's book; correct?

19             MR. BYRNE:   Objection, form.   Objection,

20   leading.

21     A.    Yes.

22     Q.    (BY MR. PIERCE)   Did you ever see any actual

23   finished book for Jawbreakers?

24     A.    Me personally, no.

25     Q.    Do you know if Antarctic Press ever did?

1     A.    I think Brian saw a finished product.

2     Q.    Are you able to estimate with any reasonable

3  certainty the number of Jawbreakers's books that would

4  have been sold if published by Antarctic Press?

5     A.    I remember at the time when he announced

6  that -- that we were -- you know, he had X number of

7  followers, and I thought to myself, well, even if we

8  get 1 percent of those people to buy the book from a

9  retailer, it was a significant number more than we

10 normally would sell.  And so I can't say to you off the

11 top of my head what number it was, but I -- my guess

12 was between a thousand and 5,000 copies.

13    Q.    And that was -- that was just your guess?

14    A.    That was just my guess.

15    Q.    I -- I take it you would agree that it's --

16 it's speculative as to how any particular book that AP

17 publishes will actually sell in the market?

18              MR. BYRNE:  Objection, form.

19    A.    Correct.

20    Q.    (BY MR. PIERCE)  I've read in some of the

21 documents that AP has experienced some financial

22 struggles over the years; is that correct?

23    A.    Correct.

24    Q.    And does it happen sometimes that AP puts out a

25 book and it performs a lot worse than what AP hoped?

1    A.    Yes.

2    Q.    And do some books turn out to be unprofitable?

3    A.    Yes.

4    Q.    And it's possible that Jawbreakers may have

5    turned out to be unprofitable as well; correct?

6              MR. BYRNE:   Objection, form.

7    A.    Yes.

8    Q.    (BY MR. PIERCE)   Do you know if AP were able to

9    sell the 1,000 to 5,000 books what Mr. Meyer's take

10   from that would have been?

11   A.    Based on our contract, I do not think we had

12   determined a cover price at that point in time.  I

13   think we were in discussion with that.  Probably

14   between -- I mean, if it sold on the low end, maybe 12

15   to $1500.00.  On the high end -- high end, maybe

16   $10,000.00.

17   Q.    And that's if you sold 1,000 to 5,000 books?

18   A.    Correct.

19   Q.    And that's not a given either, is it?

20   A.    There's no guarantees, no.

21              MR. PIERCE:   I want to mark -- what

22   exhibit number are we up to?

23              THE REPORTER:   40.

24              MR. PIERCE:   40.  I think this will be

25   the last one.

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3    RICHARD MEYER,              *
         Plaintiff,              *
 4
      VS.                         *   CIVIL ACTION NO.
 5                                    1:18-CV-00800-LY
      MARK WAID,                  *
 6       Defendant.               *   (Jury Demanded)

 7

 8

 9                  REPORTER'S CERTIFICATE

10              VIDEOTAPED ORAL DEPOSITION

11                         OF

12              JOEMING W. DUNN, M.D.

13                   MARCH 6, 2019

14

15

16          I, Shan Morris Blanchard, Certified

17    Shorthand Reporter in and for the State of Texas,

18    hereby certify to the following:

19        That the witness, JOEMING W. DUNN, M.D., was duly

20    sworn by the officer and that the transcript of the

21    oral deposition is a true record of the testimony given

22    by the witness;

23        I further certify that pursuant to FRCP Rule (f)(1)

24    that the signature of the deponent;

25          _____ was requested by the deponent or a party
```

1    before the completion of the deposition and instruction

2    given that it be returned within 30 days from the

3    receipt of the transcript.  If returned, the attached

4    Changes and Signature Page contains any changes and the

5    reasons therefor;

6       __X__ was not requested by the deponent or a party

7    before the completion of the deposition.

8       I further certify that I am neither attorney or

9    counsel for, nor related to or employed by any of the

10   parties to the action in which this deposition is

11   taken.

12      Further, I am not a relative or employee of any

13   attorney or party of record in this cause, nor do I

14   have a financial interest in the action.

15      Subscribed and sworn to on this the 20th of

16   March, 2019.

17                    *Shan Blanchard*

18   _____

19                 Shan Morris Blanchard, CSR
                        Texas CSR #3863
                   Expiration Date:  10/31/21
20        Leixtas - Firm Registration No. 539
                   100 N.E. Loop 410, Suite 955
21                 San Antonio, Texas 78216
                        (210) 481-7575

22

23

24

25