IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RICHARD MEYER, | § | |
|        Plaintiff | § | |
| | § | |
| v. | § | Case No. 1:18-cv-00800-LY |
| | § | |
| MARK WAID, | § | |
|        Defendant | § | |

---

**DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT
FOR LACK OF PERSONAL JURISDICTION**

---

## INTRODUCTION

Plaintiff Richard Meyer brought this suit against Mark Waid, a California citizen, in an illegitimate effort to intimidate and silence Waid.  Waid is a well-known comic book author who has written stories featuring many of the world's iconic superheroes, such as Superman, Captain America, Wonder Woman, and Daredevil, to name a few.  Plaintiff created a YouTube channel to promote his views that comics had become too diverse in gender, race, and sexuality in terms of characters and creators—views that are regularly expressed with patently offensive and hateful language, targeting not just the work itself but the creative people behind it.  Plaintiff also sought to create his own comic book entitled JAWBREAKERS—LOST SOULS.  When a publisher decided not to publish his book after learning about Plaintiff's ongoing negative campaign against diversity, Plaintiff baselessly blamed Waid, who is an outspoken proponent of diversity and defender of women and others historically under-represented in the comics industry, rather than putting the blame where it belongs: Plaintiff's own unfavorable reputation he created through his personal words and conduct.  Plaintiff's refusal to accept responsibility (and appetite for attention) culminated in this baseless lawsuit.

Plaintiff asserts claims for tortious interference with contract and defamation.  These claims are completely meritless.  But the problem at the outset, and which is proper to address, is that this Court lacks personal jurisdiction over Defendant Waid.  Fifth Circuit precedent requires that each claim be analyzed separately for whether personal jurisdiction exists.

 Plaintiff's tortious-interference claim is based entirely on a single phone call between Waid, who was in California at the time, and a San Antonio publishing company.  That is far short of the necessary substantial connection with Texas to justify personal jurisdiction.  Waid did not even know at the time that Plaintiff apparently lives in Texas (particularly in light of Plaintiff's

effort to create the public impression he is in New York City, as discussed below).  For that reason alone, Fifth Circuit precedent requires a finding of no personal jurisdiction.

As for Plaintiff's defamation count, he alleges multiple defamatory statements that fall into two categories: (a) statements by Waid through social media, and (b) statements at a comic convention in Houston occurring after the publisher decided against publishing Plaintiff's book. Under Texas law, each alleged defamatory statement constitutes a separate claim—which, in turn, requires a jurisdictional analysis as to each.  Personal jurisdiction inarguably does not exist as to the first category.  Moreover, especially since Waid did not know Plaintiff resided in Texas, jurisdiction also does not exist as to the second category.

Pursuant to Federal Rule of Civil Procedure 12(b)(2), Defendant Waid prays that the Court dismiss this lawsuit for lack of personal jurisdiction.

## FACTUAL BACKGROUND

### A.  Mark Waid has no connection to Texas.

Waid is a citizen of California and lives in Santa Monica.  Declaration of Mark Waid ("Waid Decl."), attached as Exhibit A, ¶ 3.  He works from California as a freelance author of comic books.  *Id*.  Waid does not maintain any agents for service of process in the State of Texas. *Id*.  He was served with the summons and Complaint at his home in California.  *Id*.

Waid has no interest in, use of, or possession of real property within Texas.  *Id.* ¶ 4.  He does not own or lease any personal property in Texas.  *Id*.  He does not have any bank accounts in Texas.  *Id*.  He does not maintain any assets in Texas.  *Id*.  He is not required to pay any income, business, or property taxes to Texas.  *Id*.  He has not used the Texas court system as a litigant other than as a Defendant in this matter. *Id*.   He does not regularly do or solicit business in Texas, nor does he have any ongoing business relationships in Texas.  *Id*.  He does not have a mailing address

or telephone number in Texas.  *Id.* ¶ 5.  He lived in Texas in the early 1980s when he was young, but he has not lived in Texas since then.  *Id*.  He has never had office space in Texas.  *Id.* ¶ 6.

### B. The alleged contacts concerning Mr. Waid's connection to Texas are at most random, fortuitous, and attenuated.

Plaintiff operates a YouTube channel called "Diversity & Comics" ("D&C"). First Am. Compl. ("FAC") ¶¶ 9-10.  Plaintiff broadcasts the channel across YouTube—it is not aimed at Texas.  He claims over 88,000 "followers" of his channel and 28 million "views" of his videos, *id.* ¶ 10.  As part of his marketing, Plaintiff has been an active user of Twitter, with about 20,000 "followers."  *See* Ex. A ¶¶ 7-8 & Ex. 1.  Plaintiff's D&C's Twitter profile has identified, at all known times relevant to this lawsuit, "New York, NY" as his location. Ex. A, Ex. 1; Ex. 7.

Plaintiff alleges Waid "interfered" with the publication of Plaintiff's book JAWBREAKERS—LOST SOULS.  According to Plaintiff's allegations, JAWBREAKERS— LOST SOULS would be "a story about five ex-superheroes that come out of retirement to protect a giant, mutant ape from being exploited by a warlord"; it is not a book involving any story about Texas or one aimed only at Texas audiences.  *See, e.g.*, FAC ¶ 15.  Plaintiff alleges he had "teamed up with top tier artists to illustrate and color the book."  *Id.*  Those artists have been identified as Jon Malin, Ethan Van Sciver, and Brett Smith.  *See, e.g.*, Ex. A, Ex. 2, *No Enemy But Peace— Richard Meyer, Antarctic Press, and Jawbreakers*, Bleeding Cool.  Mr. Malin's Twitter profile page indicates he is in Michigan; Mr. Van Sciver's Twitter profile page notes he is in New Jersey; and Mr. Smith's Twitter profile page identifies him as being in Arizona.  *See* Ex. A ¶ 11 & Ex. 3.

Waid made two or three social media posts (on Facebook and Twitter) regarding Plaintiff. These posts were not directed to Texas but rather were posts accessible and viewable by all of his more than 5,000 Facebook "friends" and nearly 100,000 Twitter "followers," regardless of where they were located.  Ex. A ¶ 10; FAC ¶ 11, 18.  Plaintiff alleges Waid sent a tweet stating that he

had "a call in to Antarctic Press," which, Plaintiff alleges, *"[o]n information and belief*…triggered an onslaught by Waid's followers against Antarctic Press, with calls and threats to Antarctic Press…."  FAC ¶ 18 (emphasis added).  Waid did not instruct or tell any of his "followers" or "friends" to call or threaten Antarctic Press ("AP").  Ex. A ¶ 18.

Plaintiff alleges Mr. Waid had one phone call with an owner of Antarctic Press ("AP"). FAC ¶ 19.  Waid did have one relatively brief phone call with someone who identified himself as associated with or an owner of AP.  Waid had left a message at AP and asked that someone return his call.  Ex. A ¶ 14. Someone associated with AP called Waid back, and they discussed Plaintiff. *Id*.  At that time, Waid did not know where AP was located, and Waid did not know where the person with whom he spoke lived, whether in Texas or elsewhere.  *Id*.  It was not until after that call that Waid even learned AP had operations in Texas.  *Id.* ¶ 21.

Waid also did not know where Plaintiff lived or was located.  Waid did not know that Plaintiff resided in Texas or had any connection at all to Texas.  *Id.* ¶¶ 9, 14. As noted, Plaintiff's Twitter account clearly identified that he is in New York.  *Id.*, Exs. 1 & 7.

### C. Plaintiff's own words and conduct directed towards the world (not just Texas) have created substantial reason why people may not do business with him.

By the time Waid had spoken to AP, the publisher indicated it had already decided to sever ties with Plaintiff, because it had learned more about his conduct and unfavorable reputation.  *See* Ex. A ¶¶ 16-17.  The representative told Waid that, *after learning more about Plaintiff*, AP found Plaintiff's conduct "indefensible."  *Id.*  Waid did not tell or even ask AP to not publish JAWBREAKERS.  *Id*. ¶¶ 16-18.  In public tweets, AP confirmed that Plaintiff's own conduct led to their decision to not publish Plaintiff's book, not anything Waid did. *See id.*, Exs. 5-6.

In deposition testimony, Joe Dunn, the owner of AP with whom Waid spoke, confirmed that Waid did not cause AP to decide not to publish Plaintiff's book:

| Q: | *And so, again, there were factors that led to Antarctic Press's decision that had no relationship to Mark Waid; correct?* |
|----|----|
| A: | *Yes.* |
| Q: | And those factors were concern that your staff and freelancers had expressed; correct? |
| A: | Correct. |
| Q: | And including Mr. Meyer's own conduct; correct? |
| A: | Correct. |
| Q: | *And those factors that led to AP's decision are factors unrelated to Mark Waid; correct?* |
| A: | *Correct.* |
| . . . . | |
| Q: | Did – you made the decision for Antarctic Press; correct? |
| A: | Correct. |
| Q: | And that was your decision; correct? |
| A: | 100 percent. |
| Q: | And you made that decision voluntarily? |
| A: | Correct. |
| Q: | *And Mark Waid, did he do anything to prevent AP from publishing Mr. Meyer's book*? |
| A: | *No.* |

Ex. B, Ryan Pierce Decl., Ex. 1 Dunn Depo. at 107:20-108:19; 111:7-111:16 (emphasis added).

After AP initially announced it would publish JAWBREAKERS, AP then learned Plaintiff had revealed the identities of stores that had decided against carrying the book because of Plaintiff's well-earned negative reputation for harassment and hateful rhetoric. *Id.* at 74:17-76:19 & Ex. 2. AP's social-media director reported to AP staff that Plaintiff had promised not to "rat out" these retailers, and Mr. Dunn expressed the hope Plaintiff would "respond in the proper way." *Id.* at 77:3-78:10; 83:16-85:10. But Plaintiff did not respond in any way that could be called "proper." Instead, he publicly "ratted out" the stores by tweeting about a private Facebook chat among the retailers, and even openly encouraged his Twitter followers to research and reveal the identities of store employees:



Mr. Dunn ultimately became aware of this spiteful effort. *Id.* at 80:12-25 & Ex. 3.  As Plaintiff had

requested, one of his followers publicly listed the names of store employees and related phone

numbers.  *See id.*, Ex. 4 (redacted for privacy); Ex. 1, 81:5-20.  Not content with this, on the

morning of May 11, 2018, Plaintiff also re-tweeted an apparent threat of violence against those

stores and praised his "Incel army."[1] *See id.* at 82:5-23 & Depo. Ex. 5.   All this occurred before

Dunn ever spoke to Waid.

 After announcing its decision to publish JAWBREAKERS, AP also came to learn about

some of the shocking comments Plaintiff had made about other creators.  Among other things,

AP's "editor in chief" (or "EIC") reported to Mr. Dunn that he had learned that Plaintiff had called

his "Star Wars editor" a "c*m dumpster."  Ex. B, Ex. 1 at 94:11-95:21; Ex. 8. This was in addition

to other horrific statements Plaintiff made in a YouTube video, including defaming Waid and

others as "pedophiles."  *Id*. at 86:22-88:23. Plaintiff never revealed this YouTube video to AP, but

AP learned of all this before Dunn spoke with Waid. *Id.* at 73:18-74:1; 88:11-23.

---

[1]   "Incels"   are   known   for   promoting   hate   speech   against   women.   *See,   e.g.*,
https://www.nytimes.com/2018/04/24/world/canada/incel-reddit-meaning-rebellion.html

AP's EIC found Plaintiff's conduct so egregious he sent the following email to Mr. Dunn (before Dunn ever spoke with Waid), to make clear that he did not want AP associated in any way with Plaintiff:

> …. ***I haven't been able to sleep or work and that's because it boils down to this: I'm not comfortable being associated with this guy, it's not his work, and it's not his beliefs, it's his conduct***. And, if it were any of the other guys at AP that conducted themselves similarly I would divest AP of them as well. There are standards of civil and professional conduct I believe in. This guy obviously has issues. ***I've told [another AP employee] to take my name of [sic] the books immediately*** and I'm also worried about how this may affect other AP creators and San Diego and the booth. Please be careful.

Ex. B, Ex. 6 (emphasis added); Ex. 1 at 96:24-99:24; 101:16-23.

A further sampling of Plaintiff's various hate-filled attacks can be found in tweets at Ex. 4 of Waid's declaration. This is just the tip of the iceberg, and Waid could recount page after page of YouTube videos and tweets spewing division and hatred (many of which Plaintiff actually deleted after he filed the lawsuit but which have been saved at least in part by those who monitor his hateful activities). Given Plaintiff's egregious record of targeting creators and others in the comics world, it is no surprise that, as Plaintiff's own allegations admit, "[b]y late 2017, media reports began to emerge characterizing Mr. Meyer as a bigot, racist, and part of a group that promotes white supremacy." FAC ¶ 13.

It is Plaintiff's earned reputation—as someone against non-white, non-straight, and female members of the comic-book world—that caused Waid and many others to have legitimate concerns about Plaintiff and that caused AP to not do business with him—not anything involving Texas. Ex. A ¶ 13; Ex. B, Ex.1 at 107:20-108:19; 111:7-111:16.

## THE COURT LACKS PERSONAL JURISDICTION OVER WAID.

A court must dismiss an action when it lacks personal jurisdiction over the defendant. FED. R. CIV. P. 12(b)(2). The plaintiff has the burden of proof in establishing personal jurisdiction and

carries the initial burden of showing a *prima facie* case supporting jurisdiction. *See Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010). While uncontroverted allegations in the complaint must be taken as true, the court is not required "to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001). In deciding a Rule 12(b)(2) motion, evidence takes precedence over allegations. *See Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).

A district court may exercise personal jurisdiction over a non-resident defendant only if (1) the forum state's long-arm statute creates personal jurisdiction, and (2) the exercise of jurisdiction is consistent with due process. *Johnston*, 523 F.3d at 609. *General* personal jurisdiction is unrelated to plaintiff's cause of action and requires that the defendant have "continuous and systematic" contacts with the forum state. *See Helicopteros Nacionales*, 466 U.S. 408, 415-16 (1984); *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002). *Specific* jurisdiction requires, among other things, that the defendant's contacts with the forum state arise from, or directly relate to, the cause of action. *See Helicopteros Nacionales*, 466 U.S. at 414-15 & n.8; *Revell*, 317 F.3d at 470. Neither exists in this case.

## I.     Plaintiff Cannot Establish General Jurisdiction Over Waid.

For a federal court to exercise general jurisdiction, the defendant's affiliations with the state must be so "continuous and systematic as to render [defendant] essentially *at home* in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (citation omitted). The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Johnston*, 523 F.3d at 609 (citation omitted).

Plaintiff cannot establish general jurisdiction. Waid is a California citizen who lives in Santa Monica, California. Compl. ¶ 2; Ex. A ¶ 3. Waid has no presence or even property in Texas,

and has no other continuous and systematic ties to Texas. *Id.* ¶¶ 3-6. He simply cannot be said to be *at home* in Texas.

## II.     Plaintiff Cannot Establish Specific Jurisdiction Over Waid.

"A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant[] must establish specific jurisdiction as to each claim." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006). This principle—and the absence of any "pendent" or "supplemental" personal jurisdiction—is dictated by the Due Process Clause, which requires that "specific jurisdiction . . . be established for each claim." *Id.* at 275 & n.6. If this were not clear enough, the Fifth Circuit expressly relied on the following principle:

> *There is no such thing as supplemental specific personal jurisdiction; if separate claims are pled, specific personal jurisdiction must independently exist for each claim and **the existence of personal jurisdiction for one claim will not provide the basis for another claim**. Id.* (emphasis added) (citation omitted).

Thus, for example, the Fifth Circuit found personal jurisdiction over a fraud claim but rejected personal jurisdiction over a breach-of-contract claim even though the same phone calls allegedly led to both claims. *See Trois v. Apple Tree Auction Ctr, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018). This claim-by-claim inquiry even applies when separate claims are the same "*type* of claim." *See Carmona v. Leo Ship Mgt*, 924 F.3d 190, 198 n.16 (5th Cir. 2019) ("[Plaintiff] suggests that because he has raised only one *type* of claim—i.e., negligence—the court need not analyze specific jurisdiction on a claim-by-claim basis. [I]t matters not that [plaintiff's] allegations all sound in negligence; the court must separately consider specific jurisdiction for each claim that arises from different forum contacts." (emphasis in original)). Therefore, Plaintiff's tortious-interference and defamation claims must be separately analyzed for jurisdiction—and, as discussed below, personal jurisdiction does not exist for any of the claims.

A. **Plaintiff has not established personal jurisdiction as to the interference claim.**

"For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a *substantial connection* with the forum State." *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphasis added). Even contracting with or being employed by a Texas company, without significantly more, is insufficient to establish the requisite minimum contacts for jurisdictional purposes. *See, e.g.*, *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) ("[M]erely contracting with a resident of [Texas] is insufficient to subject the nonresident to the forum's jurisdiction."). The necessary minimum contacts are not satisfied "by demonstrating contacts between the plaintiff (or third parties) and the forum State," *Walden*, 571 U.S. at 286, as the defendant must have *purposefully* created a substantial connection with the forum.   As discussed below, in the intentional-tort context, this requires, among other things, a showing that the defendant *knew* the plaintiff would suffer the brunt of harm in the forum state.

Here, Plaintiff does not allege *any* relationship between Waid and Plaintiff, business or otherwise.  Plaintiff's interference claim rests entirely on a phone call between one of the owners of AP and Waid.  That is not enough to support jurisdiction.  Especially since Waid undisputedly did not know Plaintiff resided in Texas, personal jurisdiction plainly does not exist.

1. Fifth Circuit precedent requires that defendant knew the plaintiff resided in the forum.

To establish personal jurisdiction over a defendant who allegedly committed an intentional tort in the forum state, the plaintiff must show—as one of the necessary prerequisites—that "'the defendant *knew* that the plaintiff would suffer the brunt of the harm caused by the tortious conduct *in the forum*, and point to specific activity indicating that the defendant expressly aimed [his] tortious conduct *at the forum*.'"  *Revell*, 317 F.3d at 475-476 & n.63 (quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 266 (3d Cir. 1998)) (emphasis in original).  The requirement that the

defendant have known the plaintiff was in the forum is based on the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984).

While *Calder* involved defamation, the Fifth Circuit has consistently applied *Calder* to a variety of intentional torts. In explaining the principle regarding the defendant's knowledge of the location of the plaintiff's injury, *Revell* cited and quoted two non-defamation cases—one of which involved a tortious-interference-with-contract claim. *See Revell*, 317 F.3d at 475-476 & n.63 (relying on the following quote from *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 266 (3d Cir. 1998), a tortious-interference case: "[T]he plaintiff must show that the defendant *knew* that the plaintiff would suffer the brunt of the harm caused by the tortious conduct *in the forum*, and point to specific activity indicating that the defendant expressly aimed its tortious conduct *at the forum*." (emphasis in original)); *Revell*, 317 F.3d at 475-476 & n.63 (relying on the following quote from *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000), a trademark-infringement case: "[*Calder* requires that] the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant *knows to be a resident of the forum state*" (emphasis in original)). The Fifth Circuit itself has applied *Calder* to tortious-interference claims. For example, in *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 772 (5th Cir. 1988), the Fifth Circuit applied *Calder* and found no personal jurisdiction as to plaintiff's tortious-interference claims. The *Southmark* Court interpreted *Calder* as follows:

> In *Calder*, the Supreme Court held that when an alleged tort-feasor's intentional actions are expressly aimed at the forum state, and the tort-feasor *knows that the brunt of the injury will be felt by a particular **resident** in the forum*, the tort-feasor must reasonably anticipate being haled into court there to answer for its tortious actions.

*Southmark*, 851 F.2d at 772 (emphasis added); *see also Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (applying *Calder* and explaining "foreseeability of

causing injury in Texas" is necessary, though not sufficient, prerequisite to exercise of jurisdiction and finding lack of jurisdiction over tortious-interference claim, even though defendant allegedly knew plaintiff was in Texas); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999) (explaining that *Calder* "test applies outside the context of defamation").[2]

The primary case on which Plaintiff will likely rely, *Trois v. Apple Tree Auction Ctr, Inc.*, 882 F.3d 485 (5th Cir. 2018), similarly supports this analysis. While *Trois* reasoned that a single communication "*may* be enough" to support jurisdiction, it remains a necessary prerequisite that the defendant knew the plaintiff resided in the forum at the time of the allegedly tortious conduct and that the harm would occur there. At the outset of *Trois*, the Court expressly stated that, with respect to the telephone calls at issue, the defendant allegedly "*knew* [the plaintiff] lived in Texas." *Id.* at 488 (emphasis added). The calls concerned the defendant's efforts to auction items owned by the plaintiff in Texas—thus further indicating the defendant knew plaintiff's location and that harm would occur in that jurisdiction. *Id.* at 491-492. Indeed, the *Trois* Court discussed the effect of a defendant's knowledge that the plaintiff was in the forum, but made the point that "mere knowledge" of the plaintiff's forum location is not alone enough to support jurisdiction. *Id.* at 492 n.7. *Trois* is in harmony with *Revell* and other prevailing Fifth Circuit precedent.

Mere knowledge of location alone would not support jurisdiction, but jurisdiction does not exist, as a matter of law, absent that showing. *See, e.g.*, *IMO*, 155 F.3d at 266 ("While knowledge that the plaintiff is located in the forum is necessary to the application of *Calder*, . . . it alone is insufficient. . . ."). As Judge Sparks held in a fraud case:

> [Defendant] alleges he did not know where [plaintiff] lived while the two of them were communicating via Skype, and [plaintiff] does not challenge the truth of that

---

[2] While some of this case law involved a contract negotiated or performed outside Texas, the Court made clear that an inescapable threshold requirement is that "the tort-feasor knows that the brunt of the injury will be felt by a particular resident in the forum." *Southmark*, 851 F.2d at 772.

allegation.  '*Knowledge of the particular forum in which a potential plaintiff will bear the brunt of the harm forms an essential part' of the purposeful availment analysis*. . . . Because [defendant] did not know where [plaintiff] was located during their communications, [defendant's] conduct was necessarily not purposefully directed at Texas, and specific jurisdiction cannot lie.

*See Rad v. Bragg*, No. 14-1074, 2015 WL 12748177, at *3 (W.D. Tex. May 8, 2015) (emphasis added); *see also Festor v. Wolf*, No. 09-0054, 2009 WL 10669519, at *5 (W.D. Tex. Aug. 24, 2009) (distinguishing Fifth Circuit case law involving allegedly tortious phone calls in which "there was no dispute regarding whether the defendants knew that the plaintiffs were in Texas," and finding no jurisdiction where, in contrast, "Plaintiffs fail[ed] to establish a prima facie case that [defendant] knew that Plaintiffs resided in Texas" at the time of the alleged tortious conduct).

   2.   Waid undisputedly did not know Plaintiff resided in Texas.

   Plaintiff does not even allege Waid knew he resided in Texas at the time of the alleged offense.  Nor could he allege this.  Waid did not know Plaintiff resided in Texas at the time of the calls on which Plaintiff's tortious-interference claim is based.  In fact, Waid did not know Plaintiff was in Texas until this lawsuit.  *See* Ex. A ¶¶ 9, 14.  Indeed, Plaintiff publicly held himself out to be located in New York.  *Id.* ¶ 8 & Exs. 1 & 7.  Accordingly, Fifth Circuit precedent requires dismissal of Plaintiff's tortious-interference claim for lack of personal jurisdiction.

   3.  Waid also did not know AP was located in Texas.

   The publisher AP is not the plaintiff and therefore any knowledge regarding its location is not material given Waid's lack of knowledge regarding *Plaintiff's* location. But Waid also notes that the evidence affirmatively shows he did not know AP was in Texas at the time of his calls with AP.  *See* Ex. A ¶ 14.  Nor does Plaintiff's Complaint allege otherwise.

   Plaintiff will likely point to San Antonio's area code—without any evidence that Waid knew that area code was associated with Texas.  Moreover, even if Waid had such knowledge

(which he did not), that would be insufficient.  *See, e.g.*, *Tornado Bus. Co. v. Bus. & Coach Am. Corp.*, No. 14—3231, 2014 WL 7333873, at *3 (N.D. Tex. Dec. 23, 2014) (noting "courts are reluctant to find jurisdiction based only on emails and phone calls because reliance on telephone calls and email can no longer reliably prove purposeful availment" (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790 (Tex. 2005)).  In fact, the evidence shows that AP itself admitted it was not known as a Texas-based publisher. Ex. B, Ex. 1, 32:17-33:7.  Ultimately, Plaintiff can merely show Defendant knew ***after the calls*** that AP was in Texas—which would not be relevant even if AP itself were the plaintiff.  *See, e.g.*, *Festor*, 2009 WL 10669519, at *5 (holding defendant's knowledge plaintiff lived in Texas was not relevant to or in conflict with dispositive point that he did not know this at time of fraudulent communications).

However, even if Waid knew Plaintiff (and/or AP) was in Texas at the time of the phone discussion with AP—which he did not know—that still would not support personal jurisdiction in this case.  "[The] minimum contacts analysis looks at the defendant's contacts with the forum State itself, *not the defendant's contacts with persons who reside there.*"  *Walden*, 571 U.S. at 285 (emphasis added).  The larger context of the dispute must also be considered, even if the defendant knew the plaintiff resided in the forum state.  *See also Herman v. Cataphora, Inc.*, 730 F.3d 460, 462, 465-466 (5th Cir. 2013) (finding no jurisdiction over tortious-interference and defamation claims because "focal point" of dispute was not forum, Louisiana, even though defendant, a trial consultant, made statements to a legal-affairs website to the effect plaintiffs, lawyers who worked in Louisiana, had acted improperly in relation to multi-district litigation in Louisiana, because statements at issue did not mention Louisiana and focused on parties' larger contractual relationship).

This case concerns a comic book to be created by a team spread across multiple states, whose subject matter would not be Texas (but rather a giant mutant ape), and that would be aimed at the world-wide comic-book market generally (not specifically Texas).  *See* FAC ¶¶ 15-17; Ex. A ¶ 11 & Exs. 2-3.  And Waid's comments concerning Plaintiff stems from Plaintiff's anti-diversity campaign that targets the comic-book market generally—not anything unique or connected to Texas.  *See* Ex. A ¶ 13; Ex. 4.[3]

### B.   Plaintiff has not established personal jurisdiction as to the defamation count.

Like his tortious-inference claim, Plaintiff's defamation claims are entirely meritless.  But, at the outset, the Court lacks jurisdiction over Waid as to the defamation count—which is based on (a) alleged statements to social-media followers and (b) statements at a Houston convention.[4]

The defamation count states:

> ***Including*** his statements described above in Houston, Texas, Waid has intentionally published statements of fact ***to his followers and the general public*** regarding Meyer, including falsely stating that Meyer published the first and last names of comic book store employees to encourage his followers to harass and threaten them, as well as characterizing Meyer as a racist, serial harasser of minorities, and as affiliated with white supremacists….

---

[3]In fact, while Plaintiff's Amended Complaint alleges Waid caused AP to decide not to publish Plaintiff's book, the evidence affirmatively defeats that allegation, namely, AP's own deposition testimony—which notably was taken prior to the filing of the Amended Complaint and therefore renders these continuing assertions to be disingenuous and demonstrably baseless—makes clear that Waid did not cause AP to not publish the book.  *See, e.g.*, Ex. B, Ex. 1, 107:20-108:19; 111:7-111:16.  Rather, AP made that decision based on Plaintiff's own statements and conduct. *Id.*  Also, while Plaintiff alleges AP breached a contract, the facts affirmatively show AP did not breach any contract (and that no executed contract even existed).  *Id.* at 71:4-8; 72:10-73:5.  Thus, the actual facts and evidence reveal that AP's decision arose out of Plaintiff's own targeting of others in the comics industry, not any connections between Waid and Texas.

[4]Like his tortious-interference claim, Plaintiff's defamation claims are entirely meritless.  Among other reasons, Plaintiff did not comply with the Defamation Mitigation Act, the count is largely time-barred, and Plaintiff has an egregious track record of hatefully targeting others in the comics world, such that, as he admits, "[b]y late 2017, media reports began to emerge characterizing Mr. Meyer as a bigot, racist, and part of a group that promotes white supremacy." FAC ¶ 13.

FAC ¶ 24 (emphasis added).  The reference to "followers" is a reference to Waid's social-media accounts.  Plaintiff alleges Waid "has thousands of friends following his Facebook posts, and almost 100,000 Twitter followers." *Id.* ¶ 11.  Plaintiff alleges that "[a]t various times, Waid has described Meyer as a serial harasser of women and minorities, and claimed that he promotes hate and intolerance." *Id.* ¶ 13.

Allegedly defamatory "statements [made] at different times and for different audiences . . . represent completely different torts because they are different publications."  *Deaver v. Desai*, 483 S.W.3d 668, 676 (Tex. App.—Houston [14th Dist.] 2015, no pet.).  Therefore, a district court must consider whether personal jurisdiction exists as to each alleged defamatory statement.  *See Seifarth*, 472 F.3d 266 at 274 ("A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim.").

1.  Waid's lack of knowledge of Plaintiff's forum location defeats jurisdiction.

Merely because a defamatory statement is published in the forum state does not necessarily support jurisdiction.  Instead, as discussed further above, "[k]nowledge of the particular forum in which a potential plaintiff will bear the brunt of the harm *forms an essential part of the Calder [specific-jurisdiction] test*."  *Revell*, 317 F.3d at 475 (emphasis added). In *Calder*, defamatory statements were widely published in the forum, *and* the defendant knew the plaintiff resided in the forum. *Calder*, 465 U.S. at 785-786; *see Southmark*, 851 F.2d at 772 (explaining *Calder* test as involving tort-feasor who "knows that the brunt of the injury will be *felt by a particular resident in the forum*" (emphasis added)).  No exception is identified based merely on the fact that certain defamatory statements were made in the forum.[5]  Because Waid undisputedly did not know

---

[5] *Carmona v. Leo Ship Mgt.*, 924 F.3d 190 (5th Cir. 2019), discussed the role of presence in the forum in the jurisdictional inquiry.  *Carmona* involved a negligence claim for personal injury occurring in the forum; thus, it was directly known that the plaintiff suffered harm inside the

Plaintiff resided in Texas, that alone defeats jurisdiction as to both the "social media" or "general public" defamation claims and the "Houston convention" defamation claim.

    2.  <u>Jurisdiction plainly does not exist as to any "social media" or non-Houston defamation.</u>

    At the very least, there is no personal jurisdiction as to Plaintiff's defamation claims based on Waid's alleged non-Texas or "social media" statements—even if Waid knew Plaintiff resided in Texas (which he did not). Judge Lane previously correctly reached that conclusion. Dkt. #26 at 8-9. Such alleged statements (even assuming they were actually made) do not mention Texas; they were accessible by and aimed at audiences anywhere (not specifically in Texas); they stem from Plaintiff's attacks on diversity aimed at the comic-book world generally (rather than uniquely Texas); and they allegedly harmed efforts to publish a book aimed generally at the comic-book market (rather than uniquely Texas). *See, e.g.*, *Clemens*, 615 F.3d at 377-381 (finding no jurisdiction over defamatory statements that were published in "every major newspaper in Texas" because statements were not focused on Texas, even though defendant undisputedly knew plaintiff lived in Texas); *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 425-428 (5th Cir. 2005) (finding no jurisdiction over defamatory statements discussing Texas residents, even though article expressly discussed Texas, because involvement of Texas was "merely collateral to the focus of the articles").

    That the alleged defamatory statements were made over "social media," such as Twitter and Facebook, highlights the absence of jurisdiction. Websites like Twitter and Facebook are "not social media pages specifically targeted to Texas residents," but rather are aimed at the world at

---

state—as opposed to an intentional tort like defamation where it is the plaintiff's reputation at issue. In a case like *Carmona*, the connection between the act and the injury inside the forum is obvious. The Fifth Circuit in *Carmona* also emphasized that "the Supreme Court has never held that such presence [in the forum] is dispositive," as "[p]urposeful availment is a constitutional prerequisite, regardless of where the tortious conduct occurred." *Id.* at 194.

large. *Xenex Disinfection Servs., LLC v. Deal*, No. 16-232, 2016 WL 3033779, at *3 (W.D. Tex. May 25, 2016) (dismissing case for lack of personal jurisdiction where alleged defamation occurred over social media including Twitter, which did not "specifically target" Texas).[6]

In sum, Waid's lack of knowledge regarding Plaintiff's forum location defeats jurisdiction as to Plaintiff's entire defamation count. Alternatively, Plaintiff's defamation claims based on the alleged non-Texas or "social media" or "general public" statements must be dismissed.

    3.   <u>Alternatively, exercising jurisdiction over any part of the defamation count would not be fair and reasonable.</u>

Even if jurisdiction were appropriate for a claim based on the Houston statements, this is one of those cases in which the "fair and reasonable" factors weigh against exercising jurisdiction. *See McFadin v. Gerber*, 587 F.3d 753, 759-760 (5th Cir. 2009). These factors include: the burden on the nonresident defendant; the forum state's interests; the plaintiff's interest in securing relief; the interest of the interstate judicial system in the efficient administration of justice; and the shared interests of the states in furthering fundamental social policies. *Id.*

- Defendant has no connection to Texas (*see* Ex. A ¶¶ 3-6).

---

[6] *See also Higgins v. Save Our Heroes*, No. 18-42, 2018 WL 2208319, at **3-5 (D. Minn. May 14, 2018) (dismissing for lack of jurisdiction where defamatory statements were made over internet, including Facebook and Twitter, because that was not evidence the statements were "particularly connected to Minnesota," though plaintiff lived there; "if the use of a Facebook page or Twitter handle was sufficient to confer personal jurisdiction, a defendant could be haled into court in any state"); *BroadVoice, Inc. v. TP Innovations LLC*, 733 F. Supp. 2d 219, 226 (D. Mass. 2010) (dismissing for lack of jurisdiction even though defamatory statements were made on website specifically created to allow complaints against plaintiff, because the "defamatory website was aimed at Massachusetts only in the sense that it could be accessed by Massachusetts residents (along with the rest of the world)").

- Texas has little interest in resolving a defamation claim based on the Houston statements.[7] Keeping only part of Plaintiff's defamation count in Texas would undercut the efficient administration of justice; and California has shared interests in this dispute. The alleged defamation concerns Plaintiff's anti-diversity views about the comic-book market generally (which is not centered in Texas, *see* Ex A ¶ 6), relates to a book whose subject matter has no relationship to Texas and which was being created by a team spread across multiple states, and the subject matter of the alleged defamatory statements do not discuss Texas. *See id.* ¶¶ 11-12, 20; FAC ¶¶ 15, 22.  Moreover, it would be extremely inefficient to keep such a small part of the case in Texas, when the Due Process Clause plainly forbids litigation of the bulk of the case in Texas.

- Plaintiff's interest in securing relief as to this claim is extremely weak.  Plaintiff alleges the Houston statements are substantially similar to earlier statements without connection to Texas (*see, e.g.*, FAC ¶ 24), and the Houston statements occurred *after* AP decided not to publish the book (FAC ¶ 22).  Plaintiff has admitted that the gist of his lawsuit is AP's decision to not publish his book.  *See* Dkt. 23 at p.1.  It is only after AP's sworn testimony demolished Plaintiff's tortious-interference claim that he now seeks to desperately expand his defamation claims.

In sum, personal jurisdiction does not exist over either Plaintiff's tortious-interference claim or his defamation claims.   The only claim that arguably creates a close case is Plaintiff's defamation claim based on the Houston statements, but ultimately the Fifth Circuit's principle regarding defendant's knowledge of the plaintiff's location still applies.  But, even if the Court

---

[7] As discussed *supra*, the Fifth Circuit—by virtue of the Due Process Clause—does not permit "supplemental" or "pendent" personal jurisdiction, such that personal jurisdiction must independently exist for each claim.

were inclined to find jurisdiction over a defamation claim based on the Houston statements, it should decline to exercise jurisdiction over that claim under application of the "fair and reasonable" factors—as Plaintiff's remaining claims plainly cannot be litigated in Texas.  In the alternative, for the same reasons, the Court should transfer any such claim to the Central District of California, pursuant to 28 U.S.C. § 1404(a).  *See, e.g.*, *Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 761 (5th Cir. 1989) ("Such transfers [under 28 U.S.C. § 1404(a)] may [even] be made *sua sponte*.").[8]

## CONCLUSION AND PRAYER

Defendant Mark Waid prays that this Court dismiss Plaintiff Richard Meyer's claims and therefore this lawsuit, pursuant to Fed. R. Civ. P. 12(b)(2).  Mr. Waid further prays for such other and further relief to which he may be justly entitled, at law or in equity.

---

[8] The section 1404 factors include such factors as:  "practical problems that make trial of a case easy, expeditious and inexpensive"; "administrative difficulties flowing from court congestion"; and "the local interest in having localized interests decided at home."  *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008).  Whether to transfer is "committed to the sound discretion of the transferring judge," *Mills*, 886 F.2d at 761, and the ultimate decision is whether a transfer would serve "the convenience of parties and witnesses" and promote the "interest of justice," 28 U.S.C. § 1404.  For the reasons discussed above, a section 1404 analysis also reveals that litigation of a single defamation claim based on Waid's Houston statements should not occur in Texas, given that the core of this dispute—AP's decision to not publish Plaintiff's book—cannot be litigated in Texas as a matter of constitutional law.

Respectfully submitted,

REEVES & BRIGHTWELL LLP


/s/ Ryan Pierce
Beverly Reeves, Esq.
State Bar No. 16716500
breeves@reevesbrightwell.com
Ryan Pierce, Esq.
State Bar No. 24035413
rpierce@reevesbrightwell.com
221 W. 6th Street, Suite 1000
Austin, TX  78701
(512) 334-4500
(512) 334-4492 (facsimile)

Mark S. Zaid, Esq.
D.C. Bar #440532 (admitted *Pro Hac Vice*)
Mark@MarkZaid.com
Mark S. Zaid, P.C.
1250 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax

**ATTORNEYS FOR DEFENDANT**


**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of August 2019, the above and foregoing document was served using the Court's ECF system on the following counsel of record:

Daniel H. Byrne
Dale L. Roberts
Fritz, Byrne, Head & Gilstrap, PLLC
221 W. 6th St., Suite 960
Austin, TX 78701
dbyrne@fbhg.law
droberts@fbhg.law


/s/ Ryan Pierce
Ryan Pierce