IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RICHARD MEYER, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No. 1:18-cv-00800-LY |
| | § | |
| MARK WAID, | § | |
| Defendant | § | |

## DECLARATION OF RYAN PIERCE IN SUPPORT OF DEFENDANT'S  MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

I, Ryan Pierce, upon oath, declare as follows:

1.      My name is Ryan Pierce.  I am over 18 years old, of sound mind, and I am capable of making this declaration.  The facts stated in this declaration are within my personal knowledge and are true and correct.

2.      I am an attorney with the law firm of Reeves and Brightwell LLP.  I represent Defendant Mark Waid in the above-referenced proceeding.  In that capacity, I am personally familiar with the pleadings on file, the discovery, and other conduct regarding this lawsuit.

3.      The documents attached to this declaration are true and correct copies of documents as further detailed below.

4.      Attached as **Exhibit 1** are true and correct copies of excerpts from the March 6, 2019 deposition of Joeming Dunn.

5.      Attached as **Exhibit 2** is a true and correct copy of Deposition Exhibit 25 from the March 6, 2019 deposition of Joeming Dunn.  Certain information has been redacted for privacy.

6.      Attached as **Exhibit 3** is a true and correct copy of Deposition Exhibit 27 from the March 6, 2019 deposition of Joeming Dunn.

7.      Attached as **Exhibit 4** is a true and correct copy of Deposition Exhibit 28 from the March 6, 2019 deposition of Joeming Dunn.  Certain information has been redacted for privacy.

8.      Attached as **Exhibit 5** is a true and correct copy of Deposition Exhibit 29 from the March 6, 2019 deposition of Joeming Dunn.

9.      Attached as **Exhibit 6** is a true and correct copy of Deposition Exhibit 34 from the March 6, 2019 deposition of Joeming Dunn.

10.     Attached as **Exhibit 7** is a true and correct copy of Deposition Exhibit 38 from the March 6, 2019 deposition of Joeming Dunn.

11.     Attached as **Exhibit 8** is a true and correct copy of Deposition Exhibit 32 from the March 6, 2019 deposition of Joeming Dunn. Certain information has been redacted for privacy.

12.     Attached as **Exhibit 9** is a true and correct copy of Deposition Exhibit 39 from the March 6, 2019 deposition of Joeming Dunn.

13.     Attached as **Exhibit 10** are true and correct copies of excerpts from the March 6, 2019 deposition of Ben Dunn.

14.     Attached as **Exhibit 11** are true and correct copies of excerpts from the February 26, 2019 deposition of Mark Waid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on August 7, 2019.

_____

Ryan Pierce

EXHIBIT 1

1       IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                  AUSTIN DIVISION

3   RICHARD MEYER,                *
        Plaintiff,                *
4
    VS.                           *   CIVIL ACTION NO.
5                                     1:18-CV-00800-LY
    MARK WAID,                     *
6       Defendant.                *   (Jury Demanded)

7

8

9              VIDEOTAPED ORAL DEPOSITION

10                          OF

11              JOEMING W. DUNN, M.D.

12                   MARCH 6, 2019

13

14

15          VIDEOTAPED ORAL DEPOSITION of JOEMING W.

16   DUNN, M.D., produced as a witness on behalf of

17   Plaintiff and duly sworn, was taken in the above-styled

18   and numbered cause on March 6, 2019, between the hours

19   of 12:20 p.m. and 4:08 p.m. before Shan Morris

20   Blanchard, Certified Shorthand Reporter in and for the

21   State of Texas, reported by computerized stenotype

22   machine at the offices of Langley & Banack, Inc., 745

23   E. Mulberry, Suite 700, San Antonio, Texas 78212

24   pursuant to Federal Rules and the provisions stated on

25   the record or attached hereto.

```
1                    A P P E A R A N C E S

2

3      FOR THE PLAINTIFF:

4          Mr. Daniel H. Byrne
           Fritz, Byrne, Head & Gilstrap, PLLC
5          221 W. 6th Street, Suite 960
           Austin, Texas 78701
6          Telephone: 512-476-2020
           Fax: 512-477-5264
7          Email: dbyrne@fbhg.law

8      FOR THE DEFENDANT:

9          Mr. Ryan Pierce
           Reeves & Brightwell, LLP
10         221 West Sixth Street, Suite 1000
           Austin, Texas 78701
11         Telephone: 512-334-4500
           Fax: 512-334-4492
12         Email: rpierce@reevesbrightwell.com

13     FOR THE WITNESS:

14         Mr. Otto S. Good
           Langley & Banack, Inc.
15         745 E. Mulberry, Suite 900
           San Antonio, Texas  78212
16         Telephone: 210-736-6600
           Fax: 210-735-6889
17         Email: ogood@langleybanack.com

18     WITNESS:

19         Joeming W. Dunn, M.D.

20     CERTIFIED SHORTHAND REPORTER:

21         Shan Morris Blanchard

22     VIDEOGRAPHER:

23         Lawrence Delgado

24

25
```

```
1              (The reading of introductions into the
2    record according to Rule 30(b)(5)(A) was waived by all
3    parties present.)
4              THE VIDEOGRAPHER:   We're on the record on
5    March the 6th, 2019, at 12:20 p.m.
6              JOEMING W. DUNN, M.D., the witness, being
7    duly cautioned and sworn to tell the truth, the whole
8    truth and nothing but the truth, testified as follows:
9              (Time: 12:20 p.m.)
10                      EXAMINATION
11   BY MR. BYRNE:
12        Q.   Would you state your name for the record,
13   please, sir?
14        A.   My full name is Joeming Wolf Dunn, D-u-n-n.
15        Q.   And do you go by Joe Dunn?
16        A.   I go by Joe or Joeming depending on who my
17   friend are, I guess.
18        Q.   Okay.  Mr. Dunn, my name is Dan Byrne, and I'm
19   representing Richard Myer in a lawsuit that I think
20   you're aware of that's been brought against Mark Waid,
21   and I'm sitting here with Mr. Meyer to my right and
22   Mr. Waid's counsel, Ryan Pierce, is sitting across the
23   table.  All right?
24        A.   Yes, sir.
25        Q.   And you -- you and I haven't met or talked
```

```
 1   there was a decision that needed to be made, I would
 2   make it, but beyond that, that was my role.
 3       Q.   So these -- these -- these -- these folks,
 4   whether they're true employees or independent
 5   contractors, were given a fair amount of latitude on
 6   keeping things going on a day-to-day basis?
 7       A.   Yes, sir.
 8       Q.   Okay.  Have you ever met Richard Meyer before
 9   you got into -- in -- in person before you got into
10   today's deposition?
11       A.   No, sir.
12       Q.   Okay.  Have you ever met Mark Waid in person?
13       A.   I -- I attended a lot of conventions over the
14   years and it's possible I met him.  I don't remember,
15   but it's possible, you know, we shook hands one time or
16   talked briefly, you know, when I was in San Diego
17   Comic-Con.
18       Q.   Is it -- would it be true that you don't have
19   any independent recollection of that, you're just a
20   acknowledging the possibility?
21       A.   Yes.
22       Q.   And you knew who -- who Mark Waid was --
23       A.   Yes.
24       Q.   -- before the phone call we'll get to that
25   occurred in May of 2018; is that correct?
```

1   Mark Waid on the telephone?

2       A.   One time.

3       Q.   And after you made the decision not to publish

4   Jawbreakers, how many telephone conversations did you

5   have with Mr. Meyer?

6       A.   I think that it was just the one time after I

7   decided not to publish Jawbreakers.

8       Q.   Okay.  Were you the final decisionmaker on the

9   decision to publish Jawbreakers in the first place?

10      A.   Yes.

11      Q.   And what do you recall about the -- the

12  evolution of the circumstances that led to that

13  decision?  When did you first hear about Jawbreakers

14  and from what source and -- and what -- what process

15  did you go through?

16      A.   My recollection was during a normal weekly

17  meeting that we have, Brian Denham mentioned to me

18  there was a book, Jawbreakers, that he thought was a

19  good project to publish and he told me that Mr. Meyer

20  had a great deal of followers on YouTube and I -- I

21  think that's the point when I -- when that was first

22  brought up.

23      Q.   Okay.  Were you aware of any controversy

24  associated with Mr. Meyer's YouTube channel at that

25  time?

1   personally attended, probably around three a year.

2       Q.   Okay.  Are they typically located in Texas or

3   at various locations around the country?

4       A.   The ones I've attended are in Texas.

5       Q.   And had you ever seen Mr. Waid -- Mark Waid

6   present at any of those conventions?

7       A.   No.

8       Q.   Where -- did you ever attend any conventions

9   where he was in attendance, to your knowledge?

10      A.   I'm sure I've attended some conventions that he

11  was in attendance.

12      Q.   Okay.  Does Antarctic Press do something to

13  create a presence at -- at these conventions?  Does it

14  have a booth or do any advertising?

15      A.   Yes.

16      Q.   What -- what is the normal activity that

17  Antarctic Press takes -- takes at -- at the comic

18  conventions you're familiar with?

19      A.   We usually set up as a booth.

20      Q.   Okay.  And how would attendees at conventions

21  come to know -- what -- what would they learn about

22  Antarctic Press in the course of seeing a booth for

23  you?

24           MR. PIERCE:  Object to form.

25      A.   Typically, at a booth that we attend --

Joeming W. Dunn, M.D.                                                      32

1    Q.    (BY MR. BYRE)   Let -- let me -- let me rephrase

2    that question.   What -- what is it that you attempt to

3    convey about your company by setting up a booth to the

4    people attending these conventions?

5    A.    Typically, when we set up at conventions, we

6    try to reach the audience that attends the conventions

7    that may be comic book fans in hopes to obtaining new

8    fans.

9    Q.    New customers?

10   A.    New customers, yes.

11   Q.    And what is it that you convey about yourself

12   in order to attempt to create new customers?

13   A.    We typically sell the books that we published

14   during that period of time, and if possible, to have

15   creators attend our booth to meet with the fans and

16   potential customers.

17   Q.    Do you convey that you're a -- a -- a

18   Texas-based publisher in the course of these

19   promotions?

20            MR. PIERCE:   Object to form.

21   A.    Typically not.

22   Q.    (BY MR. BYRE)   Okay.  Do you -- do you have a

23   sign up that identifies you as based in San Antonio?

24   A.    No.

25   Q.    Do you believe that folks know where you're --

Joeming W. Dunn, M.D.                                      33

1   where you're based --

2             MR. PIERCE:  Object to form.

3       Q.   (BY MR. BYRNE)  -- based on what -- what you

4   see happen at these conventions and what you know about

5   your reputation?

6             MR. PIERCE:  Object to form.

7       A.   I believe no.

8       Q.   (BY MR. BYRNE)  Let me hand you what's been

9   previously marked as Deposition Exhibit 5.  Is that an

10  accurate reflection of your website displays as of May

11  of 2019 on -- on the Antarctic Press web page?

12      A.   Well, I -- I have not been on the web page

13  recently but it -- it looks like it -- it is.

14      Q.   You've looked at it occasionally over the

15  years, have you not?

16      A.   Yes, sir.

17      Q.   Any reason to dispute that this accurately

18  reflects your web page as of May of 2018?

19      A.   Looks like it accurately does reflect.

20             (Deposition Exhibit 17 marked.)

21      Q.   (BY MR. BYRNE)  I hand you what's been marked

22  as Exhibit 17 to your deposition.  As distinguished in

23  the Exhibit 5, this is a printout that -- well, let me

24  ask.  Can you identify this as the "About" page for

25  Antarctic Press's website as of May of 2018?

Joeming W. Dunn, M.D.                                        36

1    Q.    -- is -- is that the only office number that
2    Antarctic Press had at the time?
3    A.    Correct.
4    Q.    And that's a landline?
5    A.    Correct.
6    Q.    And who do you recall getting the message
7    relayed to you about Mr. Waid's inquiry?
8    A.    Typically, Doug answers all the phone calls,
9    and so my suspicion is that Doug answered the call.
10   Q.    Okay.  At the time that that message was
11   received, do you have any recollection of where things
12   stood in terms of the buzz or controversy concerning
13   the social media activity since the announced decision
14   to publish Jawbreakers?
15               MR. PIERCE:  Object to form.
16   A.    I recall at that period of time that there was
17   quite a bit of information coming to me from a variety
18   of different sources, but I was gathering information
19   mostly from the people that I trusted the most, which
20   was Brian and Joey at the time, and as information was
21   being gathered, that's when Mark -- Mark's phone call
22   came in and when I -- and I responded to his phone
23   call.
24   Q.    Okay.  At the time you responded to Mr. Waid's
25   phone call, had you decided to reverse your decision to

1    they put -- they were put into a no-win situation, but

2    one student that was able to beat the Kobayashi Maru,

3    which was Captain Kirk, and so I felt like this was a

4    no-win situation for our -- our company.

5        Q.    Did you -- did you have the Captain Kirk

6    solution fashioned yet?

7                    MR. PIERCE:  Object to form.

8        A.    No.

9        Q.    (BY MR. BYRNE)  You make reference to social

10   media pressure.  Was that social media pressure coming

11   in both direction?

12                   MR. PIERCE:  Object to form.

13       A.    Yes.

14       Q.    (BY MR. BYRNE)  Now, in the -- in the second

15   paragraph you make a reference to, "I'm going to rant

16   not to each of you personally, but to everyone who has

17   put us in this situation."  Was this -- was this being

18   circulated beyond just Joey?

19       A.    No, it was just between me and Joey.

20       Q.    Obviously, you use a -- a lot of powerful

21   language here, Mr. Dunn, and I don't need to go through

22   it with you line by line.  By the end of this email,

23   are you still, at least at this point, standing by your

24   decision to proceed with the publication?

25                   MR. PIERCE:  Object to form.

1      A.    I -- I think at -- by the end of this rant that

2    I did in this email, I had felt that my emotional

3    status had been drained and I felt like I didn't want

4    to continue down that pathway.

5                   MR. WAID:   Yes.

6                   MR. BYRNE:   Let's go off the record.

7                   THE VIDEOGRAPHER:   Off the record at

8    1:42 p.m.

9                   (Recess taken 1:42 p.m. to 1:52 p.m.)

10                  THE VIDEOGRAPHER:   Back on the record at

11   1:52 p.m.

12   BY MR. BYRNE:

13     Q.    Mr. Dunn, before we went on the break we were

14   talking about Exhibit 19, which is the email you sent

15   at 4:38 p.m. on Friday, May 11th, last year.   To put

16   this email in context, was this email written after you

17   had received the message that Mr. Waid wanted you to

18   call him back?

19     A.    I think so.

20     Q.    But was it written before you actually spoke to

21   Mr. Waid?

22     A.    I think so.

23     Q.    And what was the reaction around your office

24   when Mr. Waid left his message, that you recall?

25     A.    At the time, Mr. Waid called the office, the --

Joeming W. Dunn, M.D.                                          50

1  relationship with Joey at this time was such that he

2  was close to your family?

3      A.   Correct.

4      Q.   And you were worried that if you stuck with

5  your decision to publish that that might alienate Joey?

6      A.   Among other things, yes.

7      Q.   Turn to Exhibit 7 in this deposition binder, if

8  you can.  First of all, just let me ask you to

9  generally confirm that this is a series of text

10  messages between your cellphone and that of Mr. Mark

11  Waid that took place between -- well in May of 2018.

12      A.   Okay.  I do remember this actually.

13      Q.   So is that, in fact, a series of text messages

14  between you and Mr. Waid from May of '18?

15      A.   Yes, but I am going to -- I'm going to make a

16  clarification.  I was texting and responding to a lot

17  of people and I actually am not -- I thought this was

18  somebody else when I was texting some of these

19  messages, I think.  And so I can't remember who I was

20  talking to at the time, but there was a whole bunch of

21  texts that I was responding to -- to a variety of

22  people and I don't think I was aware that this was Mark

23  Waid until later on, and -- and then on -- on these

24  series of texts when I realized it was Mark, I said

25  that I'm not commenting anymore.

1  on Exhibit 7 is 16 minutes later; --

2      A.    Correct.

3      Q.    -- correct?  So are you telling -- are you

4  thanking Mr. Waid for talking to you that afternoon in

5  this text?

6      A.    Like I said, I don't think so actually.  I

7  think I was talking to somebody else.

8      Q.    Who -- who else did you talk to that afternoon

9  about the --

10     A.    I talked to a multitude of people -- or texted

11 a lot of people, and I think -- like one of the people

12 was Timothy Lim, who was at the time friends with or --

13 I'm guessing still with -- friends with Mr. Meyer, and

14 my brother.

15     Q.    Your -- your brother --

16     A.    Well, my brother was there so I -- I guess I

17 was talking to him at my -- at my house, but I remember

18 talking to a whole bunch of different people, texting a

19 whole bunch of people, and I may have been confused

20 about who I was texting at the time.

21     Q.    Okay.  You were at your house that afternoon?

22     A.    Correct.

23     Q.    Do you have a landline?

24     A.    I do.

25     Q.    Do you have phone records for your landline?

Joeming W. Dunn, M.D.                                    55

1   calls from a variety of different places and when I

2   finally realized that that was -- when I realized that

3   was Mark Waid I said, "Oh, you know," -- I said "I

4   don't want to talk to him anymore," and so -- so

5   then -- when I realized that, I had marked it "Mark

6   Waid" at the time.  That's why I think I remember that.

7        Q.    Your -- your cellphone, when you dial in, a

8   text message does pop up the name of who you're

9   communicating with; correct?

10                MR. PIERCE:   Object to form.

11       A.    Yes.

12       Q.    (BY MR. BYRNE)   Do you have an iPhone?

13       A.    Yes.

14       Q.    Okay.

15       A.    But at the time I was getting calls and texts

16  from a multitude of people.

17       Q.    Right, but Mr. Waid has validated Exhibit 7 as

18  an exchange of emails between his phone and your phone?

19                MR. PIERCE:   Object to form.

20       A.    I --

21       Q.    (BY MR. BYRNE)   You don't disagree with that,

22  do you?

23       A.    I don't disagree with that because -- but I

24  think that some of my texts to -- it was not -- it was

25  not of a -- intended for him, I don't think, and then

1    when I realized that, that's when I said to him at some

2    point during the message that I don't want to -- I

3    realized I was texting the wrong person, then I said,

4    "Oh, I don't want to talk to you anymore."

5         Q.   Mr. Dunn, when -- what is it about this

6    exchange here that is inconsistent with you having

7    conversations -- text conversations with Mr. Waid in

8    May of 2018?

9              MR. PIERCE:   Object.   It's argumentative.

10        A.   I had come to the realization that I didn't

11   want to deal with the situation any further and I was

12   letting some people know that that's what my -- my

13   decision was.

14        Q.   (BY MR. BYRE)  Who would -- who else would you

15   be texting with about being prepared for a lashing from

16   the other direction besides Mr. Waid?

17        A.   At the time, I was talking to Timothy Lim quite

18   a bit.

19        Q.   Is Timothy Lim in your contacts?

20        A.   Yes.

21        Q.   Now, there's a change in the tone of your texts

22   in this exhibit starting on Tuesday, May 15th.   Do you

23   see that?

24        A.   Correct.

25        Q.   "I'm not commenting anymore"?

Joeming W. Dunn, M.D.                                    57

1      A.    Right.    That's when I think I real -- that's

2   why I think I realized I was texting the wrong person

3   and responding to the wrong person at the time.   I

4   didn't realize that was Mr. Waid at the time.

5      Q.    Why didn't you say, "I didn't realize who I was

6   talking to" in your texts?

7                 MR. PIERCE:    Object form.

8      A.    At the time, I didn't want to deal with anybody

9   associated with this situation, and so I decided I

10  wouldn't respond to anybody.   I wasn't going to respond

11  to anybody.   I wasn't going to talk to anybody, and --

12  and I -- since that period of time, I have been

13  consistent in that.   I have not talked or -- to mention

14  to this anybody.

15     Q.    (BY MR. BYRNE)   Tell me about the conversation

16  you had with Mr. Meyer after your decision to terminate

17  the publication.

18     A.    After -- after the decision -- after, you know,

19  getting all the information that I had gathered in

20  regards to the situation, I knew that I was the

21  buck-stopped-here type of person about making a

22  decision.   I also realize the passionate nature of some

23  of Mr. Meyer's followers, but I --

24     Q.    I was just asking about what you -- what you

25  talked about.   You said you had a phone call.

1    discussions.

2                    MR. BYRNE:  Let's take a break.

3                    THE VIDEOGRAPHER:  Off the record at

4    2:34 p.m.

5                    (Recess taken 2:34 p.m. to 2:45 p.m.)

6                    THE VIDEOGRAPHER:  We're back on the

7    record at 2:45 p.m.

8                    MR. BYRE:  We'll pass the witness.

9                    (Time: 2:45 p.m.)

10                           EXAMINATION

11   BY MR. PIERCE:

12       Q.   Mr. Dunn, we met earlier today.  I'm Ryan

13   Pierce and I represent Mr. Waid.  Thank you for your

14   patience today.  You talked about Brian quite a bit.

15   What -- what's his last name?

16       A.   Denham.

17       Q.   And how long has he worked with Antarctic

18   Press?

19       A.   Oh, gosh.  He worked for us like two -- for a

20   couple of years like in the early 2000s and then he

21   left for a while and then he came back, I would say,

22   about four years ago.

23       Q.   So a total of how many years?

24       A.   Probably seven or eight years.

25       Q.   And do you trust him?

1    up.   Who held that position in May of 2018?

2        A.    Joe Weltjens.

3        Q.    And we've referred to him today some as Joey?

4        A.    Yeah, Joey or Jochen.

5        Q.    What does the EI -- what are the

6    responsibilities of the EIC?

7        A.    Well, in our company, it's to oversee the

8    release and production of our books.

9        Q.    And how long has Joey been associated with

10   Antarctic Press?

11       A.    20 years.

12       Q.    And do you trust Joey?

13       A.    Yes.

14       Q.    And does his opinion at Antarctic Press carry a

15   lot of weight?

16       A.    Yes.

17       Q.    And when it comes to publishing books, would

18   you override Joey's opinion if he had a strong opinion

19   on whether to publish a book?

20                  MR. BYRNE:   Objection, form.

21       A.    I very rarely override anybody.

22       Q.    (BY MR. PIERCE)   And that include Joey?

23       A.    Correct.

24       Q.    Was -- was there an actual written contract

25   between Antarctic Press and Mr. Meyer?

Joeming W. Dunn, M.D.                                    71

1    A.    My recollection was I sent a copy of a contract

2    to Brian to send to Mr. Meyer, but I never got a

3    written signed contract returned.

4    Q.    Was it Antarctic Press's contemplation that

5    there would be a signed, written contract in place?

6    A.    Yes.

7    Q.    And you never received that contract?

8    A.    Correct.

9    Q.    And given that there was no contract in place,

10   did Antarctic Press have discretion in deciding whether

11   or not to publish Jawbreakers at -- around the time of

12   May of 2018?

13   A.    My guess was that there was the -- the shaking

14   of the hands and it was good enough for us to proceed.

15   Q.    And what were the terms of the shaking of the

16   hands?

17   A.    Well, my -- my guess would be that I sent the

18   contract to Brian to send to Mr. Meyer and -- and he

19   looked it over and I thought -- my guess would be it

20   was acceptable at the time.

21   Q.    So your understanding is the written contract

22   that would have been sent to Mr. Meyer would be the

23   terms that would apply?

24   A.    Correct.

25   Q.    And I take it you have a copy of that contract

1    or somebody at Antarctic Press has a copy of that

2    contract?

3        A.    Correct.

4        Q.    And did you understand that Mr. Meyer

5    understood that those would be the terms of the

6    contract as reflected in that written document?

7               MR. PIERCE:  Objection, form.

8        A.    I -- I never discussed it with Mr. Meyer

9    directly, but that's my understanding.

10       Q.    (BY MR. PIERCE)  And under those written terms,

11   did Antarctic Press have discretion in deciding whether

12   or not to publish a book?

13       A.    Yes.

14              MR. BYRNE:  Objection, form.

15       Q.    (BY MR. PIERCE)  And that decision whether to

16   publish the book under those terms would be up to

17   Antarctic Press?

18              MR. BYRNE:  Objection, form.

19       A.    Yes.

20       Q.    (BY MR. PIERCE)  So as of May of 2018,

21   Antarctic Press had the right under those terms to not

22   publish Jawbreakers; correct?

23              MR. BYRNE:  Objection, form.  Objection,

24   leading.

25       A.    Yes.

Joeming W. Dunn, M.D.                                          73

1    Q.    (BY MR. PIERCE)  Did Antarctic Press as of May

2   of 2018 have the right to decide not the publish

3   Jawbreakers?

4              MR. BYRNE:  Objection, form.

5    A.    Yes.

6    Q.    (BY MR. PIERCE)  I think you indicated that you

7   were not aware of Mr. Meyer's association with

8   Diversity & Comics; is that right?

9    A.    That's correct.

10   Q.    And did Mr. Meyer ever tell Antarctic Press

11  about his involvement in Diversity & Comics before you

12  guys discussed Jawbreakers?

13   A.    I can't speak for other people, but I'm pretty

14  sure Brian knew Mr. Meyer.

15   Q.    Were you aware of his activity on Diversity &

16  Comics?

17   A.    No, not at all.

18   Q.    Did Mr. Meyer, as far as you know, ever share

19  with Antarctic Press a YouTube video that has been

20  referred to as The Dark Roast?

21   A.    Not that I'm aware of.

22   Q.    So when Antarctic Press was entering into

23  discussions with Mr. Meyer about whether to public

24  Jawbreakers, Antarctic Press, as far as you know, was

25  not aware of The Dark Roast?

Joeming W. Dunn, M.D.                                    74

1       A.    I was not aware of The Dark Roast.

2       Q.    Are -- in some of the emails there was

3   reference to a Kickstarter campaign.. Do you recall

4   that?

5       A.    In regards to?

6       Q.    Mr. Byrne showed you a couple emails that

7   referenced some information about a Kickstarter

8   campaign.  Do you recall that?

9       A.    Yes.

10      Q.    Were you aware that Kickstarter had rejected

11  Mr. Meyer's project?

12      A.    No.

13      Q.    Did Mr. Meyer make you aware of that?

14      A.    I -- first time I talked to Mr. Meyer was the

15  time I talked to him after, so not him directly, but,

16  no, I was not aware.

17      Q.    I'm going to -- this is going to be Exhibit 24.

18            MR. PIERCE:  I'm sorry.  If you want me

19  to mark them -- you don't mind?  Thank you.

20            (Deposition Exhibit 24 marked.)

21      Q.    (BY MR. PIERCE)  Mr. Dunn, I -- I believe we've

22  looked at at least some of these emails.  Does -- does

23  Exhibit 24 -- and it is 24; correct?  Sorry.  Does

24  Exhibit 24 appear to be a couple of emails dated May

25  9th, 2018?

1    A.    Correct.

2    Q.    And do you see the email from Megan Kilar with

3    the subject "Jawbreakers" at the bottom?

4    A.    Correct.

5    Q.    Do you know who Megan Kilar is?

6    A.    No.

7    Q.    Do you see where she says, "Based on the

8    harassment online by Diversity & Comics, I have decided

9    to boycott your company if you choose to publish

10   Jawbreakers."  Do you see that?

11   A.    Correct.

12   Q.    And was this the -- the -- had you been aware

13   of any potential harassment online by Diversity &

14   Comics before you received this email?

15   A.    Me, no.

16   Q.    And do you see Brian Denham replies?

17   A.    Yes.

18   Q.    And he copies mcazja@ ^REDACTED   Is that Joey?

19   A.    That's correct.

20   Q.    Brian says, "There will be a lot more."  How

21   did you interpret that -- the reference to, "There will

22   be a lot more"?

23   A.    At the time, I thought -- I actually didn't

24   know what to think about that.

25   Q.    And do you see he goes on to say, "A few of the

1    retailers got together in a secret Facebook group to

2    boycott whatever publisher picked up Jawbreakers."  Do

3    you see that?

4         A.   Correct, yes.

5         Q.   And is it your understanding that when the word

6    "boycott" is used in this context, what that means is

7    the retailers have decided to not carry the book?

8                   MR. BYRNE:  Objection, form.  Objection,

9    leading.

10        A.   Correct.

11        Q.   (BY MR. PIERCE)  Well, what's your

12   understanding of the use of the term "boycott" in this

13   context?

14        A.   My understanding of boycott is that they would

15   not purchase a book that was released by Antarctic

16   Press.

17        Q.   And that's a decision they would have a right

18   to make; correct?

19        A.   Yes.

20                   MR. PIERCE:  This will be Exhibit 25.

21                   (Deposition Exhibit 25 marked.)

22        Q.   (BY MR. PIERCE)  And by the way, if I give you

23   an exhibit, you take as much time as you need, but I'll

24   try to direct you to -- to where I'm going to ask

25   questions, but you should always tell me, "Stop.  I

1    need more time."

2        A.    Okay.

3        Q.    Does -- does Exhibit 25, the -- the last couple

4    of pages, appear to be the same emails that we just

5    reviewed?

6        A.    Yes.

7        Q.    And do you see Mr. Denham's email of May 9th at

8    9:48 p.m. and he appears to be attaching a social media

9    screen shot?  Do you see that?

10       A.    Yes.

11       Q.    And it says -- and it -- and it has some

12   comments from some individuals that appear to -- to be

13   protesting the publication of the Diversity & Comics

14   book; correct?

15       A.    Yes.

16       Q.    And can you turn the -- the page -- oh, I'm

17   sorry.  Turn back to the first page.  Do you see at the

18   bottom of the email it says, "Richard reach out to one

19   of the retailers to inform him what's going on.  He

20   promised to not rat them out.  So that retailer

21   informed Richard.  Richard posted on YouTube that

22   retealer -- retailers are colluding with each other to

23   boycott."  Do you see that?

24       A.    Yes, I do.

25       Q.    And this email is from May 9th; correct?

1    A.    Correct.

2    Q.    And that's before you ever spoke with Mark

3  Waid; right?

4    A.    Correct.

5    Q.    And Brian, in that email -- or in the sentence

6  I just read, indicates that Mr. Meyer had promised not

7  to rat out the retailers.  What's your understanding of

8  what that means to not rat them out?

9    A.    I'm guessing that -- not to expose the

10  retailers that are in this group.

11              MR. PIERCE:  This is -- will be

12  Exhibit 26.

13              (Deposition Exhibit 26 marked.)

14    Q.    (BY MR. PIERCE)  Mr. Dunn, does this appear to

15  be a screen shot of a tweet from Diversity & Comics?

16    A.    It appears so.

17    Q.    And do you see it's dated May 9th at the

18  bottom?

19    A.    On the bottom?

20    Q.    Yeah, there -- there's a date at the bottom.

21    A.    Oh, yes, I see that now.

22    Q.    And in -- in this tweet, it's stated, "It's

23  from a private Facebook group for retailers titled,

24  Final Order Cutoff."  Do you see that?

25    A.    Yes.

1    Q.    Do you know what Final Order Cutoff is?

2    A.    Yes.

3    Q.    What is that?

4    A.    In a retail -- comic book retail environment

5    when they're buying comics through Diamond

6    Distribution, there is a date -- what they call final

7    order cutoff -- before the publisher goes to

8    publication that allows retailers to either up their

9    orders or to downgrade their orders before they

10   actually go to press, so that way the publisher has a

11   more accurate representation of what numbers to

12   publish.

13   Q.    And were you aware that there could be private

14   Facebook groups for this?

15   A.    I'm aware there are private Facebook groups.

16   Q.    And did you come to know that Mr. Meyer was

17   sending on his -- sending out on his Twitter account

18   screen shots from a private Facebook group?

19   A.    I was not aware of it until later on.

20   Q.    What do you mean -- when -- later on -- at what

21   point?

22   A.    Well, after the announcement was made, then I

23   started gathering information and that's when I got

24   some of this information.

25   Q.    And that was before you spoke with Mr. Waid?

Joeming W. Dunn, M.D.                                        80

1    A.    Correct.

2              MR. PIERCE:   This is going to be

3    Exhibit 27.

4              (Deposition Exhibit 27 marked.)

5    Q.    (BY MR. PIERCE)   Mr. Dunn, does Exhibit 27

6    appear to be a tweet from the Diversity & Comics

7    account?

8    A.    It appears that way.

9    Q.    And this is dated May 10th at -- May 10th at

10   7:04 a.m.; correct?

11   A.    Correct.

12   Q.    And in tweet Mr. Meyer says, "I did the

13   research on about four or five of the stores, but if

14   someone could go through those screen shots from the

15   retailer Facebook group and make a list of the people,

16   the stores they work at, and the cities, that would be

17   great."  Do you see that?

18   A.    Correct.

19   Q.    And I take it that you had become aware that

20   Mr. Meyer was asking for his followers to make a list

21   of people working in stores that had decided not to

22   carry his book?

23             MR. BYRNE:   Objection, form.  Objection,

24   leading.

25   A.    Yes.

1    Q.    (BY MR. PIERCE)   And that was before you spoke

2    with Mr. Waid; correct?

3       A.    Yes.

4                 (Deposition Exhibit 28 marked.)

5                 MR. PIERCE:   This is Exhibit 28.   And

6    this, I would note, is going to be confidential under

7    the protective order because it reveals phone numbers

8    and names.

9                 THE REPORTER:   Wait just a minute.

10                MR. PIERCE:   Sorry.

11      Q.    (BY MR. PIERCE)   Mr. Dunn, does this appear to

12   be a screen shot from Twitter?

13      A.    Yes.

14      Q.    And do you see at the top of the document it

15   says, "Here are the shops from the collusion screen

16   shots."   Do you see that?

17      A.    Yes.

18      Q.    And do you see that there are names of

19   employees and phone numbers listed?

20      A.    Yes.

21      Q.    Were -- were you aware that the names of

22   individuals and their phone numbers were being revealed

23   publicly in response to a request from Mr. Meyer?

24      A.    I did not see these, but I was made aware that

25   there was some mention of stores.

Joeming W. Dunn, M.D.                                                      82

1    Q.   And that was before you spoke with Mr. Waid?

2    A.   Yes.

3              MR. PIERCE:   This will be Exhibit 29.

4              (Deposition Exhibit 29 marked.)

5    Q.   (BY MR. PIERCE)   Mr. Dunn, does this appear to

6    be a screen shot from Twitter associated with Diversity

7    & Comics?

8    A.   Yes.

9    Q.   And do you see that it's dated May 11th, 2018,

10   and the time is 6:41 a.m.?

11   A.   Yes.

12   Q.   And do you see that Mr. Meyer re-tweets or

13   quotes a tweet from the Twitter handle, Million Dollar

14   Prons, P-r-o-n-s?  Do you see that?

15   A.   Yes.

16   Q.   And that quote states, "Don't carry

17   Jawbreakers.  Say hi to leg breakers."  Do you see

18   that?

19   A.   Yes.

20   Q.   And the Diversity & Comics Twitter account

21   re-tweets and says, "To me, my Incel Army."  Do you see

22   that?

23   A.   Yes.

24   Q.   Do you know what "Incel" is?

25   A.   I think it means incelibate or something.  I'm

```
 1    not sure about that.

 2       Q.   Are you aware that it's been designated as a

 3    hate group by certain organizations?

 4               MR. BYRNE:  Objection, form.

 5       A.   I did not know that.

 6       Q.   (BY MR. PIERCE)  And -- and have you ever seen

 7    this tweet before as far as you can recall?

 8       A.   No.

 9       Q.   Would -- would it concern Antarctic Press if

10    one of its creators had hinted at violence if stores

11    weren't carrying his book?

12       A.   Yes.

13       Q.   And you would appreciate knowing that if that

14    were occurring; correct?

15       A.   Yes.

16               MR. PIERCE:  This will be Exhibit 30.

17               (Deposition Exhibit 30 marked.)

18       Q.   (BY MR. PIERCE)  And does Exhibit 30 appear to

19    be an email chain from May 10th of 2018?

20       A.   Correct.

21       Q.   And can you go to the third page and do you see

22    at 8:08 a.m. you send an email and you say, "I do not

23    want to get into a let's boycott the stores."  Do you

24    see that?

25       A.   Correct.
```

1    Q.    What did you mean by that?

2    A.    When I first got information about the stores

3    that were listing up to boycott Antarctic Press, I was

4    surprised and -- because I didn't know the whole

5    situation at that time and -- and I wanted to get more

6    infer -- more information basically.

7    Q.    And -- and you -- do you see where you say, "I

8    hope he can respond in the proper way."  Do you see

9    that?

10   A.    Yes.

11   Q.    And who were you referring to with "he"?

12   A.    I'm guessing Mr. Meyer.

13   Q.    And to your mind, would the proper way of

14   responding include asking that the detail of stores,

15   including their employees, be publicly revealed?  Would

16   that be a proper way of treating this situation in your

17   opinion?

18               MR. BYRNE:  Objection, form.  Objection,

19   leading.

20   A.    You know, I really don't like to speak for

21   other people.

22   Q.    (BY MR. PIERCE)  Well, in -- in -- in your

23   view, when you say, "I hope he can respond in the

24   proper way," did you have in mind that -- that he would

25   invite detail about the stores not carrying the book to

```
 1  be publicly revealed?
 2      A.    My hope is always to have a peaceful resolution
 3  to everything.
 4      Q.    And would you agree that revealing detail on
 5  stores not carrying the book may not advance a peaceful
 6  resolution?
 7             MR. BYRNE:   Objection, form.   Objection,
 8  leading.
 9      A.    I believe that if -- if I was put in the
10  situation, I don't think I would approach it that way.
11             MR. PIERCE:   This will be Exhibit 31.
12  Sorry, guys.
13             (Deposition Exhibit 31 marked.)
14      Q.    (BY MR. PIERCE)   And, Mr. Dunn, does this
15  appear to be an email chain dated May 10th, 2018, and
16  the top email is from, I believe, apcog1 to Brian
17  Denham?
18      A.    Correct.
19      Q.    And apcog is Doug?
20      A.    Correct.
21      Q.    Do you see where the email says, "Poor David
22  got an earful while I was out of the office.   Some
23  local person called just to rant about what a bad
24  person Richard is."   Do you see that?
25      A.    Correct.
```

Joeming W. Dunn, M.D.                                          86

1     Q.    And what did you mean -- or I'm sorry -- what

2     did your interpret Brian to me -- mean by referring to

3     a local person?

4                  MR. BYRNE:   Objection, form.

5     A.    This was from Doug to Brian.

6     Q.    (BY MR. PIERCE)   I'm sorry.   From Doug.

7                  MR. BYRNE:   Same objection.

8     Q.    (BY MR. PIERCE)   What -- what's with your

9     interpretation, if any, about what is meant by local

10    person?

11                 MR. BYRNE:   Same -- objection, form.

12    A.    My guess would be somebody in San Antonio that

13    called to express their displeasure with our choice.

14    Q.    (BY MR. PIERCE)   And you're copied on this

15    email; correct?

16    A.    Correct.

17    Q.    Did -- did you ever get any further detail

18    about what this person who called said?

19    A.    No.

20    Q.    And this is May 10th; correct?

21    A.    Correct.

22                 MR. PIERCE:   This will be Exhibit 32.

23                 (Deposition Exhibit 32 marked.)

24                 THE WITNESS:   Thank you.

25    Q.    (BY MR. PIERCE)   And does this appear to be an

1    email chain dated May 10th, 2018?

2        A.    Correct.

3        Q.    And -- and I believe it may be a continuation

4    of some of the emails we've already looked at.   Does

5    that appear right to you?

6        A.    Yes.

7        Q.    Can you turn to the second page?   Do you -- do

8    you see where apcog, who is Doug, replies at 2:23 p.m.

9    on May 10th?   Do you see that?

10       A.    Yes.

11       Q.    And Doug refers to an email that he had just

12   received; correct?

13       A.    Correct.

14       Q.    And the referenced email refers to Mr. Meyer's

15   Jawbreakers; correct?

16       A.    Correct.

17       Q.    And according to Doug's email, that email he

18   received said, "Meyer had said some pretty awful

19   things"; correct?

20       A.    He --

21             MR. BYRNE:   Objection, form.

22       A.    He informed me of what -- I guess informed what

23   email he got and referred -- in reference to what

24   Richard said.

25       Q.    (BY MR. PIERCE)   And among what Richard had

1   said, according to this email, is that Mr. Waid and two

2   other gentlemen were pedophiles.  Do you see that?

3       A.   Yes.

4       Q.   And that Mr. Meyer had accused a Marvel editor

5   of rising through the ranks because of sex; correct?

6       A.   Correct.

7       Q.   And Mr. Meyer also used a derogatory term

8   relating to another creator's sexuality.  Do you see

9   that?

10      A.   Yes.

11      Q.   And then Mr. Meyer according to this email

12  referred to a transgender creator as, "A crazy person

13  who is definitely going to kill himself."  Do you see

14  that?

15      A.   Yes.

16      Q.   And these are Mr. Meyer's words as reported in

17  this email by Doug; correct?

18               MR. BYRNE:  Objection, form.

19      A.   Correct.

20      Q.   (BY MR. PIERCE)  And this is May 10th; correct?

21      A.   Correct.

22      Q.   Before you ever spoke with Mr. Waid?

23      A.   Yes, correct.

24      Q.   Are -- are these the type of statements about

25  creators that Antarctic Press would want to be

1   associated with?

2            MR. BYRNE:  Objection, form.

3       A.    I think -- I think at the time I wanted to make

4   sure that they were true.

5       Q.    (BY MR. PIERCE)  But if they were true, would

6   Antarctic Press want to be associated with these

7   statements?

8            MR. BYRNE:  Objection, form.

9       A.    No.

10      Q.    (BY MR. PIERCE)  And Joey asks, "Brian, are any

11  of the statements attributed to Richard below true."

12  Do you see that?

13      A.    Yes.

14      Q.    Is it fair to say that Joey is concerned about

15  this?

16      A.    Yes.

17      Q.    And were you concerned?

18      A.    Yes.

19      Q.    Can you turn to the first page?  And Brian

20  responds, do you see, on May 10th at 9:19 p.m., "I

21  didn't know about that stuff.  I looked it up online."

22  Do you see that?

23      A.    Yes.

24      Q.    And according to his email, he found proof that

25  Mr. Meyer had made at least most of these statements;

Joeming W. Dunn, M.D.                                    90

```
 1    correct?
 2        A.    Correct.
 3        Q.    And this email from Brian is May 10th, which is
 4    after the March and April emails that we reviewed with
 5    Mr. Byrne; correct?
 6        A.    Correct.
 7        Q.    And Brian is saying he didn't know about this
 8    stuff; correct?
 9        A.    Correct.
10        Q.    Do you recall discussing these statements
11    attributed to Mr. Meyer with anyone at Antarctic Press?
12        A.    Yes.
13        Q.    What do you recall?
14        A.    That after the accusation was made about these
15    statements that I wanted to make sure that they were
16    true and that we -- you know, we -- we came and met and
17    we talked about they were true or not.
18        Q.    And when they were confirmed to have been made
19    by Mr. Meyer, did that have an impact on your view of
20    the Jawbreakers project?
21        A.    Yes.
22        Q.    A negative view, I -- I assume?
23        A.    Yes.
24              MR. BYRNE:  Objection, form.  Objection,
25    leading.
```

Joeming W. Dunn, M.D.                                        92

1    Q.   (BY MR. PIERCE)  All right.  You know, as

2    indicated by this last set of emails, is it fair to say

3    that AP staff had concerns about its possibly

4    publishing Jawbreakers at this point in time?

5    A.   Yes.

6    Q.   Who among AP staff expressed concerns about AP

7    publishing Jawbreakers, that you can recall?

8    A.   I believe everybody had concerns, but as in

9    most staff environments, some people expressed more

10   concerns than others.

11   Q.   Who are expressed more concerns than others?

12   A.   I would say that I think Joey, Brian, and

13   Austin were the ones that spoke out the most.

14   Q.   And Joey was the editor-in-chief; correct?

15   A.   Correct.

16   Q.   And what was Austin Rogers?

17   A.   He was another pub -- he was -- we were trying

18   to do a collaboration with another publisher and he was

19   the head of Guardian Knights comics.

20   Q.   And are -- are these people whose opinions you

21   trust?

22   A.   Yes.

23   Q.   What about any AP freelancers?  Did they

24   express any concerns that you recall about publishing

25   Richard Myer's book?

Joeming W. Dunn, M.D.                                          93

```
 1      A.    Yes.

 2      Q.    Who do you recall?

 3      A.    Joe White.  I received a lot of calls and texts

 4   and I can't remember everybody that did one way or the

 5   other.

 6      Q.    Lee Duhig is somebody you mentioned?

 7      A.    Yeah, Lee I don't think had an opinion.

 8      Q.    That you can recall?

 9      A.    That I can recall, yeah.

10      Q.    But there were freelancers that -- that

11   expressed concerns about publishing Jawbreakers?

12      A.    Yes.

13      Q.    Did any staff or freelancers inform you that

14   they did not want their name on any book from Meyer

15   that was going to be published by AP?

16      A.    I recall one freelancer, and I can't remember

17   his name, that pulled his project because of the

18   situation with Jawbreakers.

19      Q.    Do you remember what the project was?

20      A.    It was a short story in an anthology we did

21   called Mangazine and he was scheduled to be in one of

22   the issues and I think he pulled his story because of

23   it.

24      Q.    Because of Jawbreakers?

25      A.    Yes, sir.
```

Joeming W. Dunn, M.D.                                          94

```
 1        Q.    And these concerns that -- that staff and
 2   freelancers expressed to you about Jawbreakers, that --
 3   those concerns were raised before you spoke with
 4   Mr. Waid; correct?
 5        A.    Correct.
 6        Q.    And did these concerns that you received have
 7   an impact on AP's decision making in terms of whether
 8   to publish Jawbreakers?
 9        A.    At the time I was gathering information to make
10   the decision, so yes.
11               MR. PIERCE:  This will be Exhibit 33.
12               (Deposition Exhibit 33 marked.)
13               MR. GOOD:  We have a 40-exhibit limit.
14               MR. BYRNE:  Local rule.
15               MR. PIERCE:  I'm trying to go through
16   them quickly.
17               MR. BYRNE:  33?
18               THE WITNESS:  Yes.
19        Q.    (BY MR. PIERCE)  And does this appear to be an
20   email chain from May 11, 2018, between you and Joey?
21        A.    Correct.
22        Q.    And this is at May 11, 2018, at 10:23 a.m.;
23   correct?
24        A.    Correct.
25        Q.    And in Joey's email he says, "Brian confirmed
```

1  that Richard said the things that retailer note --

2  notified us about.  He did, indeed -- indeed, call my

3  Star Wars editor a cum dumpster."  Do you see that?

4      A.   Yes.

5      Q.   And what is -- what's the reference to his "my

6  Star Wars editor"?  What does that mean?

7      A.   Joey belongs to a group called Guru-eFX and

8  they do coloring for Marvel Comics.

9      Q.   And was it your understanding that the woman

10 whom Mr. Meyer called a cum dumpster was somebody that

11 Joey worked with?

12          MR. BYRNE:  Objection, form.

13     A.   Correct.

14     Q.   (BY MR. PIERCE)  Did Joey work with the person

15 that's the subject of the statement about being a cum

16 dumpster?

17     A.   Correct.

18     Q.   And it -- it seems that Joey thought this was a

19 big deal; is that fair?

20          MR. BYRNE:  Objection, form.

21     A.   Yes.

22     Q.   (BY MR. PIERCE)  And you respond by saying you

23 would remove him from any decision-making issues.  Do

24 you see that?

25     A.   Correct.

1    Q.   And were you concerned that publishing

2    Jawbreakers would inevitably associate AP folks with

3    this type of rhetoric from Mr. Meyer?

4              MR. BYRNE:  Objection, form.  Objection,

5    leading.

6    A.   Yes.

7              MR. PIERCE:  Exhibit 34.

8              (Deposition Exhibit 34 marked.)

9              MR. PIERCE:  And I apologize.  We've

10   marked this.  This is a duplicate, but I didn't want to

11   dig through my stack and try to find it.

12   Q.   (BY MR. PIERCE)  Does this appear to be an

13   email between you and Joey from May 11th, 2018, at 4:38

14   p.m.?

15   A.   Correct.

16   Q.   And you're sending this to Joey, correct, --

17   A.   Correct.

18   Q.   -- the top one?  Can you go to page 2, the

19   second page?  And do you see at the very bottom there's

20   an email from Joey to you and then the date and time

21   folds over to the next page, May 11th, 2018, at 2:57

22   p.m.  Do you see that?

23   A.   Yes.

24   Q.   And Joey says in his email, "I'm honestly not

25   sure you understand what you're getting into.  I was at

1    the comic book store and even Bob said so."  Do you

2    know who Bob is?

3        A.   Bob is Bob   REDACTED    He's manager of a comic

4    book store            REDACTED

5            REDACTED

6        Q.   And what -- what was your interpretation of

7    what Joey was telling you here in relation to Bob?

8        A.   He was saying that, you know, since Bob was a

9    manager at a store that he didn't believe that this

10   would blow over as -- you know -- I mean, he thought

11   this was going to go longer than what we had -- what we

12   would anticipate.

13       Q.   And what you mean by "this blowing over"?  You

14   mean the -- the concern or the outcry about publishing

15   Jawbreakers?

16            MR. BYRNE:  Objection, form.  Objection,

17   leading.

18       A.   Yes.

19       Q.   (BY MR. PIERCE)  And then Joey says, "I haven't

20   been able to sleep or work and that's because it boils

21   down to this.  I'm not comfortable being associated

22   with this guy."  Do you see that?

23       A.   Yes.

24       Q.   What did you interpret "this guy"?  To whom did

25   that reference?

Joeming W. Dunn, M.D.                                                    98

1    A.   Mr. Meyer.

2    Q.   Did you feel that your editor-in-chief's

3  inability to sleep or work was a big deal to be taken

4  seriously?

5    A.   Yes.

6    Q.   Why is that?

7    A.   Because he is a friend and good -- good friend,

8  almost family.

9    Q.   And then Joey says it's his conduct that he's

10  concerned about.  Do you see that?

11   A.   Yes.

12   Q.   What -- what is meant by "his conduct" in your

13  interpretation?

14           MR. BYRNE:   Objection, form.

15   A.   When we found out some of the facts behind the

16  quotes that were sent to us that we were unaware of

17  that were true, I think that that is what conduct he

18  means.

19   Q.   (BY MR. PIERCE)   The statements by Mr. Meyer?

20   A.   Yes.

21   Q.   And he's referring to Mr. Meyer's own conduct.

22  Not that of -- not that of somebody else, Mr. Waid, or

23  anyone else; correct?

24   A.   Correct.

25   Q.   And then Joey says, "If it were any of the

1    other guys at AP that conducted themselves similarly, I
2    would divest AP of them as well."  Do you see that?
3        A.    Yes.
4        Q.    What was your understanding of what he was
5    saying there?
6        A.    That he believed that the -- that that conduct
7    was not that acceptable.
8        Q.    And then Joey says, "I've told Doug to take my
9    name off the books immediately."  Do you see that?
10       A.    Yes.
11       Q.    What -- what does that mean for his name to be
12   taken off the books?
13       A.    That means he would have no more association
14   with the books that we publish.
15       Q.    The -- Richard Meyer's books?
16       A.    All of the books.
17       Q.    And what was the reason he felt that way from
18   your perspective?
19             MR. BYRNE:  Objection, form.
20       A.    I think he was worried about guilt by
21   association.
22       Q.    (BY MR. PIERCE)  Association with Richard
23   Meyer?
24       A.    Correct.
25       Q.    And then Joey expresses worry about how this

1  may affect other AP creators in San Diego and the

2  booth.  Do you see that?

3      A.   Yes.

4      Q.   What -- what does -- what does that mean, if

5  you know, the reference to other AP creator in San

6  Diego and the booth?

7               MR. BYRNE:  Objection, form.

8      A.   You know, we have been publishing for many

9  years and we deal with many freelancers creators and we

10  have a fairly decent presence in San Diego and he was

11  worried about the possibility of that impacting us.

12      Q.   (BY MR. PIERCE)  Okay.  Can you go to the

13  second page of the email.  Do you see in the second

14  full paragraph it starts, "All you do work for AP way

15  beyond the call of duty and I will have your back."  Do

16  you see that?

17      A.   Excuse me.  I'm sorry.  Where is that?

18      Q.   I'm sorry.  It's the second full paragraph?

19      A.   Second page.  Oh, okay.  Sorry.

20      Q.   Do you see where it says, "All you do for

21  work" -- I'm sorry -- "All you do work for AP way

22  beyond the call of duty and I will have your back."  Do

23  you see that?

24      A.   Yeah.

25      Q.   What did you mean by having your back?

1      A.      I will support them for whatever decision they

2   make.

3      Q.      So if Joey doesn't want to be -- or doesn't

4   want Antarctic Press to -- to be associated with

5   Jawbreakers you'll have his back?

6      A.      I think the context was whatever decision a

7   person makes, I will have -- support them.

8      Q.      And --

9      A.      Either one way or the other.

10     Q.      And Joey had made clear that he did not want

11  Antarctic Press to be associated with Jawbreakers;

12  correct?

13             MR. BYRNE:  Objection, form.  Objection,

14  leading.

15     A.      Correct.

16     Q.      (BY MR. PIERCE)  And did Joey's concerns and

17  the concerns of other AP staff and freelancers weigh

18  heavily on you as you were trying to make a decision

19  about what to do?

20     A.      Yes.

21     Q.      And this email from Joey that we reviewed was

22  before you ever spoke to Mr. Waid; correct?

23     A.      Yes.

24             MR. PIERCE:  This will be Exhibit 35.

25             (Deposition Exhibit 35 marked.)

Joeming W. Dunn, M.D.                                    102

1    Q.   (BY MR. PIERCE)  And this is another exhibit --

2    I apologize -- I think we've covered already.  This --

3              MR. BYRNE:  Mine just aren't good enough

4    for you, are they?

5              MR. PIERCE:  No, if I try to find them in

6    my stack, it -- we'll be here for hours.

7    Q.   (BY MR. PIERCE)  Is Exhibit 35 an email dated

8    May 11, 2018, at 12:25 p.m.?

9    A.   Yes.

10   Q.   And it -- it's from Doug; correct?

11   A.   Correct.

12   Q.   And Doug says, "I just got a call from Mark

13   Waid"; right?

14   A.   Correct.

15   Q.   And Doug reports that Mr. Waid had stressed he

16   wasn't trying to dictate what AP can or can't publish;

17   correct?

18   A.   Correct.

19   Q.   Do you have any reason to doubt that Mr. Waid

20   had stressed that he wasn't trying to dictate what AP

21   can or can't publish?

22   A.   I didn't take the call so I can't speak, but

23   Doug is -- you know, Doug is Doug.  He will say what he

24   heard.

25   Q.   Was that consistent with what Mr. Waid said to

1   you, that he wasn't trying to dictate what AP could

2   publish?

3       A.   Yes.

4       Q.   Earlier when you were talking about the

5   conversation with Mr. Waid and -- and Mr. Byrne asked

6   you questions about misogynist and racist and that kind

7   of thing -- do you recall that?

8       A.   The conversation with Mr. Waid?

9       Q.   I'm sorry.  I'm referencing Mr. Byrne's

10  questions to you.  Do you know if what Mr. Waid was

11  saying was based on statements that he had seen or read

12  from Mr. Meyer?

13      A.   I think, yes.

14      Q.   During the May 2018 timeframe, Brian Denham

15  managed the social media accounts; correct?

16      A.   Correct.

17              MR. PIERCE:  This will be Exhibit 36.

18              (Deposition Exhibit 36 marked.)

19      Q.   (BY MR. PIERCE)  And do you see -- does -- does

20  this appear to be a tweet from the Antarctic Press

21  account dated May 12th, 2018?

22      A.   Yes.

23      Q.   And it starts with, "FACTS:  Mark Waid put a

24  call into our office.  Staff took a message and told

25  Mr. Waid our publisher would be informed.  Nobody at AP

1    threat, but, you know, like I said, at the time, I was

2    under a lot of pressure at that time and I felt like a

3    lot of this pressure was uncalled for.

4        Q.   Do you -- do you recall making the statement to

5    Mr. Waid that you felt that the comments or conduct of

6    Mr. Meyer was indefensible?

7        A.   I would have a hard time for me to defend those

8    comments.

9                 (Deposition Exhibit 37 marked.)

10               MR. PIERCE:   This will be Exhibit 37.

11       Q.   (BY MR. PIERCE)   This -- does this appear to be

12   a tweet associated with the Antarctic Press account?

13       A.   It appears to, yes.

14       Q.   And this tweet also says, "Mark Waid did not

15   bully anyone at our company."  Do you see that?

16       A.   Correct.

17       Q.   And that was sent out by Antarctic Press in --

18   as part of its social media account; correct?

19       A.   Correct.

20       Q.   And you say, "Though he did call and express

21   concern, Mark shed more light on the situation and

22   other factors came into play that do not involve any

23   staff or freelancers at any other company that led us

24   to our decision."  Do you see that?

25       A.   Yes, I do.

Joeming W. Dunn, M.D.                                    108

1     Q.    And was it true that, "Other factors came into

2   play that do not involve any staff or freelancers at

3   any other company that led us to our decision"?

4     A.    I don't know if I would agree with that.  I

5   mean, because there are -- we have a lot of staff --

6   well, freelancers that work at other companies that --

7   you know, that -- I mean, a multitude of them.

8     Q.    And so, again, there were factors that led to

9   Antarctic Press's decision that had no relationship to

10  Mark Waid; correct?

11    A.    Yes.

12    Q.    And those factors were concern that your staff

13  and freelancers had expressed; correct?

14    A.    Correct.

15    Q.    And including Mr. Meyer's own conduct; correct?

16    A.    Correct.

17    Q.    And those factors that led to AP's decision are

18  factors unrelated to Mark Waid; correct?

19    A.    Correct.

20           MR. PIERCE:   This will be Exhibit 38.

21           (Deposition Exhibit 38 marked.)

22    Q.    (BY MR. PIERCE)   And is this another -- does

23  this appear to be another social media post associated

24  with Antarctic Press?

25    A.    Correct.

1     Q.    And this one says, "Ultimately, some of our

2     staff and freelancers were uncomfortable sharing a

3     platform with anyone who makes disparaging remarks

4     about anyone in this community.  We had to cut ties.

5     We wish Richard all the best."  Was this post accurate?

6     A.    Yes.

7               MR. PIERCE:  Exhibit 39.

8               (Deposition Exhibit 39 marked.)

9     Q.    (BY MR. PIERCE)  And do these appear to be

10    additional social media posts associated with the

11    Antarctic Press account?

12    A.    It appears so, but I don't actually remember

13    reading these posts.

14    Q.    Did you remember reading the previous posts

15    that we -- that we just reviewed?

16    A.    No.

17    Q.    Were you aware that those posts had been made,

18    the -- the ones that we looked at previously?

19    A.    I was I think made aware of some of those

20    posts, but I never -- I never read any of these

21    posts --

22    Q.    Okay.

23    A.    -- prior -- when they first came out.

24    Q.    And do you see the third message down, it says,

25    "It came down to letting them know the extent of

Joeming W. Dunn, M.D.                                      110

1    Richard's online presence and some of the staff were

2    not even comfortable with the thought of standing with

3    him at a con."  Do you see that?

4        A.   Yes.

5        Q.   What is a con?

6        A.   It's a convention, comic book convention I'm

7    sure they're referring to.

8        Q.   Do you -- do you recall that some AP staff were

9    not comfortable with the thought of standing with

10   Mr. Meyer at a convention?

11       A.   Yes.

12       Q.   Who -- who expressed that concern?

13       A.   I think Joey.

14       Q.   Do you recall that we reviewed some text

15   messages between you and Richard Meyer?

16       A.   Yes.

17       Q.   Did you ever become aware that Mr. Meyer had

18   publicly tweeted out your texts with him?

19       A.   I was not --

20            MR. BYRNE:  Objection, form.

21       A.   I was not aware of that.

22       Q.   (BY MR. PIERCE)  When you were texting with

23   him.  Would you have expected that he would publicly

24   tweet out the text messages between you and him?

25       A.   I believe I have no expectation of privacy.

1     Q.    Well, did you have an expectation that he would

2     publicly tweet them out?

3     A.    I -- I didn't think he would, but -- yeah.

4     Q.    Was Antarctic Press's decision not to publish

5     Mr. Meyer's book made of its own volition?

6     A.    I'm not sure if I understand that question.

7     Q.    Did -- you made the decision for Antarctic

8     Press; correct?

9     A.    Correct.

10    Q.    And that was your decision; correct?

11    A.    100 percent.

12    Q.    And you made that decision voluntarily?

13    A.    Correct.

14    Q.    And Mark Waid, did he do anything to prevent AP

15    from publishing Mr. Meyer's book?

16    A.    No.

17    Q.    Rather it was entirely up to Antarctic Press

18    whether to publish Mr. Meyer's book; correct?

19              MR. BYRNE:  Objection, form.  Objection,

20    leading.

21    A.    Yes.

22    Q.    (BY MR. PIERCE)  Did you ever see any actual

23    finished book for Jawbreakers?

24    A.    Me personally, no.

25    Q.    Do you know if Antarctic Press ever did?

Joeming W. Dunn, M.D.                                              112

1      A.    I think Brian saw a finished product.

2      Q.    Are you able to estimate with any reasonable

3   certainty the number of Jawbreakers's books that would

4   have been sold if published by Antarctic Press?

5      A.    I remember at the time when he announced

6   that -- that we were -- you know, he had X number of

7   followers, and I thought to myself, well, even if we

8   get 1 percent of those people to buy the book from a

9   retailer, it was a significant number more than we

10  normally would sell.  And so I can't say to you off the

11  top of my head what number it was, but I -- my guess

12  was between a thousand and 5,000 copies.

13     Q.    And that was -- that was just your guess?

14     A.    That was just my guess.

15     Q.    I -- I take it you would agree that it's --

16  it's speculative as to how any particular book that AP

17  publishes will actually sell in the market?

18             MR. BYRNE:  Objection, form.

19     A.    Correct.

20     Q.    (BY MR. PIERCE)  I've read in some of the

21  documents that AP has experienced some financial

22  struggles over the years; is that correct?

23     A.    Correct.

24     Q.    And does it happen sometimes that AP puts out a

25  book and it performs a lot worse than what AP hoped?

1    A.    Yes.

2    Q.    And do some books turn out to be unprofitable?

3    A.    Yes.

4    Q.    And it's possible that Jawbreakers may have

5    turned out to be unprofitable as well; correct?

6              MR. BYRNE:   Objection, form.

7    A.    Yes.

8    Q.    (BY MR. PIERCE)   Do you know if AP were able to

9    sell the 1,000 to 5,000 books what Mr. Meyer's take

10   from that would have been?

11   A.    Based on our contract, I do not think we had

12   determined a cover price at that point in time.  I

13   think we were in discussion with that.  Probably

14   between -- I mean, if it sold on the low end, maybe 12

15   to $1500.00.  On the high end -- high end, maybe

16   $10,000.00.

17   Q.    And that's if you sold 1,000 to 5,000 books?

18   A.    Correct.

19   Q.    And that's not a given either, is it?

20   A.    There's no guarantees, no.

21              MR. PIERCE:   I want to mark -- what

22   exhibit number are we up to?

23              THE REPORTER:   40.

24              MR. PIERCE:   40.  I think this will be

25   the last one.

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3    RICHARD MEYER,               *
         Plaintiff,                *
 4
      VS.                          *   CIVIL ACTION NO.
 5                                     1:18-CV-00800-LY
      MARK WAID,                   *
 6       Defendant.                *   (Jury Demanded)

 7

 8

 9                    REPORTER'S CERTIFICATE

10                 VIDEOTAPED ORAL DEPOSITION

11                            OF

12                  JOEMING W. DUNN, M.D.

13                      MARCH 6, 2019

14

15

16          I, Shan Morris Blanchard, Certified

17    Shorthand Reporter in and for the State of Texas,

18    hereby certify to the following:

19       That the witness, JOEMING W. DUNN, M.D., was duly

20    sworn by the officer and that the transcript of the

21    oral deposition is a true record of the testimony given

22    by the witness;

23       I further certify that pursuant to FRCP Rule (f)(1)

24    that the signature of the deponent;

25          _____ was requested by the deponent or a party
```

1    before the completion of the deposition and instruction

2    given that it be returned within 30 days from the

3    receipt of the transcript.  If returned, the attached

4    Changes and Signature Page contains any changes and the

5    reasons therefor;

6        X   was not requested by the deponent or a party

7    before the completion of the deposition.

8        I further certify that I am neither attorney or

9    counsel for, nor related to or employed by any of the

10   parties to the action in which this deposition is

11   taken.

12       Further, I am not a relative or employee of any

13   attorney or party of record in this cause, nor do I

14   have a financial interest in the action.

15       Subscribed and sworn to on this the 20th of

16   March, 2019.

17                        *Shan Blanchard*

18   _____

19                    Shan Morris Blanchard, CSR
                          Texas CSR #3863
                      Expiration Date:  10/31/21
20             Leixtas - Firm Registration No. 539
                    100 N.E. Loop 410, Suite 955
21                  San Antonio, Texas 78216
                          (210) 481-7575

22

23

24

25

EXHIBIT 2

| Subject: | Re: Jawbreakers |
| --- | --- |
| From: | Brian Denham (briandenham@         REDACTED |
| To: | apcog1@ REDACTED |
| Cc: | jdunn@   REDACTED       ; mzajza@   REDACTED |
| Date: | Wednesday, May 9, 2018 9:48 PM |

The retailers have a group on Facebook.

Some of the retailers have heard Jawbreaker would be not only a fundraised Indiegogo, but it would be offered in stores.

So this happened...

### Photo



Another retailer posted on Twitter yesterday that if he finds out the publisher of Jawbreakers he will have to consider a boycott.

Richard reached out to one of the retailers to inform him of what's going on. He promised to not rat them out. So that retailer informed Richard. Richard posted on Youtube that retailers are colluding with each other to boycott

the unannounced publisher. So the retailers have been trying to figure out it's us.

It's all happening earlier today and some of it is going on right now.

On Wed, May 9, 2018 at 9:42 PM, Antarctic Press <apcog1@g    REDACTED wrote:
Well, I guess that's good to know.  How did these complaints that led to a boycott even get started?  Was it anything of substance, or something blown out of proportion, or nothing at all?

Doug

On Wed, May 9, 2018 at 9:38 PM, Brian Denham <briandenham@     REDACTED wrote:
There will be a lot more. Ignore them.

A few of retailers got together in a secret Facebook group to boycott whatever publisher picked up Jawbreakers.

Richard (Diversity and comics) will announce tonight on Youtube who the publisher will be. Some have speculated it's us. That's why you may have gotten this letter early.

There will be a lot more this week, but they probably don't order form us anyway.

There are a lot more fans supporting us. Don't worry about these retailers. The customers will order form retailers who support them.

These boycott retailers are saying they won't support any of our books if we carry Jawbreakers.

But the fans are hearing this and they will boycott the stores and order it directly from us, or from other retailers who support their choices.

We've already one up by a lot of fans on Twitter. Fans are going to start buying stuff off the site so you may see a small uptick in online sales.

On Wed, May 9, 2018 at 8:18 PM, Antarctic Press <apcog1@     REDACTED wrote:
Well, this is interesting.  Any thoughts on a response?

Doug

---------- Forwarded message ----------
From: **Megan Kilar** <        REDACTED        >
Date: Wed, May 9, 2018 at 8:05 PM
Subject: Jawbreakers
To: apcog1@REDACTED

Based on the harassment online by Diversity and Comics, I have decided to boycott your company if you choose to publish Jawbreakers.

I am responsible for the Diamond order ar my retail location and we will no lonfer be ordering from a company that supports online harassment and threats.

Regards,

Megan M Kilar

---

## Attachments

- image.png (705.78KB)

EXHIBIT 3

 **Diversity & Comics**
@DiversityAndCmx

[ Follow ]  ⌄

I did the research on about four or five of
them but yeah if someone could go through
those screenshots from that retailer
Facebook group and make a list of the
people the stores they work out and the
cities that would be great

> **Yawg** @Yawgmothx
> Replying to @DiversityAndCmx
>
> Can someone put their organization or business names next to who they are? As
> they say, sunlight is the best disinfectant. I think we need to start dragging these
> cabals into the light.

7:04 AM - 10 May 2018



EXHIBIT
27
J Dunn
PENGAD 800-631-6989

EXHIBIT 4




EXHIBIT

28

EXHIBIT 5



**Diversity & Comics**
@DiversityAndCmx

Follow

"To me, my Incel army!"

**Million Dollar Prons** @PronsGM

Replying to @DiversityAndCmx

"Don't carry Jawbreakers? Say hi to the LEG BREAKERS"

6:41 AM - 11 May 2018



EXHIBIT 6

| Subject: | Re: It Appear AP is moving |
| --- | --- |
| From: | Joeming Dunn (jdunn@    REDACTED |
| To: | Mzajza@     REDACTED |
| Date: | Friday, May 11, 2018 4:38 PM |

As you are all well aware we are in the Kobayashi Maru of comic books, a no win situation. As you are all aware we have agreed to publish Jawbreakers which is authored by a very controversial figure. This has created a passionate response on both sides of this unfortunate equation in the comic book community. This essentially put us in a **"NO WIN" situation**. We could not release this book even though we are contractually obligated to do so and succumb to social media pressure (which feels a bit like we are being bullied to not release the book) or we could publish the book and continue to get the wrath we have undergone these past days from a multitude of sources. So we are stuck in between a rock and a hard place.

As you all know we have taken a "silence" line in regards to this situation. There are two reasons for my decision to do this. One is that as with any viral controversies on the internet, they tend to be put to the side after a couple of days, especially over the weekend. Second that gives us time to meet on Monday to make a decision on this situation. My most important concern is to protect everyone at Antarctic Press and I hope to make a decision about our direction on Monday. But in the meantime I am going to rant…not at each of you personally but to everyone who has put us in this situation. On Monday we are going to vote on this situation and in lieu of that impending vote I want everyone to be aware of the rant I will most likely give. No matter the decision I will take the heat for the decision so there will be nobody getting thrown under a bus and nobody will point fingers. I can take the heat and I will take the brunt of the criticism.

Now originally I was going to list the pros and cons of our decision but I realized that this is not just a pros and cons thing. This has become a personal issue in many regards with no black and white answers. But we can go over the basic facts. In its purest form this is a decision on whether we as a company can separate the "ART" from the "ARTIST." Do we hold accountable the fact that this person has said many mean spirited and controversial statements which goes beyond then normal "opinions". It is where we are going to draw the line. Do we draw the line at Rod saying many insulting condescending thing about conservatives and their policies? Or is it Ben saying some things about liberals? Are those "tolerable" lines and opinions we can accept since we know them both. We have never "vette" a creator but we all know bias goes with any decision we make. If we meet a creator we don't like I am sure in the back of your mind you would say that I would never give that creator a chance to publish their work even though we are supposed to be unbiased. If anyone had a personal grudge with someone, I would certainly take that into account if especially if we decided to consider their work. That is vastly unfair but I know that life is unfair. Are we drawing a line at this creator for his severely offensive rhetoric? He did not commit a crime but he expressed an offensive opinion. I will accept any line that you all vote for but my rant to everyone else in the industry…WHERE DO YOU DRAW THAT FUCKING LINE? And where is the line drawn on these type of issues...if a creator has 10 offensive tweets 5 years ago does that preclude them from being published now...or is the line 15 tweets...or 20...or is just 2...or even 1 tweet from last year....where is the proverbial line for any creator? What if we want to publish someone who is Islamic or an anti-abortionist or a socialist or have a certain sexual orientation? Are we precluded from publishing them since they may have a statement or opinion that you do not agree with? Are we now restricted from publishing someone who may be an ultra douche bag? We are an ALL-INCLUSIVE publisher for the very we believe in ALL INCLUSIVITY. Have we gotten to the point where when someone from the certain religion does something bad we blame the whole religion,. When a cop does something bad, we accuse all the cops of being bad. When one person of color commits a crime, we condemn the entire race. When one politician or media member lies we think all the politicians and media members lie. So now that we publish a book that people do not agree with because of the creator of the book (for whatever reason) people are making judgments on our entire publication line? FUCK THEM.

EXHIBIT

34

J Dunn

I will admit that to a certain aspect this was a financial decision for me…I knew that he was a popular online figure I just did not realize he was that polarizing. As everyone knows we are running on fumes. Over the past two years I have had to put close to $70,000 of my own money to keep Antarctic Press afloat. To make sure bills are paid on time, to keep the lights and phone on…to keep the printers going. I know currently this is not just a financial decision and prior to this shit storm I looked at it as a purely financial decision and I thought we could handle it (using My Hero as a measure). I was extremely happy that My Hero saved our ass these past weeks… his online sales for has been remarkable and a godsend despite the flack we received (which is tame compared to what we have been getting with Richard). What Jawbreaker did on Indigogo did put some dollar signs in my eyes. Could I finally get some sustainability for Antarctic Press without me having to contribute constantly? Could he bring the fans to us as My Hero did? Now again my rant again not to you but to everyone else….I know this is not going to be a purely financial decision but I know that he could help us financially as I know his fans are passionate and supporting. But it bothers the fuck out of me that we are getting these industry professionals and pundits telling us how we should run our business even as an ALL-INCLUSIVE supporter of creator's rights. I will stand by our record of inclusion for any sex, race, religion, social standing and sexual orientation and any other fucking thing you can think of…but in this case that is completely irrelevant now. But how many of these people really support Antarctic Press? Does Rich Johnston only write about Antarctic Press when there is some sort of controversy? Would any of these "industry" supporters really support us if we called for help? If I asked Lea Hernandez to do some art for us or Mark Waid to write us a story to help us out do you think she or he would do it for free? How many of these people on the internet telling us what to do actually bought and Antarctic Press book both fans and retailers…How many copies of the 300 sales on Rochelle or the 600 sales on Adventure Finders did they buy or even worse the 1400 copies of Gold Digger? While Richard may be the most offensive fuck in the whole world he came to us with fans and financial support where no other professional did so. Even though I do not agree with Tim's political opinions when I talked to him all he wanted to do is make sure Antarctic Press was viable and financially supported and he followed up with his fans coming to us and buying his book. And for all the posers who are telling our ALL INCLUSIVE Company what to do and how to do it and never buy an Antarctic Press book…FUCK YOU!

All you do work for AP way beyond the call of duty and I will have your back. Even if we decide to publish his book I will most likely remove any of our names from anywhere in the book. Antarctic Press will still be the publisher and we will not hide that fact but IF we publish the book we can remove our personal association with it…which gets me to not to the credo of the company (Creator rights) or the financial aspect but the moral aspect. Not the moral aspect of agreeing or disagreeing with Richard but now another fucking rant…I do not give a flying fuck if you agree or disagree with Richard. But we now have to make a decision on a book based on GUILT BY ASSOCIATION. It does not matter that we are ALL INCLUSIVE CREATOR'S RIGHTS Company….but now I have to deal with the repercussions of this guilt. Richard made some very offensive inflammatory comments about many people in the industry and now because of that could that come back to harm some of you individually. You would hope any personal attack on someone by Richard would not translate into because we published him we must be like him…but I fucking know life is fucking unfair…GUILT BY ASSOCIATION. People are now taking us to task on Jawbreakers now they may take it out on the innocent people (us) just because of fucking GUILT BY ASSOCIATION. AND THOSE FUCKING PEOPLE DO NOT SEES THE FUCKING DOUBLE STANDARD IRONY of those types of actions. Richard's actions are bullying but the reaction to this is MORE BULLYING by people who are against Richard…fucking double standard irony. If I don't like a person or a product I DON'T FUCKING buy it. If I don't like a politician…I DON'T VOTE FOR THEM. But to give us threats of boycotts etc…just because of our ASSOCIATION with Richard… Christ that is so fucking unfair (and I know life is unfair) but that makes them as bad as Richard's actions and what makes it worse is THEY DON'T SEE IT. It is justified in their minds to "make a point." This does not absolve Richard…I think he is an ass online and I think he knows he is an ass online and I would tell him that and he would agree with me. It's because of that I may lose a friend (close to family) to his fucking action and that ROYALLY PISSES ME OFF.

---

From: Joey <Mzajza@REDACTED
To: Joeming Dunn <jdunn@a    REDACTED

**Sent:** Friday, May 11, 2018 2:57 PM
**Subject:** Re: It Appear AP is moving

I'm honestly not sure you understand what you're getting into, I was at the comicbook store and even Bob said so and he said,"if Joe thinks this is gonna blow over, it isn't." I thought about it long and hard, I haven't been able to sleep or work and that's because it boils down to this: I'm not comfortable being associated with this guy, it's not his work, and it's not his beliefs, it's his conduct. And, if it were any of the other guys at AP that conducted themselves similarly I would divest AP of them as well. There are standards of civil and professional conduct I believe in. This guy obviously has issues. I've told Doug to take my name of the books immediately and I'm also worried about how this may affect other AP creators and San Diego and the booth. Please be careful.

EXHIBIT 7

 **Antarctic Press** Ultimately, some of our staff and freelancers were uncomfortable sharing a platform with anyone who makes disparaging remarks about anyone in this community. We had to cut ties. We wish Richard all the best.

Like · Reply · 1d        12



EXHIBIT 8

| Subject: | Re: Jawbreakers |
| --- | --- |
| From: | Antarctic Press (apcog1@REDACTED |
| To: | jdunn@ REDACTED |
| Cc: | briandenham@REDACTED alcperez@REDACTED twilightxmail@REDACTED;    davidjhutchison@REDACTED |
| Date: | Thursday, May 10, 2018 10:02 PM |

I still plan to ignore the two initial complaints I've received. I'll give them that response if they write me again. (The second one seemed to come from Richard himself, though.)

Doug

On Thu, May 10, 2018 at 9:48 PM, Joeming Dunn <jdunn@   REDACTED   > wrote:

I have decided on radio silence on Jawbreakers...essentially ignore any inquiry or email or discussion with any one...if you get a question, tweet, facebook post or call about it just say...we publish lots of books and I don't have any info on the book at this time if you have any questions about the book the creator told us you can contact him and we will answer your questions...do not engage any interview or request for questions or any inquiry...if they are not satisfied with that answer be apologetic and tell them any questions will be happily answered by the creator of the book since we cannot talk in his place. We cannot divulge his info but he can found on facebook, twitter etc...

Brian if you tweet anything...just be tweet about other books, no mention of Jawbreakers....check out these books coming out in "whenever"...you have been doing a good job on humor and deflection on twitter so keep that up...deflect any response...and be self effacing....if someone ask about Jawbreakers...give the aww shucks sorry I do not know the answer to that question...hey...you should ask the creator.

If someone emails you Doug....you can respond...thanks we appreciate your email...we are aware of your concerns about "whatever"...it may be best to contact the creator about those "statements" so that he can clarify or explain that statement to you since we cannot talk for him. You can reach him via twitter or facebook since we cannot divulge his personal information.

**EXHIBIT**
32
JDunn

**From:** Brian Denham <briandenham@REDACTED
**To:** Joey <Mzajza@REDACTED
**Cc:** Antarctic Press <apcog1@REDACTED ; Joeming Dunn <jdunn@   REDACTED
**Sent:** Thursday, May 10, 2018 9:19 PM
**Subject:** Re: Jawbreakers

I didn't know about that stuff. I looked it up online.

He did call Heather a cum dumpster in a private video for certain elite tier fans of his channel. One of them released the private video to the public. He later publicly apologized.

Richard has called people "pedophiles", or "they look like pedophiles" before. He has said those things about Mark Waid and Dan Slott.

I can't find that line about Mags- the "DC Transgendered writer" being a fucking crazy person... etc.", but it might be in one of his videos.

Him and Mags have apologized to each other, and then they started up again when a comic writer called out Richard for having a dishonorable discharge and Mags supported that creator.

On Thu, May 10, 2018 at 7:49 PM, Joey <Mzajza@REDACTED wrote:
Brian, are any of the statements attributed to Richard below true?

On May 10, 2018, at 2:23 PM, Antarctic Press <apcog1@REDACTED wrote:

Okay, but none of that tells explains what these retailers have against Jawbreaker. However, this email I just received might:

On Thu, May 10, 2018 at 1:19 AM, Meyers Richard <cmxanddiversity@REDACTED wrote:
Just saw the news that you're publishing Richard C. Meyer's JAWBREAKERS.

Your newest writer has publicly refereed to a female Marvel editor as a "cum dumpster," who sucked her way to the top, called an online reporter a "fucking fag," and suggested writers Brian Bendis, Dan Slott and Mark Waid were pedophiles.

He also referred to a trangendered DC writer as, "...a fucking crazy person, a criminal, who is definitely, definitely going to kill himself and it's just where when and how."

Good to know where your standards lie, guys, and that you don't mind being associated with such a class act, because you're now tied together at the hip.

Hope it's worth it.

Certainly none of that appears flattering, but neither does it prove how much of that it is true or explain why any of it might have happened.

Also, I'm not sure if the fact that it came from a Richard Meyers and is about a Richard Meyers is due to odd coincidence or a name spoof or what.

Doug

On Wed, May 9, 2018 at 9:47 PM, Brian Denham <briandenham@REDACTEDwrote:
The retailers have a group on Facebook.

Some of the retailers have heard Jawbreaker would be not only a fundraised Indiegogo, but it would be offered in stores.

So this happened...
<image.png>

Another retailer posted on Twitter yesterday that if he finds out the publisher of Jawbreakers he will have to consider a boycott.

Richard reached out to one of the retailers to inform him of what's going on. He promised to not rat them out. So that retailer informed Richard. Richard posted on Youtube that retailers are colluding with each other to boycott the unannounced publisher. So the retailers have been trying to figure out it's us.

It's all happening earlier today and some of it is going on right now.

On Wed, May 9, 2018 at 9:42 PM, Antarctic Press <apcog1@REDACTEDwrote:
Well, I guess that's good to know. How did these complaints that led to a boycott even get started? Was it anything of substance, or something blown out of proportion, or nothing at all?

Doug

On Wed, May 9, 2018 at 9:38 PM, Brian Denham <briandenham@REDACTED wrote:
There will be a lot more. Ignore them.

A few of retailers got together in a secret Facebook group to boycott whatever publisher picked up Jawbreakers.

Richard (Diversity and comics) will announce tonight on Youtube who the publisher will be. Some have speculated it's us. That's why you may have gotten this letter early.

There will be a lot more this week, but they probably don't order form us anyway.

There are a lot more fans supporting us. Don't worry about these retailers. The customers will order form retailers who support them.

These boycott retailers are saying they won't support any of our books if we carry Jawbreakers.

But the fans are hearing this and they will boycott the stores and order it directly from us, or from other retailers who support their choices.

We've already one up by a lot of fans on Twitter. Fans are going to start buying stuff off the site so you may see a small uptick in online sales.

On Wed, May 9, 2018 at 8:18 PM, Antarctic Press <apcog1@   REDACTED   wrote:
Well, this is interesting. Any thoughts on a response?

Doug

---------- Forwarded message ----------
From: **Megan Kilar** <   REDACTED   >
Date: Wed, May 9, 2018 at 8:05 PM
Subject: Jawbreakers
To: apcog1@REDACTED

Based on the harassment online by Diversity and Comics, I have decided to boycott your company if you choose to publish Jawbreakers.

I am responsible for the Diamond order ar my retail location and we will no lonfer be ordering from a company that supports online harassment and threats.

Regards,

Megan M Kilar

EXHIBIT 9

6:21 ⏀                    ·ıll 🛜 ▭

<   **Antarctic Press - Comics Are...**  ⓘ
          @AntarcticPress

We got a pitch and liked it, and
that's the extent of it. The
story was hate free. We put it
to a vote to publish it on the
merit of the comic and that's
about it.

The owner, editors, staff,
production didn't know who
Richard was, or had never
heard of diversity and comics.



5/12/18, 9:31 PM

It came down to letting them
know the extent of Richard's
online presence and some of
the staff were not even
comfortable with the thought
of standing with him at a con.



5/12/18, 9:34 PM

I think it could be summed up
with one of our people saying
"If I'm running a bar and one of
my bartenders calls any
customer a name they can just
get the fuck out right there."

5/12/18, 9:37 PM

🖼 GIF   Start a message   ☺

🏠      Q      🔔      ✉



EXHIBIT
39
J. Dunn
PENGAD 800-631-6989

# EXHIBIT 10

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3    RICHARD MEYER,                 *
         Plaintiff,                  *
 4
      VS.                            *   CIVIL ACTION NO.
 5                                       1:18-CV-00800-LY
      MARK WAID,                     *
 6       Defendant.                  *   (Jury Demanded)

 7

 8

 9              VIDEOTAPED ORAL DEPOSITION

10                        OF

11                    BEN DUNN

12                 MARCH 6, 2019

13

14

15              VIDEOTAPED ORAL DEPOSITION of BEN DUNN,

16    produced as a witness on behalf of Plaintiff and duly

17    sworn, was taken in the above-styled and numbered cause

18    on March 6, 2019, between the hours of 9:58 a.m. and

19    11:02 a.m. before Shan Morris Blanchard, Certified

20    Shorthand Reporter in and for the State of Texas,

21    reported by computerized stenotype machine at the

22    offices of Langley & Banack, Inc., 745 E. Mulberry,

23    Suite 700, San Antonio, Texas 78212 pursuant to Federal

24    Rules and the provisions stated on the record or

25    attached hereto.
```

1                    A P P E A R A N C E S

2

3      FOR THE PLAINTIFF:

4          Mr. Daniel H. Byrne
           Fritz, Byrne, Head & Gilstrap, PLLC
5          221 W. 6th Street, Suite 960
           Austin, Texas 78701
6          Telephone: 512-476-2020
           Fax: 512-477-5264
7          Email: dbyrne@fbhg.law

8      FOR THE DEFENDANT:

9          Mr. Ryan Pierce
           Reeves & Brightwell, LLP
10         221 West Sixth Street, Suite 1000
           Austin, Texas 78701
11         Telephone: 512-334-4500
           Fax: 512-334-4492
12         Email: rpierce@reevesbrightwell.com

13     FOR THE WITNESS:

14         Mr. Otto S. Good
           Langley & Banack, Inc.
15         745 E. Mulberry, Suite 900
           San Antonio, Texas   78212
16         Telephone: 210-736-6600
           Fax: 210-735-6889
17         Email: ogood@langleybanack.com

18     WITNESS:

19         Ben Dunn

20     CERTIFIED SHORTHAND REPORTER:

21         Shan Morris Blanchard

22     VIDEOGRAPHER:

23         Lawrence Delgado

24

25

```
 1                 (The reading of introductions into the
 2     record according to Rule 30(b)(5)(A) was waived by all
 3     parties present.)
 4                     THE VIDEOGRAPHER:  And we're on the
 5     record on March the 6th, 2019, at 9:58 a.m.
 6                     BEN DUNN, the witness, being duly cautioned
 7     and sworn to tell the truth, the whole truth and
 8     nothing but the truth, testified as follows:
 9                 (Time: 9:58 a.m.)
10                         EXAMINATION
11     BY MR. BYRNE:
12         Q.   Would you state your name for the record,
13     please?
14         A.   Ben Dunn.
15                     MR. PIERCE:  Dan, do you want to cover
16     the preliminary things we talked about?
17                     MR. BYRNE:  Sure.  Go ahead.
18                     MR. PIERCE:  Plaintiff's counsel and
19     defendant's counsel have agreed that objection to form
20     will be sufficient to preserve objections relating to
21     form-related objections and that the parties will --
22     will have any -- will have a running objection to
23     questions that go beyond the Court's order regarding
24     jurisdictional discovery.
25                     MR. BYRNE:  And scope just generally,
```

1    Q.   Okay.

2    A.   I know he's a colorist for Marvel.  He does a

3  lot of Star Wars stuff.

4    Q.   Okay.  You know you're giving testimony in a

5  lawsuit that's pending between Richard Meyer and Mark

6  Waid?

7    A.   Oh, yes, I'm quite aware.

8    Q.   Okay.  Have you ever met Mark Waid?

9    A.   I have seen him.  I have never met him.

10   Q.   And where have you seen him?

11   A.   I've seen him at various comic book

12  conventions, but I do not know him personally.

13   Q.   Okay.  Were any -- do you remember seeing him

14  at any conventions located in the state of Texas?

15   A.   Oh, gosh, perhaps.  Maybe back in the old days.

16  I mean, truth be told, I was not a big follower of his

17  work, so I didn't really pay much attention.

18   Q.   Okay.  We -- we're going to be talking in a

19  minute about some events that took place in May of

20  2018.

21   A.   Yes, sir.

22   Q.   Did you happen to attend the convention that

23  took place in Houston toward the end of May 2018?

24   A.   No, I was not at -- at that convention.

25   Q.   Okay.  To your knowledge, have you ever spoken

1  Mr. Waid, but as I understand it, you don't know one

2  way or another whether Mr. Waid called or whether your

3  brother, Joe, called Mr. Waid; is that correct?

4      A.   No, I knew because he told me, "This is Mark

5  Waid.  I got to take this," and then he left the room.

6      Q.   And so your recollection is that Mr. Waid was

7  calling your brother?

8      A.   That is correct.

9      Q.   But I -- I take it, you would defer to your

10  brother's recollection on that since he was on the

11  call?

12      A.   That is correct.

13      Q.   And you did not, it sounds like, talk to your

14  brother about the substance of the call with Mr. Waid;

15  correct?

16      A.   That's correct, yes.

17      Q.   And you did not talk with your brother about

18  what impact, if any, that call had on your brother's

19  decision-making regarding Jawbreakers; correct?

20      A.   Well, the decision that he made not to do the

21  book was obviously influenced somewhat by the call

22  afterwards, because we would have continued with our

23  plans to publish the book.  So it was surprising for me

24  to hear that he going to cancel it.  So I didn't pursue

25  it because I know my brother well enough that I didn't

1    want to further distress him, you know.

2       Q.   And -- but that -- that's not based on anything

3    that Joe said to you; correct?

4       A.   That's correct.

5       Q.   This -- this is your -- your speculation as to

6    what occurred; correct?

7       A.   That's correct, yes.

8       Q.   Do you know if there was an actual contract

9    between Antarctic Press and Mr. Meyer regarding the

10   publication of Jawbreakers?

11      A.   I'm not aware of any contract -- or I did not

12   see one nor was one presented to me.

13      Q.   Is it your understanding that there was not an

14   actual contract?

15      A.   Oh, there was a contract because my brother

16   would not have announced anything without some sort of

17   prior agreement.

18      Q.   Do you know the terms of that agreement?

19      A.   I do not know the terms of the agreement.

20      Q.   Do you know the extent to which Antarctic Press

21   had the right to decide not to move forward with

22   publication?

23      A.   I didn't -- was not privy to that information.

24               (Deposition Exhibit 10 marked.)

25               MR. PIERCE:   I'm going to mark this a

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                    AUSTIN DIVISION

3    RICHARD MEYER,              *
          Plaintiff,             *
4
     VS.                         *   CIVIL ACTION NO.
5                                    1:18-CV-00800-LY
     MARK WAID,                  *
6         Defendant.             *   (Jury Demanded)

7

8                 REPORTER'S CERTIFICATE

9              VIDEOTAPED ORAL DEPOSITION

10                          OF

11                       BEN DUNN

12                   MARCH 6, 2019

13

14          I, Shan Morris Blanchard, Certified

15   Shorthand Reporter in and for the State of Texas,

16   hereby certify to the following:

17       That the witness, BEN DUNN, was duly sworn by the

18   officer and that the transcript of the oral deposition

19   is a true record of the testimony given by the witness;

20       I further certify that pursuant to FRCP Rule (f)(1)

21   that the signature of the deponent;

22          _____ was requested by the deponent or a party

23   before the completion of the deposition and instruction

24   given that it be returned within 30 days from the

25   receipt of the transcript.  If returned, the attached

1  Changes and Signature Page contains any changes and the

2  reasons therefor;

3  __X__ was not requested by the deponent or a party

4  before the completion of the deposition.

5  I further certify that I am neither attorney or

6  counsel for, nor related to or employed by any of the

7  parties to the action in which this deposition is

8  taken.

9  Further, I am not a relative or employee of any

10  attorney or party of record in this cause, nor do I

11  have a financial interest in the action.

12  Subscribed and sworn to on this the 20th of

13  March, 2019.

14  *ShanBlanchard*

15  _____

16  Shan Morris Blanchard, CSR
   Texas CSR #3863
   Expiration Date:  10/31/21

17  Leixtas - Firm Registration No. 539
   100 N.E. Loop 410, Suite 955

18  San Antonio, Texas 78216
   (210) 481-7575

19

20

21

22

23

24

25

EXHIBIT 11

1            UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DIVISION OF TEXAS

3                   AUSTIN DIVISION

4

5    RICHARD MEYER,                    )
                                       ) Case No. 1:18-CV-00800-LY
6              Plaintiff,              )
                                       )
7         v.                           )
                                       )
8    MARK WAID,                        )
                                       )
9              Defendant.              )
     _____ )

10

11

12

13          VIDEOTAPED DEPOSITION of MARK WAID taken

14    on behalf of the Plaintiff at 10250

15    Constellation Boulevard, 19th Floor, Los

16    Angeles, California, on Tuesday, February 26,

17    2019 at 1:26 p.m. before Vivian C. Lane,

18    Certified Shorthand Reporter No. 11339.

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2
     For Plaintiff:
 3
                 FRITZ, BYRNE, HEAD & GILSTRAP, PLLC
 4               By:  DANIEL H. BYRNE, ESQ.
                 221 West Sixth Street
 5               Suite 960
                 Austin, Texas 78701
 6               (512)476-2020
                 dbyrne@fbhg.law
 7
     For Defendant:
 8
                 REEVES & BRIGHTWELL
 9               By:  RYAN M. PIERCE, ESQ.
                 221 West Sixth Street
10               Suite 1000
                 Austin, Texas 78701-3410
11               (512)334-4503
                 rpierce@reevesbrightwell.com
12
                        -and-
13
                 LAW OFFICES OF MARK S. ZAID, P.C.
14               By:  MARK S. ZAID, ESQ.
                 1250 Connecticut Avenue Northwest
15               Suite 200
                 Washington, D.C. 20036
16               (202)454-2809
                 mark@markzaid.com
17
     Also Present:
18
                 John Hank, Videographer
19               Richard Meyer

20

21

22

23

24

25
```

1       THE VIDEOGRAPHER:  Would the court reporter please

2   swear in the witness.

3

4           (The oath was administered to the

5        deponent, MARK WAID, as follows:)

6

7       THE REPORTER:  Will you raise your right hand,

8   please.

9           Do you solemnly state under penalty of perjury

10  that the testimony you give in this deposition shall be

11  the truth, the whole truth, and nothing but the truth?

12      THE WITNESS:  I do.

13      MR. BYRNE:  And let the record also reflect that

14  Richard Meyer, one of the parties is -- is also present.

15

16                      EXAMINATION

17  BY MR. BYRNE:

18      Q    Would you state your name for the record,

19  please.

01:27  20      A    Sure.  William Mark Waid.

21      Q    And Mr. Waid, have you ever been deposed

22  before?

23      A    Yes.  I was an expert witness once.

24      Q    Okay.  Any other times?

01:27  25      A    No.

| 03:27 | 1 | BY MR. PIERCE: |
| | 2 | Q    Mr. Waid, earlier you indicated that there was |
| | 3 | a point of correction that you wanted to make. |
| | 4 | Do you recall that? |
| 03:27 | 5 | A    I do. |
| | 6 | Q    What -- what was that? |
| | 7 | MR. BYRNE:  Objection.  Form. |
| | 8 | BY MR. PIERCE: |
| | 9 | Q    What -- what was the point of clarification |
| 03:27 | 10 | that you wanted to provide? |
| | 11 | A    The point of clarification was when I spoke |
| | 12 | about learning when Antarctic Press was in Texas, I may |
| | 13 | have misspoken and said I learned that Mr. Meyer was in |
| | 14 | Texas at that time, and that's inaccurate.  What I |
| 03:27 | 15 | learned -- when I learned that, it was around the time |
| | 16 | the lawsuit was filed. |
| | 17 | MR. PIERCE:  No further questions. |
| | 18 | MR. BYRNE:  Okay.  I guess we're done. |
| | 19 | THE VIDEOGRAPHER:  We're off the record on |
| 03:28 | 20 | February 26th, 2019 at 3:28 p.m., and this is the end of |
| | 21 | the video-recorded deposition of Mark Waid. |
| | 22 | (A discussion was held off the record.) |
| | 23 | THE REPORTER:  Do you want the transcript prepared? |
| | 24 | MR. BYRNE:  Yes, I do. |
| 03:28 | 25 | THE REPORTER:  Thank you. |

1                     DEPOSITION OFFICER'S CERTIFICATE

2

   STATE OF CALIFORNIA    )

3                                )  ss.
   COUNTY OF LOS ANGELES  )

4

5

6          I, Vivian C. Lane, hereby certify:

7   I am a duly qualified Certified Shorthand

8   Reporter in the State of California, holder of

9   Certificate Number CSR 11339 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12          I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17          I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action. (Fed. R. Civ. P.

21   28).

22          I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25   / / /

79

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3         Before completion of the deposition, review of

4    the transcript [XX] was [  ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8    Dated:

9

10

11

12

13

14    _____

15    Vivian C. Lane
      Lexitas Legal Firm Registration No. 17
16    1016 La Posada, Ste. 294
      Austin, Texas  78752
17    512-465-9100

18

19

20

21

22

23

24

25

BARKLEY
Court Reporters