## Page 1

1    UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DIVISION OF TEXAS

3    AUSTIN DIVISION

4

5   RICHARD MEYER,                )
                                  ) Case No. 1:18-CV-00800-LY
6        Plaintiff,               )

7        v.                       )

8   MARK WAID,                    )
                                  )
9        Defendant.               )
    _____)

10

11

12

13       VIDEOTAPED DEPOSITION of MARK WAID taken

14   on behalf of the Plaintiff at 10250

15   Constellation Boulevard, 19th Floor, Los

16   Angeles, California, on Tuesday, February 26,

17   2019 at 1:26 p.m. before Vivian C. Lane,

18   Certified Shorthand Reporter No. 11339.

19

20

21

22

23

24

25

## Page 2

1   APPEARANCES:

2

3   For Plaintiff:

4        FRITZ, BYRNE, HEAD & GILSTRAP, PLLC
         By:  DANIEL H. BYRNE, ESQ.
5        221 West Sixth Street
         Suite 960
6        Austin, Texas 78701
         (512)476-2020
7        dbyrne@fbhg.law

8   For Defendant:

9        REEVES & BRIGHTWELL
         By:  RYAN M. PIERCE, ESQ.
10       221 West Sixth Street
         Suite 1000
11       Austin, Texas 78701-3410
         (512)334-4503
12       rpierce@reevesbrightwell.com

13              -and-

14       LAW OFFICES OF MARK S. ZAID, P.C.
         By:  MARK S. ZAID, ESQ.
15       1250 Connecticut Avenue Northwest
         Suite 200
16       Washington, D.C. 20036
         (202)454-2809
17       mark@markzaid.com

18   Also Present:

19       John Hank, Videographer
         Richard Meyer

20

21

22

23

24

25

## Page 3

1              I N D E X

2   WITNESS:  MARK WAID

3

4   EXAMINATION                        PAGE

5   BY MR. BYRNE                         6

6

7              E X H I B I T S

8   PLAINTIFF'S                        PAGE

9   1    Copy of Personal Appearance Agreement    51
         Bates stamped DEF00025 through DEF00027;
10       3 pages

11  2    Transcript of part of Mr. Waid's          52
         conversations with audience during
12       Comicpalooza in Houston in May of 2018;
         4 pages

13
    3    Flash drive containing audio recording    54
14       of Mark Waid's conversations with
         audience at Comicpalooza in Houston in
15       May of 2018

16  4    Printout of pages from Facebook; 2 pages  69

17  5    Printout from Antarctic Press Web page;   70
         5 pages

18
    6    Facebook post Mr. Waid posted on          72
19       afternoon of May 11th, 2018 while
         waiting for Mr. Dunn to return the
20       message he left; 2 pages

21  7     Series of text messages exchanged        72
         between you and Mr. Dunn beginning on
22       Friday May ,11th at 5:51 p.m. and
         continuing several days thereafter;
23       9 pages

24

25

## Page 4

1              I N D E X (Continued)

2

3

4

5

6

7   QUESTIONS INSTRUCTED NOT TO ANSWER

8        (None)

9

10

11

12

13

14

15   INFORMATION REQUESTED

16        (None)

17

18

19

20

21

22

23

24

25

## Page 5

01:25

1  LOS ANGELES, CALIFORNIA, TUESDAY, FEBRUARY 26, 2019

2          1:26 P.M.

3

4      THE VIDEOGRAPHER:  We're on the record to begin the

5  video-recorded deposition of Mark Waid in the matter of

6  Richard Meyer vs. Mark Waid.  Today is February 26th,

7  2019.  The time is approximately 1:26 p.m.  The case is

8  filed in United States District Court for the Western

9  District of Texas, Austin Division, Case

01:26   10  No. 1:18-CV-00800-LY.  This deposition was requested by

11  counsel for the plaintiff, Richard Meyer.  We are in the

12  offices of Glaser Weil located at 10250 Constellation

13  Boulevard, Los Angeles, California, 90067.

14      The court reporter is Vivian Lane with the

01:26   15  offices of Barkley Court Reporters.  My name is John

16  Hank.  I'm a representative of Lexitas located at 13101

17  Northwest Freeway, Suite 210, Houston, Texas 77040.

18      If all counsel present could identify

19  themselves, who they represent, and the location of their

01:26   20  offices.

21      MR. BYRNE:  Dan Byrne with the firm in Austin,

22  Texas, and I'm here representing Richard Meyer.

23      MR. PIERCE:  Ryan Pierce here for the defendant,

24  Mr. Waid, from Austin, Texas.  And sitting next to me is

01:27   25  Mark Zaid from Washington, D.C.

## Page 6

1      THE VIDEOGRAPHER:  Would the court reporter please

2  swear in the witness.

3

4          (The oath was administered to the

5          deponent, MARK WAID, as follows:)

6

7      THE REPORTER:  Will you raise your right hand,

8  please.

9      Do you solemnly state under penalty of perjury

10  that the testimony you give in this deposition shall be

11  the truth, the whole truth, and nothing but the truth?

12      THE WITNESS:  I do.

13      MR. BYRNE:  And let the record also reflect that

14  Richard Meyer, one of the parties is -- is also present.

15

16          EXAMINATION

17  BY MR. BYRNE:

18      Q   Would you state your name for the record,

19  please.

01:27   20      A   Sure.  William Mark Waid.

21      Q   And Mr. Waid, have you ever been deposed

22  before?

23      A   Yes.  I was an expert witness once.

24      Q   Okay.  Any other times?

01:27   25      A   No.

## Page 7

01:27   1      Q   What kind of a case?

2      A   I'm sorry?

3      Q   What kind of a case?

4      A   It was a copyright case.

01:27   5      Q   All right.  You understand the oath you just

6  took is the same one you'd take in front of a judge and a

7  jury?

8      A   I do.

9      Q   And as we just did in the announcements, you

01:28   10  know I'm here representing Richard Meyer in the lawsuit

11  that's pending between the two of you?

12      A   Yes, sir.

13      Q   Okay.  I'm going to try to be as efficient as

14  possible today.  Tell me a little bit about

01:28   15  your -- your -- your background.  I -- I think I've read

16  somewhere that you were born in -- in Alabama?

17      A   That's correct.  I was born in Alabama.  Moved

18  around the South as a child.  Lived in Virginia, lived in

19  Buffalo and in California and in Florida.  I've been out

01:28   20  here off and on for about 16 years.

21      Q   Okay.  Did you go to college somewhere?

22      A   Virginia Commonwealth University.

23      Q   Okay.  And when did you graduate, if you

24  graduated?

01:28   25      A   I did not graduate.

## Page 8

01:28   1      Q   And I think I also read somewhere that there

2  was a period of time when you actually lived in Texas?

3      A   That's correct.

4      Q   When was that?

01:29   5      A   That would have been from '82 to approximately

6  '84, '85.

7      Q   Okay.  And what -- what brought you to Texas in

8  the -- in the early '80s?

9      A   My mother was ill.

01:29   10      Q   And I guess she had relocated there?

11      A   Right.  Exactly, yes.

12      Q   And were you working during that time?

13      A   Uh, yes.

14      Q   And what kind of work were you doing --

01:29   15      A   Assistant to an accountant.

16      Q   And when did you get into the business

17  of -- of -- I'm not sure how to -- the comic book

18  industry --

19      A   Oh, sure.

01:29   20      Q   -- and in what way?

21      A   I began on staff in 1987 as an assistant

22  editor -- associate editor of DC Comics.

23      Q   And what city was that in?

24      A   That was in New York.

01:30   25      Q   All right.  And how long did you live in New

## Page 37

| | |
|---|---|
| 02:12 | 1  substance and content of the -- the actual Jawbreaker |
| | 2  comic that is offensive? |
| | 3  **A   To Kickstarter, yes.** |
| | 4  Q   I'm sorry, to -- to Kickstarter? |
| 02:12 | 5  **A   Yes, sir.** |
| | 6  Q   I'm not asking about Kickstarter right now. |
| | 7  I'm asking about you. |
| | 8  **A   That wasn't clear.  You were just asking** |
| | 9  **about --** |
| 02:12 | 10  Q   Okay. |
| | 11  **A   Okay.  Well, based on -- if you're asking to** |
| | 12  **this day, based on my knowledge that Kickstarter rejected** |
| | 13  **this project on the basis of victory and misogyny, then** |
| | 14  **the answer would be yes.** |
| 02:12 | 15  Q   So you're saying that you assume, even though |
| | 16  you don't know, that there's something about the content |
| | 17  of the comic that was produced that must be offensive, |
| | 18  otherwise Kickstarter wouldn't have done what it did? |
| | 19  MR. PIERCE:  Object to form. |
| 02:13 | 20  THE WITNESS:  I know for a fact Kickstarter rejected |
| | 21  the project on those grounds.  We have documentation of |
| | 22  that fact. |
| | 23  BY MR. BYRNE: |
| | 24  Q   Because of the content of the work, not because |
| 02:13 | 25  of the -- those issues being affiliated with Mr. Meyer? |

## Page 38

| | |
|---|---|
| 02:13 | 1  MR. PIERCE:  Object to form. |
| | 2  THE WITNESS:  That's correct. |
| | 3  BY MR. BYRNE: |
| | 4  Q   So did you -- at some point you decided to call |
| 02:13 | 5  Antarctic Press? |
| | 6  **A   Correct.** |
| | 7  Q   Did you go online and Google Antarctic Press to |
| | 8  get the number?  Or did you already have it -- |
| | 9  **A   Not to the best of my recollection.** |
| 02:14 | 10  Q   I'm sorry? |
| | 11  **A   Not to the best of my recollection.** |
| | 12  Q   Did you already have contact information in |
| | 13  your contacts? |
| | 14  **A   No, sir.** |
| 02:14 | 15  Q   How did you go about getting contact |
| | 16  information for Antarctic Press? |
| | 17  **A   To the best of my recollection, I contacted** |
| | 18  **industry colleagues, seeing if anybody had contact** |
| | 19  **information for them.** |
| 02:14 | 20  Q   Do you remember who you contacted? |
| | 21  **A   I remember I contacted ▓▓▓▓▓▓▓▓.  I don't** |
| | 22  **recall anyone else I may have gotten the information** |
| | 23  **from.  I don't necessarily -- I don't recall whether or** |
| | 24  **not ▓▓▓▓ even picked up the phone or whether or not** |
| 02:14 | 25  **I got the number from ▓▓▓.  I do -- I just remember me** |

## Page 39

| | |
|---|---|
| 02:14 | 1  **reaching out making contact -- or trying to make contact.** |
| | 2  Q   Okay.  Is it possible you could have Googled it |
| | 3  and found it on the Internet? |
| | 4  MR. PIERCE:  Object to form. |
| 02:14 | 5  THE WITNESS:  Not to my recollection. |
| | 6  BY MR. BYRNE: |
| | 7  Q   I didn't ask whether -- obviously you don't |
| | 8  recall going to the Internet. |
| | 9  **A   I don't.** |
| 02:15 | 10  Q   Would -- would that not be a normal action that |
| | 11  you would typically take in this situation where you're |
| | 12  trying to get a number of a business? |
| | 13  MR. PIERCE:  Object to form. |
| | 14  THE WITNESS:  Again, that wasn't -- that wasn't the |
| 02:15 | 15  direction I went. |
| | 16  BY MR. BYRNE: |
| | 17  Q   I'm not asking what you did in this case.  I'm |
| | 18  asking what you would normally if you want to try to |
| | 19  reach a business somewhere around the country, isn't it a |
| 02:15 | 20  normal action for you to type the name of the business in |
| | 21  on Google to see if you can find what you need on the |
| | 22  Internet? |
| | 23  MR. PIERCE:  Object to form. |
| | 24  THE WITNESS:  If it's a company outside the purview |
| 02:15 | 25  of my industry, sure.  If I'm trying to lodge a complaint |

## Page 40

| | |
|---|---|
| 02:15 | 1  with Amazon.com, yes.  But we're not talking about that. |
| | 2  BY MR. BYRNE: |
| | 3  Q   And why do you not use that same tool when |
| | 4  you're within the industry? |
| 02:15 | 5  MR. PIERCE:  Object to form. |
| | 6  THE WITNESS:  It was simply just the direction I |
| | 7  went. |
| | 8  BY MR. BYRNE: |
| | 9  Q   I understand that's what happened here. |
| 02:16 | 10  **A   Right.** |
| | 11  Q   But I'm asking why you would differentiate |
| | 12  between how you would reach a business that you didn't |
| | 13  have a number for that's in your industry versus one |
| | 14  that's outside your industry. |
| 02:16 | 15  MR. PIERCE:  Object to form, asked and answered. |
| | 16  THE WITNESS:  Honestly, I don't call -- recall. |
| | 17  BY MR. BYRNE: |
| | 18  Q   Who did you talk to first at Antarctic Press? |
| | 19  **A   I don't know the person's name.** |
| 02:16 | 20  Q   Whoever answered the phone? |
| | 21  **A   Whoever answered the phone.** |
| | 22  Q   And what do you recall about that conversation? |
| | 23  **A   I recall that I left a message.  It was regards** |
| | 24  **their announcement.  I said specifically during that** |
| 02:17 | 25  **conversation, "I wish to speak to the owner" -- not in** |

## Page 41

02:17  1  anger. I said specifically, "I'm not calling to tell you
2  what to publish or not to publish, but I would simply
3  like to speak to Mr. Dunn and see if he understands, you
4  know, why the backlash is happening."
02:17  5  Q   So you left a -- a message specifically for Ben
6  Dunn?
7  A   I did.
8  Q   Okay.  And was that on Friday?
9  A   Yes, sir.
02:17  10  Q   And how long did it take for  hat call -- that
11  message to be returned approximately?
12  A   Approximately two hours.
13  Q   And who called you back?
14  A   I believed it was Ben Dunn at the time.  I
02:18  15  later learned it was his brother, Joe.
16  Q   Had you ever met Joe?
17  A   Not to my recollection.
18  Q   What do you know about their different roles,
19  or what do you -- did you understand their different
02:18  20  roles were within Antarctic Press at the time of this
21  call?
22  A   I had no idea.  My understanding at the time
23  was that Ben Dunn was still the publisher/owner, and
24  that's why I went -- reached out to him.
02:18  25  Q   And how long did you talk to Mr. Dunn on that

## Page 42

02:19  1  Friday?
2  A   To the best of my recollection, approximately
3  15 minutes, perhaps a little longer.
4  Q   Was that on your cell phone?
02:19  5  A   Yes, sir.
6  Q   Do you have records of that call?
7  A   Not to the best of my recollection, no, sir.
8  Q   Have you tried to get them?
9  A   I have not tried to get them, no.
02:19

02:20

17  Q   Okay.  So tell me what you recall about the
18  substance of the conversation with Mr. Dunn that lasted
19  approximately 15 minutes or maybe longer?
02:20  20  A   Certainly.
21  Mr. Dunn called -- I was expecting -- I was
22  expecting a call, or at least hoping to expect a call, so
23  I picked up the phone.  The first words out of Mr. Dunn's
24  mouth were a sigh and then "I know."
02:20  25  I laughed and we started talking about

## Page 43

02:20  1  what -- what do you know.  And then he explained he had
2  already had a morning and afternoon of angry freelancers
3  and of his own staff being angry and threatening to quit
4  over this situation.
02:21  5  I said, "How did you not know?"
6  He said, "I'm not on social media.  This is not
7  my full-time job."
8  I said, "I am not calling to tell you what to
9  publish or not to publish, that is not my intent, and
02:21  10  people can publish whatever they want to publish.  I just
11  wanted to make sure you understood why there was such a
12  firestorm coming your way and why there was such an
13  outcry."
02:21  14  He indicated that he now understood.  He didn't
15  understand at the beginning of that day, but by that time
16  he had understood.  He indicated to me that that point he
17  was ready to sever ties with Mr. Meyer.  He used the
18  phrase "his behavior is indefensible."
19  Q   Uh-huh.
02:22  20  A   And from there, we started talking about
21  believing that, you know, we were on the same page at
22  that point.  The conversation became more genial.  Now,
23  good on you being able to stay in business this long and
24  the good and bad times.
02:22  25  We talked about the role of a publisher,

## Page 44

02:22  1  how -- you know, the role of divorcing the work from the
2  creative person.  Sometimes you -- you know, you won't
3  publish something because you find the -- the author
4  repellent.  Sometimes you will.  Sometimes my -- it
02:22  5  became a conversation about where do you draw the line.
6  How offensive or how immoral does somebody have to be for
7  you, as a publisher, to say, all right, I can't divorce
8  the work from this person, I can't publish this.  It was
9  a very congenial and very friendly conversation.
02:23  10  Q   So he talked about the recognition in the
11  industry, that the work and the person should not be
12  viewed as one thing but should be viewed independently,
13  correct?
14  MR. PIERCE:  Object to form.
02:23  15  THE WITNESS:  Not correct, no, sir.
16  We talked about to the extent at which that's
17  the case.  He never indicated absolutely that you should
18  always separate the person from the product.  That
19  was -- that was the whole point of the conversation.
02:23  20  BY MR. BYRNE:
21  Q   So when you got the call on your -- do you have
22  an iPhone?
23  A   I do.
24  Q   When you got your -- the call on your iPhone,
02:23  25  did you notice that the origination of the number was

## Page 45

| | |
|---|---|
| 02:23 | 1  San Antonio, Texas? |
| | 2  **A   I don't recall.** |
| | 3  Q   When did you figure out that Antarctic Press |
| | 4  and Mr. Dunn were based in San Antonio? |
| 02:24 | 5  **A   To the best of my recollection, it was in the** |
| | 6  **week or week-and-a-half following when the entire thing** |
| | 7  **became a giant industry brew-ha-ha.  And there was much** |
| | 8  **discussion, there was much hatred flying my way on social** |
| | 9  **media.  Much anger and somewhere in that maelstrom, I** |
| 02:24 | 10 **believe it was brought or it was just brought to my** |
| | 11 **attention that Mr. Meyer was in Texas -- which was news** |
| | 12 **to me.  That Antarctic Press was in Texas, which was news** |
| | 13 **to me.** |
| | 14 Q   And why would that have been a relevant data |
| 02:24 | 15 point in the -- in the maelstrom that followed the phone |
| | 16 call? |
| | 17 **A   Well, with respect that you would -- I -- you'd** |
| | 18 **have to ask the people who put that information out** |
| | 19 **there.  Um, to the best of my recollection, it became,** |
| 02:25 | 20 **you know -- you know, well, you know, this is -- this is** |
| | 21 **bad behavior, and I honestly don't know.** |
| | 22 Q   Mr. Waid, is it possible that you knew, based |
| | 23 on your prior extensive familiarity with the industry and |
| | 24 it being a fairly small industry, that Antarctic Press |
| 02:25 | 25 was based in San Antonio before you made the call there? |

## Page 46

| | |
|---|---|
| 02:25 | 1  MR. PIERCE:  Object to form. |
| | 2  THE WITNESS:  Not that I recall. |
| | 3  BY MR. BYRNE: |
| | 4  Q   But you also can't recall how it came up in the |
| 02:25 | 5  context of the discussions in the week or two following |
| | 6  the call that Texas was where you had directed your |
| | 7  communications during that call? |
| | 8  MR. PIERCE:  Object to form. |
| | 9  THE WITNESS:  Not to the best of my recollection, |
| 02:26 | 10 no, sir. |
| | 11 MR. PIERCE:  Dan, when you get to a good point, |
| | 12 okay?  We've been going about an hour.  Can we take a |
| | 13 bathroom break?  Just whenever you get to an okay |
| | 14 stopping point. |
| 02:26 | 15 MR. BYRNE:  Sure.  This is as good as any. |
| | 16 Off the record. |
| | 17 THE VIDEOGRAPHER:  We are off the record at 2:26. |
| | 18 (Recess taken.) |
| | 19 THE VIDEOGRAPHER:  We are back on the record at |
| 02:38 | 20 2:38. |
| | 21 THE WITNESS:  If I may, before we start, there's a |
| | 22 couple of things I'd like to clarify. |
| | 23 MR. BYRNE:  You can just do that when you get your |
| | 24 deposition transcript if you feel like you need to |
| 02:38 | 25 correct something, or your lawyer can ask follow-up |

## Page 47

| | |
|---|---|
| 02:38 | 1  questions. |
| | 2  BY MR. BYRNE: |
| | 3  Q   The Friday that we're talking about here where |
| | 4  this phone call took place -- |
| 02:38 | 5  **A   Yes.** |
| | 6  Q   -- is May 11th, 2018, correct? |
| | 7  **A   Correct.** |
| | 8  Q   And did you come away from your call with |
| | 9  Mr. Dunn on May 11th with the understanding that he |
| 02:39 | 10 was -- his company was not going to proceed with |
| | 11 publishing Mr. Meyer's comic book? |
| | 12 **A   My understanding was that he had personally** |
| | 13 **made that decision.** |
| | 14 Q   And did you feel like as a result of that |
| 02:39 | 15 decision that you had achieved your goal -- |
| | 16 MR. PIERCE:  Objection; form. |
| | 17 BY MR. BYRNE: |
| | 18 Q   -- for the call? |
| | 19 **A   My goal for the call was simply to alert him of** |
| 02:39 | 20 **the -- of the hornet's nest he was stumbling into.  So** |
| | 21 **any sense that that mission was accomplished, was** |
| | 22 **accomplished within the first 30 seconds of the call.** |
| | 23 Q   Well, did you have any sense personally that |
| | 24 you had won? |
| 02:39 | 25 MR. PIERCE:  Object to form. |

## Page 48

| | |
|---|---|
| 02:40 | 1  THE WITNESS:  There was no winning or losing, no, |
| | 2  sir.  That was not the -- that was not the object. |
| | 3  BY MR. BYRNE: |
| | 4  Q   Well, you would acknowledge that your hoped-for |
| 02:40 | 5  outcome when you initiated the call was for him to |
| | 6  reconsider the decision to publish Mr. Meyer's book, |
| | 7  right? |
| | 8  MR. PIERCE:  Object to form. |
| | 9  THE WITNESS:  Not necessarily, sir. |
| 02:40 | 10 BY MR. BYRNE: |
| | 11 Q   Would you say you were pleased with the |
| | 12 decision Mr. Dunn made at -- by the conclusion of your |
| | 13 call? |
| | 14 MR. PIERCE:  Object to form. |
| 02:40 | 15 THE WITNESS:  I would say that's accurate. |
| | 16 BY MR. BYRNE: |
| | 17 Q   What's the next substantive communication you |
| | 18 recall having in the days following your call on  he |
| | 19 Antarctic Press announcement that related to Mr. Meyer? |
| 02:41 | 20 **A   Not long after.  I -- I can't remember exactly** |
| | 21 **how long.  But that afternoon or early that evening I** |
| | 22 **received a text message from Mr. Dunn that initiated a** |
| | 23 **conversation that was quite pleasant.** |
| | 24 Q   A text conversation? |
| 02:41 | 25 **A   Yes, sir.** |

Mark Waid

13 (49 - 52)

Page 49

02:41  1    Q   Okay.  All right.  And did that text
       2  conversation continue into the following week?
       3    THE WITNESS:  Gesundheit.
       4    I wouldn't say "continue."  There were -- there
02:41  5  were other conversations.  Yes, I believe there were
       6  three interactions via text in all.
       7  BY MR. BYRNE:
       8    Q   And you were seeking assurance from Mr. Dunn
       9  that he didn't feel bullied by you during your call,
02:42 10  correct?
      11    MR. PIERCE:  Object to form.
      12    THE WITNESS:  That is correct.
      13  BY MR. BYRNE:
      14    Q   Did he ever give you that -- that assurance in
02:42 15  the days following the call?
      16    MR. PIERCE:  Object to form.
      17    THE WITNESS:  He did not.
      18  BY MR. BYRNE:
      19    Q   Do you recall the issue of Mr. Meyer and the
02:42 20  Antarctic Press "Jawbreaker" decision coming up during
      21  your appearance in Houston later in May?
      22    A   I do.
      23    Q   And what is it that prompted you to remember
      24  that conversation?
02:43 25    A   I was speaking at a panel, as one does at these

Page 50

02:43  1  things, in front of a group of fans who asked questions
       2  about my career, about my involvement, about my life,
       3  about whatever.  I'm an open book when it comes to that
       4  kind of stuff.  And at some point, someone asked about
02:43  5  Meyer or about the foofaraw that had blown up around it.
       6    Q   And had you forgotten about answering questions
       7  about Mr. Meyer in Houston in May of 2018 when you filled
       8  out your first affidavit in support of a motion to
       9  dismiss in this case?
02:43 10    A   Yes.  That's why we followed up with the
      11  correction once I remembered, yes.
      12    Q   Okay.  I'll just tell you, for the record, that
      13  that affidavit was executed on November 1st and -- and
      14  there was a follow-up one -- a day or so later.  Several
02:44 15  days -- excuse me -- on November 12th.
      16    A   Uh-huh.
      17    Q   So what happened between November 1st and
      18  November 12th of 2018 to refresh your recollection about
      19  the fact that you had indeed directed communications
02:44 20  concerning Mr. Meyer to persons in the state of Texas?
      21    A   I honestly don't recall.
      22    Q   Did you go back and listen to the audio of your
      23  interview before you signed your supplemental affidavit?
      24    A   The supplemental one, yes, sir.
02:45 25    MR. PIERCE:  Oh, you'll get that copy.

Page 51

02:45  1    (Plaintiff's Exhibit 1 was marked for
       2    identification by he court reporter and was
       3    attached hereto.)
       4    THE WITNESS:  Thank you.
02:45  5  BY MR. BYRNE:
       6    Q   I'm going to hand you what's been marked as
       7  Exhibit 1 to your deposition.
       8    A   Uh-huh.
       9    Q   Do you recognize this as the Personal
02:45 10  Appearance Agreement that you entered into in connection
      11  with your appearance at the Houston event in May of 2018?
      12    A   I do.
      13    Q   And is there a signed version of this
      14  somewhere?
02:46 15    A   I assume there is.
      16    Q   Okay.  Did you -- did you make any effort to
      17  locate it?
      18    A   No, sir.
      19    Q   Is this a fairly standard form of agreement you
02:46 20  get for appearing at these events?
      21    A   It's hard to say.  This was a new arrangement
      22  with a -- representative who had organized these
      23  things, and then he's paid and then I am paid through
      24  him.
02:46 25    Q   So you had a different promoter for this one

Page 52

02:46  1  than you usually use?
       2    A   I generally don't use promoters.
       3
       4
02:46  5
       6
       7
       8
       9
02:47 10
      11    (Plaintiff's Exhibit 2 was marked for
      12    identification by the court reporter and was
      13    attached hereto.)
      14    THE REPORTER:  Thank you.
02:47 15    THE WITNESS:  You're welcome.
      16  BY MR. BYRNE:
      17    Q   I'm going to hand you what's marked as
      18  Exhibit 2 to your deposition and ask you if that appears
      19  to be an accurate transcript of part of your conversation
02:47 20  with the audience during the Houston event in May of
      21  2018.
      22    MR. PIERCE:  You're -- are you asking him to certify
      23  that this is an accurate transcript of --
      24    MR. BYRNE:  Yeah, I'm asking if it looks right to
02:48 25  him.

## Page 53

| | | |
|---|---|---|
| 02:48 | 1 | MR. PIERCE:  Yeah. |
| | 2 | MR. BYRNE:  I'm not asking him to give a verbatim |
| | 3 | blessing to it. |
| | 4 | MR. PIERCE:  So just generally? |
| 02:48 | 5 | MR. BYRNE:  Just generally, yes. |
| | 6 | (Whereupon, the witness reviews the |
| | 7 | document.) |
| | 8 | THE WITNESS:  Okay.  The question again was? |
| | 9 | BY MR. BYRNE: |
| 02:49 | 10 | Q   Does that appear to generally be an accurate |
| | 11 | transcription of your comments and -- and your |
| | 12 | interaction with an audience member at the Houston |
| | 13 | May 2018 event? |
| | 14 | **A   Yes, sir.** |
| 02:49 | 15 | Q   I'm -- I'm going -- let me just play the -- |
| | 16 | **A   Sure.** |
| | 17 | Q   -- the one that's marked. |
| | 18 | THE WITNESS:  Okay.  Which? |
| | 19 | MR. BYRNE:  I'm going to play the audio file. |
| 02:49 | 20 | THE WITNESS:  The one that's marked?  I don't -- |
| | 21 | you're looking for the one that's marked? |
| | 22 | MR. PIERCE:  Has this been marked yet? |
| | 23 | THE REPORTER:  I -- I'll sticker it later. |
| | 24 | THE WITNESS:  Oh, okay.  I see what you're saying. |
| 02:50 | 25 | MR. PIERCE:  Okay. |

## Page 54

| | | |
|---|---|---|
| 02:50 | 1 | MR. BYRNE:  So it will be marked as Exhibit 3? |
| | 2 | THE REPORTER:  Yes. |
| | 3 | (Plaintiff's Exhibit 3 was marked for |
| | 4 | identification by the court reporter and was |
| 02:50 | 5 | attached hereto.) |
| | 6 | MR. BYRNE:  I'll ask you to listen to this |
| | 7 | recording. |
| | 8 | THE WITNESS:  Uh-huh. |
| | 9 | (The audio recording was played as |
| 02:50 | 10 | follows: |
| | 11 | "You guys created the -- did their |
| | 12 | comic.  Great.  Awesome.  Then they started |
| | 13 | doing things like making a list of |
| | 14 | the -- there was a -- there was a bunch of |
| 02:50 | 15 | stores that decided they weren't going to |
| | 16 | carry the comic" --) |
| | 17 | MR. BYRNE:  I think I may be playing the wrong |
| | 18 | excerpt. |
| | 19 | MR. PIERCE:  Yeah.  That was in the middle. |
| 02:50 | 20 | (The audio recording was played as |
| | 21 | follows: |
| | 22 | "That's tough to answer me because I'm |
| | 23 | trying to... you don't want to give oxygen too |
| | 24 | much to toxic, toxic people.  But what he's |
| 02:51 | 25 | basically talking about there is, there are -- |

## Page 55

| | | |
|---|---|---|
| 02:51 | 1 | just as there are in pop -- I mean, right |
| | 2 | there in -- in -- in the world right now, not |
| | 3 | just in comic books but in the world, you |
| | 4 | got... heavily, you know, male knows... um, |
| 02:51 | 5 | movements of guys where trying to move |
| | 6 | things back, or towards white supremacy, back |
| | 7 | towards a world in which women knew their |
| | 8 | place, uh... that kind of nonsense, um, and |
| | 9 | they are the proud boys or they're, you know, |
| 02:51 | 10 | the -- they're this group or they're that |
| | 11 | group.") |
| | 12 | MR. BYRNE:  Let me just pause right there. |
| | 13 | BY MR. BYRNE: |
| | 14 | Q   Is that your voice that we're hearing on the |
| 02:51 | 15 | recording? |
| | 16 | **A   Yes, sir.** |
| | 17 | Q   Okay.  And so far, does the transcription track |
| | 18 | a fair degree of accuracy what -- what you were saying |
| | 19 | back at the time? |
| 02:52 | 20 | MR. PIERCE:  Object to form. |
| | 21 | THE WITNESS:  Yes, sir. |
| | 22 | BY MR. BYRNE: |
| | 23 | Q   Is there anything about it that was inaccurate |
| | 24 | that you've heard? |
| 02:52 | 25 | **A   Not that I've caught.** |

## Page 56

| | | |
|---|---|---|
| 02:52 | 1 | Q   Okay.  And you, in making these comments, were |
| | 2 | responding to an audience member's question about |
| | 3 | Diversity & Comics and Mr. Meyer, correct? |
| | 4 | **A   Let me read his question again.** |
| 02:52 | 5 | (Whereupon, the witness reviews the |
| | 6 | document.) |
| | 7 | THE WITNESS:  The answer to the question would be a |
| | 8 | little more general about these people, but yes. |
| | 9 | BY MR. BYRNE: |
| 02:52 | 10 | Q   But there is a specific question about |
| | 11 | Diversity Comics which you -- you identify with |
| | 12 | Mr. Meyer, correct? |
| | 13 | **A   Buried in here there is a specific question.** |
| | 14 | Q   Okay. |
| 02:52 | 15 | (The audio recording was played as |
| | 16 | follows: |
| | 17 | "And comics has you know a group or two |
| | 18 | like that too, comics fans have a group like |
| | 19 | that or two too, and it's a shame, um, trying |
| 02:52 | 20 | to say without inflaming anything. |
| | 21 | "Recently um one of them one of  hese |
| | 22 | groups kickstarted a comic and great, awesome, |
| | 23 | they're gonna do their own graphic novel |
| | 24 | because they're super conservative, hyper |
| 02:53 | 25 | conservative guys.") |

## Page 57

| | |
|---|---|
| 02:53 | 1 BY MR. BYRNE: |
| | 2    Q   Were you referring to -- let me interrupt the |
| | 3 recording again. |
| | 4    Are you referring to Mr. Meyer as the group |
| 02:53 | 5 that's going to do their own graphic novel? |
| | 6    **A   He and his collaborator, yes, sir.** |
| | 7    Q   Do you know whether he had any coauthors? |
| | 8    **A   I -- I know because of the way the craft works,** |
| | 9 **that he would have been working with an artist because** |
| 02:53 | 10 **he's not a --** |
| | 11    Q   And a colorist? |
| | 12    **A   And a colorist, yes.** |
| | 13    Q   Okay.  So you're referring to that group, |
| | 14 Mr. Meyer, and his colorist and his artist, right? |
| 02:53 | 15    **A   It's -- we're on the line.  I -- one of these** |
| | 16 **groups -- I was talking -- again, that's -- I'm talking** |
| | 17 **specifically about those three people, just more in a** |
| | 18 **general sense of Comicsgate has started.  Because again,** |
| | 19 **by that time, in most people's minds, including my own,** |
| 02:54 | 20 **Meyers and Comicsgate were interchangeable.** |
| | 21    Q   In this statement, you're actually talking |
| | 22 about a graphic novel, correct? |
| | 23    **A   That is correct, yes, sir.** |
| | 24    Q   And that would be Mr. Meyers and his colorist |
| 02:54 | 25 and his artist, graphic (inaudible) that you're referring |

## Page 58

| | |
|---|---|
| 02:54 | 1 to, correct? |
| | 2    **A   That's correct.** |
| | 3    (The audio recording was played as |
| | 4 follows: |
| 02:54 | 5    "And the myth was, the wrap was that |
| | 6 comics was not interested in creating |
| | 7 conservative creators and we're not, we're |
| | 8 throwing conservative creators out.  That's |
| | 9 not the case at all, it's a lot of |
| 02:54 | 10 conservative creators at comics, we don't -- |
| | 11 we're throwing assholes out, that's [sic] what |
| | 12 we're doing and [sic] for every, for every |
| | 13 conservative asshole we don't work with in |
| | 14 comics, there's ten liberal assholes [sic] we |
| 02:54 | 15 don't work with in comics, so if that's not, |
| | 16 there's no -- there's no political yardstick |
| | 17 here. |
| | 18    "Uh these guys created the, you |
| | 19 know, they did their comic, great, awesome. |
| 02:54 | 20 Then they started doing things like |
| | 21 um...making a list of the stor -- there |
| | 22 was, there was a bunch of stores that decided |
| | 23 they weren't going to carry the comic, so |
| | 24 these guys made a list of those stores...and |
| 02:55 | 25 their phone numbers and the names, first and |

## Page 59

| | |
|---|---|
| 02:55 | 1 last of all their employees.") |
| | 2 BY MR. BYRNE: |
| | 3    Q   And again, you're referring in this comment to |
| | 4 Mr. Meyer, correct?  The list of employees that you |
| 02:55 | 5 testified about earlier? |
| | 6    MR. PIERCE:  Object to form. |
| | 7 BY MR. BYRNE: |
| | 8    Q   Or is that a reference to someone else? |
| | 9    **A   It's a -- it's a more general statement to** |
| 02:55 | 10 **what -- it -- not necessarily to him, but to the people** |
| | 11 **who are working on this book.** |
| | 12    Q   Did -- did anyone besides Mr. Meyer, to your |
| | 13 knowledge, circulate a list of stores and phone numbers? |
| | 14    **A   Not that I recall, no.** |
| 02:55 | 15    Q   Okay. |
| | 16    (The audio recording was played as |
| | 17 follows: |
| | 18    "And with the idea that, 'oh no, don't |
| | 19 call them and harass them, we're not telling |
| 02:55 | 20 you to do that at all!' But here's their phone |
| | 21 numbers and their first and last names of all |
| | 22 their employees.  Well, c'mon. |
| | 23    "So, there was a --") |
| | 24 BY MR. BYRNE: |
| 02:55 | 25    Q   And is your comment here -- let's pause |

## Page 60

| | |
|---|---|
| 02:56 | 1 again -- intended to suggest that there was, in fact, a |
| | 2 implied direction to harass the stores and their |
| | 3 employees? |
| | 4    **A   Absolutely.** |
| 02:56 | 5    Q   Okay. |
| | 6    Back to the tape. |
| | 7    (The audio recording was played as |
| | 8 follows: |
| | 9    "-- publisher here in Texas who was |
| 02:56 | 10 going to publish their comic, for, after it |
| | 11 had been kickstarted they were gonna, I ke |
| | 12 publish it for comic stores and... there was a |
| | 13 huge amount of hatred towards that publisher |
| | 14 at this moment.  There was a, most people in |
| 02:56 | 15 comics, most fans in comics were looking at |
| | 16 this as 'How? What are you doing?  These guys |
| | 17 are, these are indefensible human beings.' Uh |
| | 18 they are, they, they harass women, they harass |
| | 19 minorities, they harass LGBTQ people, um, |
| 02:56 | 20 they're full of hate.  What are you doing?") |
| | 21 BY MR. BYRNE: |
| | 22    Q   And Mr. Meyer -- pause again -- |
| | 23 Mr. Meyer -- Mr. Waid? |
| | 24    **A   Uh-huh.** |
| 02:56 | 25    Q   In this excerpt, you're referring to Antarctic |

Page 61

| | | |
|---|---|---|
| 02:57 | 1 | Press, correct? |
| | 2 | **A**   Correct. |
| | 3 | Q   And you're using "they" but you're really |
| | 4 | referring to Mr. Meyer; are you not? |
| 02:57 | 5 | MR. PIERCE:  Object to form. |
| | 6 | THE WITNESS:  "They" harass.  When they harass -- |
| | 7 | you mean, in that context, but they harass, they do this, |
| | 8 | yes. |
| | 9 | BY MR. BYRNE: |
| 02:57 | 10 | Q   Okay. |
| | 11 | (The audio recording was played as |
| | 12 | follows: |
| | 13 | "And my feeling is, look let the baby |
| | 14 | have his bottle, let, I don't care who |
| 02:57 | 15 | publishes the comic.  I don't care whether you |
| | 16 | published this comic or not.  I don't care. |
| | 17 | But I knew the publisher and I don't think he |
| | 18 | was aware of why all of a sudden it was this |
| | 19 | gigantic groundswell of hate towards him.  So |
| 02:57 | 20 | I said before we burn this place to the |
| | 21 | ground --") |
| | 22 | BY MR. BYRNE: |
| | 23 | Q   I'm going to pause there. |
| | 24 | Um, what did you mean here when you said |
| 02:57 | 25 | "before we burn this place to the ground," referring to |

Page 62

| | | |
|---|---|---|
| 02:57 | 1 | your conversation with Mr. Dunn? |
| | 2 | MR. PIERCE:  Object to form. |
| | 3 | THE WITNESS:  It was a hyperbolic statement that |
| | 4 | before the industry as a whole decides to condemn  hem, |
| 02:58 | 5 | let's find out what they really knew, give them the |
| | 6 | benefit of the doubt that  hey weren't aware. |
| | 7 | BY MR. BYRNE: |
| | 8 | Q   Were you conveying there that had he not |
| | 9 | changed his mind, you would have been one of the people |
| 02:58 | 10 | burning this place to the ground, metaphorically |
| | 11 | speaking? |
| | 12 | **A**   No -- |
| | 13 | MR. PIERCE:  Object to form. |
| | 14 | THE WITNESS:  No, sir. |
| 02:58 | 15 | BY MR. BYRNE: |
| | 16 | Q   Okay. |
| | 17 | (The audio recording was played as |
| | 18 | follows: |
| | 19 | "Let me call him and just find out |
| 02:58 | 20 | what's going on, whether he understands really |
| | 21 | what's being-if he wants to publish it it's |
| | 22 | great I don't care but I just, I know the guy |
| | 23 | and want to make sure he knows why the Hordes |
| | 24 | of Hell are descending upon him right now. |
| 02:58 | 25 | That seems reasonable, right?") |

Page 63

| | | |
|---|---|---|
| 02:58 | 1 | BY MR. BYRNE: |
| | 2 | Q   And what did -- what did you mean by your |
| | 3 | reference to the "Hordes of Hell"? |
| | 4 | **A**   **Another hyperbolic reference to the fact that** |
| 02:58 | 5 | **there was such a huge social media outcry against this** |
| | 6 | **from the industry.** |
| | 7 | (The audio recording was played as |
| | 8 | follows: |
| | 9 | "Long story short, I did call the |
| 02:59 | 10 | publisher and said 'look you do what you want |
| | 11 | and I'm not, I'm -- I'm not asking you to not |
| | 12 | publish it, I'm not even saying, I'm not |
| | 13 | saying anything, I'm just kinda curious what |
| | 14 | you're thinking.'  And the answer was, 'Oh my |
| 02:59 | 15 | God, we had no idea, like we really didn't vet |
| | 16 | this before we decided to publish it.'  And so |
| | 17 | they made an announcement they weren't gonna |
| | 18 | to publish it. |
| | 19 | "Uhhh that's their choice, I wasn't... |
| 02:59 | 20 | I, you know, I, I didn't, I wasn't |
| | 21 | intimidating them.  I wasn't pushing them into |
| | 22 | doing one thing or another, I just wanted to, |
| | 23 | to look out for him, make sure he understood |
| | 24 | why people were angry at him.  Um, and so |
| 02:59 | 25 | that's turned into what, me getting death |

Page 64

| | | |
|---|---|---|
| 02:59 | 1 | threats every, you know, 5, 6 hours for a |
| | 2 | while ummm... |
| | 3 | "'Cause I'm clearly hate, you know, |
| | 4 | clearly hate conservatives.  Because I didn't, |
| 02:59 | 5 | I said, all right clearly I'm |
| | 6 | bullying comic-I'm apparently I'm bullying |
| | 7 | publishers, I'm calling publishers and |
| | 8 | bullying them into not publi-if I could, if I |
| | 9 | could bully publishers I'd be rich.  If I |
| 02:59 | 10 | could bully publishers I'd be writing Superman |
| | 11 | tomorrow, I could-there'd be so many things I |
| | 12 | would be doing if I were really-if I had a |
| | 13 | power to make publishers do what I wanted them |
| | 14 | to do. |
| 03:00 | 15 | "Um does that kinda answer your |
| | 16 | question?  It's...kinda? |
| | 17 | "It's uh,... people can you know feel |
| | 18 | how they wanna feel, uh, uh yeah.  You are, |
| | 19 | you aren't, you aren't with them, are ya? |
| 03:00 | 20 | (audience laughter)  Okay, I didn't, I didn't |
| | 21 | drive you guys out, did I?...  One more |
| | 22 | question.") |
| | 23 | BY MR. BYRNE: |
| | 24 | Q   Okay.  Does that -- rest of that audio confirm |
| 03:00 | 25 | that the transcript marked as Exhibit 2 is accurate? |

## Page 65

03:00  1    MR. PIERCE:  Object to form.  You mean word-for-word
       2    verbatim?
       3        MR. BYRNE:  I'm asking him that, yes.
       4        THE WITNESS:  With the possible excep ion of a "and"
03:00  5    or a "the" every once in a while, but substantively, yes.
       6    BY MR. BYRNE:
       7        Q    Okay.  And there's a reference in  here,
       8    Mr. Waid, to five or six hours of death threats.
       9        What -- what are you talking about  here?
03:00 10        MR. PIERCE:  Object to form.  Oh, I'm sorry.  Go
      11    ahead.
      12        THE WITNESS:  I'm talking about the fact that once
      13    Antarctic Press made their announcement, all of
      14    Comicsgate descended on my Facebook feed like locusts.
03:01 15    Peppering -- posts not only about comics but about, you
      16    know, my dog.  I mean -- figuratively speaking.  But I
      17    mean, it had nothing to do with any of this, with fuck
      18    you, Mark Waid, fuck you for doing this, I hope you rot
      19    in hell, I hope you die, over and over and over again,
03:01 20    within the next five or six hours.  The whole rest of the
      21    evening was me having to try to delete and shoo off all
      22    these flies who were descending upon me with absolute
      23    hate, blaming me for what has happened.
      24    BY MR. BYRNE:
03:01 25        Q    Do you still have any documentation of dea h

## Page 66

03:01  1    threats you received?
       2        A    No.  Anything I have I would have provided
       3    already.
       4        Q    So did you delete anything that would have
03:02  5    evidenced death threats by anyone in response to what
       6    happened with Antarctic Press?
       7        A    I mean, I wish I hadn't, but I did at the time.
       8    Why give them more of a platform to keep screaming.
       9        Q    When did you delete those posts?
03:02 10        A    Pretty much as they were happening.  The idea
      11    was to stiff arm and keep -- try to keep it from becoming
      12    a giant -- as I put it, a landing.  My -- my social media
      13    became a landing strip for lunatics.
      14        Q    Did you take any of the death threats
03:02 15    seriously, or did you think of it as venting by folks on
      16    the Internet?
      17        A    Well, at first you take it as venting, but
      18    there's only so many times you can get that kind of stuff
      19    without it reaching into your head a little bit.
03:03 20        Q    Okay.  And again, I'm going to just make the
      21    record clear.  The -- the recording that I played in the
      22    course of the deposition is, I think, labeled full five
      23    minute among several files on that thumb drive.
      24        MR. BYRNE:  And I also tendered you a duplicate,
03:03 25    Ryan.

## Page 67

03:04  1    BY MR. BYRNE:
       2        Q    Did you ever uncover any direct evidence of
       3    white supremacy on the part -- statements on the part of
       4    Mr. Meyer?
03:04  5        MR. PIERCE:  Again, object to form.
       6        How does this relate to jurisdiction?  'Cause
       7    we're -- we're starting to yonder into, I think, more
       8    substantive areas in a way that is really getting away
       9    from the Court's order.  This has nothing to do --
03:04 10        MR. BYRNE:  Well --
      11        MR. PIERCE:  -- with jurisdiction.
      12        MR. BYRNE:  I think if there are defamatory
      13    statements made in Texas, and there's a reference to
      14    white supremacy tied to Mr. Meyer, I think I'm entitled
03:04 15    to explore that a little bit.
      16        MR. PIERCE:  Okay.  I get you -- I'll give you a
      17    little bit of room.
      18        THE WITNESS:  Ask it again, please.
      19    BY MR. BYRNE:
03:05 20        Q    Do you -- do you have any basis to substantiate
      21    a contention that Mr. Meyer is a white supremacist?
      22        MR. PIERCE:  Object to form.
      23        THE WITNESS:  I would say in the materials I
      24    provided to the Court is various social media posts about
03:05 25    how, you know, it's not a -- you know, the one about

## Page 68

03:05  1    the -- you know, it's not -- what a sideshow or a circus,
       2    whatever, when you hire black people for comics, that
       3    sort of thing that's in there, yeah, absolutely.  At
       4    least indicated a propensity towards what we -- what we
03:05  5    refer to as white supremacy  hese days.  It's a pretty
       6    broad spectrum.
       7    BY MR. BYRNE:
       8        Q    Do you have any documentation or other evidence
       9    of Mr. Meyer directly espousing white supremacist
03:05 10    doctrines, or are you inferring from  he materials you
      11    submitted to the Court that he must think that way?
      12        MR. PIERCE:  Object to form.
      13        What -- what statement is this tied to?  I
      14    mean, what specific -- you mentioned a defamatory
03:06 15    statement.
      16        MR. BYRNE:  He's talking about moving things back
      17    toward white supremacy.
      18        THE WITNESS:  Are you asking, is there a specific
      19    moment when he -- when I am aware of he said "I am a
03:06 20    white supremacist?"
      21    BY MR. BYRNE:
      22        Q    Or espoused principles you associate with white
      23    supremacist --
      24        A    I associate?  Absolutely.  Again, I stepped on
03:06 25    you.  I apologize.

Page 69

03:06  1      Q   Okay.  And are -- are -- are all of those
2  materials to substantiate that -- those included among
3  those that you submitted to the Court in connection with
4  the motion that's pending?
03:06  5      MR. PIERCE:  Object to form.
6      THE WITNESS:  To the best of my recollection, that's
7  correct.
8  BY MR. BYRNE:
03:06  10     Q   And you certainly produced all of them to us in
10  the course of discovery, or given them to your lawyers to
11  produce to us in the course of discovery, correct?
12     MR. PIERCE:  Objection to form.
13     THE WITNESS:  To the best of my recollection, yes,
14  sir.
03:06  15     (Plaintiff's Exhibit 4 was marked for
16     identification by the court reporter and was
17     attached hereto.)
18  BY MR. BYRNE:
19     Q   I think you testified earlier you don't recall
03:07  20  ever characterizing Mr. Meyer as a doxer?
21     A   I don't recall that.
22     MR. PIERCE:  This has -- so this has nothing to do
23  with the Houston -- so to clarify, now you're getting
24  into statements that aren't tied to that meeting in
03:08  25  Houston or the Q & A session in Houston?

Page 70

03:08  1      Is -- is that right?
2      MR. BYRNE:  Um...
3      MR. PIERCE:  I mean, I think we're just get ing too
4  far afield here.
03:08  5      MR. PIERCE:  All right.  We'll save that for the
6  merits.
7      MR. PIERCE:  What exhibit number are we on?
8      THE REPORTER:  4.
9      MR. PIERCE:  Thank you.
03:09  10     MR. BYRNE:  No, we're on 5.
11     THE REPORTER:  You want to keep that as 4?
12     MR. BYRNE:  Yep.
13     THE REPORTER:  Can I remark that, please?
14     THE WITNESS:  Oh, sure.  Of course.
03:09  15     (Plaintiff's Exhibit 5 was marked for
16     identification by the court reporter and was
17     attached hereto.)
18     MR. BYRNE:  Sorry.  I wasn't real clear.
19  BY MR. BYRNE:
03:09  20     Q   Mr. Waid, I'm going to hand you what's been
21  marked as Exhibit 5.
22     A   Uh-huh.
23     Q   And represent to you that that is a printout
24  from the Internet of the Antarctic Press web page as it
03:09  25  appeared in May of 2017, and just ask you to glance over

Page 71

03:09  1  that and see if  hat refreshes your memory about whether
2  you may have used that as a tool to locate the phone
3  number for Antarctic Press before you left your message
4  for Mr. Dunn?
03:10  5      A   No, sir.  I have no memory seeing any of this
6  before.
7      Q   Okay.  Do you see the name "Doug Dlin"?
8      A   Uh...
9      Q   Second-to-last page.
03:10  10     A   I do.
11     Q   Do you know whether you spoke to Mr. Dlin when
12  you called and left your message?
13     A   I have no idea who I spoke to at that time.
14     Q   So seeing his name there doesn't ring a bell?
03:10  15     A   I know it was a woman.  My recollection is that
16  it was a woman.  Let me rephrase that.
17     Q   But you don't remember her name?
18     A   That's correct.
19     Q   By the time you made the call to Antarctic
03:11  20  Press to make sure that they were informed, had you
21  already been receiving death threats, or did those come
22  in the wake of your conversation wi h Mr. Dunn and the
23  cancelation?
24     A   Specific to this incident in the wake of,
03:11  25  although death threats are a part of -- sadly a part of

Page 72

03:11  1  being a public figure, I've gotten many of them in the
2  past.
3      Q   Do you remember talking about death  hreats in
4  your conversation wi h Mr. Dunn?
03:11  5      A   I have no recollection of that, no, sir.
6      Q   It could have come up, you just don't remember?
7      A   I don't remember.
8      Q   And I take it you don't deny that the phone
9  call you had with Mr. Dunn on the afternoon of May 11th,
03:12  10  2018 might have lasted as long as 27 minutes?
11     MR. PIERCE:  Object to form.
12     THE WITNESS:  It might have.
13     (Plain iff's Exhibit 6 was marked for
14     identification by  he court reporter and was
03:12  15     attached hereto.)
16     THE WITNESS:  Thank you.
17  BY MR. BYRNE:
18     Q   And I'm handing you what's marked as Exhibit 6.
19  Is this a correct copy of a Facebook post  hat you posted
03:13  20  on the afternoon of May 11th, 2018 while you were waiting
21  for Mr. Dunn to return the message you left?
22     A   Yes, sir, that's accurate.
23     (Plain iff's Exhibit 7 was marked for
24     identification by  he court reporter and was
03:14  25     attached hereto.)

## Page 73

03:14 1    THE WITNESS: Thank you.

2    BY MR. BYRNE:

3    Q   I'm handing you what's been marked as Exhibit 7

4  to your deposition, Mr. Waid, and ask you to confirm that

03:14 5  this is a series of text messages exchanged between you

6  and Mr. Dunn beginning on Friday, May 11th at 5:51 p.m.

7  and continuing several days thereafter.

8    (Whereupon, the witness reviews  he

9  exhibit.)

03:15 10    THE WITNESS: That's accurate, yes, sir.

11    BY MR. BYRNE:

12    Q   Okay.  'Cause the last series of texts looks --

13  looks like it's dated Tuesday, May 15th.

14    Is that your interpretation as well?

03:15 15    **A   I'm not sure where you're seeing a date on the**

16  **last round of -- or I mean last --**

17    Q   Well, if you go to page 2, you see Saturday

18  May 12th.

19    **A   Right.**

03:15 20    MR. PIERCE: There's a Bates number at the bottom.

21    BY MR. BYRNE:

22    Q   You go to page 4 which is Bates numbered

23  Defendants '9.  There's a May 15th.

24    And that's  he last date change I see in this

03:16 25  string.

## Page 74

03:16 1    Am I missing something or did this all happen

2  on Tuesday -- all the entries after that day happen on

3  Tuesday, May 15th as you interpret this?

4    **A   Well, my recollection is there was a gap**

03:16 5  **between "I'm happy to leave" -- as you see, it says, "I'm**

6  **happy to leave you" -- and it's cut off.**

7    **And then the next one starts up with, "What**

8  **have I done to offend you?"**

9    **My recollection is there was a gap there.**

03:16 10    Q   Okay.

11    **A   It was a separate conversation.**

12    Q   A day or two later?

13    **A   A day or two later.**

14    Q   Okay.

03:17 15    THE WITNESS: All right.  Can we take a bathroom

16  break real quick?

17    MR. BYRNE: Sure.

18    THE VIDEOGRAPHER: We are off the record at 3:17.

19  This is the end of Media No. 1.

03:21 20    (Recess taken.)

21    THE VIDEOGRAPHER: We are back on the record on

22  Media No. 1 at 3:21.

23    BY MR. BYRNE:

24    Q   Shortly after your call with Mr. Dunn on

03:21 25  May 11th, within days at least, you took down your

## Page 75

03:21 1  Facebook page; is that right?

2    **A   I -- yes, I didn't close the account but I took**

3  **down the Facebook page, yes.**

4    Q   And did -- did anyone advise you to do that, or

03:21 5  is that something you decided to do independently of

6  hird-party suggestions or --

7    **A   Totally on my own.**

8    **I stepped on you again.  I'm sorry.**

9    Q   And is that because of negative feedback you

03:21 10  were getting from supporters of  he Antarc ic Press

11  publication of "Jawbreakers" that were unhappy with your

12  role in that not happening?

13    MR. PIERCE: Object to form.

14    THE WITNESS: Because of the incessant, yes.

03:22 15    BY MR. BYRNE:

16    Q   Have you spoken to Mr. Ben Dunn or Mr. Joe Dunn

17  since May 11th of 2018?

18    **A   You mean other than texts?**

19    Q   Right.

03:22 20    **A   I have not.**

21    Q   Okay.  Are there any texts with either of the

22  Dunns besides those that we've just reviewed that are

23  marked in evidence?

24    **A   Not to the best of my recollection.  I -- if**

03:23 25  **they're -- because of the way these are cropped on the**

## Page 76

03:23 1  **screen caps, as I already indicated, there's one balloon**

2  **that was, you know, cut off -- you know, "I'm happy to**

3  **leave you" -- so I also submitted these exact same texts.**

4  **The cutoffs may be different in mine.**

03:23 5    **So if that makes any sense.  So between the two**

6  **of them --**

7    Q   Okay.

8    **A   -- that would be an accurate record of what's**

9  **there, yeah.**

03:23 10    Q   But no hing else substantive that you can

11  recall?

12    **A   That's correct.**

13    Q   Besides what we have here, correct?

14    **A   That's correct.**

03:23 15    Q   Have you been back to Texas since you were in

16  Houston for the May of 2018 event?

17    **A   No, sir.**

18    MR. BYRNE: All right.  We'll reserve the rest of

19  our questions for a later stage of the proceedings.

03:24 20    MR. PIERCE: Could we just take a quick break?

21    MR. BYRNE: Sure.

22    THE VIDEOGRAPHER: We are off the record at 3:24.

23    (Recess taken.)

24    THE VIDEOGRAPHER: We're back on the record at 3:27.

03:27 25  Media No. 1.

**Comicpalooza, May 25-27, 2018, Houston, Texas**

**Panel question by audience member and answer by Mark Waid**

*Audience Member*: "I just want to get your quick opinion about small comic book creators like this guy we been hearing about on Twitter …Diversity & Comics… big-time comic creators like yourself…Marvel…he seems obsessed with …  breaking into the scene, … I'm trying to figure out, you know what's your opinion obsession…

*Mark Waid*:  "That's…It's tough to answer, because I'm trying to…you don't want to give oxygen too much to toxic, toxic people.  But what he's basically talking about there is, there are….just as there are in pop- I mean right in the world right now, not just in comic books but in the world you got… heavily you know male heavy …um movements of guys who are trying to move things back towards white supremacy, or back towards a world in which women knew their place, uh… that kind of nonsense, um and they're the proud boys or they're you know they're this group or they're that group.


 And comics has you know a group or two like that too, comics fans have a group like that or two too and it's a shame, um… trying to say without inflaming anything.


Recently um one of them, one of these groups kickstarted a comic and great, awesome they're gonna do their own graphic novel cause they're super conservative, hyper conservative guys and the myth was, the rap was that comics was not interested in creating conservative creators or



we're not, we're throwing conservative creators out.  That's not the case at all, it's a lot of conservative creators in comics, we don't, we're throwing assholes out, that what we're doing for every, for every conservative asshole we don't work with in comics, there's ten liberal assholes who we don't work within comics, so if that's not, there's no, there's no political yardstick here.

Uh these guys created the, you know, they did their comic, great, awesome.  Then they started doing things like um…making a list of the stor-, there was, there was a bunch of the stores that decided they weren't going to carry the comic, so these guys made a list of those stores …and their phone numbers and the names, first and last, of all their employees.  And with the idea that "Oh no, don't call them and harass them, we're not telling you to do that at all!"  But here's their phone numbers and their first and last names of all their employees.  Well c'mon.

So, there was a publisher here in Texas who was going to publish their comic, for, after it had been kickstarted they were gonna, like publish it for comic stores and …there was a huge amount of hatred toward that publisher at this moment.  There was a, most people in comics, most fans of comics were looking at this as "How? What are you doing? These guys are, these are indefensible human beings." Uh they are, they, they harass women, they harass minorities, they harass LGBTQ people, um, they're full of hate, what are you doing?"

And my feeling is, look let the baby have his bottle, let, I don't care who publishes the comic. I don't care whether you publish this comic or not. I don't care. But I knew the publisher and I don't think he was aware of why all of a sudden there was this *gigantic* groundswell of hate towards him.  So I said before *we burn his place to the ground,* let me call him and just find out what's going on, whether he understands really what's being- if he wants to publish it that's great I don't care but I just, I *know* the guy and want to make sure he *knows why* the *Hordes of Hell* are descending upon him right now.  That's seems reasonable, right?

Anyway, so, the long story short, I did call the publisher and said "Look, you do what you want and I'm not, im-, I'm not asking you to not publish it, I'm not even saying, I'm not saying anything, I'm just kinda curious what you're thinking." And the answer was, "Oh my God, we had no idea, like we really didn't vet this before we decided to publish it." And so they made an announcement that they weren't gonna publish it.


Uhhh that's their choice, I wasn't… I, you know I, I didn't, I wasn't intimidating them, I wasn't pushing them into doing one thing or another, I just wanted to, to look out for him and make sure he understood why people were angry at him.  Um, and so that's turned into what, me getting death threats every, you know 5,6 hours for a while, ummm…

Cause I'm clearly hate, you know, I clearly hate conservatives.  Because I didn't, I said, all right clearly I'm bullying comic- I'm apparently I'm bullying publishers, I'm calling publishers and bullying them into not publi-, if I could, if I could bully publishers I'd be rich.  If I could bully publishers I'd be writing Superman *tomorrow*, I could- there'd be so many things I would be doing if I were really-  if I had a power to make publishers do what I wanted them to do.

Um does that *kinda* answer your question?  It's... kinda?

It's uh, ...people can you know feel how they wanna feel, uh uh yeah. You are, you aren't, you aren't with them are ya? (audience laughter) Okay. I didn't, I didn't drive you guys out, did I?... One more question."

 

**Mark Waid**
19 mins · 🌐

I have a call in to Antarctic Press. Until I hear back, I'm (hesitantly) willing to give them the benefit of the doubt that they don't really understand who or what they're getting into business with, which--though it would seem a stretch--is a possibility. If I do hear back, I'll report in. Curious as to how they feel about publishing creators whose marketing strategy is to allegedly (*koff*) encourage their fans to threaten the employees of stores, and/or harass and one-star-review-bomb stores, that don't order their product.

Are we as creators responsible for the actions of our fans? Ultimately, of course not. But it is morally bankrupt f... Continue Reading

6

stretch--is a possibility. If I do hear back, I'll report in. Curious as to how they feel about publishing creators whose marketing strategy is to allegedly (*koff*) encourage their fans to threaten the employees of stores, and/or harass and one-star-review-bomb stores, that don't order their product.

Are we as creators responsible for the actions of our fans? Ultimately, of course not. But it is morally bankrupt for creators with a voice to pretend they have zero influence over their fans, and it is incumbent upon them as human beings in a society to use that influence to intervene if and when people are getting harassed or threatened in their name. You can bet your ass that if I ever found out any of my fans were spreading misogyny, transphobia, racism, or bigotry as a way of "supporting" my work, I would take active steps to shut that shit down in a cocaine heartbeat, not just shrug my shoulders.



**BD**

Ben

iMessage
Fri, May 11, 5:51 PM

Thank for talking to me this afternoon...I have decided to drop the project...statement on Facebook coming soon

You are a VERY good man. Text or DM me when the statement goes up and I'll recirculate it if you like.

It's posted

Good man. Thank you, and stay in touch

Do you want me to repost it, or will that create more headaches for you?

I am not sure how to approach it...I'm prepared for the lashing



iMessage

DEF00006



**10:27 AM**    100%

**BD**

Ben

I am not sure how to approach it...I'm prepared for the lashing I'm about to get from the other direction

Why don't I give it a day? That way, it looks less like I'm just trying to take a victory lap.

And sleep on it a couple of nights, but my offer to do an interview is still good.

Sounds good...I appreciate your support

Of course. Be well.

Sat, May 12, 1:58 PM

Just checking in to see how you're holding up.

iMessage












DEF00007

.oo AT&T 🛜          10:27 AM          ✳ 100% ▬

BD

Ben

I went to a small show to get away...I have not gone to FaceBook or checked my email since yesterday so that reduces my stress

Thanks for asking

I wrote a 4 page indictment of the industry last night...I think u will enjoy it when I finish

I had to close my FB account after all the non-stop death threats. Would LOVE to read your manifesto.

No problem...also will u be in temple Memorial Day weekend

That Houston show? Yeah

My wife's family reunion is in

  iMessage  

      

DEF00008

 AT&T    10:27 AM     100%



Ben

My wife's family reunion is in temple Memorial Day weekend

Tue, May 15, 4:04 PM

Holding up? Why in the world is Meyer claiming that you called him in tears? Hope you're well.

I am not commenting anymore

I don't blame you. You haven't turned on me, I hope?

I said that tongue in cheek, but the lack of a reply has me nervous. When can we talk?

I do apologize...but essentially I am trying to put this behind me and as not to say or do anything that can be misinterpreted or

      iMessage    

      

DEF00009



**10:27 AM**

**BD**

**Ben**

I do apologize...but essentially I am trying to put this behind me and as not to say or do anything that can be misinterpreted or misunderstood I have instructed everyone including myself not to comment on the situation

Well, I understand that, and you know that I'm here to help. You're not even getting any blame any more—the story is that you called in tears to confess and that I bullied you. I think that's 100% fiction—You said at the time you didn't feel I was bullying or harassing you in the least, correct?

Ben?

iMessage



**Ben**

Left you a VM. Not asking for anything but confirmation that you and I are good with one another still—or if not, what can I do?

I'm sorry but this is not Ben..I'm his brother and publisher of Antarctic Press. Again I'm sorry but I've avoided being online and taking calls at all for the past 5 days to avoid all this. This has taken both a mental and physical toll on me and my family. I do not want to say or do anything at this time. I hope you can please respect that.

So long as you let me know that we're good, because now I'm concerned. If you can just do that, I'm happy to leave you

iMessage














BD

Ben

> What have I done to offend you?

I do not want to be misconstrued...I do not want to have to use disclaimer words...I do not want any words I use for public consumption...i do not want any misinterpretation... personally I can say we're good in the sense that I'm not angry at anyone but myself..I blame me myself and I for everything and I'm living with that now and I now I have to live with myself that I facilitated more rhetoric. Nobody has offended me I offended myself.

> You said I didn't bully you. Do you still feel that way? It weighs on me.

> Ben, that is all I will ever ask of

iMessage

  

      

DEF00012



**10:28 AM**

BD

Ben

> Ben, that is all I will ever ask of you, and it stays between us. Do you now think that I bullied you?

I made my decisions based on a variety of many many many factors to protect me but mostly to protect my family and employees...I ultimately made the decision...it was 100% my decision...I will accept the total consequence of that decision.

> No, the consequence is now on me, not you. I wish you'd been honest with me on Friday. All of this, all of it, was an effort to help you. Will you at least give me that?

> Because everything you are saying to me indicates that you

iMessage

  

      

DEF00013



help you. Will you at least give me that?

Because everything you are saying to me indicates that you weren't straight with me when you confirmed you didn't feel bullied by me at all and that we were good.

Are you changing your story to say that I bullied you, or were you straight with me on Friday? That's all I need to know, then I'll leave you alone.

I'll lose your number, you never need to hear from me again.

Just tell me I didn't intentionally bully you or hurt you, because if I did, I need to know.

Delivered

  iMessage 

      

DEF00014